# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

DARRYL CHALMERS,               )
DARREN CONNORS,            )
GLENN MENDEZ,             )
JAMES NOVA, and            )
FATIMA Q. ROSEMOND,       )
                         )
On behalf of themselves and all others   )
similarly situated, and            )    Civil No. _____
                         )
AFSCME DISTRICT COUNCIL 37    )    **COMPLAINT**
   LOCAL 2507, on behalf of its members  )
                         )    CLASS ACTION
       Plaintiffs,            )
                         )
v.                          )
                         )
CITY OF NEW YORK,         )
                         )
       Defendant.         )
                         )

The Plaintiffs – Darryl R. Chalmers, Darren Connors, Glenn Mendez, James Nova, Fatima Q. Rosemond, and AFSCME District Council 37 Local 2507 – allege as follows as their Complaint against the City of New York:

## I.  INTRODUCTION

1.     The fire protection inspectors and associate fire protection inspectors (collectively "FPIs") who work for the Fire Department of New York ("FDNY") conduct inspections in which they examine buildings, facilities, vehicles, and public activities in New York City to ensure compliance with safety codes, rules, and regulations.

2.     Before 1990, the great majority of FPIs were white employees.  During the 1990's, racial minorities surged into the ranks of FPIs, and for most of the past 15-20 years only

about 30% of FPIs who have self-identified a single race have identified themselves as "white" employees.  As of June 30, 2019, there were about 400 FPIs.

3.　　This racially mixed force has been remarkably effective.  In 1990, New York City experienced 275 civilian fire-related deaths.  In each of the last 14 years, the City has suffered fewer than 100 fire-related deaths.

4.　　In addition to saving lives, the work of FPIs produces a significant source of earned income for the Fire Department of New York ("FDNY").  Currently the FDNY receives revenue of over $100 million per year, that is, over $200,000 per FPI, from the inspections, licenses, fees, and fines that FPIs issue.  This revenue stream has roughly doubled during the period from about 2005 until today.  During the past 15 years, FPI work has generated over $1.25 billion.

5.　　Notwithstanding FPIs' stellar performance in preventing fires, saving lives, and generating revenue, the City engages in racial discriminates against them by paying them much less than the building inspectors assigned to the City's Department of Buildings who perform similar work.

6.　　Since at least FY 2008, the City has paid FPIs salaries that are substantially lower than the salaries for the City's building inspectors ("BIs") who work for the Department of Buildings ("DOB").  Adjusting for differences in hours worked, the City has paid FPIs salaries that are lower than BI salaries.  The pay gap has ranged from a low of about $1,600 in 2010 to a high of about $9,000 in recent years.  The average pay gap has been steadily increasing over the past decade or more, and shows no signs of abating, highlighting the need for class-wide injunctive as well as monetary relief.

7.      A substantial portion of the compensation of both FPIs and BIs comes from overtime pay, and because overtime is paid at 1.5 times regular salary rate, BIs' higher salaries also means higher overtime pay.  The overtime pay differentials compound the salary shortfall that FPIs suffer compared to BIs.

8.      Moreover, city workers' pension benefits upon retirement are based on their three highest consecutive annual salaries.  Higher salary rates will eventually translate into larger pensions for BIs than FPIs.

9.      The City engages in this discrimination because of the difference in the racial composition of FPIs and BIs.  In contrast to the 30% of FPIs who are white, about 50% of BIs are white.

10.      The pay discrimination that FPIs experience is part of a broader pattern of discrimination inflicted on FPIs by the City.  FDNY issues FPIs fewer and inferior safety equipment and protective clothing than it gives to FDNY's largely white firefighter force and racially mixed (about 50% white) emergency medical service ("EMS") force.  It requires FPIs to wear patches on their clothes differentiating them from firefighters and EMS employees and prohibits FPI supervisors from wearing the same type of shirt that all other supervisors of uniformed services wear.  It excludes FPIs from award ceremonies.  Most other municipalities do not impose this type of second-class status on their fire protection inspectors.

11.      This pattern of racial discrimination continues the FDNY's long, sad history of racial discrimination.  Federal judges have twice ordered the City to change its examination and recruitment of outside candidates for firefighter positions in response to lawsuits filed by the federal government.  In addition, a pending class action claims that FDNY discriminates against

African American applicants for civilian positions and against African American employees in its advancement and compensation.

12.     The pay disparities between the FPIs and BIs cannot be explained by differences in job duties.  The educational and experiential requirements for FPI and BI positions are similar. The topics covered in the training provided to new FPIs and BIs are virtually identical although the FPI training takes longer because it is more comprehensive than the narrower training that BIs receive.  The duties of the approximately 400 FPIs and the approximately 625 BIs as of June 30, 2019 are substantially similar.  Indeed, to the limited extent that the duties do vary, especially with regard to the relative risks associated with the work, the differences favor higher, not lower, salaries for FPIs.

13.     The pay disparities also cannot be explained by market demands.  According to data reported by the United States Department of Labor, the median salary of fire protection inspectors exceeds the median salary of building inspectors regardless whether one looks at national averages or other large population states.  In six of the eight other largest cities in the United States for which DOL reports data, fire protection inspectors were paid in excess of 10% more than building inspectors on average in 2018.  New York City paid fire protection inspectors about 15% less than building inspectors in 2018, the largest pay gap adverse to fire protection inspectors in any of the ten largest cities.  The average fire protection inspector in New York City even is paid less than the average fire protection inspector in New York State, whereas building inspectors in the City are paid far more on average than those in the State.

14.     The only explanation that makes sense of the data is that the City pays FPIs less than BIs because the BI white workforce percentage is between 50% and 100% greater than the FPI white workforce percentage (50% compared to 30%).

15.     The intentional discrimination has been carried out through a facially neutral practice, that of paying almost all FPIs the minimums allowed under their collective bargaining agreements ("CBA") but of paying virtually all BIs more than the minimum under their CBAs; indeed, the City frequently pays BIs more than the maximums specified in their collective bargaining agreements.  This practice has had a disparate impact on racial minorities that cannot be adequately justified through any legitimate business reason.

16.     The City's discrimination in the compensation paid to FPIs violates 42 U.S.C. § 1981 enforced under 42 U.S.C. § 1983, Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e-1 *et seq.* ("Title VII"), and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq*.  The City is liable under all three statutes under a disparate treatment theory and under Title VII and the NYCHRL also under a disparate impact theory.

17.     Under the continuing violations doctrine, the claims of discrimination in violation of the NYCHRL are asserted back to at least 2008, the earliest year for which publicly available data is available to establish the pay differential between FPIs and BIs. Plaintiffs, however, believe that the disparity has existed since 2005, if not before.

18.     The representative Plaintiffs – Plaintiffs Chalmers, Connors, Mendez, Nova and Rosemond – bring the claims of intentional discrimination in compensation on behalf of themselves and a class of all FPIs defined below.  They bring the claim of disparate impact discrimination on a subclass of all non-white FPIs also defined below.  The representatives' union, AFSCME District Council 37 Local 2507 ("Local 2507"), joins in the action as a non-representative plaintiff.

## II.  JURISDICTION AND VENUE

19.     This Court has jurisdiction over the claims under 42 U.S.C. §§ 1981 and 1983 and under Title VII pursuant to 28 U.S.C. § 1343(a)(4), which confers original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief or other relief under any Act of Congress providing for protection of civil rights; pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action arising under the Constitution or laws of the United States; and pursuant to 28 U.S.C. § 1337, which confers original jurisdiction upon this court in a civil action arising under any Act of Congress regulating commerce.

20.     Each of the five individual Plaintiffs has filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). They have not yet exhausted the administrative exhaustion requirement under Title VII because they have not yet received right-to-sue letters from the EEOC. Plaintiffs intend to amend the Complaint to reflect the issuance of right-to-sue letters when they are received.

21.     This Court has jurisdiction over the claims under the NYCHRL pursuant to 28 U.S.C. § 1367(a), which confers supplemental jurisdiction upon this Court over claims "that are so related to claims in the action within [its] original jurisdiction that they form part of the same case or controversy."

22.     Venue is proper in this Court as to the Section 1981/1983 claims and the NYCHRL claims under 28 U.S.C. § 1391 because Defendant resides in this judicial district and because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. Venue is proper in this Court as to the Title VII claims under 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices described below have been committed in the State of New York and because the employment records relevant to those unlawful practices are maintained and administered in this district.

### III.  THE PARTIES

23.     Plaintiff Darryl R. Chalmers is an African American who has been employed by the City as a fire protection inspector from November 4, 1991 until FY 2009 and as an assistant fire protection inspector from FY 2009 until today.  While serving as a fire protection inspector in FY 2008 and 2009, and upon information and belief in years prior to 2008, he was paid less than the average salary for building inspectors with "incumbent salaries."  (Incumbents are employees with at least two years of tenure; the minimum salary for incumbents under the collective bargaining agreements for both FPIs and BIs is 15% higher than the minimum salary for new hires.)  During the entirety of his tenure as an associate fire protection inspector, he has been paid less than the average salary for associate building inspectors with similar levels of responsibility.  He is a proposed representative of the Class and Subclass.

24.     Plaintiff representative Darren Connors is a white male who has been employed by the City as a fire protection inspector from November 3, 2005 through FY 2008 and as an associate fire protection inspector from FY 2009 until today.  While serving as a fire protection inspector in FY 2008, and upon information and belief in years prior to 2008, he was paid less than the average salary for building inspectors with incumbent salaries.  During the entirety of his tenure as an associate fire protection inspector, he has been paid less than the average salary for associate building inspectors.  He is a proposed Class representative.

25.     Plaintiff Glenn Mendez is a Hispanic male who has been employed by the City as a fire protection inspector from June 6, 2011 through FY 2016 and as an associate fire protection inspector from FY 2017 until today.  While serving as a fire protection inspector, he was paid less than the average salary for building inspectors.  Similarly, while serving as an associate fire

protection inspector, he has been paid less than the average salary for associate building inspectors.  He is a proposed representative of the Class and Subclass.

26.     Plaintiff James Nova is an Hispanic male who has been employed by the City as a fire protection inspector in FDNY since November 26, 2018.  During the entirety of his tenure as a fire protection inspector, he has been paid less than the average salary for building inspectors in their first two years.  He is a proposed representative of the Class and Subclass.

27.     Plaintiff Fatima Q. Rosemond is an African American who has been employed by the City as a fire protection inspector in FDNY since March 2019.  During the entirety of her tenure as a fire protection inspector, she has been paid less than the average salary for building inspectors in their first two years.  She is a proposed representative of the Class and Subclass.

28.     AFSCME Local 2507 is a local union affiliated with AFCSME District Council 37.  Local 2507 is comprised of Paramedics, Emergency Medical Technicians ("EMTs"), and FPIs employed by the City of New York in FDNY. The City of New York is a municipality organized under the laws of the State of New York.  It consists of five boroughs that were consolidated in 1898.  It is operated under the New York City Charter, which creates a mayor-city council form of Government.

29.     The City has created several agencies, including two agencies that are the principal focus of this lawsuit: FDNY and the Department of Buildings.  Under the New York City Charter, "all actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law."

30.     The FDNY is the agency charged with protecting the lives and property of the people of New York City through prevention, education, fire suppression, medical services and

other related emergency and non-emergency activities.  The Fire Commissioner, who heads the

agency, is appointed by and reports directly to the Mayor of the City of New York.

## IV.   DISCRIMINATION IN COMPENSATION

**A.      Only About 30% of the City's FPIs Are White Employees Whereas About 50% of the BIs Are White.**

31.      In 2017, about 30% of FPIs were white, about 40% were African American,

about 15% were Asian American, and about 15% were Hispanic American.  The white

percentage of FPIs has been almost constant throughout the period from 2008 through present.

32.      Based on the Workforce Profile Report for FY 2017 prepared by the Department

of Citywide Administrative Services for the City of New York ("2017 Workforce Report"),

about 50% of BIs were white employees that year.  Upon information and belief, the percentage

of BIs who were white was close to 50% throughout the period from 2008 through present.

**B.      FPI Job Duties Justify Payment on the Same or a Higher Pay Scale than Bis.**

33.      Nothing about the nature of the FPI and BI jobs justifies the City in paying FPIs

lower salaries than BIs on a per hour basis.  As described in greater detail below, the two types

of position have similar educational and experiential requirements.  They receive similar training

after the City hires them although the FPI job requires somewhat longer and more

comprehensive training.  FPIs and BIs have substantially similar job duties.  To the extent that

they differ, FPI duties tend to be broader and more technical.  They have virtually identical

powers after conducting inspections.  They also frequently work together on joint task forces.

The jobs, however, differ in one important respect: FPIs face substantially greater risks in terms

of employee health and safety.  The similarity of the duties justifies payment on at least the same

salary scales; to the extent that the differences should be factors in determining the pay scales,

they favor a higher, not a lower, pay scale for FPIs.

      **1.**      **The City's Process and Requirements for Hiring FPIs and BIs Are Similar.**

      34.      FPIs and BIs both work in civil service positions.  The City's Department of Citywide Administrative Services ("DCAS") supervises the examinations administered to applicants for entry-level FPI and BI positions.

      35.      The specified educational and experiential requirements for FPI and BI positions are similar but not identical.  Both positions may be satisfied with either the requisite education or the requisite experience or a combination of both.  As set out below, the requirements are similar: the educational requirements are equivalent except that the BI requirements are more specialized; while the experiential requirements are somewhat higher for an FPI.

      36.      The educational requirements for an FPI include an associate's degree in any major (generally 60 credits); a high school diploma and 20 college credits with at least nine credits in specified subjects related to the FPI work; or completion of specified types of plumbing programs.  The experiential requirements include at least three years of full-time experience in fields directly related to fire protection or of inspection of facilities for compliance with fire and building codes and other safety standards.

      37.      The educational requirements for a BI include at least 60 college credits towards a degree in civil engineering, engineering technology, architecture, architectural technology, construction management, or a closely related field.  The experiential requirements include at least two years of full-time experience working in the construction trades or related work or a license as a professional engineer, registered architect, or site safety manager issued by New York State or the City.

      38.      One difference that justifies higher pay for FPIs is that FPIs must reside in the City with its higher cost of living at the time of hire and for two years afterward.  BIs are not so restricted.  FPIs also must be U.S. citizens; BIs need not be.

39.     The DCAS-administered exams for FPIs and BIs cover similar subject matter and are similar in duration.

**2.      The Training for Newly Hired FPIs and BIs Is Similar.**

40.     After hire, new FPIs and BIs undergo City-administered training.  FPI training is longer: about 80 days as compared to 30 days for BIs.

41.     The range of subjects that may be covered in the training is identical or virtually identical.  The training for both types of employees covers, for example, topics related to the construction of buildings, electrical wiring, plumbing, and the functions of machines typically found in buildings.  The trainings differ, however, in that FPI hires receive the entire comprehensive curriculum, whereas BI hires receive only the portions of the training that deal with the specific areas in which they are expected to work.

**3.      FPIs and BIs Conduct Field Inspections.**

42.     Once training is completed, one of the principal duties of both FPIs and BIs is conducting field inspections to ensure conformance with the City's codes and standards and the plans and specifications submitted by or on behalf of property owners.  As discussed below, the scope of the field inspections substantially overlap although are not identical.

43.     The requirement that buildings and their use comply with plans and specifications necessitates review of those plans and specifications.  The review is performed by BIs and FPIs. The plans and specifications typically are stored on the intranet of the Department of Buildings but FPIs have access to that intranet and review the plans and specifications to perform their duties, just as BIs do.

44.     In conducting the field inspections, BIs enforce only the City's building codes. FPIs enforce not only the building codes but also the City's fire codes.  The fire codes are more technical and detailed than the building code.

11

45.    BIs inspect all types of buildings ranging from single family houses to commercial buildings, towering office buildings, and places of assembly such as theaters and amusement parks.  FPIs inspect all the same types of buildings as BIs except that FPIs inspect one- and two-family housing only in connection with joint task forces, discussed below.  FPI inspections are not, however, limited to buildings.  Among other things, they inspect fixtures and equipment that are related to fire suppression, such as sprinklers, alarms, standpipes, and gravity tanks; evacuation plans and maintenance of safe ingress and egress issues; gas tanks, oil and gas pipelines, and terminals; and hazardous activities such as storing explosives, radioactive waste, fireworks, and other flammable materials.

46.    BI inspections are limited largely to time periods in which buildings are under construction, repair, alteration, or demolition or in response to reported violations.  During BI inspections of reported violations they are limited to line-of-sight violations.  FPIs engage in inspections during the same time periods and in response to reported violations but also perform annual or other periodic inspections to ensure that buildings and the activities inside them are being conducted safely in conformance with the applicable codes.  FPIs are not limited to line-of-sight violations.

47.    The CBAs for FPIs and BIs do not provide for differences in minimum or maximum salaries between generalists and specialists and among the specialties.  All BIs are specialists in areas such as construction, plumbing, and electrical.  Some FPIs, who are assigned to area offices called "divisions," are generalists.  Other FPIs are specialists in areas such as bulk fuel safety, explosives, fire alarms, fire suppression sprinklers/standpipes, and public assembly.

48.    Each type of inspector may and under certain circumstances does rely on certifications of third parties, such as the architects who design construction or renovation

projects, in conducting the inspections.  However, ultimately both types of inspectors are responsible for certifying the property or activity for safety, habitability, and compliance with plans and specifications.

      **4.**      **FPIs and BIs Have Similar Powers at the Conclusion of the Inspections.**

      49.      FPIs and BIs have similar powers upon the conclusion of an inspection.  If an inspection does not reveal any violations of applicable codes, standards, plans and specifications, BIs are authorized to direct issuance of certificates of occupancy after final construction signoff or certificates of assembly for places where large groups of people assemble. Similarly, if an inspection does not reveal any violations of applicable codes, standards, plans, and specifications, FPIs are authorized to direct issuance of permits authorizing continued use of facilities that previously received certificates of occupancy or assembly.

      50.      In addition, the FDNY issues a number of different types of certificates of fitness to individuals who pass tests administered by FDNY, such as for different types of alarm systems.  When FPIs inspect premises, they talk with the persons with certificates of fitness for the safety systems in the premises and, if the person's responses are adequate, authorize renewal of the certificates of fitness.  BIs and the Department of Buildings do not issue any equivalent to certificates of fitness.

      51.      In sum, while the certificates issued by BI and FPIs have different names, they have the same effect, to allow occupancy or use, or continued occupancy or use, of the premises or facilities.  The permits authorized by FPIs, however, draw on multiple codes and require broader and more detailed knowledge than the certificates authorized by BIs.

      52.      The certificates issued by both departments will not issue without payment of a fee to the City.  In 2019 the City received over $100 million attributable to the work of FPIs.

53.    On the other hand, if an inspection reveals violations of applicable codes, standards, plans, and specifications, FPIs are peace officers and BIs are not.  As peace officers, FPIs have the power to issue criminal summonses and court appearance tickets.  BIs generally lack that power, although there are a small number of DOB employees who can issue criminal violations.  Both FPIs and BIs must testify if a matter proceeds to hearing.  FPIs and BIs also have the power to issue violations on which fines are levied pursuant to a scheduled list pursuant to the City's rules and regulations.  In extreme situations, both FPIs and BIs can stop projects or vacate occupied buildings.

**5.    FPIs and BIs Frequently Work on Joint Task Forces.**

54.    The FDNY and the Department of Buildings assign FPIs and BIs to various joint task forces, sometimes with employees of other City agencies and sometimes only with FPIs and BIs.  Recent examples of joint task forces include three quarter housing and illegal conversion (both involving only FPIs and BIs) and the health department task force (involving FPIs, BIs, and other agencies).  Currently an average of about 75 FPIs, if not more, are involved in joint task forces with BIs.

55.    FPIs and BIs generally work on an equal and collaborative footing in the planning and execution of the work of the joint task forces although they may inspect different components of a property during an inspection or other activity conducted by the task force.

56.    FPIs and BIs generally perform the work of joint task forces in addition to their regular assignments.  Thus, for both FPIs and BIs joint task force work typically is performed on an overtime basis.

**6.    FPI Work Involves Greater Risks than Does BI Work.**

57.    FPIs' work frequently entails greater physical risks than BIs' work.

58.     FPIs frequently must inspect equipment containing hazardous, combustible, or flammable materials including oil and gas pipelines, jet fuel transfer terminals, restaurant range hoods, propane tanks, junkyards, and radioactive waste.  FPIs also inspect explosive materials, supervise fireworks displays, and climb water towers on the tops of skyscrapers.  BIs do not face similar risks to their health and safety.

59.     FPIs also may be required to enter buildings while fires are still smoldering or shortly after they have been extinguished.  The buildings or parts of the buildings sometimes have collapsed.  Many FPIs were at the World Trade Center shortly after the Twin Towers fell and are still suffering from WTC-related sicknesses caused by exposure to the poisonous fumes and toxic materials.   Again, BIs, who are not first responders, do not face similar physical risks.

**C.     The City Has Paid FPIs Lower Salaries than Comparable Bis.**

60.      FPI and BI job titles are arranged hierarchically, with higher level employees entitled to higher salaries under the respective collective bargaining agreements.  The table below shows the comparable FPI and BI tiers:

| **FPIs** | **BIs** |
| --- | --- |
| | Apprentice inspector |
| Fire protection inspector I | Inspector; Senior inspector |
| Associate fire protection inspector I | Associate inspector; Principal inspector |
| Associate fire protection inspector II | |
| Associate fire protection inspector III | |

The senior inspector and principal inspector titles for BIs are used only for current incumbents and will be eliminated when persons with those titles stop working.

61.     The salaries of City employees are publicly available from fiscal year 2008 through fiscal year 2019.  The payroll data on the public sites do not distinguish among levels, so

that, for example, all Associate Fire Protection Inspectors are shown as having the same title. Senior inspectors are shown as inspectors on the site, and all Bis with the job title principal inspector are shown as associate inspectors.

62.     These publicly available data reflect that every year between 2008 and 2019, the City has paid FPIs lower salaries than BIs, even adjusting for differences in their regular hours worked per week, and that the pay gap has been growing steadily over time.

63.     The table below shows the minimum, median, and maximum salaries of FPIs and BIs in FY 2008:

| **FPIs** | | | | **BIs** | | | |
|---|---|---|---|---|---|---|---|
| **Title** | Min. | Median | Max. | Title | Min. | Median | Max. |
| Fire Prot. Insp. | $34,340 | $43,568 | $53,667 | Insp./Sr. Insp. | $47,408 | $51,934 | $65,308 |
| Assoc. Fire Prot. Insp. | $49,741 | $54,695 | $86,865 | Assoc. Insp./PI | $54,001 | $65,515 | $86,831 |

64.     As reflected in the table, FPIs were paid on average about $9,600 less in salary than BIs in FY 2008.  In that year, FPIs were paid for a 35-hour week while BIs were paid for a 40-hour week.  Adjusting for the difference in hours, FPIs were paid about $2,500 less than BIs.

65.     There were about 300 FPIs at the end of FY 2008.  If they had been paid at the same rate per hour as BIs, they would have been paid about $800,000 more in salary that year than they were paid.

66.     The table below shows the minimum, median, and maximum salaries of FPIs and BIs in FY 2009:

| **FPIs** | | | | **BIs** | | | |
|---|---|---|---|---|---|---|---|
| **Title** | **Min.** | **Median** | **Max.** | **Title** | **Min.** | **Median** | **Max.** |
| Fire Prot. Insp. | $33,291 | $45,311 | $55,846 | Insp./Sr. Insp. | $47,326 | $51,939 | $67,920 |
| Assoc. Fire Prot. Insp. | $47,911 | $56,702 | $71,145 | Assoc. Insp./PI | $51,441 | $68,128 | $90,304 |

67.     As reflected in the table, FPIs were paid on average about $9,000 less in salary than BIs in FY 2009.  In that year, FPIs were paid for a 35-hour week while BIs were paid for a 40-hour week.  Adjusting for the difference in hours, FPIs were paid about $1,800 less than BIs.

68.     There were about 320 FPIs at the end of FY 2009.  If they had been paid at the same rate per hour as BIs, they would have been paid about $600,000 more in salary that year than they were paid.

69.     The table below shows the minimum, median, and maximum salaries of FPIs and BIs in FY 2010:

| FPIs | | | | BIs | | | |
|---|---|---|---|---|---|---|---|
| **Title** | **Min.** | **Median** | **Max.** | **Title** | **Min.** | **Median** | **Max.** |
| Fire Prot. Insp. | $39,400 | $45,311 | $55,846 | Insp./Sr. Insp. | $47,408 | $51,936 | $67,920 |
| Assoc. Fire Prot. Insp. | $50,615 | $56,702 | $71,554 | Assoc. Insp./PI | $51,441 | $67,674 | $81,192 |

70.     As reflected in the table, FPIs were paid on average about $8,800 less in salary than BIs in FY 2010.  In that year, FPIs were paid for a 35-hour week while BIs were paid for a 40-hour week.  Adjusting for the difference in hours, FPIs were paid about $1,600 less than BIs.

71.     There were about 300 FPIs at the end of FY 2010.  If they had been paid at the same rate per hour as BIs, they would have been paid about $500,000 more in salary that year than they were paid.

72.     The table below shows the minimum, median, and maximum salaries of FPIs and BIs in FY 2011:

| FPIs | | | | BIs | | | |
|---|---|---|---|---|---|---|---|
| **Title** | **Min.** | **Median** | **Max.** | **Title** | **Min.** | **Median** | **Max.** |
| Fire Prot. Insp. | $39,401 | $45,311 | $55,846 | Insp./Sr. Insp. | $48,017 | $51,954 | $67,920 |
| Assoc. Fire Prot. Insp. | $50,615 | $56,702 | $71,554 | Assoc. Insp./PI | $57,823 | $67,852 | $90,304 |

17

73.     As reflected in the table, FPIs were paid on average about $8,900 less in salary than BIs in FY 2011.  In that year, FPIs were paid for a 35-hour week while BIs were paid for a 40-hour week.  Adjusting for the difference in hours, FPIs were paid about $1,700 less than BIs.

74.     There were about 320 FPIs at the end of FY 2011.  If they had been paid at the same rate per hour as BIs, they would have been paid about $500,000 more in salary that year than they were paid.

75.     The table below shows the minimum, median, and maximum salaries of FPIs and BIs in FY 2012:

| **FPIs** | | | | **BIs** | | | |
|---|---|---|---|---|---|---|---|
| **Title** | **Min.** | **Median** | **Max.** | **Title** | **Min.** | **Median** | **Max.** |
| Fire Prot. Insp. | $38,286 | $45,311 | $55,846 | Insp./Sr. Insp. | $48,017 | $55,889 | $98,184 |
| Assoc. Fire Prot. Insp. | $50,615 | $56,702 | $71,554 | Assoc. Insp./PI | $57,823 | $67,852 | $90,304 |

76.     As reflected in the table, FPIs were paid on average about $10,800 less in salary than BIs in FY 2012.  In that year, FPIs were paid for a 35-hour week while BIs were paid for a 40-hour week.  Adjusting for the difference in hours, FPIs were paid about $3,700 less than BIs.

77.     There were about 340 FPIs at the end of FY 2012.  If they had been paid at the same rate per hour as BIs, they would have been paid about $1,300,000 more in salary that year than they were paid.

78.     The table below shows the minimum, median, and maximum salaries of FPIs and BIs in FY 2013:

| **FPIs** | | | | **BIs** | | | |
|---|---|---|---|---|---|---|---|
| **Title** | **Min.** | **Median** | **Max.** | **Title** | **Min.** | **Median** | **Max.** |
| Fire Prot. Insp. | $39,401 | $45,311 | $55,676 | Insp./Sr. Insp. | $48,017 | $56,091 | $70,000 |
| Assoc. Fire Prot. Insp. | $50,615 | $56,702 | $68,881 | Assoc. Insp./PI | $57,823 | $68,136 | $86,970 |

79.     As reflected in the table, FPIs were paid on average about $11,000 less in salary than BIs in FY 2013. In that year, FPIs were paid for a 35-hour week while BIs were paid for a 40-hour week. Adjusting for the difference in hours, FPIs were paid about $3,900 less than BIs.

80.     There were about 330 FPIs at the end of FY 2013. If they had been paid at the same rate per hour as BIs, they would have been paid about $1,300,000 more in salary that year than they were paid.

81.     The table below shows the minimum, median, and maximum salaries of FPIs and BIs in FY 2014:

| FPIs | | | | BIs | | | |
|---|---|---|---|---|---|---|---|
| **Title** | **Min.** | **Median** | **Max.** | **Title** | **Min.** | **Median** | **Max.** |
| Fire Prot. Insp. | $39,401 | $45,311 | $55,676 | Insp./Sr. Insp. | $51,936 | $55,889 | $75,600 |
| Assoc. Fire Prot. Insp. | $50,615 | $56,702 | $68,881 | Assoc. Insp./PI | $57,823 | $68,273 | $86,898 |

82.     As reflected in the table, fire protection inspectors were paid on average about $14,500 less in salary than building inspectors in FY 2014, while associate fire protection inspectors were paid about $10,500 less than associate building inspectors. The average salary difference was about $11,000. In that year, FPIs were paid for a 35-hour week while BIs were paid for a 40-hour week. Adjusting for the difference in hours, FPIs were paid salaries of about $4,000 less than BIs.

83.     There were 330 FPIs at the end of FY 2014. If they had been paid at the same rates per hour as BIs, they would have been paid about $1,300,000 more in salary in FY 2014 than they were paid.

84.     The table below shows the minimum, median, and maximum salaries of FPIs and BIs in FY 2015:

| FPIs | BIs |
|---|---|
| | |

| Title | Min. | Median | Max. | Title | Min. | Median | Max. |
|---|---|---|---|---|---|---|---|
| Fire Prot. Insp. | $39,401 | $45,311 | $55,676 | Insp./Sr. Insp. | $51,936 | $58,446 | $73,707 |
| Assoc. Fire Prot. Insp. | $50,615 | $56,702 | $68,881 | Assoc. Insp./PI | $60,421 | $73,425 | $93,146 |

85.     As reflected in the table, fire protection inspectors were paid on average about $13,100 less in salary than business inspectors in FY 2015, while associate fire protection inspectors were paid on average about $16,700 less than associate building inspectors.  The average salary difference was about $15,000.  In that year, FPIs were paid for a 35-hour week while BIs were paid for a 40-hour week.  Adjusting for the difference in hours, FPIs were paid average salaries of about $7,300 less than BIs.

86.     There were about 330 FPIs at the end of FY 2015.  If they had been paid at the same rate per hour as BIs, they would have been paid about $2,400,000 more in salary in FY 2015 than they were paid.

87.     The table below shows the minimum, median, and maximum salaries of FPIs and BIs in FY 2016:

| FPIs | | | | BIs | | | |
|---|---|---|---|---|---|---|---|
| Title | Min. | Median | Max. | Title | Min. | Median | Max. |
| Fire Prot. Insp. | $39,401 | $45,311 | $55,676 | Insp./Sr. Insp. | $52,000 | $61,800 | $74,988 |
| Assoc. Fire Prot. Insp. | $50,615 | $56,702 | $68,881 | Assoc. Insp./PI | $60,346 | $74,913 | $95,940 |

88.     As reflected in the table, fire protection inspectors were paid on average about $16,500 less in salary than building inspectors in FY 2016, while associate fire protection inspectors were paid on average about $18,200 less than associate inspectors.  The average salary difference was about $17,400.  In that year, FPIs were paid for a 35-hour week while BIs were paid for a 40-hour week.  Adjusting for the difference in hours, FPIs were paid average salaries of about $9,000 less than BIs.

89.     There were about 340 FPIs at the end of FY 2016.  If they had been paid at the same rate per hour as BIs, they would have been paid about $3,100,000 more in salary in FY 2016 than they were paid.

90.     The table below shows the minimum, median, and maximum salaries of FPIs and BIs in FY 2017:

| **FPIs** | | | | **BIs** | | | |
|----------|------|--------|------|---------|------|--------|------|
| **Title** | **Min.** | **Median** | **Max.** | **Title** | **Min.** | **Median** | **Max.** |
| Fire Prot. Insp. | $39,992 | $52,022 | $64,040 | Insp./Sr. Insp. | $53,234 | $61,800 | $74,988 |
| Assoc. Fire Prot. Insp. | $52,658 | $65,100 | $79,200 | Assoc. Insp./PI | $64,983 | $75,911 | $95,940 |

91.     As reflected in the table, fire protection inspectors were paid on average about $9,800 less in salary than building inspectors in FY 2017, while associate fire protection inspectors were paid on average about $10,800 less than associate building inspectors.  The average salary difference was about $10,300.  Beginning during that year, FPIs were paid for a 37.5-hour week while BIs were paid for a 40-hour week.  Adjusting for the difference in hours, FPIs were paid average salaries of about $4,500 less than BIs.

92.     There were about 350 FPIs at the end of FY 2017.  If they had been paid at the same rate per hour as BIs, they would have been paid about $1,600,000 more in salary in FY 2017 than they were paid.

93.     The table below shows the minimum, median, and maximum salaries of FPIs and BIs in FY 2018:

| **FPIs** | | | | **BIs** | | | |
|----------|------|--------|------|---------|------|--------|------|
| **Title** | **Min.** | **Median** | **Max.** | **Title** | **Min.** | **Median** | **Max.** |
| Fire Prot. Insp. | $45,237 | $53,598 | $66,005 | Insp./Sr. Insp. | $61,800 | $61,800 | $74,988 |
| Assoc. Fire Prot. Insp. | $59,872 | $67,073 | $81,624 | Assoc. Insp./PI | $65,312 | $76,445 | $95,940 |

94.     As reflected in the table, fire protection inspectors were paid on average about $8,200 less in salary than building inspectors in FY 2018, while associate fire protection inspectors were paid about $9,400 less than associate building inspectors.  The average salary difference was about $8,800.  That year, FPIs were paid for a 37.5-hour week while BIs were paid for a 40-hour week.  Adjusting for the difference in hours, FPIs were paid average salaries of about $4,000 less than BIs.

95.     There were about 370 FPIs at the end of FY 2018.  If they had been paid at the same rate per hour as BIs, they would have been paid about $1,500,000 more in salary in FY 2018 than they were paid.

96.     The table below shows the minimum, median, and maximum salaries of FPIs and BIs in FY 2019:

| **FPIs** | | | | **BIs** | | | |
|---|---|---|---|---|---|---|---|
| **Title** | **Min.** | **Median** | **Max.** | **Title** | **Min.** | **Median** | **Max.** |
| Fire Prot. Insp. | $46,607 | $46,607 | $66,005 | Insp./Sr. Insp. | $61,800 | $65,087 | $80,555 |
| Assoc. Fire Prot. Insp. | $59,872 | $67,073 | $81,624 | Assoc. Insp./PI | $70,161 | $80,152 | $98,347 |

97.     As reflected in the table, fire protection inspectors were paid on average about $18,500 less in salary than building inspectors in FY 2019, while associate fire protection inspectors were paid about $13,100 less than associate building inspectors.  The average salary difference was about $15,000.  That year, FPIs were paid for a 37.5-hour week while BIs were paid for a 40-hour week.  Adjusting for the difference in hours, FPIs were paid average salaries of about $9,000 less than BIs.

98.     There were 400 FPIs at the end of FY 2019.  If they had been paid at the same rate per hour as BIs, they would have been paid about $3,600,000 more in salary in FY 2019 than they were paid.

22

99.     Although the pattern varies somewhat when FPIs, BIs, or both enter into new collective bargaining agreements with the City, *the gap between median FPI and median BI pay has grown steadily over the past 12 fiscal years*, as depicted below:



The average rate of increase in the difference between the median pay of FPIs and BIs is over $500 per year.  Without injunctive relief, the gap undoubtedly will continue to grow if the trend that has lasted over a decade continues.

100.     In total, the City paid FPIs about $6,700,000 less in salaries during the 2017-19 period than if FPIs had been paid at the same rate as BIs.  And it paid FPIs about $19,000,000 less in salaries during the entire 2008-19 period than if they had been paid at the same rate as BIs.

101.     Each of the named plaintiffs received a salary in each year for which there is publicly available data (FY 2008-2019) that was less than the corresponding average BI salary, *i.e.*, in any year in which they were fire protection inspectors their salaries were less than the

average building inspector salary, and in any year in which they were associate fire protection inspectors their salaries were less than the average associate building inspector salary.

102.   The damages that FPIs have suffered from being paid lower salaries than BIs are substantially larger than estimated in the above paragraph for two reasons.  First, the City pays valuable benefits that are tied to the amount of employees' salaries.  For example, one of the factors in the State's pension benefit formula is the average of an employee's three highest consecutive annual salaries.  If FPI salaries are depressed by about 10% on average, then their pension benefits will, in general, be at least 10% lower than they should have been.  Second, the lower salaries contribute to FPIs receiving markedly less overtime pay than BIs, as discussed below.

**D.     The City's Decision to Pay FPIs Less than BIs Is at Odds with Pay Structures Across the Country.**

103.   The City's decision to pay FPIs lower salaries than BIs since at least 2008 is the reverse of the general labor market, whether that market is measured nationally, by other large states, or by other large cities.

104.   According to the Occupational Information Network (O*NET) of the U.S. Department of Labor, in 2018 the median salary for fire inspectors across the country was $62,510 while the median salary for building inspectors was $59,700.  That is, fire inspector salaries were, on average, 5% *higher* than those paid to building inspectors.

105.   According to the same source, the median pay for fire inspectors exceeds the median pay for building inspectors in the four of the five largest states by population, and the disparity in the fifth state was much smaller than that in New York City:

| **State** | **Fire Inspectors** | **Building Inspectors** | **Gap Favoring Fire Inspectors** |
|---|---|---|---|
| California | $100,880 | $89,740 | $11,140 |

| | | | |
|---|---|---|---|
| Texas | $67,950 | $55,960 | $11,990 |
| Florida | $60,250 | $57,910 | $2,340 |
| New York | $63,600 | $62,160 | $1,440 |
| Illinois | $62,980 | $64,060 | -$1,080 |

106.     The same pattern holds for the metropolitan areas of nine of the ten largest cities

(data for the San Jose metropolitan area did not have entries for fire inspectors):

| **State** | **Fire Inspectors** | **Building Inspectors** | **Gap Favoring Fire Inspectors** |
|---|---|---|---|
| New York City | $57,390 | $66,170 | -$8,780 |
| Los Angeles | $132,350 | $92,740 | $39,610 |
| Chicago | $62,360 | $64,300 | -$1,940 |
| Houston | $70,460 | $62,160 | $8,300 |
| Phoenix | $69,810 | $59,330 | $10,480 |
| Philadelphia | $53,260 | $60,410 | -$7,150 |
| San Antonio | $72,840 | $46,740 | $26,100 |
| San Diego | $89,930 | $72,070 | $17,860 |
| Dallas | $62,570 | $55,630 | $6,940 |
| San Jose | --- | $104,920 | --- |

107.     The difference between New York City metropolitan area and the metropolitan

areas of the other eight largest cities can be easily seen by converting the differences into a

percentage of the median fire inspector salary:

25



Six of the other eight largest areas paid average salaries to fire inspectors that were at least 10% higher than building inspectors; in two of them, the disparity exceeded 40%.  In only three of these metropolitan areas were fire inspectors paid less than building inspectors; in Chicago the difference was about 3%, in Philadelphia it was about 13%, while in New York it was about 15%.  In New York City, building inspectors were paid about the average for other large cities, while fire inspectors were paid on average less than in any other large city except Philadelphia, including cities with much lower costs of living. There is no reason to think that the market for fire protection inspectors is worse in New York than in other major United States cities.

108.    A comparison of New York City to New York State also is telling.  Because fire inspectors were paid a median of $57,390 in the City and of $63,600 in the State, it follows that the median pay of fire inspectors in the State is above $63,600.  Although the cost of living in the City is far greater than in the rest of the State, and although the types of structures in the City create fire hazards not experienced in the rest of the State, the rest of the State pays fire

inspectors substantially more than the City does.  This disparity is consistent with the FDNY's

longstanding, documented history of racial animosity.

**D.     The City, Through FDNY, Pays FPIs Less than Other Safety Inspectors As Well.**

109.     In addition to FPIs and BIs, the City employs two other groups of safety

inspectors with job qualifications and duties similar as those of FPIs, although neither group

provides as appropriate a comparison as BIs.

110.     First, throughout the period from FY 2008 (and before) through FY 2019, the City

has employed inspectors and associate inspectors assigned to its Department of Housing

Preservation and Development.  The HPD inspectors and associate inspectors inspect only

residential housing – which is only one type of structure that FPDs inspect – and enforce the

City's Multiple Dwelling Law, Housing Maintenance Code and related laws.

111.     The educational and experiential requirements to become an HPD inspector are

similar to the requirements to become an FPI or BI.  Upon information and belief, the training is

similar, as are the job duties, except that the job duties are narrower than those of an FPI.  Like

BIs, however, HPD inspectors and associate inspectors face far fewer risks in performing their

jobs than FPIs.  HPD inspectors and associate inspectors also sometimes work on joint task

forces with FPIs.

112.     Nonetheless, in all twelve years between 2008 and 2019, the City paid the median

fire protection inspector less than the median HPD inspector.  The gap has ranged from a low of

7% of the fire protection inspector salary (in 2018) to a high of 32% of the median fire protection

inspector salary (in 2019).  The average difference was roughly 15%.

113.     The pattern is similar but less pronounced for associate level inspectors.  In eleven

of the twelve years between 2008 and 2019, the City paid the median associate fire protection

inspector less than the median HPD associate inspector.  In their best year relative to HPD associate inspectors (in 2018), associate fire protection inspectors received a median salary that exceeded the median salary of HPD associate inspectors by 3%.  In their worst year relative to HPD associate inspectors (in 2016), associate fire protection inspectors received a median salary that was 15% less than the median salary of HPD associate inspectors.  The average difference was about 4%.

114.    The other public safety inspector position to be compared to FPIs is the recently created position of fire inspectors for the New York City Housing Authority, which administers 326 public housing developments in the City housing more than 400,000 New Yorkers.  Before these positions were created, FPIs were the only employees trained to provide fire inspections for these housing developments.  Even now FPIs continue to perform inspections in the developments.  The starting salary for the NYCHA fire inspectors is $75,000, more than all but a handful of Associate Fire Protection Inspector IIIs are paid.

115.    The City has not overpaid BIs.  Rather, as the data for other states and cities and the data for HPD inspectors and NYCHA fire inspectors suggest, the City has year after year discriminatorily paid FPIs salaries far below what they should have been paid.  Now FPIs are paid less than what beginning NYCHA inspectors are paid.  Upon information and belief, the City pays FPIs below-market salaries because so few FPIs are white employees.

**E.      FPIs Also Receive Less in Overtime and Employee Benefits than Comparable Bis.**

116.    Overtime pay exacerbates the compensation gap between FPIs and BIs.

117.    FPIs receive less overtime pay than comparable BIs for two reasons.  First, when City non-exempt employees work more than 40 hours in a week they are paid 1.5 times their regular hourly salary rate, and since BIs have higher hourly salary rates than FPIs, they also have

higher overtime rates.  Second, the first 5 hours in a week beyond their regular schedule that FPIs worked prior to FY 2017, and the first 2.5 hours in a week beyond their regular schedule that FPIs have worked starting in FY 2017, are paid at their regular rate and not at an overtime premium rate.  These two factors negatively affect FPI overtime pay relative to BI pay in every year and are the focus of the claims relative to overtime.

118.    In some years BIs on average have worked more overtime than FPIs and hence the overtime pay gap is enhanced, while in other years FPIs on average have worked more overtime than BIs.  But even in the years in which FPIs work more overtime than BIs, the two factors identified in the prior paragraph reduce FPI overtime pay relative to BI pay.

119.    Publicly available data shows overtime pay received by FPIs and BIs for FYs 2014-19.  In every year, as alleged below, the data reflects that FPIs received less in overtime than BIs because BIs' salary rates are higher (even accounting for the differences in hours) and BIs are paid on a 40 hour week whereas FPIs have been paid on either a 35 or a 37.5 hour week. Although the publicly available data goes back only to 2014, the same would be true for as long as the City has treated FPIs and BIs differently with respect to these two factors.

120.    The table below estimates the impact of the two factors identified in paragraph 117 in FY 2014.  The first six columns compare the mean number of overtime hours and the mean overtime pay worked by fire protection inspectors, building inspectors, associate fire protection inspectors, and associate building inspectors during that year.  The next column shows the difference between the average overtime pay of the FPI group and the BI group that year. The penultimate column estimates the difference in overtime pay that would have existed if the only factor were the difference in hours worked by the FPI and BI group.  Plaintiffs estimate this amount by multiplying the difference in hours between fire protection inspectors and building

inspectors (or between associate fire protection inspectors and associate building inspectors) by

the median salary for fire protection inspectors or associate fire protection inspectors by 8/7 or

16/15 depending on the year to bring them to a 40-hour week equivalent, divide by 2,080 (work

hours in a year), and multiply by 1.5 (the overtime rate above 40 hours in a year).  The final

column is calculated by subtracting the figures in the two preceding columns and represents the

pay gap attributable to the differences between FPIs and BIs in pay rates and number of regular

hours in a week:

| FPIs' Overtime | | | BIs' Overtime | | | Diff. in Pay | Attribute To Hours Worked | Attribute to Pay and Schedule |
|---|---|---|---|---|---|---|---|---|
| Title | Hours | Pay | Title | Hours | Pay | | | |
| Fire Pro. Insp. | 142 | $4,520 | Insp./ Sr. Insp. | 130 | $5,946 | -$1,426 | $448 | -$1,874 |
| Ass. Fire Pro. Insp. | 318 | $13,739 | Ass. Insp./ Prin. Insp. | 311 | $16,245 | -$2,506 | $327 | -$2,833 |

121.    As reflected in the table above, fire protection inspectors received on average

about $1,874 less in overtime during FY 2014 than building inspectors, because of the

differences in their pay rates and in hours scheduled, while associate fire protection inspectors

received about $2,833 less than their BI counterparts on account of those two factors.  On

average the difference was about $2,400 in FY 2014.

122.    But for those two factors, the approximately 350 FPIs in FY 2014 would have

received about $840,000 more overtime pay than they actually received.

123.    The table below shows the results for FY 2015 of the same type of analysis that

was described above for FY 2014:

| FPIs' Overtime | | | BIs' Overtime | | | Diff. in Pay | Attribute To Hours Worked | Attribute to Pay and Schedule |
|---|---|---|---|---|---|---|---|---|
| Title | Hours | Pay | Title | Hours | Pay | | | |
| Fire Pro. Insp. | 193 | $6,789 | Insp./ Sr. Insp. | 123 | $4,910 | $1,879 | $2,614 | -$735 |

| Ass. Fire Pro. Insp. | 297 | $12,496 | Ass. Insp./ Prin. Insp. | 285 | $14,959 | -$2,463 | $561 | -$3,024 |

124.    As reflected in the table above, fire protection inspectors received on average about $735 less in overtime during FY 2015 than building inspectors because of the differences in pay rates and in hours scheduled, while associate fire protection inspectors received about $3,024 less than their BI counterparts on account of those two factors.  On average the difference was about $2,000 in FY 2015.

125.    But for those two factors, the approximately 340 FPIs in FY 2015 would have received about $680,000 more overtime pay than they actually received.

126.    The table below shows the results for FY 2016 of the same type of analysis that was described above for FY 2014:

| FPIs' Overtime | | | BIs' Overtime | | | Diff. in Overtime Pay | Attribute To Hours Worked | Attribute to Pay and Schedule |
|---|---|---|---|---|---|---|---|---|
| Title | Hours | Pay | Title | Hours | Pay | | | |
| Fire Pro. Insp. | 215 | $6,974 | Insp./ Sr. Insp. | 91 | $3,900 | $3,074 | $7,494 | -$4,420 |
| Ass. Fire Pro. Insp. | 360 | $15,486 | Ass. Insp./ Prin. Insp. | 275 | $16,323 | -$837 | $3,707 | -$4,544 |

127.    As reflected in the table above, fire protection inspectors received on average about $4,400 less in overtime during FY 2016 than building inspectors because of the differences in their pay rates and in hours scheduled, while associate fire protection inspectors received about $4,500 than their BI counterparts on account of those two factors.  On average the difference was about $4,500 in FY 2016.

128.    But for those two factors, the approximately 340 FPIs in FY 2016 would have received about $1,530,000 more in overtime pay than they actually received.

129.    The table below shows the results for FY 2017 of the same type of analysis that was described above for FY 2014:

| FPIs' Overtime | | | BIs' Overtime | | | Diff. in Pay | Attribute To Hours Worked | Attribute to Pay and Schedule |
|---|---|---|---|---|---|---|---|---|
| Title | Hours | Pay | Title | Hours | Pay | | | |
| Fire Pro. Insp. | 140 | $5,249 | Insp./ Sr. Insp. | 123 | $5,481 | -$232 | $680 | -$  912 |
| Ass. Fire Pro. Insp. | 311 | $15,834 | Ass. Insp./ Prin. Insp. | 304 | $17,554 | -$1,720 | $351 | -$2,071 |

130.    As reflected in the table above, fire protection inspectors received on average about $900 less in overtime during FY 2017 than building inspectors because of  the differences in their pay rates and in hours scheduled, while associate fire protection inspectors received about $2,700 less than their BI counterparts on account of those two factors.  On average the difference was about $1,900 in FY 2017.

131.    But for those two factors, the approximately 360 FPIs in FY 2017 would have received about $680,000 more in overtime pay than they actually received.

132.    The table below shows the results for FY 2018 of the same type of analysis that was described above for FY 2014:

| FPIs' Overtime | | | BIs' Overtime | | | Diff. in Pay | Attribute To Hours Worked | Attribute to Pay and Schedule |
|---|---|---|---|---|---|---|---|---|
| Title | Hours | Pay | Title | Hours | Pay | | | |
| Fire Pro. Insp. | 103 | $3,165 | Insp./ Sr. Insp. | 139 | $ 6,289 | -$3,124 | -$1,484 | -$1,640 |
| Ass. Fire Pro. Insp. | 167 | $8,794 | Ass. Insp./ Prin. Insp. | 296 | $16,503 | -$7,709 | -$6,656 | -$1,053 |

133.    As reflected in the table above, fire protection inspectors received on average about $1,640 less in overtime during FY 2018 than building inspectors because of  the differences in their pay rates and in hours scheduled, while associate fire protection inspectors received about $1,053 less than their BI counterparts on account of those two factors.  On average the difference was about $1,300 in FY 2018.

32

134.    But for those two factors, the approximately 370 FPIs in FY 2018 would have received about $480,000 more in overtime pay than they actually received.

135.    The table below shows the results for FY 2019 of the same type of analysis that was described above for FY 2014:

| FPIs' Overtime | | | BIs' Overtime | | | Diff. in Pay | Attribute To Hours Worked | Attribute to Pay and Schedule |
|---|---|---|---|---|---|---|---|---|
| Title | Hours | Pay | Title | Hours | Pay | | | |
| Fire Pro. Insp. | 80 | $2,852 | Insp./ Sr. Insp. | 103 | $4,563 | -$1,711 | -$825 | -$886 |
| Ass. Fire Pro. Insp. | 306 | $15,448 | Ass. Insp./ Prin. Insp. | 332 | $17,350 | -$1,902 | -$1,341 | -$561 |

136.    As reflected in the table above, fire protection inspectors received on average about $886 less in overtime during FY 2019 than building inspectors because of the differences in their pay rates and in hours scheduled, while associate fire protection inspectors received about $561 less than their BI counterparts on account of those two factors. On average the difference was about $700 in FY 2019.

137.    But for those two factors, the approximately 400 FPIs in FY 2019 would have received about $280,000 more in overtime pay than they actually received.

138.    Plaintiffs estimate damages of $1,440,000 for FY 2017-19 associated with lost overtime pay arising out of their lower salaries than BIs and the differences in FPIs' and BIs' regular work weeks. For the six years between FY 2014 and 2019, inclusive, damages are approximately $4,500,000. The damages associated with the same two factors will be even greater when years prior to 2014 are included.

**D.   The City's Pay Discrimination Against FPIs Is Part of a Pervasive Pattern of Discrimination Against FPIs and Against Racial Minorities More Generally at FDNY.**

139.    The City's decision to pay BIs higher salaries than FPIs is part of the pattern of racial discrimination in compensation at FDNY.  As shown in the civilian lawsuit, the racial composition and average salaries of job groups at FDNY are strongly correlated; the lower the percentage of white employees in a job group, the lower the pay of that group, and the higher the percentage of white employees in a job group, the higher the pay.

140.    Upon information and belief, top City officials are aware of the compensation disparities between (a)  FPIs and BIs and (b) FPIs and other public safety inspectors and have adopted the practices that result in the disparities with the intent of paying the white BIs more than FPIs.

141.    Multiple facts and circumstances indicate that the low percentage of Caucasians among FPIs motivated the City to pay BIs more than FPIs.  Indeed, the pay disparity would not have existed but for the difference in the racial composition of FPIs and BIs.

**1.      FDNY's Treatment of FPIs as Separate and Unequal Uniformed Employees**

142.    FDNY has three groups of employees whom the City recognizes as uniformed as opposed to civilian employees:  firefighters (including fire marshals), EMS employees, and FPIs. In multiple ways, the City treats FPIs as separate from firefighters, who are over 80% white, and to a lesser extent from EMS employees, who are about 50% white.  And just as in the nation during the days of "separate but equal," separate means unequal, and the FPIs are treated as second class employees because of their racial composition.

143.    The City pays firefighters much higher salaries than it pays FPIs.  In FY 2018, for example, after five years firefighters' base salaries were $85,292, whereas incumbent FPIs' minimum salaries were either $52,022 or $58,111, depending on whether they advanced to the associate inspector level.  The gap, therefore, was roughly $30,000.

144.    Firefighters easily could increase their salaries by 50% or more by working overtime, much more than FPIs could earn through overtime.  In FY 2018, about 402 FDNY firefighters received total monetary compensation of over $150,000 by piling up overtime pay in addition to their salaries.  The greatest total monetary compensation of a fire protection inspector that year was $78,447, only about half the amount amassed by over 400 firefighters.

145.    The City has established a pension plan, including disability benefits, for firefighters that provides substantially more generous benefits than the pension benefits available to other City employees.  The City also has established a pension plan for EMS employees that also provides more generous benefits than the benefits available to other City employees, although not as generous as the benefits afforded to firefighters.  FPIs are lumped in with civilian City employees without any special benefits protections, even though the City treats FPIs as uniformed employees for purposes of collective bargaining and they face much greater risks than most civilian employees.

146.    The City also provides special medical, dental and educational benefits to firefighters and EMS employees.  These benefits are more generous than the medical, dental and educational benefits offered to other City employees, including FPIs.

147.    FPIs do not receive safety protections equivalent to firefighters and EMS employees in multiple ways.  Three recent examples are described below but the pattern has been going on for years.  The examples reflect that the City treats FPIs' lives and health as expendable.  An employer that has so little regard for one group of its employees also is likely to have little regard for making sure that they are paid equally to others doing similar work.

    a.    For many years, FDNY issued carbon monoxide meters to firefighters, EMS employees, and FPIs.  In approximately January 2020, however, FDNY without

explanation ordered FPIs to hand in their meters.  The order does not extend to firefighters or EMS employees.  Yet FPIs are the employees who need them most, both for their own safety and the safety of the public, because FPIs frequently inspect premises with the possibility of unsafe levels of carbon monoxide.  In response to the order, FPIs documented 26 recent incidents in which they needed their carbon monoxide meters.  This list made no difference to City officials; indeed, the City did not even provide the courtesy of a response.

b.      FDNY also had issued bunker jackets to firefighters, EMS employees, and FPIs who monitor fireworks and explosives.  These jackets are fire resistant, which may be critical if the FPI is hit with sparks or embers or if there is an explosion. The jackets show on the back that the wearer is a fire protection inspector so the public cannot possibly be confused.  But again, without explanation, FDNY revoked the issuance of bunker jackets to FPIs in March 2020.  It has not tried to take back bunker jackets from firefighters or EMS employees.

c.      Firefighters, EMS employees, and fire protection inspectors are all considered essential employees who are expected to continue working during the coronavirus pandemic.  Earlier this year FDNY made available to firefighters and EMS employees a phone application that allows them to check in and, if manifesting symptoms of the virus, take the day off without being charged a day of sick leave. Information about the application, however, was not given to FPIs.  Plaintiff Chalmers heard about the application, pressed Bureau of Fire Prevention ("BFP") brass to make it available to FPIs and was rebuffed.  Only when he went above the Bureau Chief in late March 2020 was the application made available to FPIs.

But FDNY still has not made available to FPIs adequate personal protective equipment even though their job requires them to enter buildings and interact with people every day.  Many FPIs have contracted the coronavirus, and two FPIs have died from the virus.  In recognition of the danger of contracting the virus that FPIs face, they are no longer allowed to sign out at the end of the day at fire stations. Nonetheless, FDNY has not provided FPIs with masks even though firefighters and EMS employees have them and FPI representatives specifically have asked for them. Local 2507 obtained masks but the Chief of the BFP forbade their distribution.  Then the widow of a former Chief of the BFP offered to supply masks to all FPIs but again the gift was rejected by FDNY supposedly because it would appear to be an illegal gratuity, even though FDNY after 9-11 accepted gifts of food and other gifts for the firefighters.  FDNY has issued each FPI one pair of disposable plastic gloves for each week, which is not adequate to protect them against exposure given the nature of their work.   The CDC guidelines provide that service workers discard disposable gloves after each interaction with the public.  By contrast, the City has issued masks and gloves to each BI.

148.   The FDNY also makes sure that FPIs' uniforms make them distinguishable from firefighters and EMS employees in multiple ways that brand FPIs as inferior, including those set out below.  The FDNY executives' conduct smacks of the "separate but equal" fiction that was used in an attempt to justify segregation in the southern states for more than fifty years.

   a.   For many years FDNY did not allow FPI supervisors at the associate fire protection inspector level to wear white shirts except when appropriate to be in full dress uniform, which happens very rarely.  In all other uniformed services

throughout the City, including firefighters and EMS, supervisors are allowed to
wear white shirts.  Partly the refusal to treat FPI supervisors equally was a
reminder that they were regarded as less important than other uniformed services
but it also is important in a crisis for uniformed employees and involved civilians
to be able to quickly identify the persons in charge.  FDNY executives rebuffed
FPIs in their efforts to have their supervisors treated equally with other uniformed
services but finally in about 2014 the Vulcan Society arranged a meeting with
newly elected Mayor de Blasio, who agreed with FPIs and overrode years of
resistance from FDNY executives.

b.      Mayor de Blasio also in about 2014 overrode FDNY refusals and ordered
issuance of class A dress uniforms to FPIs.  Unwilling for FPIs to be allowed to
wear equivalent dress uniforms to firefighters and EMS employees, however,
about a year later FDNY ordered FPIs to wear a yellow patch on the left side of
the jackets designating that they were with the BFP.  Firefighters and EMS
employees don't have to wear patches.  FDNY chaplains are issued class A dress
uniforms, but they don't have to wear patches designating them as chaplains.
Some businesspeople or other non-employees are made "honorary chiefs" and
receive dress uniforms.  Their uniforms don't contain a patch indicating that they
are not really uniformed employees.

c.      After hire, new firefighters, EMS employees, and FPIs generally attend the FDNY
Academy for training.  For many years, firefighter and EMS employees wore light
blue shirts with bell caps at the graduation ceremonies but FPI graduates could
not.  Finally, after lobbying from FPIs, FDNY allowed FPI graduates to wear the

same blue shirts and bell caps.  But unwilling to allow FPIs to look the same, FDNY executives insisted that the blue shirts that FPIs wore have the yellow BFP patch.

149.    FPIs also are treated separately and unequally when it comes to ceremonies other than Academy graduations, including but not limited to:

a.    FDNY has a uniformed ceremonial unit that represents the agency in parades, funerals and other special occasions.  Firefighters and EMS employees, but not FPIs, are included.  When FPI representatives pressed for FPI representation, FDNY executives informed them that they would not be included in the firefighter-EMS unit but that they could form their own ceremonial unit if they wished.

b.    FDNY conducts a joint firefighter and EMS promotion ceremony for employees receiving promotions, such as from firefighter or paramedic to lieutenant.  On the civil service scale a similar promotion is from fire protection inspector to associate fire protection inspector.  FPIs were rebuffed in their effort to be included in the ceremony.  Accordingly, the BFP organized and has conducted its own promotion ceremonies for the past few years.  FDNY top brass regularly attend the firefighter-EMS ceremony.  Few if any top brass attend the BFP promotion ceremony.

c.    FDNY also conducts an annual medal day to recognize acts of valor by agency employees.  FDNY invites firefighters and EMS employees and invariably bestows the awards on firefighters and EMS employees.  FPIs are not invited and are never awarded.

d.      FDNY also observes Martin Luther King, Jr. through an invitation-only

celebration on or about his birthday that recognizes diversity.  FPIs do not receive

invitations.  It is ironic that the most racially diverse unit in FDNY is not included

in the Martin Luther King, Jr. celebrations.

150.    The City knowingly pays FPIs lower salaries than firefighters, provides FPIs

lesser benefits than firefighters and EMS employees, and treats FPIs as separate and unequal

with respect to health and safety, uniforms, and honors than firefighters and EMS employees.

This combination of economic and non-economic badges of inferiority is the product of

discriminatory animus.  This same attitude animates the pay disparities between FPIs and BIs.

### 2.      FDNY's History of Racial Discrimination

151.    The history of racial discrimination at FDNY goes well beyond FPIs.  During the

past 50 years, two large class action lawsuits against the City of New York have resulted in

rulings that the FDNY has discriminated against African Americans and Hispanics in the hiring

of firefighters.  Although the lawsuits involved applicants for firefighter positions rather than

FPIs, the lawsuits are relevant because of the resistance to integration exhibited by high levels of

the FDNY.

152.    Almost 45 years ago, in 1973, Judge Weinfeld of the Southern District of New

York after a bench trial held that the City's written and physical examinations for entry-level

firefighters violated the Equal Protection Clause because of their discriminatory impact on

African American and Hispanic applicants.  *See Vulcan Society of New York City Fire Dep't,

Inc. v. Civil Serv. Comm'n*, 360 F. Supp. 1265, 1269 (S.D.N.Y.), *aff'd in relevant part*, 490 F.2d

387 (2d Cir. 1973).  At that time, African Americans and Hispanics constituted 32% of the City's

population, but only 5% of the Department.  The judge ordered that at least 25% of the new hires

for firefighter positions be racial minorities and ordered defendants to create a new examination

that did not discriminate against African Americans and Hispanics.  *Vulcan Society of New York*

*City Fire Dep't, Inc. v. Civil Serv. Comm'n*, 490 F.2d at 391.

153.    The Vulcan Society injunction lapsed in 1977, and the City promptly abandoned

the 3:1 hiring ratio and instituted a hiring procedure that required applicants to take a cognitive

examination and demonstrate minimum appointment requirements such as college credits, a

driver's license, and certified first responder with defibrillation training.  Firefighter

demographics did not change.  In 1990, African Americans made up 29% of the City's

population, but only 4% of firefighters.  In 2002, 25% of the City's residents were black,

compared to only 2.6% of its firefighters.  *United States v. City of New York*, 683 F. Supp. 2d

225, 241 (E.D.N.Y. 2010) (citations omitted).

154.    In response to the ongoing discrimination, the United States brought suit in May

2007 in the Eastern District of New York against the City under Title VII alleging that the City's

procedures for screening and selecting applicants for entry-level firefighter positions

discriminated against black and Hispanic applicants under a disparate impact theory.  *Id.* at 233

(summarizing procedural history).  In September 2007, the court permitted the Vulcan Society (a

group of African American firefighters) and three individuals to intervene.  The intervenors

claimed that the City had engaged in a pattern or practice of intentional discrimination against

black applicants.  *Id.* at 234 (discussing procedural history).

155.    In July 2009, the Court ruled on a summary judgment motion that the City was

liable for disparate impact discrimination under Title VII.  *United States v. City of New York*, 637

F. Supp. 2d 77, 82-83, 132 (E.D.N.Y. 2009).  The next year, the Court granted the intervenors'

motion for summary judgment on their pattern-or-practice claims as well.  Although the Second

41

Circuit later reversed and remanded, finding that there were genuine factual issues as to whether the FDNY had intended to discriminate against African American and Latino applicants, it did not disturb Judge Garaufis' disparate impact ruling or the finding that the Vulcan Society and other intervenors presented convincing evidence that the City had been aware that the FDNY's hiring procedures discriminated against black applicants and had nonetheless refused to take steps to remedy this discrimination.  *City of New York*, 683 F. Supp. 2d at 250-51 (citations omitted).

156.  Judge Garaufis found in 2010 that the FDNY had engaged in "34 years of intransigence and deliberate indifference."  *Id.* at 262.  That intransigence and deliberate indifference continued even while the litigation was ongoing.  After the City administered a new test in 2010 that again had an adverse impact on African American and Latino applicants, Judge Garaufis gave the City five alternatives to modify the results so that its hiring more closely approximated the percentages of various minority groups taking the test.  *United States v. City of New York*, No. 07-CV-2067 (NGG) (RLM), 2010 U.S. Dist. LEXIS 95083 (E.D.N.Y. Sept. 13, 2010).  The City refused to adopt any of these alternatives and stated that it would not hire at all until it developed a new test.  Hal Budnick, *Smoking Out Racism in the FDNY: The Dwindling Use of Race-Conscious Hiring Remedies*, 77 BROOK. L. REV. 1249, 1270 (2015), available at: http://brooklynworks.brooklaw.edu/blr/vol77/iss3/9.

157.  The City and plaintiffs settled the suit before Judge Garaufis in or about 2014 for payment of nearly $100 million and programmatic relief.

158.  The two class action lawsuits described above did not raise claims about racial discrimination against racial minorities in other than firefighter jobs within FDNY.  In 2017, a new racial discrimination class action lawsuit was filed against the City on behalf of African

Americans whose applicants for civilian positions the FDNY were rejected and civilian African American employees who claim that the City, through the FDNY, discriminated against them in favor of white employees in promotion and compensation decisions.  That case is ongoing.

###    3.    Lack of Business Justifications for Pay Disparity Between BIs and FPIs

159.    Finally, the lack of any bona fide business reason to pay BIs more than FPIs provides additional circumstantial evidence that the pay disparity is the result of intentional discrimination.

160.    First, the labor market does not support a pay differential to the detriment of FPIs. As alleged above, nationwide, state, and city data compiled by the DOL reveal that fire inspectors are, on average, paid more than building inspectors, not less.

161.    Second, the job duties of FPIs, as set forth in Section II.C above, require more wide-ranging and more detailed knowledge than the job duties of BIs.

162.    Third, the job duties of FPIs, also as set forth above, involve greater physical risks than do the job duties of BIs.

163.    Fourth, the City has had trouble filling FPI positions, which generate revenue for the FDNY.  If it paid FPIs higher salaries, the problem of a shortage of FPIs would be lessened or eliminated and the City would realize more, not less, net revenue.

164.    Finally, according to widespread rumors, the City began paying BIs more than FPIs some time between 2000 and 2008 because of widespread bribe-taking by BIs.  Numerous BIs were indicted for and convicted of taking bribes.  As per the rumors, the City hoped that higher salaries would reduce the financial pressures on BIs to accept bribes.  But FPIs live in the same metropolitan area as BIs and are subject to the same living costs.  They, like BIs, have the power to issue summons, stop projects, or vacate buildings, and building owners have an

incentive to bribe them as well.  If BIs needed more income to reduce the pressure to accept

bribes, so too did FPIs.  Wrongdoing by some BIs is not a valid reason to increase the pay of all

BIs above the pay of the primarily racial minority FPIs who as a group did not succumb to

corruption.

**F.    The City's Practice of Paying Most FPIs the Minimums Allowed by Their CBA But to Pay Almost All BIs More than the Minimums Allowed by Their CBA Has Had a Disparate Impact on Racial Minorities.**

165.    Local 2507, representing the FPIs, and Allied Building Inspectors, Local 211,

International Union of Operating Engineers ("Local 211"), which represents the building

inspectors, have negotiated separate collective bargaining agreements (CBAs) with the City.

These CBAs over the years have set similar pay ranges for employees considering the difference

in number of hours worked.  The City's practices in complying with these CBAs, however, have

created a disparate impact against racial minorities.  Over the past 12 years (or longer) the City

has had a practice of paying virtually every FPI the minimum allowed under Local 2507's CBA.

Conversely, the City's practice also has been to pay virtually every BI much more than the

minimum under Local 211's CBA and, in some instances, even to exceed the maximum

prescribed by the CBA.  This practice, although facially neutral among racial groups, has had a

disparate impact against racial minorities.

166.    For example, Local 2507's CBA provided the following minimum salaries for

new hire (first two years) and incumbent (after the first two years) FPIs at end of FY 2018:

| Title | New Hire Minimum | Incumbent Minimum | Maximum |
|---|---|---|---|
| Fire Protection Inspector | $46,607 | $53,598 | $65,549 |
| Assoc. Fire Protection Inspector I | $52,063 | $59,872 | $73,309 |
| Assoc. Fire Protection Inspector II | $58,324 | $67,073 | $81,098 |
| Assoc. Fire Protection Inspector III | $64,596 | $74,285 | $88,904 |

Local 211's CBA provided the following minimum salaries for new hire (first two years) and incumbent (after the first two years) BIs at end of FY 2018:

| Title | New Hire Minimum | Incumbent Minimum | Maximum |
|---|---|---|---|
| Inspector | $49,862 | $57,341 | $72,836 |
| Senior Inspector | $51,328 | $59,027 | $73,174 |
| Associate Inspector | $56,793 | $65,312 | $80,996 |
| Principal Inspector | $62,927 | $72,368 | $87,765 |

Multiplying the FPI scale by 16/15 to reflect the difference between FPI 37.5 hour weeks and BI 40 hour weeks discloses that the minimum new hire salary for BI inspectors was about $150 more than for FPI fire protection inspectors and that the minimum incumbent salary for BI inspectors was about $170 more than for FPI fire protection inspectors. The minimum new hire salary for BI associate inspectors was about $1,300 more than for associate fire protection inspectors level 1, while the incumbent differential was about $1,400.

167.    Throughout the period for which publicly available data exists, the salaries of fire protection inspectors closely tracked the minimums set by Local 2507's CBA.  For example, in FY 2018, the table below shows the salaries of fire protection inspectors at the end of FY 2018 and the number of FPIs assigned that salary.  The table also shows the number of FPIs with salaries other than the contractually mandated minimums.  As can be seen, 88% of salaries were the minimums for new hires or incumbents specified by the CBA:

| Salary | No. of Employees | Relationship to CBA Amounts |
|---|---|---|
| Below $46,607 | 1 | |
| $46,607 | 61 | Fire Protection Inspector new hire minimum |
| Between $46,607 and $53,598 | 0 | |

| $53,598 | 67 | Fire Protection Inspector incumbent minimum |
| Greater than $53,598 | 17 | |

Moreover, 16 of the 17 fire protection inspectors paid more than the CBA incumbent minimum were within $400 of the minimum.  Put another way, all but two of the 146 fire protection inspectors in FY 2018, or 99%, were paid at or within $400 of the minimum prescribed in the CBA; one was paid less than the new hire minimum, and the other was paid a few hundred dollars more than the CBA maximum for fire protection inspectors.

168.    Contrast that with building inspectors and senior inspectors.  The table below shows the salaries of inspectors (which in the public data includes senior inspectors) at the end of FY 2018, showing each salary assigned to more than two inspectors and the number of inspectors assigned that salary.  The table also shows the number of inspectors with unique salaries between the salaries specified in the table.

| **Salary** | **No. of Employees** | **Relationship to CBA Amounts** |
| --- | --- | --- |
| $61,800 | 365 | $11,938 above inspector new hire minimum |
| Between $61,800 and $72,100 | 42 | |
| $72,100 | 9 | $736 below inspector incumbent maximum |
| More than $72,100 | 4 | |

169.    Whereas the City paid over 80% of fire protection inspectors at or below their CBA's minimums, and paid 99% within $400 of those minimums, the City did not pay any Department of Building inspectors at the Local 211 CBA minimum.  Instead, the starting salaries for inspectors were almost $12,000 *above* the stated minimum.  About 87% of inspectors received that $61,800 salary, and the remainder were even higher.  Again unlike the FPIs, there

was substantial differentiation of inspector salaries above the lowest salary. While there was a small cluster at the $72,100 level, over 10% of inspectors received unique salaries, whereas only about 1% of fire protection inspectors received unique salaries.

170.     Associate fire protection inspectors also, by and large, have been paid only the minimum salaries specified in the Local 2507 CBA. The table below shows the salaries of associate fire protection inspectors at the end of FY 2018, showing each salary assigned to more than two FPIs, the number of FPIs assigned that salary, and an explanation corresponding to the levels set by the CBA. The table also shows the number of FPIs with unique salaries between the salaries specified in the table:

| **Salary** | **No. of Employees** | **Further Description of Salaries** |
|---|---|---|
| Below $59,872 | 0 | Nobody paid AFPI new hire minimums |
| $59,872 | 49 | Assoc. Fire Protection Inspector I incumbent minimum |
| Between $59,872 and $67,073 | 9 | 8 of the 9 were paid within $200 of the AFPI I incumbent minimum |
| $67,073 | 66 | Assoc. Fire Protection Inspector II incumbent minimum |
| Between $67,073 and $74,285 | 44 | 41 of the 44 were paid within $400 of the AFPI II incumbent minimum |
| $74,285 | 13 | Assoc. Fire Protection Inspector III incumbent minimum |
| Above $74,285 | 42 | 37 of the 42 were paid within $500 of the AFPI III incumbent minimum |

No associate fire protection inspectors were at the new hire minimums, presumably because it took more than two years to advance to the associate fire protection inspector level. 57% of salaries were the incumbent minimums specified by the CBA, and another 38% were within $500 of incumbent minimums. Only about 5% of salaries exceed minimums by more than $500. Only one associate fire protection inspector was above the level II maximum and no associate fire protection inspector was above the level III maximum.

171.    Again, the City has chosen to pay associate inspectors in the Department of Buildings far more generously despite the similarity of the CBA pay schedules.  One associate inspector was at the incumbent minimum.  Over 75% of the 155 associate inspectors had a unique salary at the end of FY 2018.  The median salary was $76,445, which was only about $4,000 less than the *maximum* for associate inspectors under the CBA.  Thirty-two associate inspectors, over 20%, received salaries in excess of the maximum for associate inspectors of $80,996 and 11 even received salaries in excess of the maximum for principal inspectors of $87,765.

172.    While the numbers varied somewhat from 2008 – the earliest year for which there is publicly available data – through 2019, the City's practice has remained constant:  the City pays the great majority of FPIs the minimum allowed under Local 2507's CBA or barely above that amount but pays virtually every BI far more than the allowed minimum, and frequently even in excess of the allowed maximum.

173.    Because of the differences in the racial compositions of FPIs and BIs, the City's practice of confining FPIs, with very few exceptions, to the minimums specified under Local 2507's CBAs while simultaneously paying virtually all BIs far in excess of the minimums under Local 211's CBAs has had a disparate impact on racial minorities.

174.    As discussed in section IV.E above, the City cannot show that its practice bears a significant relationship to any significant business objective.  And even if it could, the City has less discriminatory alternatives, including equalizing the pay of FPIs and BIs (or paying FPIs more to reflect their greater duties and physical risks.

**G.     The City's Policy or Practice of Paying FPIs Less than BIs Has Been a Continuing Violation of Law Under the NYCHRL Since 2008 If Not Before**

175.    The City's decision to pay BIs more than FPIs, which would not have been made but for the differences in the racial compositions of the two groups of employees, was made sometime before FY 2008, and has been adhered to on a continuous basis at all times since then.

176.    Similarly, the City established a practice of paying BIs substantially more than the minimum salaries set in their CBA but of paying FPIs, with very few exceptions, only the minimum salaries set in their CBA sometime before FY 2008 and has adhered to that policy or practice on a continuous basis at all times since then.  The disparate impact against racial minorities caused by this policy or practice also has been continuous since FY 2008 if not before.

177.    The City's decision or practice has caused members of the proposed Class and Subclass defined below to receive far less in salaries, overtime compensation, and employee benefits than they would have on a continuing basis in every year between 2008 (or earlier) and the present.

## VI.   CLASS ALLEGATIONS

178.    The individual plaintiffs bring their disparate treatment claims under all three statutes on behalf of themselves and a class defined as all persons who have been employed by the City as fire protection inspectors or associate fire protection inspectors in the FDNY at any time between three years prior to the filing of this Complaint and the date a class is certified (the "Class").  All of them except plaintiff Connors also bring their disparate impact claims under Title VII and the NYCHRL on behalf of themselves and a subclass defined as all persons who do not self-identify as white and who have been employed by the City as fire protection inspectors or associate fire protection inspectors in the FDNY at any time between three years prior to the filing of this Complaint and the date a subclass is certified (the "Subclass").

### 1.    The Class

179.    The Class is sufficiently numerous that joinder of all its members in this lawsuit would be impractical.  As alleged above, there were about 400 FPIs at the end of FY 2019.  With turnover, there are probably about 500 members of the Class.

180.    The Class's claims raise numerous common questions of fact or law, including but not limited to:

- Are the duties of the City's FPIs and BIs sufficiently similar that it should have paid FPIs at least as much as BIs?

- Did the City decide to pay BIs higher salaries than FPIs because there was a substantially lower percentage of racial minorities among BIs than among FPIs in violation of Section 1981?

- Was the fact that there was a substantially lower percentage of racial minorities among BIs than among FPIs a motivating factor in the City's decision to pay BIs higher salaries than FPIs in violation of Title VII?

- Was the fact that there was a substantially lower percentage of racial minorities among BIs than among FPIs a factor in the City's decision to pay BIs higher salaries than FPIs in violation of the NYCHRL?

- Was the decision to pay BIs higher salaries than FPIs made at least in part by a small number of City officials?

- Has the City engaged in continuing intentional discrimination against Class Members that entitles them to relief under NYCHRL for discriminatory salaries back to 2008 (if not before)?

181.    Plaintiffs Chalmers, Connors, Mendez, Nova, and Rosemond are typical of other Class Members in that they have been FPIs of FDNY during the liability period and have claims

of lower salaries than BIs as a result of the same factors that led to discrimination against other

Class Members.  Their claims, like the claims of other Class Members, also give rise to

NYCHRL liability under the continuing violations doctrine.

182.    Plaintiffs Chalmers, Connors, Mendez, Nova, and Rosemond are adequate

representatives of the Class.  Their claims are typical of the claims of other Class Members; they

have no conflicts with the Class Members; and they have retained experienced counsel capable

of representing the Class.

183.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(2)

because the City has acted or refused to act on grounds that apply generally to the Class,

principally by paying FPIs substantially lower salaries than BIs although they perform similar

job duties.  These actions and failures make appropriate Class-wide injunctive relief, including

but not limited to the measures identified in the Prayer for Relief below.

184.    Class certification also is appropriate under Federal Rule of Civil Procedure

23(b)(3).  The common issues identified above will predominate over any purely individual

issues.  Moreover, a class action is superior to other means for fairly and efficiently adjudicating

the controversy.  Although many if not all FPIs realize that the City pays BIs higher salaries than

FPIs receive despite the similar nature of the jobs, no FPIs have filed individual actions because

the cost involved in such litigation would not justify such a lawsuit unless the FPIs combined

forces in a single class action.  Moreover, after all these years, injunctive relief is needed to

address the discrimination.  That type of relief would be difficult if not impossible to obtain in a

non-class suit brought by one or a small number of plaintiffs.

185.    If the Court decides not to certify the Class under Rule 23(b)(2) or (3), class

certification is appropriate with respect to each of the common issues, including those identified

above and any other common issues that may be identified during the litigation, pursuant to Federal Rule of Civil Procedure 23(c)(4).

### 2.    The Subclass

186.    The Subclass is sufficiently numerous that joinder of all its members in this lawsuit would be impractical.  There were about 300 non-white FPIs at the end of FY 2019. With turnover, there are probably about 400 members of the Subclass.

187.    The Subclass' claims raise numerous common questions of fact or law, including but not limited to:

- Are the duties of the City's FPIs and BIs sufficiently similar that the City should have paid FPIs at least as much as BIs?

- Was the decision to pay BIs above the minimum salaries set out in their CBA while paying FPIs the minimum salaries set out in their CBA a practice that could give rise to a disparate impact claim?

- Does the City have a valid business reason for establishing a practice of paying BIs above the minimum salaries set out in their CBA while paying FPIs the minimum salaries set out in their CBA and, if so, is there a less discriminatory alternative that would achieve the City's goal?

- Has the City implemented a continuing practice that has had a disparate impact against Subclass Members that entitles them to relief under NYCHRL for discriminatory salaries back to 2008 (if not before)?

188.    Plaintiffs Chalmers, Mendez, Nova, and Rosemond are typical of other Subclass Members in that they have been FPIs of FDNY during the liability period and have claims of lower salaries than BIs as a result of the same factors that led to discrimination against other

Subclass Members.  Their claims, like the claims of other Subclass Members, also give rise to NYCHRL liability under the continuing violations doctrine.

189.    Plaintiffs Chalmers, Mendez, Nova, and Rosemond are adequate representatives of the Subclass.  Their claims are typical of the claims of other Subclass Members; they have no conflicts with the Subclass Members; and they have retained experienced counsel capable of representing the Subclass.

190.    Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(2) because the City has acted or refused to act on grounds that apply generally to the Subclass, principally by paying FPIs substantially lower salaries than BIs although they perform similar job duties.   These actions and failures make appropriate Subclass-wide injunctive relief, including but not limited to the measures identified in the Prayer for Relief below.

191.    Class certification also is appropriate under Federal Rule of Civil Procedure 23(b)(3).  The common issues identified above will predominate over any purely individual issues.  Moreover, a class action is superior to other means for fairly and efficiently adjudicating the controversy.  Although many if not all Subclass members realize that the City pays BIs higher salaries than FPIs receive despite the similar nature of the jobs, no FPIs have filed individual disparate impact actions because the cost involved in such litigation would not justify such a lawsuit unless the FPIs combined forces in a single class action.  Moreover, after all these years, injunctive relief is needed to address the discrimination.  That type of relief would be difficult if not impossible to obtain in a non-class suit brought by one or a small number of plaintiffs.

192.    If the Court decides not to certify the Subclass under Rule 23(b)(2) or (3), class certification is appropriate with respect to each of the common issues, including those identified

above and any other common issues that may be identified during the litigation, pursuant to Federal Rule of Civil Procedure 23(c)(4).

## VII.  Counts

### A.  Count One:  Disparate Treatment Claims Under 42 U.S.C. §§ 1981 and 1983 on Behalf of the Class

193.   Plaintiffs reallege each of the paragraphs above as if they were expressly set out in this paragraph.

194.   The City has impaired under color of state and municipal law the right of Plaintiffs and members of the proposed Class to make and enforce contracts of employment, which under 42 U.S.C. § 1981 shall be the same as the right of white persons, in that the City through the FDNY has discriminatorily paid FPIs, because they are primarily racial minorities, lower salaries than BIs even though FPI job duties, and the risks associated with performing the duties, warrant FPIs being paid salaries equal to, if not larger than, BIs.

195.   In making its decisions concerning the compensation of FPIs relative to BIs, the City and its officials and managers have acted under color of the statutes, ordinances, regulations, customs, and usages, of the laws of the State of New York which, among other things, delegate authority over these decisions to the City.

196.   The City has subjected the Plaintiffs and the members of the proposed Class to the deprivation of the rights, privileges, or immunities secured by 42 U.S.C. § 1981, as set forth above.

197.   The discrimination in compensation relative to the BIs against Plaintiffs and members of the proposed Class has been performed pursuant to a policy or custom within the City entitling Plaintiffs and the proposed Class members to relief under 42 U.S.C. § 1983.  The discrimination has been so persistent or widespread to constitute a custom or usage with the

force of law.  It also has been so manifest as to imply the constructive acquiescence of senior policy-making officials within FDNY, which is the City's agent, and the City Government.  The City's failure to make non-discriminatory decisions and to train and supervise its employees to avoid discriminatory decisions display a deliberate indifference to the constitutional rights of FPIs, who are primarily racial minorities.

198.    Even though the pay discrimination would not have occurred but for the fact that few FPIs are white, the disparate treatment equally affects the white FPIs who are Plaintiffs and Class members.

199.    Plaintiffs and members of the proposed Class have been damaged by the discrimination in compensation relative to BIs since 2008 (if not before) or such later date as they first became employed as FPIs.  This damage takes the form of lost pay, lost overtime, and diminishment of those employee benefits tied to pay levels for Class members.  Class Members will be damaged in the future by the discrimination unless injunctive relief is entered.

**B.      Count Two:  Disparate Treatment Claims Under Title VII on Behalf of the Class**

200.    Plaintiffs reallege each of the paragraphs above as if they were expressly set out in this paragraph.

201.    The City has discriminated against Plaintiffs and members of the proposed Class in their compensation because of their race in violation of Title VII, in that the City through the FDNY has been motivated to pay FPIs, because they are primarily racial minorities, lower salaries than BIs even though FPI job duties, and the risks associated with performing the duties, warrant FPIs being paid salaries equal to, if not larger than, BIs.

202.    The discrimination in compensation relative to the BIs against Plaintiffs and members of the proposed Class has been so manifest as to imply the constructive acquiescence

of senior policy-making officials within FDNY, which is the City's agent, and the City

Government.  The City's failure to make non-discriminatory decisions and to train and supervise

its employees to avoid discriminatory decisions display a deliberate indifference to the rights of

FPIs, who are primarily racial minorities.

203.    Even though the fact that few FPIs are white has been a motivating factor in the

City's decision to pay FPIs less than BIs, the disparate treatment equally affects the white FPIs

who are Plaintiffs and Class members.

204.    Plaintiffs and members of the proposed Class have been damaged by the

discrimination in compensation relative to BIs throughout the liability period under Title VII.

This damage takes the form of lost pay, lost overtime, and diminishment of those employee

benefits tied to pay levels for Class members.  Class Members will be damaged in the future by

the discrimination unless injunctive relief is entered.

**C.    Count Three:  Disparate Treatment Claims Under the NYCHRL on Behalf of the Class**

205.     Plaintiffs reallege each of the paragraphs above as if they were expressly set out

in this paragraph.

206.    The City has discriminated against Plaintiffs and Class members in their

compensation because of their race in violation of N.Y.C. Admin. Code § 8-107.1(a)(3), in that

the fact that FPIs are primarily racial minorities has been a factor in the City's decision to pay

FPIs lower salaries than BIs even though FPI job duties, and the risks associated with performing

the duties, warrant FPIs being paid salaries equal to, if not larger than, BIs.

207.    The City has violated the rights of Plaintiffs and members of the proposed Class

in violation of N.Y.C. Admin. Code § 8-107.13(b)(2) in that it knew of the compensation

discrimination practiced by its employees or agents against FPIs and acquiesced in such conduct

or failed to take immediate and appropriate corrective action.  Among other indicia of the City's

knowledge, its managers or supervisors knew of the discrimination practiced by its employees or

agents.

208.    The City has violated the rights of Plaintiffs and members of the proposed Class

in violation of N.Y.C. Admin. Code § 8-107.13(b)(3) in that it should have known of the

discriminatory conduct of its employees and agents and failed to exercise reasonable diligence to

prevent such discriminatory conduct.

209.    The discrimination in compensation relative to the BIs against Plaintiffs and

members of the proposed Class has been so manifest as to imply the constructive acquiescence

of senior policy-making officials within FDNY, which is the City's agent, and the City

Government.  The City's failure to make non-discriminatory decisions and to train and supervise

its employees to avoid discriminatory decisions display a deliberate indifference to the rights of

FPIs, who are primarily racial minorities.

210.     Even though the fact that few FPIs are white has been a factor in the City's

decision to pay FPIs less than BIs, the disparate treatment equally affects the white FPIs who are

Plaintiffs and Class members.

211.    The City has discriminatorily and intentionally paid BIs more than FPIs in

violation of the NYCHRL on a continuous basis since 2008, if not before, and continuing up to

the present.

212.    Plaintiffs and members of the proposed Class have been damaged by the

discrimination in compensation relative to BIs throughout the liability period under the

NYCHRL, including the period back to FY 2008, or even earlier, under which it is liable under

the continuing violation doctrine.  This damage takes the form of lost pay, lost overtime, and

diminishment of those employee benefits tied to pay levels for Class members.  Class Members will be damaged in the future by the discrimination unless injunctive relief is entered.

**D.      Count Four:  Disparate Impact Claims on Behalf of the Subclass Under Title VII**

213.    Plaintiffs reallege each of the paragraphs above as if they were expressly set out in this paragraph.

214.    For many years, the City has engaged in the practice of paying virtually all BIs higher salaries than the minimums specified in their collective bargaining agreements but paying almost all FPIs the minimum salaries specified in their collective bargaining agreements.

215.    The practice described in the paragraph above, combined with the fact that a much higher percentage of BI employees than FPIs are white, has created a disparate impact in violation of Title VII under which racial minorities receive lower compensation than white employees.

216.    In addition, the provisions in the BI collective bargaining agreements making their standard work week 40 hours compared to the provisions in the FPI collective bargaining agreements making their standard work week 37.5 hours has exacerbated the disparate impact created by the practice described two paragraphs above.

217.    The City has had no valid business reasons for engaging in the practices that have caused BIs to be paid more than FPIs.  Indeed, the FPI job duties, and the risks associated with performing the duties, warrant FPIs being paid salaries equal to, if not larger than, BIs.

218.    Plaintiffs and the Subclass Members have been damaged by the disparate impact discrimination described above throughout the Title VII liability period or since such later date as they were first employed as FPIs.  This damage takes the form of lost salary, lost overtime, and diminishment of those employee benefits tied to pay levels for members of the Subclass.

Subclass Members will be damaged in the future by the discrimination unless injunctive relief is entered.

**E.     Count Five:  Disparate Impact Claims on Behalf of the Subclass Under the NYCHRL**

219.    The Plaintiffs reallege each of the paragraphs above as if they were expressly set out in this paragraph.

220.    Since 2008, if not before, the City has engaged in the practice of paying virtually all BIs higher salaries than the minimums specified in their collective bargaining agreements but paying almost all FPIs the minimum salaries specified in their collective bargaining agreements.

221.    The practice described in the paragraph above, combined with the fact that a much higher percentage of BI employees than FPIs are white, has created a disparate impact in violation of N.Y.C. Admin. Code § 8-107.17(a)(1) under which racial minorities receive lower compensation than white employees.

222.    In addition, the provisions in the BI collective bargaining agreements making their standard work week 40 hours compared to the provisions in the FPI collective bargaining agreements making their standard work week initially 35 hours, then 37.5 hours, has exacerbated the disparate impact created by the practice described two paragraphs above.

223.    The City's practices described above have not had a significant relationship to its significant business objectives.  Indeed, the FPI job duties, and the risks associated with performing the duties, warrant FPIs being paid salaries equal to, if not larger than, BIs.

224.    Even if the City could prove that its practices have had a significant relationship to its significant business objectives, the City violated N.Y.C. Admin. Code § 8-107.17(a)(2) by failing to engage in the alternative policy or practice of paying FPIs on the same scale and same hourly schedule as BIs, which would have had less disparate impact on protected racial groups.

225.    The City's practice of paying virtually all BIs more than the minimum required under their collective bargaining agreement while paying almost all FPIs the minimum required under their collective bargaining agreement has had a disparate impact against non-white Plaintiffs and Subclass members in violation of the NYCHRL on a continuous basis since 2008, if not before, and continuing up to the present.

226.    Plaintiffs and members of the proposed Subclass have been damaged by the discriminatory disparate impact throughout the liability period under the NYCHRL, including the period back to FY 2008, or even earlier, during which the City is liable under the continuing violation doctrine.  This damage takes the form of lost pay, lost overtime, and diminishment of those employee benefits tied to pay levels for Subclass members.  Subclass Members will be damaged in the future by the disparate impact unless injunctive relief is entered.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendant and in favor of Plaintiffs and the Class and Subclass Members and award the following relief:

A.    An order: certifying this action as a class action on behalf of the proposed Class pursuant to Federal Rule of Civil Procedure 23; declaring Plaintiffs Chalmers, Connors, Mendez, Nova, and Rosemond as representatives of the Class; and declaring Plaintiffs' counsel as counsel for the Class;

B.    An order: certifying this action as a class action on behalf of the proposed Subclass pursuant to Federal Rule of Civil Procedure 23; declaring Plaintiffs Chalmers, Mendez, Nova, and Rosemond as representatives of the Subclass; and declaring Plaintiffs' counsel as counsel for the Subclass;

C.      An order granting Plaintiffs and members of the Class and Subclass actual

damages for violations of 42 U.S.C. § 1981 and 1983 and of the NYCHRL,

including but not limited to back pay, front pay, lost overtime pay, and other

forms of lost compensation such as the value of lost employee benefits;

D.      An order granting Plaintiffs and the members of the Class and Subclass

reasonable attorneys' fees and expenses and other compensable costs and

expenses;

E.      An order granting Plaintiffs and the Class and Subclass appropriate injunctive and

declaratory relief for a period of time to be determined by the Court but not less

than five years, including but not limited to:

- Requiring the City to pay FPIs salaries that are similar to if not more than

    BI salaries, unless the City receives prior consent from an outside monitor

    to pay FPIs lower salaries than BIs;

- Appointing an outside monitor who will review BI and FPI salaries before

    they become effective to assure that FPIs are paid at least as much as BIs

    at similar levels of the organizational hierarchies; and

- Empowering the outside monitor to consider and rule on any reasons that

    the City may choose to present in writing that did not exist at the time of

    the final Order in this case for paying FPIs as a group less than BIs after

    any such written explanation also is provided to counsel for Plaintiffs who

    will have a reasonable opportunity to present any counterarguments to the

    monitor; and

F.     An order granting Plaintiffs and the Class and Subclass members such

other, further and different relief as the nature of the case may require or as may be

determined to be just, equitable and proper by this Court.

## IX.   DEMAND FOR A JURY TRIAL

Plaintiffs demand a jury trial on all issues triable as of right by a jury.

Respectfully submitted,

_____

**VALLI KANE & VAGNINI, PLLC**

Rob J. Valli, Jr.
Sara Wyn Kane
Matthew Berman
Valli Kane & Vagnini LLP
600 Old Country Road, Suite 519
Garden City, New York 11530
Telephone: (516) 203-7180
Facsimile: (516)706-0248
rvalli@vkvlawyers.com
skane@vkvlawyers.com
mberman@vkvlawyers.com

**MEHRI & SKALET PLLC**

Cyrus Mehri (*pro hac vice pending*)
Michael D. Lieder (*pro hac vice pending*)
Aisha Rich
Mehri & Skalet, PLLC
1250 Connecticut Ave., NW, Suite 300
Washington, DC 20036
Telephone: (202) 822-5100
Facsimile: (202) 822-4997
cmehri@findjustice.com
mlieder@findjustice.com
arich@findjustice.com