## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

DARRYL CHALMERS, *et al.*                    )
                                             )
                              Plaintiffs,    )
                                             )
            -against-                        )        Case No. 1:20-cv-03389-AT
                                             )
CITY OF NEW YORK,                            )
                                             )
                              Defendant.     )

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR (A) CERTIFICATION OF A CLASS AND SUBCLASS, (B) APPOINTMENT OF CLASS COUNSEL, AND (C) EXCLUSION OF THE REPORT AND TESTIMONY OF DR. CHRISTOPER ERATH

## TABLE OF CONTENTS

TABLE OF EXHIBITS………………………………………………………………………vii

I.      INTRODUCTION .................................................................................................... 1

II.     FACTS ..................................................................................................................... 3

        A.    The Proposed Class and Subclass .............................................................. 3

        B.    BIs Are a Comparator Group for FPIs. ...................................................... 4

              1.    FPI job duties are similar to those of BIs. ....................................... 4

              2.    BIs differ from FPIs in racial demographics. ................................... 8

        C.    The City Has Paid FPIs Less than BIs for Many Years. ............................ 9

        D.    The Lower Pay Rates for FPIs Are a Function of Policies Adopted at High
              Levels of FDNY and DOB. ..................................................................... 12

              1.    The City has deviated from its policy of paying employees the minimums
                    authorized under their CBAs for BIs but stuck to that policy for FPIs. .......... 12

              2.    The City's insistence on pattern bargaining with unions and its confinement
                    of FPIs to civilian pattern bargaining prevents the FPIs from increasing their
                    average pay through collective bargaining so that it approximates the average
                    pay of BIs. .................................................................................... 16

              3.    Until recently, the City has failed to monitor for occupational segregation
                    that results in adverse impact against members of a protected group. ............. 18

        E.    The Racial Composition of FPIs Is a Factor in FDNY Decision-Making. ............... 19

III.    ARGUMENT ......................................................................................................... 20

        A.    The Court Should Not Consider Dr. Erath's Report and Testimony in Deciding
              Whether to Certify the Proposed Class and Subclass. .............................. 20

              1.    Erath's discussion of the similarity of the FPI and BI jobs should be
                    excluded under Rule 702. ............................................................. 21

                    a.    The section of Erath's report dealing with the similarity of the jobs
                          will not help the Court decide any facts in issue on class certification. ... 21

                    b.    The section of Erath's report dealing with the similarity of the jobs is
                          not based on reliable facts or data. ......................................... 24

                    c.    The section of Erath's report dealing with the similarity of the jobs is
                          not the product of reliable principles and methods. ..................... 24

                    d.    Erath has not reliably applied any principles and methods to a comparison
                          of the FPI and BI jobs...…………………………………………………28

2.   Erath's discussion of the compensation paid to FPIs and BIs should be excluded under Rule 702. ............................................................................ 30

    a.   The compensation section of Erath's report will not help the Court determine any facts in issue on class certification. ................................. 30

    b.   Erath has not reliably applied his principles and methods to the facts of the case in his analysis of the timing of pay increases ......................... 33

3.   Erath's Discussion of the Racial Composition of the FPI and BI Workforces Should Be Excluded Under Rule 702 .............................................................. 34

B.   The Court Should Certify the Proposed Class and Subclass Because They Satisfy All the Requirements of Rule 23(a) and (b)(3) ........................................................ 35

    1.   The Proposed Class and Subclass Satisfy the Implied Ascertainability Requirement ............................................................................................... 36

    2.   The Proposed Class and Subclass Satisfy the Numerosity Requirement ......... 37

    3.   The Proposed Class and Subclass Satisfy the Commonality Requirement ...... 37

    4.   The Claims of the Five Plaintiffs Are Typical of the Claims of Class and Subclass Members They Seek to Represent .................................................... 44

    5.   The Five Plaintiffs Are Adequate Representatives of the Class and Subclass Members. ......................................................................................................... 45

    6.   The Proposed Class and Subclass Satisfy the Requirements of Rule 23(b)(3) .................................................................................................... 45

        a.   Questions of law common to all class and subclass members predominate over individualized questions (if any) ....................................................... 46

        b.   A class action is the best means of resolving the dispute. ......................... 48

C.   The Court Should Appoint Plaintiffs' Lawyers as Class Counsel. ........................... 49

IV.   CONCLUSION .................................................................................................................. 50

# TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*Andrews v. City of New York*,
 118 F. Supp. 3d 630 (S.D.N.Y. Aug. 3, 2015)........................................................................42

*Aziz v. City of New York*,
 No. 1:18cv2334, 2021 U.S. Dist. LEXIS 28536 (S.D.N.Y. Feb. 16, 2021) .................... *passim*

*Betances v. Fischer*,
 No. 11-CV-3200 (RWL), 2021 U.S. Dist. LEXIS 77310
 (S.D.N.Y. Feb. 23, 2021)....................................................................................................22, 23

*Boelk v. AT&T Teleholdings, Inc.*,
 No. 12-cv-40-bbc, 2013 U.S. Dist. LEXIS 178476 (W.D. Wis. Mar. 11, 2013)....................38

*Brown v. Sega Amusements, U.S.A., Inc.*,
 No. 13 Civ. 7558 (RMB)(HBP), 2015 U.S. Dist. LEXIS 171925
 (S.D.N.Y. Nov. 30, 2015)........................................................................................................36

*Chen-Oster v. Goldman, Sachs & Co.*,
 325 F.R.D. 55 (S.D.N.Y. 2018) ................................................................................... *passim*

*Chertkova v. Conn. Gen. Life Ins. Co.*,
 92 F.3d 81 (2d Cir. 1996) ........................................................................................................46

*Danley v. Bayer*,
 169 F. Supp. 3d 396 (S.D.N.Y. Mar. 8, 2016).......................................................................22

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993).................................................................................................................26

*Davis v. Dist. of Columbia*,
 246 F. Supp. 3d 367 (D.D.C. 2017) ........................................................................................39

*Dukes v. Wal-Mart Stores, Inc.*,
 964 F. Supp. 2d 1115 (N.D. Cal. 2013) ..................................................................................38

*Electra v. 59 Murray Enters.*,
 987 F.3d 233 (2d Cir. 2021)...............................................................................................30, 34

*Evans v. New York City Transit Auth.*,
 19 Civ. 1404 (AT), 2020 U.S. Dist. LEXIS 180623 (S.D.N.Y. Sep. 30, 2020)....37, 39, 44, 45

*Fonseca v. Dircksen & Talleyrand Inc.*,
No. 13 Civ. 5124 (AT), 2015 U.S. Dist. LEXIS 136427
(S.D.N.Y. Sep. 28, 2015) ........................................................................................41

*Forte v. Liquidnet Holdings, Inc.*,
No. 14 Civ. 2185 (AT), 2015 U.S. Dist. LEXIS 136474
(S.D.N.Y. Sep. 30, 2015) ....................................................................................31, 32

*In re Fosamax Prods. Liab. Litig.*,
645 F. Supp. 2d 164 (S.D.N.Y. 2009) ................................................................21, 24

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ..............................................................................................23

*Goldemberg v. Johnson & Johnson Consumer Cos.*,
317 F.R.D. 374 (S.D.N.Y. 2016) ...........................................................................36

*Hart v. Rick's Cabaret Int'l, Inc.*,
60 F. Supp. 3d 447 (S.D.N.Y. 2014) .......................................................................30

*Hill v. City of New York*,
136 F. Supp. 3d 304 (E.D.N.Y. 2015) .....................................................................42

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324 (1977) ..............................................................................................49

*Jermyn v. Best Buy Stores, L.P.*,
276 F.R.D. 167 (S.D.N.Y. 2011) ............................................................................38

*Katz v. Prof'l Billing Collections, LLC*,
No. 20 Civ. 3043 (AT), 2021 U.S. Dist. LEXIS 111188
(S.D.N.Y. June 14, 2021) .......................................................................................36

*Matter of City of Long Beach v. Civil Serv. Empls. Assn., Inc.--Long Beach Unit*,
867 N.E.2d 389 (N.Y. 2007) ..................................................................................27

*Mazzocchi v. Windsor Owners Corp.*,
204 F. Supp. 3d 583 (S.D.N.Y. 2016) .....................................................................27

*Montgomery Cty. v. Microvote Corp.*,
320 F.3d 440 (3d Cir. 2003) ...................................................................................24

*N.K. v. Abbott Labs.*,
731 Fed. App'x 24 (2d Cir. 2018) ...........................................................................21

*Pers. Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979) ..............................................................................................43

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   711 F.3d 1348 (Fed. Cir. 2013)...................................................................................24

*Ram v. N.M. Dep't of Env't*,
   No. CIV 05-1083 JB/WPL, 2006 U.S. Dist. LEXIS 95369
   (D.N.M. Dec. 15, 2006) ..............................................................................................23

*Richardson v. City of New York*,
   No. 17-CV-9447 (JPO), 2018 U.S. Dist. LEXIS 168208
   (S.D.N.Y. Sep. 28, 2018) ............................................................................................44

*Scotti v. New York*,
   Nos. 84 Civ. 3503 (DNE), 84 Civ. 4529 (DNE), 84 Civ. 5462 (DNE),
   1990 U.S. Dist. LEXIS 19417 (S.D.N.Y. Feb. 28, 1990).........................................40

*Smith v. Xerox Corp.*,
   196 F.3d 358 (2d Cir. 1999)..........................................................................................8

*Taylor v. D.C. Water & Sewer Auth.*,
   205 F.R.D. 43 (D.D.C. 2002).......................................................................................49

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016).................................................................................................41

*United States CFTC v. Wilson*,
   No. 13 Civ 7884 (AT), 2016 U.S. Dist. LEXIS 177705
   (S.D.N.Y. Sep. 30, 2016) ............................................................................................34

*United States v. Asare*,
   No. 15 Civ 3556 (AT), 2019 U.S. Dist. LEXIS 233984
   (S.D.N.Y. June 17, 2019).....................................................................................30, 34

*United States v. City of New York*,
   717 F.3d 72 (2d Cir. 2013)....................................................................................43, 47

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)..........................................................................................37, 38, 41

**Rules**

Fed. R. Civ. P. 23 ............................................................................................... *passim*

Fed. R. Evid. 702 ................................................................................................ *passim*

**Statutes**

42 U.S.C. § 2000e-2 ..................................................................................................47

N.Y.C. Admin. Code 12-307a(4)(i) ...........................................................................17

**Other Authorities**

RONALD G. EHRENBERG & ROBERT S. SMITH, MODERN LABOR ECONOMICS: THEORY & PUBLIC
POLICY (13th ed. 2017) ...................................................................................25

Derek S. Chapman, Krista L. Uggerslev, Sarah A. Carroll, Kelly A. Piasentin, & David A. Jones,
*Applicant Attraction to Organizations and Job Choice: A Meta-Analytic Review of the*
*Correlates of Recruiting Outcomes*, 90 J. APPLIED PSYCHOL. 928....................................25, 26

**TABLE OF EXHIBITS**

| Exhibit Number | Document | Bates Number(s) |
|---|---|---|
| 1 | New York City Council, "Pay Equity in NYC" (Aug. 2021) | PLFPI-GEN003064-003142 |
| 2 | Excerpt from FY 2018 Workforce Profile Report | PLFPI-GEN000349 |
| 3 | Excerpts from Deposition Transcript of Robert Rampino | none |
| 4 | Excerpts from Deposition Transcript of James Nova | none |
| 5 | Excerpts from Deposition Transcript of Fatima Rosemond | none |
| 6 | Excerpts from Deposition Transcript of Darryl Chalmers | none |
| 7 | Excerpts from Deposition Transcript of Darren Connors | none |
| 8 | Excerpts from Deposition Transcript of Glenn Mendez | none |
| 9 | Harold Goldstein and Charles Scherbaum's Expert Report | none |
| 10 | Defendant's Responses & Objections to Plaintiffs' Request for Admission No. 12 | none |
| 11 | Harold Goldstein and Charles Scherbaum's Expert Rebuttal Report | none |
| 12 | Declaration of Michael Lieder | none |
| 13 | Excerpts from Deposition Transcript of Timothy Hogan | none |
| 14 | AFPI II Tasks and Standards (2009) | CHALMERS_FPI_LIT-00037583-00037584 |
| 15 | AFPI II Tasks and Standards/Performance Evaluation (2018) | CHALMERS_FPI_LIT-00000227-00000232 |
| 16 | Excerpts from Deposition Transcript of Debra Palmieri-Russo | none |
| 17 | Declaration of Robert Kaufman | none |
| 18 | Robert Rampino Deposition Exhibit 42 | CHALMERS_FPI_LIT-00038460 |
| 19 | Robert Rampino Deposition Exhibit 48 | CHALMERS_FPI_LIT-00022952-00022954 |
| 20 | Robert Rampino Deposition Exhibit 51 | CHALMERS_FPI_LIT-00036589-00036593 |
| 21 | Robert Rampino Deposition Exhibit 46 | CHALMERS_FPI_LIT-00033406-00033409 |
| 22 | Robert Rampino Deposition Exhibit 28 | CHALMERS_FPI_LIT-00033804-00033805 |

| 23 | Christopher Erath's Expert Report | none |
|---|---|---|
| 24 | Deposition Transcript of Christopher Erath | none |
| 25 | Robert Rampino Deposition Exhibit 26 | CHALMERS_FPI_LIT-00025422 |
| 26 | Robert Rampino Deposition Exhibit 27 | CHALMERS_FPI_LIT-00025423 |
| 27 | Excerpts from Deposition Transcript of Steven Banks | none |
| 28 | Excerpts from Deposition Transcript of Stephen Rush | none |
| 29 | Robert Rampino Deposition Exhibit 12 | CHALMERS_FPI_LIT-00026838-00026841 |
| 30 | Stephen Rush Deposition Exhibit 3 | CHALMERS_FPI_LIT-00039351-00039352 |
| 31 | Stephen Rush Deposition Exhibit 5 | CHALMERS_FPI_LIT-00039463-00039466 |
| 32 | Stephen Rush Deposition Exhibit 9 | CHALMERS_FPI_LIT-00035987 |
| 33 | Stephen Rush Deposition Exhibit 4 | CHALMERS_FPI_LIT-00039457-00039458 |
| 34 | Excerpts from Deposition Transcript of Sharon Neill | none |
| 35 | Declaration of Charles Scherbaum | none |
| 36 | Sharon Neill Deposition Exhibit 2 | CHALMERS_FPI_LIT-00044948 |
| 37 | Sharon Neill Deposition Exhibit 3 | CHALMERS_FPI_LIT-00044949-00044951 |
| 38 | Sharon Neill Deposition Exhibit 4 | CHALMERS_FPI_LIT-00044952-00044953 |
| 39 | BI CBAs & MOAs | PLFPI-GEN000764-000802; CHALMERS_FPI_LIT-00001532-00001567; CHALMERS_FPI_LIT-00001463-00001470; CHALMERS_FPI_LIT-00001577-00001578 |
| 40 | FPI CBAs & MOAs | CHALMERS_FPI_LIT-00001367-00001462; CHALMERS_FPI_LIT-00001471-00001531; CHALMERS_FPI_LIT-00001568-00001576 |
| 41 | Oct. 7, 2016 Email from Robert Rampino to Thomas McKavanagh re: Discretionary Action Guidelines | CHALMERS_FPI_LIT-00037787 |
| 42 | Discretionary Action Guidelines FY 2017 | CHALMERS_FPI_LIT-00037788-00037789 |
| 43 | Robert Rampino Deposition Exhibit 22 | CHALMERS_FPI_LIT-00034096-00034098 |

| 44 | Robert Rampino Deposition Exhibit 24 | CHALMERS_FPI_LIT-00024816-00024817 |
| 45 | Steven Banks Deposition Exhibit 16 | CHALMERS_FPI_LIT-00033806-00033807 |
| 46 | Steven Banks Deposition Exhibit 11 | CHALMERS_FPI_LIT-00047004-00047005 |
| 47 | Excerpt from FY 2017 Workforce Profile Report | PLFPI-GEN-001689 |
| 48 | CV of Christopher Erath | none |
| 49 | Excerpts from Deposition Transcript of Charles Scherbaum | none |
| 50 | Declaration of Robert J. Valli, Jr. | none |

## I.    **INTRODUCTION**

The New York City Council recently issued a report on pay equity that found inequity "in the form of occupational segregation. That is, certain races, ethnicities, and genders are concentrated in certain positions within City government, and those positions and careers are compensated differently than jobs filled by a different demographic of employees." Ex. 1, New York City Council, "Pay Equity in NYC" (Aug. 2021), at PLPFI-GEN0030696. The report noted that "occupational segregation appears to be a large driver of differences in pay across protected classes and is particularly prominent in certain agencies, notably the FDNY [Fire Department of New York]." *Id.* at PLFPI-GEN003078. This case involves an egregious case of occupational segregation at FDNY.

The City employs two categories of inspectors – fire protection inspectors ("FPIs") at the FDNY and inspectors with various job titles (collectively building inspectors or "BIs") at the Department of Buildings ("DOB") – who are similar in important respects. They perform substantially similar job duties. Both are unionized and their collective bargaining agreements ("CBAs") provide for similar minimum and maximum salaries. The City has had trouble recruiting and retaining persons to fill both categories of inspectors.

FPIs and BIs differ, however, in three critical respects for this case. BIs have been paid more per hour over the past 15 years and the pay gap has been widening. DOB officials have pushed to increase BI pay while FDNY officials persist in paying FPIs only the minimums authorized under their CBAs. Finally, throughout the period from fiscal year 2005 through fiscal year 2020, the percentage of BIs who are white has been 60% or more larger than the percentage of FPIs who are white.

The five individual Plaintiffs – Darryl Chalmers, Darren Connors, Glenn Mendez, James Nova, and Fatima Rosemond – are FPIs who claim the pay disparities are a product of intentional racial discrimination. The City intentionally responded to the recruiting and retention issues by increasing the pay of BIs and not doing likewise for the heavily minority FPIs who perform similar work. Alternatively, three interrelated policies or practices have had a disparate impact on the primarily minority FPIs: (a) the City has deviated from its general policy that employees should be paid only the minimums under their CBA for BIs but sticks to its policy for FPIs; (b) the City refuses to accord FPIs the percentage pay increases paid to other uniformed employees in pattern bargaining; and (c) the City has failed, at least until recently, to monitor the pay accorded to employees at different departments who perform similar job duties to ensure that the pay practices at the two departments do not have an adverse impact against members of a protected group.

The Plaintiffs ask the Court to certify a proposed class under Rule 23(b)(3) of "all persons who have been employed by the City as fire protection inspectors or associate fire protection inspectors in the FDNY at any time between three years prior to the filing of this Complaint and the date a class is certified" to litigate the disparate treatment claims. The same Plaintiffs (except for Darren Connors, who is White) also ask the Court to certify a proposed subclass under Rule 23(b)(3) of "all persons who do not self-identify as white and who have been employed by the City as fire protection inspectors or associate fire protection inspectors in the FDNY at any time between three years prior to the filing of this Complaint and the date a subclass is certified" to litigate the disparate impact claims. The class and the subclass seek damages for past discrimination and injunctive relief to equalize their pay with BIs in the future. Plaintiffs also ask that their lawyers be appointed as counsel for the class and subclass pursuant to Rule 23(g).

Plaintiffs' experts Drs. Harold Goldstein and Charles Scherbaum provide critical evidence in support of class certification. Their detailed report analyzes the similarity of the FPI and BI jobs, the differences in the racial composition of the FPI and BI workforces, and the disparities in the amounts that the City pays to FPIs and BIs. The City's expert, Dr. Christopher Erath, prepared a cursory report that consists primarily of ill-founded criticisms of plaintiffs' report. His report does not satisfy any of the requirements of Federal Rule of Evidence 702 and therefore should not be considered by the Court in deciding Plaintiffs' class certification motion. But even if the Court considers Erath's report, the conclusion should be the same: the proposed class and the proposed subclass should be certified as satisfying all the requirements of Rules 23(a) and (b)(3) and Plaintiffs' counsel should be appointed as counsel for the class and subclass under Rule 23(g).

## II.    **FACTS**

### A.    **The Proposed Class and Subclass**

FDNY is an agency of the City of New York with over 17,000 employees. Ex. 2, FY 2018 Workforce Profile Report, at PLFPI-GEN_000349. FPIs perform much of the work of FDNY's largest bureau, the Bureau of Fire Prevention ("BFP"). Ex. 3, Rampino Tr. at 83:13-23. Two Plaintiffs have been fire protection inspectors, the entry-level position, between May 1, 2017, the start of the liability period, and the present. Ex. 4, Nova Tr. at 17:21-25; Ex. 5, Rosemond Tr. at 59:23-60:8. The other three Plaintiffs have been associate FPIs during that same period. Ex. 6, Chalmers Tr. at 22:24-23:21; Ex. 7, Connors Tr. at 20:23-22:5; Ex. 8, Mendez Tr. at 35:4-20.

As of June 30, 2020, there were 395 FPIs. Ex. 9, G&S Rep. at 10-11. Between May 1, 2017 and the end of FY 2020, 507 persons have served as FPIs. *Id.* at 11. All FPIs are members of AFSCME District Council 37 Local 2507. Ex. 10, RFA 12. Local 2507 is a plaintiff in this action but not a class representative. Cmplt. at ¶¶ 28, 182.

3

The percentage of racial minorities among FPIs has increased steadily between FY 2005 and FY 2020. Ex. 9 at 13, 16. As of June 30, 2020, 74% of FPIs of known race were racial minorities; the other 26% were white. *Id.* at 14; Ex. 11, G&S Reb. Rep. at 19.[1] The heavy predominance of racial minorities among FPIs stands out at FDNY, where in 2018 about 2/3 of employees were white. Ex. 9 at 12. All the Plaintiffs except Darren Connors are racial minorities and serve as representatives of proposed subclass. Ex. 6 at 9:5-17; Ex. 7 at 9:15-18; Ex. 8 at 10:10-14; Ex. 4 at 10:16-19; Ex. 5 at 10:5-8; Cmplt. at ¶¶ 23-27.

**B.     BIs Are a Comparator Group for FPIs.**

**1.     FPI job duties are similar to those of BIs.**

Plaintiffs engaged Drs. Harold Goldstein and Charles Scherbaum ("G&S"), award-winning professors of industrial and organizational psychology ("I/O Psychology") at Baruch College, City University of New York, Ex. 9 at 7-8, to analyze the job duties of FPIs, compare those duties to those performed by BIs, and perform statistical analyses. *Id.* at 5. The City's inability to produce most of the job analyses – the foundational analysis performed by I/O psychologists to determine the job relatedness of personnel actions – for FPIs and BIs that the City's documents indicated had been performed over the 2005-20 period complicated G&S's work. Ex. 12, Lieder Decl. at ¶ 13. Nonetheless, they used other sources to provide compelling evidence that the FPI and BI job duties and the knowledge, skills, and abilities those duties require are similar. Ex. 9 at 20-40.

G&S compared the duties of FPIs and BIs in two ways. First, they reviewed the descriptions of "fire protection inspectors and investigators" and "construction and building inspectors" in the United States Department of Labor's Occupational Information Network

---

[1]      Employees who did not indicate their race or indicated they are of two or more races are excluded from the percentages. Ex. 9 at 12.

("O*NET"). *Id.* at 21-22. O*NET is the nation's "foremost source of occupation/job information." *Id.* at 21. It "captures the two most common and critical aspects of a typical job analysis, which are the *work requirements* that are commonly referred to as the activities or tasks of the job and the *worker requirements* that are commonly referred to as the knowledge, skills, and abilities (KSAs) of the job." *Id.* (emphases in original). O*NET identifies 34 activities as "important" (a score of 50 or above on a scale of 0 to 100) to the jobs of fire protection inspectors and investigators and 27 activities as "important" to the jobs of construction and building inspectors. All 27 activities important to the jobs of construction and building inspectors also are important to the jobs of fire protection inspectors and investigators. *Id.* at 23-24. G&S calculated that the job duties have a similarity index score of .89 (on a scale of 0 to 1), far exceeding an index score of .75, which indicates similarity. *Id.* The same type of O*NET analysis yielded similarity index scores for the knowledge, skills, and abilities associated with both types of jobs above the .75 threshold. *Id.* at 27-33. As a result, G&S concluded that "analysis of the O*NET data provides convincing support that the FDNY and DOB inspector jobs are similar." *Id.* at 34.

G&S then compared the job duties reflected in the job analysis performed for the DOB's construction inspector job (the job title among the BIs with the most employees) with job duties reflected in documents produced by the City applicable to FPIs. Of the 32 job duties identified as critical for construction inspectors, at least 29 are important for FPIs, and some evidence suggests that two of the three others also are important. *Id.* at 35-36. Even using the lower overlap figure of 29, the similarity index value is about .95. *Id.* at 35. G&S concluded that O*NET and the City's documents establish the similarity of the job duties and that, pending the production of additional documents from the City, O*NET indicates that the required knowledge, skills, and abilities are

similar. Ex. 11 at 3. All their analyses of the similarity of the FPI and BI jobs were based exclusively on common, not individualized, evidence.

The City recognizes the similarity of FPI and BI duties. FPI and BI tasks and standards—the criteria upon which City employees are evaluated—reflect similar responsibilities. *Compare* Ex. 13, Hogan Tr. at 34:15-45:14, *with* Ex. 14, CHALMERS_FPI_LIT-00037583-00037584 *and* Ex. 15, CHALMERS_FPI_LIT-00000227-00000232. They receive post-hire training that is similar in structure, duration, goals, passage requirements, and topics covered. *Compare* Ex. 16, Palmieri-Russo Tr. at 30:22-34:4, 44:19-25, 45:10-15, 49:5-13, 58:10-19, 65:18-20, 91:23-93:2, 93:18-113:22, 119:12-20, *with* Ex. 17, Kaufman Decl. at ¶¶ 6-25. They frequently work together on joint task forces, where they inspect primarily for the same types of violations. Ex. 6 at  68:7-71:17, 74:22-75:19, 79:10-81:2, 98:24-102:14; Ex. 7 at 80:19-87:24; Ex. 8 at 90:22-93:19, 95:22-97:6; Ex. 5 at 78:2-83:24, 115:22-117:8, 136:3-142:7. City officials have discussed on at least two occasions the possibility of merging the BFP and the DOB. Ex. 18, CHALMERS_FPI_LIT-00038460; Ex. 19, CHALMERS_FPI_LIT-00022952-00022954; Ex. 20, CHALMERS_FPI_LIT-00036589-00036593. And even though such a merger never occurred, the City has moved the duty to inspect certain types of buildings or activities from DOB to BFP. Ex. 3 at 183:21-185:24; Ex. 21, CHALMERS_FPI_LIT-00033406-00033409. Robert Rampino, the Executive Director of Administration and Planning at the BFP, concluded in 2015 in an email to the Chief of the BFP that FPIs were paid less than BIs even though the responsibilities of FPIs are "without doubt, arguably greater" than those of BIs. Ex. 22, CHALMERS_FPI_LIT-00033804-00033805; Ex. 3 at 140:14-145:23. Rampino also testified as a 30(b)(6) witness for the City that he still believed that "the responsibility of the fire protection inspectors are arguably greater than those of the DOB inspectors." Ex. 3 at 145:25-146:5.

Notwithstanding City officials' agreement that the jobs of FPIs and BIs are similar, Erath attempted to poke holes in G&S's analysis. He acknowledged that he could not address G&S's analysis directly because he is not a "job content expert." Ex. 23, Erath Rep. at 2 n.1; *see also* Ex. 24, Erath Tr. at 28:13-33:13 (admitting that he is not an I/O psychologist and has never performed a job analysis). So instead, he made two points under the heading of "Labor Market Evidence."

First, Erath stated—without any citation to literature—that, "[i]f, as plaintiffs allege, the FPI and DOB Inspector jobs are similar and the DOB positions are paid more, we should observe those in the FPI position attempting to switch jobs and become DOB Inspectors." Ex. 23 at 2. He then calculated that 669 persons held an FPI position between 2005 and 2020, 12 of them applied to take the test to become a construction inspector, and 3 of them qualified after taking the test. In contrast, 80% of the 669 applied to take a City test for another job, and there were 250 such jobs for which these 669 persons applied. *Id.* at 2-3. Erath's report contains no reference to peer-reviewed methodology and no inferential statistics examining whether any of these numbers are different than what would be expected if the jobs were similar. Nonetheless, he concluded, "[t]hese results are inconsistent with plaintiffs' allegations. Similar jobs with different pay should lead to attempted and actual movement into the higher-paying job, yet neither occurred." *Id.* at 3.

Erath then looked at the notices of examination ("NOEs") issued by the City announcing tests for FPI and construction inspector positions, which set out the minimum requirements for each job. After listing the requirements Erath concluded, with no analysis or apparent reliance upon scientific methodology, "Knowledge, experience and education requirements clearly differ between the positions. Under such circumstances it would be surprising to see much movement between FPI and DOB Inspector, and indeed such movement does not occur. Lack of movement directly contradicts plaintiffs' maintained hypothesis that the jobs are similar." *Id.* at 5.

As shown in the Argument, Erath's analysis is deeply flawed and should be excluded from the case. But if it is considered, Erath's discussion of job similarity, like G&S's, consists completely of common evidence.

### 2. BIs differ from FPIs in racial demographics.

The two workforces differ markedly in racial demographics. G&S calculated that the percentage of white employees among BIs was at least 60% greater than the percentage of white employees among FPIs each fiscal year from 2005 through 2020, ranging up to a high of 99% greater (essentially double) in 2014. Ex. 9 at 12-13; Ex. 11 at 19. G&S then used two tests to calculate that the differences in racial composition between the two groups each year at both the entry and associate levels were statistically significantly different than would be expected if racial minorities were randomly distributed between the jobs. Ex. 9 at 14-16; Ex. 11 at 20-21. Depending on the year and the level of employee (entry or associate), the disparities ranged from a low of 2.85 standard deviations, which would occur fewer than one time in a hundred as a result of random chance,[2] to a high of 6.82 standard deviations, which would occur fewer than one time in a million as a result of random chance. All of these calculations are based exclusively on common evidence.

Erath did not systematically check the calculations in G&S's original report and did not review the corrected calculations in their rebuttal report at all. Ex. 24 at 35:4-42:9, 47:6-48:8. Instead, in addition to pointing out double-counting of construction inspectors in G&S's original

---

[2]    Generally, plaintiffs must show a disparity measured by at least two standard deviations for courts to consider the disparity statistically significant and giving rise to an "inference of discrimination." *Smith v. Xerox Corp.*, 196 F.3d 358, 365-66 (2d Cir. 1999). "A standard deviation is a measure of variance from the mean (or average) value in a given sample. … If an obtained result varies from the expected result by two standard deviations, there is only about a 5% probability that the variance is due to chance." *Id.* (citations omitted).

report,[3] he leveled three criticisms: when an employee's race was not identified in the data for some years but was identified in others, G&S did not substitute the identified race for the unidentified race. Ex. 23 at 8; G&S described the BIs as predominately white, even though in 2018-20 the percentage of minorities surpassed the percentage of whites, *id.* at 9; and "[e]very statistical test [in the] G&S report rests upon the assumption that Inspectors at FDNY and DOB should have identical racial composition" but "[t]here is no a priori reason to expect the racial composition of those possessing different qualifications and passing different tests to be identical," *id.* at 8. As explained in the Argument, these criticisms do not undermine G&S's opinions or warrant consideration of Erath's report and testimony in connection with class certification.

### C.    The City Has Paid FPIs Less than BIs for Many Years.

Nationally, fire protection inspectors are paid slightly more on average than building inspectors, both overall and as employed by state and local governments. Ex. 9 at 42-43. FDNY managers several times compared the pay of FPIs and BIs. At the request of the head of FDNY's Budget and Finance bureaus, Steven Rush, an employee compared the pay of FPIs to the pay of DOB construction, elevator, and plumbing inspectors and the pay of Housing Preservation and Development inspectors. Ex. 25, CHALMERS_FPI_LIT-00025422; Ex. 26, CHALMERS_FPI_LIT-00025423. Rampino wrote a lengthy email to then-Chief Spadafora in September 2015 comparing the new hire, incumbent and maximum rates for FPIs and BIs. Ex. 22.[4]

---

[3]    The City produced data about associate construction inspectors less than a week before G&S' report was due and in their hurry to integrate the new data G&S double-counted DOB construction inspectors in years in which they moved between the entry-level and associate level positions.  Ex. 11 at 12. Their rebuttal report contains corrected versions of the affected tables.

[4]    The CBAs for most job titles specify for each year a new hire rate, which is applicable to an employee's first two years as a City employee, an incumbent minimum, and an incumbent maximum. The new hire rate generally is 15 percent below the incumbent rate. Ex. 27, Banks Tr. at 21:7-25.

He summarized, "The pay rates provided to DOB Inspectors are much higher" than the pay rates of FPIs, even under a plan that Rampino was proposing (which was not adopted) to increase FPI pay. *Id*.

Neither of these analyses was performed scientifically. G&S found that every year from FY 2005 through FY 2020, FPIs on average were paid less per hour than BIs, at both the entry and associate levels. Ex. 9 at 41-56; Ex. 11 at 22-33. The table below compares the hourly pay of entry-level new hires (first two years), entry-level incumbent employees (employees are entitled to a pay increase, typically 15%, after two years), and two levels of associate employees. It shows the FPIs' lowest percentage shortfall in hourly pay over the 16 years and the year in which that differential occurred, the FPIs' largest percentage shortfall and year in which that differential occurred, and the mean average annual difference in pay between FPIs and BIs:[5]

| Employee Level | Lowest Difference | | Largest Difference | | Average Difference |
|---|---|---|---|---|---|
| | Percent | Year | Percent | Year | |
| Entry New Hire | 7.7% | 2011 | 38.0% | 2016 | 21.2% |
| Entry Incumbent | 5.3% | 2010 | 25.8% | 2020 | 12.1% |
| Associate Level 1 | 10.8% | 2006 | 25.4% | 2016 | 16.3% |
| Associate Level 2 | 12.6% | 2006 | 30.0% | 2016 | 18.7% |

On average, the City paid BIs between 12% and 21% more than FPIs at the same level in the civil service hierarchy over the past 16 years.

Plaintiffs' experts then analyzed whether the differences in pay between inspector level and associate level FPIs and BIs were statistically significant using two different well-established

---

[5]    The percentage differentials are calculated from tables prepared by G&S showing the average pay per hour of FPIs and DOB new hire, incumbent, level 1 associate, and level 2 associate inspectors each year and the difference between the average pay of FPIs and DOB inspectors. Ex. 11 at 22, 29. Plaintiffs have calculated the percentage differentials by dividing the average difference in pay each year by the average FPI hourly pay. The mean average is calculated by adding up the percentages each year and dividing by 16 years.

methodologies: analysis of variance and multiple regression analysis. The analysis of variance looks at average differences between the FPIs and each job title of DOB inspector in each year. Ex. 9 at 45, 52. The multiple regression analyses considered the hourly pay and circumstances of each employee. G&S performed separate regressions for each year controlling for whether the employee was at the inspector or associate level, whether they were at the new hire or incumbent rate, years of experience in FPI or DOB ranks, and DOB job title. *Id.* at 46-48, 53-55. They found that the salary differences were statistically significant in every year under both methodologies. *Id.* at 45-49, 53-56; Ex. 11 at 25-28, 31-33.

In contrast, Erath made no attempt to determine whether FPIs were paid less each year than BIs or to replicate any of G&S's analyses. Ex. 23 at 5-7; Ex. 24 at 52:2-54:10, 55:24-57:22, 64:3-65:12. Instead, he identified four types of supposed omissions from G&S's analyses but did not analyze whether they would have made any difference to G&S's conclusions. Ex. 23 at 5-7. First, Erath pointed out that G&S had not included in their analysis "differentials to recognize length of service and other lesser payments" that both FPIs and BIs receive. *Id.* at 5. Second, Erath criticized G&S for not controlling for education and pre-City experience in their multiple regression analyses and for controlling for time in current job, which he characterized as "of little relevance." *Id.* at 9. Third, Erath contended that G&S had not included non-pecuniary values, such as having additional leisure time (BIs worked 40 hours per week while FPIs were scheduled for 35 hours per week until August 2016 and 37.5 hours afterward, not including overtime) or working for an entity that didn't have a reputation for corruption, in their calculations of compensation each year. *Id.* at 5-7. Finally, Erath asserted that in addition to their year-end comparisons of salaries, G&S should have taken into account that persons could become FPIs with less training than BIs and that FPIs received promotions to the associate level more quickly than BIs. *Id.* at 6. He stated that more FPIs than

BIs who had been employed for at least three years (or one year or five years), had received a promotion and that the difference was statistically significant. *Id*.

Again, none of these criticisms are valid, as discussed in the Argument. And all of them are equally applicable to all class and subclass members.

### D.    The Lower Pay Rates for FPIs Are a Function of Policies Adopted at High Levels of FDNY and DOB.

The City has paid FPIs less than comparable BIs for at least the past 16 years as a result of three interrelated policies or practices. Under these policies or practices, the FPIs' supervisors and managers have no role in setting FPI pay; the policies are set by high level officials.

> 1.    *The City has deviated from its policy of paying employees the minimums authorized under their CBAs for BIs but stuck to that policy for FPIs.*

The CBAs between the City and each union typically provide wide ranges between minimum and maximum allowable salaries. The FDNY, for example, in 2015 reported that the maximum FPI incumbent entry-level salary was about 22% higher than the minimum while the maximum BI incumbent entry-level salary was about 27% higher than the minimum under their respective CBAs. See Ex. 26.

The City's policy throughout the period from 2005 forward, and for many years before, was that employees should be paid at the CBA-prescribed minimums although exceptions up to the maximums were allowed. Ex. 27 at 85:8-88:8. With very few exceptions,[6] the City has confined FPIs to the minimums prescribed under their CBAs although, throughout the period starting in FY 2005 (if not before), the City has found it difficult to recruit and retain sufficient FPIs to meet the duties assigned to them. Typically, the City administers tests to replenish lists of qualified

---

[6]    Most of the few FPIs paid more than the minimums were hired before FY 2005. Because discovery in this case does not predate FY 2005, Plaintiffs do not know the reason(s) that these FPIs received more than the minimums.

candidates for a job title no more than once every four years. Ex. 3 at 58:23-59:14. But for FPIs, the City administered tests almost every year because the list of candidates who passed the test and were not subsequently disqualified was so quickly exhausted. *See id.* at 26:4-29:8, 50:25-53:5, 58:23-59:19; Ex. 28, Rush Tr. at 17:20-25, 30:4-31:18; Ex. 29, CHALMERS_FPI_LIT-00026838-00026841; Ex. 23 at 3-4 (noting NOEs for FPI positions each year from 2009-15 and 2017). High turnover contributed to the need for annual recruitment. As Rampino testified, "Over the years, FDNY lost FPIs "[t]o other agencies, to private firms. They would leave for a variety of other opportunities." Ex. 3 at 93:7-17.

Two of the City's 30(b)(6) witnesses believed that low compensation levels were at least partly to blame for the recruitment and retention difficulties. As discussed above (pages 6, 9-10), the BFP's Robert Rampino believed that FPIs were underpaid, including relative to BIs, and proposed increases in salaries for the FPIs to help with recruitment and retention. *Id.* at 38:25-40:4. For many years, FDNY Assistant Commissioner of Budget and Finance Steven Rush suggested to various FDNY and other City officials that they consider raising the salaries of new hire FPIs or even all FPIs to make the job more attractive to new hires and incumbents. Ex. 28 at 20:13-23:3, 35:9-37:17, 42:19-45:17; Ex. 30, CHALMERS_FPI_LIT-00039351-00039352; Ex. 31, CHALMERS_FPI_LIT-00039463-00039466; Ex. 32, CHALMERS_FPI_LIT-00035987. In 2014, he rhetorically asked an OMB official whether the City was serious about recruiting FPIs when the salary for new hires was only about $36,000. Ex. 28 at 51:8-53:15; Ex. 33, CHALMERS_FPI_LIT-00039457-00039458. The low compensation levels persisted even though the City has two good reasons to keep all FPI positions filled: the inspections that FPIs perform protect City residents, and the charges to property owners for the inspections produce more marginal revenue to the City than the marginal the cost of employing FPIs. Ex. 3 at 32:15-34:17.

While the City enforced its general policy that employees should be paid the contractual minimums with respect to FPIs, it did not for BIs. Like FDNY, DOB faced difficulties in recruiting and retaining BIs, but unlike FDNY, DOB responded by paying new hire BIs at or even above the *incumbent* minimums under the CBAs. Ex. 34, Neill Tr. at 60:23-61:18, 93:16-94:10. But this necessitated increases for incumbent entry-level BIs so that they were not paid less than or the same as the new hire employees, and further increases for associates so that they were paid more than entry-level employees. *Id*. at 97:4-20. As a result, DOB issued discretionary increases to BIs of all levels between FY 2005 and FY 2020. Ex. 35, Scherbaum Decl. at ¶ 13.

DOB did not limit itself to discretionary increases. During the second half of 2015, DOB leadership under Sharon Neill, DOB Deputy Commissioner for Finance and Administrator, determined that BI salaries should be increased and that a career ladder should be developed to better fill new and existing positions and reduce attrition. Ex. 34 at 48:5-19, 49:14-50:22. Beginning in January 2016, DOB lobbied the Department of Citywide Administrative Services ("DCAS"), the Office of Labor Relations ("OLR"), and the Office of Management and Budget ("OMB") for a revised BI salary schedule that would raise the hiring rate, incumbent rate, and minimum-maximum range or to "exercise the range of the salary table," i.e., allow salary increases approaching the CBA maximums. Ex. 36, CHALMERS_FPI_LIT-00044948; Ex. 37, CHALMERS_FPI_LIT-00044949-00044951; Ex. 38, CHALMERS_FPI_LIT-00044952-00044953; Ex. 34 at 58:19-64:13. The citywide agencies resisted much of the proposal but DOB officials continued to press the City to raise the salaries within the range. Ex. 34 at 67:6-22. DOB prepared multiple budget analyses to advocate for raising the BI minimum hiring salary to $60,000, and as a result of its persistent efforts, DOB leadership in 2016 finally obtained approval from OMB to increase the BI hiring salary to $60,000. *Id.* at 113:10-12, 139:8-25. Through DOB's

disregard of the CBA hiring rate, its discretionary increases, and its 2016 campaign to increase pay rates for BIs, DOB succeeded in paying BIs well above the minimum rates specified in their CBAs.

Comparisons of the contractual minimums for FPIs and BIs to the average salaries of FPIs and BIs each year highlight the differences in pay practices between the FDNY and the DOB. The table below shows those values for incumbent entry-level employees:

| Year | CBA Minimums[7] | | | | | Average Salaries Per Hour[8] | | |
|---|---|---|---|---|---|---|---|---|
| | FPIs | | BIs | | Difference In Hourly Rates | FPIs | BIs | Difference |
| | *Salary* | *Hourly* | *Salary* | *Hourly* | | | | |
| 2005 | $37,913 | $20.75 | $44,691 | $21.40 | $0.65 | $21.09 | $23.25 | $2.16 |
| 2006 | $38,285 | $20.96 | $45,585 | $21.83 | $0.88 | $21.76 | $23.81 | $2.05 |
| 2007 | $38,285 | $20.96 | $47,408 | $22.70 | $1.75 | $23.09 | $24.87 | $1.78 |
| 2008 | $43,568 | $23.85 | $49,938 | $23.92 | $0.07 | $24.02 | $26.84 | $2.82 |
| 2009 | $45,311 | $24.80 | $51,936 | $24.87 | $0.07 | $25.02 | $27.69 | $2.67 |
| 2010 | $45,311 | $24.80 | $51,936 | $24.87 | $0.07 | $24.97 | $26.30 | $1.32 |
| 2011 | $45,311 | $24.80 | $52,455 | $25.12 | $0.32 | $24.90 | $26.48 | $1.57 |
| 2012 | $45,311 | $24.80 | $52,980 | $25.37 | $0.57 | $24.89 | $26.83 | $1.95 |
| 2013 | $45,311 | $24.80 | $53,510 | $25.63 | $0.83 | $24.85 | $26.81 | $1.96 |
| 2014 | $45,311 | $24.80 | $54,312 | $26.01 | $1.21 | $24.85 | $28.23 | $3.37 |
| 2015 | $45,991 | $25.17 | $55,670 | $26.66 | $1.49 | $24.87 | $28.71 | $3.84 |
| 2016 | $47,140 | $25.80 | $57,341 | $27.46 | $1.66 | $24.87 | $30.44 | $5.57 |
| 2017 | $52,177 | $26.65 | $58,488 | $28.01 | $1.36 | $26.61 | $30.43 | $3.82 |
| 2018 | $53,758 | $27.46 | $59,804 | $28.64 | $1.18 | $27.38 | $30.03 | $2.65 |
| 2019 | $53,758 | $27.46 | $61,598 | $29.50 | $2.04 | $27.45 | $31.63 | $4.19 |
| 2020 | $53,758 | $27.46 | $61,598 | $29.50 | $2.04 | $27.43 | $34.49 | $7.07 |

As reflected in the table, in eight years the difference between the minimum salaries for incumbent entry-level FPIs and BIs each year has been less than $1.00 per hour, in six years it has been between $1.00 and $2.00 per hour, and in the past two years it has crept up to $2.04 per hour.

---

[7]    The CBA salary minimums are taken from the CBAs and Memoranda of Agreement (MOAs) negotiated between the City and Locals 2507 (for the FPIs) or 211 (for the BIs). Ex. 39, BI CBAs & MOAs; Ex. 40, FPI CBAs & MOAs. The minimums for low-pressure boiler inspectors, which were slightly lower than for the other BIs, are not included. Minimum hourly rates for BIs are calculated by dividing the CBA minimum salaries by 2088. Minimum hourly rates for FPIs through FY 2016 are calculated by dividing the CBA minimum salaries by 1827, and for FYs 2017. Ex. 9 at 41.

[8]    Average salaries are transcribed from G&S's rebuttal report, Table 6, at page 22 (Ex. 11).

Except in 2006 and 2007, the calculated average salary for incumbent entry-level FPIs has been within a few pennies of the CBA minimum. But in every year the average salary of BIs has been more than a dollar per hour over the CBA minimum. In eight years, including every year but one since 2014, the average BI salary has exceeded the CBA minimum by over $2.00 per hour. As a result, in every year but 2007, less than half of the difference in salaries per hour between incumbent entry-level FPI and BI has been attributable to the CBA minimums.

> 2.   *The City's insistence on pattern bargaining with unions and its confinement of FPIs to civilian pattern bargaining prevents the FPIs from increasing their average pay through collective bargaining so that it approximates the average pay of BIs.*

As the above table indicates, FPIs have not been able to narrow the gap in average pay with BIs through collective bargaining. Indeed, if anything, the difference in CBA minimums has grown over the years.

The City tends to negotiate CBAs with the unions representing its employees in rounds of bargaining covering several years. Ex. 27 at 16:21-17:7, 28:19-29:4, 34:17-35:19. In the negotiations, the City engages in pattern bargaining, with one pattern for civilian unions and another for uniformed unions, including, for example, the unions representing the firefighters or police. *Id.* at 28:14-29:4. Under pattern bargaining, each civilian union receives the same percentage increase in economic value over the term of the contract. Likewise, each uniformed union receives the same percentage increase in economic value over the term of the contract. *Id.* at 23:15-28:3. In some rounds, the percentage increases for uniform and civilian unions have been identical. But when they have differed, the uniformed unions have received larger percentage increases. *Id.* at 28:19-29:4.

About 20 years ago, the City Council amended the collective bargaining laws to provide that, for purposes of collective bargaining, "employees of the uniformed fire service shall also

include persons employed at any level of position or service by the fire department of the city of New York as … fire protection inspectors and supervisors of fire protection inspectors." N.Y.C. Admin. Code 12-307a(4)(i). Notwithstanding that provision, the City will not agree to FPIs receiving uniformed pattern increases; they are limited to the civilian pattern increases. Ex. 27 at 28:4-30:4. The City thus put FPIs in the worst of both worlds: it has treated them as civilians for purposes of pattern bargaining but as uniformed in terms of not being eligible for discretionary increases. Ex. 41, CHALMERS_FPI_LIT-00037787; Ex. 42, CHALMERS_FPI_LIT-00037788-00037789.

Because the City treats both FPIs and BIs as civilian for purposes of pattern increases, FPIs and BIs receive the same percentage increases, and FPIs cannot catch, let alone pass, BIs in wages per hour. It follows that they cannot make up through collective bargaining for the City's willingness to pay BIs but not FPIs more than the contractual minimums.

The constrictive effect of pattern bargaining can be seen in events that occurred in 2015 after Ronald Spadafora was appointed as the new chief of the Bureau of Fire Prevention. He quickly endorsed a proposal to create a step pay plan for FPIs under which salaries would increase, or "step up," at regular intervals, thereby increasing FPI pay and hopefully facilitating recruitment and retention. Spadafora proposed the step pay plan to the head of FDNY's OLR, who discussed it with the City's OLR, which was in the process of negotiating new CBA terms with the FPIs' union, Local 2507. Ex. 3 at 116:24-120:17; Ex. 27 at 91:22-102:8; Ex. 43, CHALMERS_FPI_LIT-00034096-00034098; Ex. 44, CHALMERS_FPI_LIT-00024816-00024817. During the negotiations, the union also made a proposal akin to a step pay plan to increase pay. Ex. 27 at 99:21-101:6; Ex. 45, CHALMERS_FPI_LIT-00033806-00033807. But no step pay increase, or any other increase that closed the gap between FPI and BI compensation, was negotiated because,

during the negotiations, the City insisted that FPIs not receive an increase greater than that established through civilian pattern bargaining. Ex. 28 at 49:10-51:7; Ex. 27 at 101:7-18. And unlike the DOB, the FDNY has never attempted to convince the OMB, OLR, and/or DCAS to increase the wages of FPIs outside the CBA negotiation process. Ex. 28 at 56:4-13.

> 3.  *Until recently, the City has failed to monitor for occupational segregation that results in adverse impact against members of a protected group.*

Until March 2019 no agency was charged with reviewing each exception to pay more than the CBA minimums, giving each agency "latitude to determine [its] own exceptions." Ex. 27 at 84:19-88:8. OMB reviewed requests for changes in salary but its focus was only on whether "the agency budget [can] afford to pay the person this salary." *Id.* at 88:9-17.

The City has several agencies that could have been monitoring pay in occupationally segregated jobs. The OMB reviews and approves each agency's staffing budgets before the start of each fiscal year and any changes during the year, which necessarily includes review of salaries. *Id.* at 60:5-61:11; Ex. 28 at 11:6-12:22. The great majority of New York City's municipal employees are represented by unions, https://www1.nyc.gov/site/olr/labor/labor-updates.page, and the OLR negotiates CBAs with each union, requiring knowledge of the approved salary ranges for each unionized job title. Ex. 27 at 15:12-16:12, 21:7-18, 60:23-61:11; Ex. 28 at 20:13-25. One potential factor for OLR in CBA negotiations is the salary levels in another job title "if the job duties and qualifications are the same or very similar." Ex. 27 at 102:9-16. DCAS provides shared services to support the operations of New York City government, including working with other City agencies to promote equity and effectiveness in recruiting, hiring, and training employees. NYC DCAS, *at* https://www1.nyc.gov/site/dcas/about/our-mission.page. But with no agency charged with reviewing salaries of persons in different job titles for consistency, the salaries of FPIs and BIs diverged.

In March 2019, the City announced that OMB would review requests for exceptions from minimum pay to analyze "whether, even [i]f [an agency] can afford to pay a certain salary based on [its] budget, is it appropriate, and is it consistent with what we should be doing as a city." Ex. 27 at 88:18-89:2; *see also* Ex. 46, CHALMERS_FPI_LIT-00047004-00047005 (email describing March 2019 change in policy). It remains to be seen the extent, if any, that OMB will use its oversight powers to address disparities in pay between employees in job titles with racial or gender segregation. But even if it does, the effect of past pay decisions will not suddenly disappear. Existing compensation rates are "grandfathered in.… We never had any intention of reducing any existing employees' salaries, but the idea would be to right the ship through attrition. If the rule remains in place for a long time, it will be universal." Ex. 27 at 89:3-14.

Rush, the long-time head of FDNY's finance and budget operations, believes that salaries should be increased across the board for two jobs within FDNY; one of them is FPIs. Ex. 28 at 72:14-73:13. The low pay for FPIs is a product of all three of these policies.

### E.     The Racial Composition of FPIs Is a Factor in FDNY Decision-Making.

After the FDNY refused to support the step pay plan that he had proposed, Chief Spadafora angrily told Plaintiff Darryl Chalmers in Spadafora's office that "the reason why fire prevention is treated like that is because … the fire department is racist and because [the FPIs are] mostly minority." Ex. 6 at 81:19-83:20. Spadafora did not specifically say that FDNY officials shot down the step pay plan out of racist motives, but in the context of a conversation about the rejection of the step pay plan, the clear implication was that racism caused FDNY not to support it. *Id.* at 93:5-97:6.

It is reasonable to infer that the racial composition of the FPI workforce also has influenced high-level FDNY decisions in other ways. The FDNY has two other groups of uniformed

employees – firefighters and EMS employees – who like FPIs regularly interact with the public in person. As of 2017, about 74% of firefighters and 43% of EMS employees were white, compared to the 30% of FPIs who were white. Ex. 47, FY 2017 Workforce Profile Report, at PLFPI-GEN001689; Ex. 11 at 19. FPIs are treated worse than the other two groups in multiple ways. For many years the FDNY resisted giving FPIs uniforms, even though they provided uniforms to firefighters and EMS employees. When FPIs were finally allowed to wear uniforms, FDNY first wanted to distinguish FPIs from other FDNY uniformed services by issuing them a yellow shirt and then insisted that they wear a patch designating them as fire protection inspectors, which firefighters and EMS employees do not have to do. Ex. 6 at 39:2-42:21. The affinity group for black firefighters, the Vulcan Society, had to intercede before FDNY allowed FPIs to wear "Class A uniforms" like firefighters and EMS employees. *Id.* at 39:15-40:14. The FDNY still doesn't allow FPIs to wear pins on their collars designating their ranks as can other uniformed employees. *Id.* FDNY officials also exclude FPIs and their supervisors in BFP from medal day and other ceremonies at which only firefighters and EMS employees are honored. *Id.* at 55:16-56:24, 62:22-63:15. These types of slights, and others, collectively suggest that top officials at FDNY see FPIs as less worthy than the other, less racially diverse, uniformed employees.

## III.    ARGUMENT

### A.    The Court Should Not Consider Dr. Erath's Report and Testimony in Deciding Whether to Certify the Proposed Class and Subclass.

Erath has the credentials to testify as an expert witness and frequently has done so, especially for the City. Nine of the ten cases in which he has most recently testified, and by his own estimate about 50% of his expert witness work over the past four years, has been for the City. Ex. 24 at 21:12-24:11, 26:2-28:7; Ex. 48, Erath CV, at 3. In this case, however, he should not be

allowed to testify for the City because his product does not satisfy the requirements of Federal Rule of Evidence 702.

Rule 702 allows expert opinion testimony only if:

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. These standards apply at the class certification stage. *See Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 67-72 (S.D.N.Y. 2018) (Torres, J.) (applying Rule 702 standards in evaluating admissibility of expert testimony in connection with class certification).

"As gatekeeper, the district court has significant discretion to consider numerous factors" in applying the rule. *N.K. v. Abbott Labs.*, 731 Fed. App'x 24, 26 (2d Cir. 2018). As explained below, the Court should exercise that discretion to exclude all three sections of Erath's report.

    1. *Erath's discussion of the similarity of the FPI and BI jobs should be excluded under Rule 702.*

      a. *The section of Erath's report dealing with the similarity of the jobs will not help the Court decide any facts in issue on class certification.*

The testimony of an expert may not help a factfinder for several reasons, including "if it simply addresses 'lay matters which the jury is capable of understanding and deciding without the expert's help.'" *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (quoting *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999)). Erath's unscientific assertions about the two jobs will not help the court decide issues related to class certification.

Erath's assertion that "[i]f, as plaintiffs allege, the FPI and DOB Inspector jobs are similar and the DOB positions are paid more, we should observe those in the FPI position attempting to switch jobs and become DOB Inspectors" is not based on scientific knowledge beyond the ken of the Court. Erath fails to support the assertion with any citations to literature from the field of labor economics (*or any other field*). When he was asked at his deposition for a supporting authority, he described the idea as "such a basic concept … [y]ou would just assume it," and made a generalized reference to a textbook that he cited in his discussion of compensation. Ex. 24 at 116:25-118:9. The appeal to a "basic concept" is an appeal to "common sense." Courts and juries do not require expert testimony simply based on common sense. *See, e.g., Betances v. Fischer*, No. 11-CV-3200 (RWL), 2021 U.S. Dist. LEXIS 77310, at *10 (S.D.N.Y. Feb. 23, 2021) ("Courts 'have therefore excluded proposed expert testimony under Rule 702 where the resolution of the factual question involved in the case turned on an application of 'common sense,' the antithesis of expert knowledge.'") (citing *Dreyer v. Ryder Auto. Carrier Grp., Inc*., 367 F. Supp. 2d 413, 439-40 (W.D.N.Y. 2005)); *Danley v. Bayer*, 169 F. Supp. 3d 396, 484 (S.D.N.Y. Mar. 8, 2016) ("If her opinion is based on simple common sense, it is not helpful; the jury does not need expert opinion because its common sense will suffice. And if the jury needs expert opinion because common sense will not suffice, it must come from an expert who is applying her expertise.").

The job mobility numbers and percentages that Erath includes in his discussion, such as that 669 persons held an FPI position between 2005 and 2020, 12 applied to take the test to become a construction inspector, and 80% applied to take tests administered by the City, also do not elevate his discussion beyond the Court's knowledge. They are simple descriptive numbers, not even averages. They are not inferential statistics such as those appearing throughout the G&S report that identify the significance of descriptive statistics. Counsel for the City inadvertently

highlighted the difference between the statistics used by Erath and plaintiffs' experts by asking Scherbaum to explain a formula "in plain English for me" during his deposition. Ex. 49, Scherbaum Tr. at 40:15-25. The Court does not need an expert to explain counts and percentages. *See Ram v. N.M. Dep't of Env't,* No. CIV 05-1083 JB/WPL, 2006 U.S. Dist. LEXIS 95369, at *37, 53-54 (D.N.M. Dec. 15, 2006) (explaining that "[t]he parties have not cited … and the Court has not found in its independent research, any federal cases in which a statistician presented expert testimony solely on the basis of descriptive analysis" and excluding proposed expert testimony because "the magnitude of the relevant data in this case was [not] so large that a jury could not fairly analyze it without expert assistance"). In *Chen-Oster*, the Court upheld Magistrate Judge Francis' exclusion of part of an expert report for several reasons, including that the expert "made no findings on the statistical significance of the studies." 325 F.R.D. at 69. The Court should reach the same conclusion here.

The second half of Erath's discussion of job similarity, based on the minimum job requirements set out in the City's NOEs, is equally non-expert opinion. He quotes or summarizes the requirements set out in several NOEs and then asserts: "Knowledge, experience and education requirements clearly differ between the positions"; because the requirements differ, the lack of movement between FPI and DOB inspector jobs is unsurprising; and "[l]ack of movement directly contradicts … that the jobs are similar." Ex. 23 at 5. This type of *ipse dixit*, especially about an area (job similarity) over which Erath admittedly has no expertise, should be excluded as unhelpful to the factfinder. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"); *Betances*, 2021 U.S. Dist. LEXIS 77310, at *9-10 (holding that neither expert's opinion "passes muster under Rule 702 or will be

helpful to the jury" because "experts may not simply offer conclusory opinions"); *Fosamax*, 645 F. Supp. 2d at 197-98 (excluding as unhelpful proffered expert testimony that "is mere personal opinion going beyond his expertise").

> b.    *The section of Erath's report dealing with the similarity of the jobs is not based on reliable facts or data.*

Erath derived his counts of the number of people who were FPIs and applied to take the City exams from a spreadsheet sent to him by the City's counsel. Ex. 24 at 9:17-10:8. During his deposition, he testified that he could not identify from which database(s) the spreadsheet was extracted, who prepared the spreadsheet, or how they prepared it. *Id.* at 10:9-11:3, 112:9-114:16. His report does not fill in any gaps about the source, simply stating, "I obtained data showing exams applied for by those who held an FPI position during the 2005-2020 period." Ex. 23 at 2.

An opinion is not based on sufficient facts or data when an expert is unaware of their provenance. *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,* 711 F.3d 1348, 1373 (Fed. Cir. 2013) (affirming exclusion of expert testimony partly because "the source of the documents on which Dr. Troxel relied for his estimate of Samsung's worldwide sales is unclear. When asked whether the provider of the documents 'found [them] off the internet,' Dr. Troxel responded, 'I can only assume so.'"); *Montgomery Cty. v. Microvote Corp.*, 320 F.3d 440, 448 (3d Cir. 2003) (affirming exclusion of expert deposition testimony when the witness "didn't seem to know where [the documents] were from or what the source of them were"). Erath knows no more about the source of the spreadsheet on which he relies than did the experts in those cases and the result should be the same as in *Power Integrations* and *Montgomery County*.

> c.    *The section of Erath's report dealing with the similarity of the jobs is not the product of reliable principles and methods.*

Erath cites no scientific authority in support of his hypothesis that job A must not be similar to or higher compensated than job B if employees do not attempt to move from job A to job B.

24

During his deposition he mentioned a labor economics textbook as supporting the idea. Ex. 24 at 116:25-118:9 (mentioning RONALD G. EHRENBERG & ROBERT S. SMITH, MODERN LABOR ECONOMICS: THEORY & PUBLIC POLICY (13th ed. 2017). But the textbook does not support Erath:

> If all jobs in a labor market were exactly alike and located in the same place, an individual's decision about where to seek work would be a simple matter of choosing the job with the highest compensation.… All jobs are not the same, however. Some jobs are in clean, modern spaces, and others are in noisy, dusty, or dangerous environments. Some permit employee discretion in regard to the hours or the pace of work, while others allow less flexibility. Some employers offer more generous employee-benefit packages than others, and different places of employment involve different commuting distances and neighborhood characteristics.

*Id.* at 270.

Other scientists agree that many factors – even more than Ehrenberg and Smith identify – influence job choice. *E.g.,* Derek S. Chapman, Krista L. Uggerslev, Sarah A. Carroll, Kelly A. Piasentin, & David A. Jones, *Applicant Attraction to Organizations and Job Choice: A Meta-Analytic Review of the Correlates of Recruiting Outcomes*, 90 J. APPLIED PSYCHOL. 928, *cited in* Ex. 11 at 5 n.1. These factors include pay, benefits, type of work, employer image, size, work environment, location, familiarity, perceived fit with organization and job, alternative employment opportunities, and likelihood of receiving a job offer. *Id.* at 929-30. A multiple regression analysis revealed that "pay and compensation and advancement predicted job pursuit intentions to a much lesser extent than most other job and organization characteristics." *Id.* at 935. G&S summarize, "From our field of human resources and Industrial-Organizational psychology, research shows there are many reasons in addition to compensation as to why people choose to apply for jobs or choose not to apply for jobs (e.g., organizational culture, development opportunities, relationships with coworkers, work hours, relationship with supervisor) so we do not view [Erath's] approach as substantive evidence of job similarity." Ex. 11 at 5. Perhaps recognizing that multiple factors may affect job choices, Erath acknowledged in his deposition that the FPI and BI jobs could be

similar and there might be "other possible reasons" for the lack of applications by FPIs to take the BI exam. Ex. 24 at 129:7-19.

The reliability of Erath's approach of ignoring all other factors that might influence the frequency with which FPIs apply for BI jobs and instead focusing only on the similarity of the two jobs and their relative compensation must be measured against the Supreme Court's analysis in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993). *Daubert* identifies five factors to consider in assessing the reliability of proffered scientific expert testimony:

> (1) whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

Fed. R. Civ. P. 702 (committee notes to 2000 amendment).

Erath's hypothesis that any failure by FPIs to apply for BI jobs must mean that either the jobs are not similar or that the BI job does not afford greater compensation cannot meet any of the factors for reliability identified by the Supreme Court. Erath has not identified any study that has tested his hypothesis; instead, he offers only a subjective, conclusory approach. He has not pointed to any peer reviewed article or any publication that endorses his hypothesis. His hypothesis has no "known or potential rate of error" or associated "standards and controls." Finally, his hypothesis has not "been generally accepted in the scientific community."

Indeed, Erath's hypothesis faces a complication that did not exist in the studies that were reviewed in the meta-analysis conducted by the Chapman team, which deal with situations in which an employer is actively recruiting to fill positions. *See* Chapman, 90 J. APPLIED PSYCHOLOGY at 928-29. In this case, DCAS offered the construction inspector test only five times

over the 16-year period from FY 2005 through present and each time there was only a 3-week application period. Ex. 24 at 144:8-146:24. In aggregate, tests for the other 249 titles undoubtedly were available for many more weeks than the construction inspector test. *Id.* at 146:25-147:14. Any reliable attempt to compare the number of FPIs signing up for the construction inspector test with the number of FPIs applying for other tests should control for the tests' relative availabilities. Moreover, the DOB seldom filled inspector vacancies through the testing process, opting instead to fill them provisionally[9] or by other non-competitive means. *Id.* at 150:24-152:17; Ex. 35 at ¶¶ 4-6. The impact of this strategy for filling construction inspector positions on potential FPI applicants is unknown. Ex. 24 at 154:16-155:21.

The scientific theory, if any, underlying Erath's conclusions drawn from the minimum requirements set out in the NOEs is unknown. If there is an underlying theory, Erath has provided no hint that it is reliable. He has provided no indication of a means to test the accuracy of his conclusions that the FI and BI job requirements "clearly differ," that the differences contribute to the lack of movement from FPI to BI positions, and that the lack of movement contradicts G&S's conclusions concerning the similarity of the positions. He has not cited to any peer reviewed or other literature in support of the theory, if one exists, or any reason to think it has been generally accepted in the scientific community. Because the identity of any scientific theory on which Erath relied is unknown, the potential rate of error and any standards and controls associated with it also are unknown. *See Mazzocchi v. Windsor Owners Corp.*, 204 F. Supp. 3d 583, 603 (S.D.N.Y. 2016)

---

[9]     The Civil Service Law authorizes provisional appointments, which are not made from lists of eligible candidates who pass a test, "only when there is no eligible list available for filling a vacancy" in competitive positions such as BIs and mandates that they end "within two months of the establishment of an appropriate eligible list," except when "termination would 'disrupt or impair essential public services.'" *Matter of City of Long Beach v. Civil Serv. Empls. Assn., Inc.-- Long Beach Unit*, 867 N.E.2d 389, 391-392 (N.Y. 2007) (quoting N.Y. Civ. Serv. Law § 65(3)).

(Torres, J.) (excluding testimony because plaintiff has not provided "evidence bearing on the reliability of [the expert's] data and methodology").

For these reasons, Erath's hypothesis that any failure by FPIs to apply for BI jobs must mean that either the jobs are not similar or the BI job does not afford greater compensation is not the product of reliable principles and methods.

> d.   *Erath has not reliably applied any principles and methods to a comparison of the FPI and BI jobs.*

Finally, Erath did not reliably apply his methods to the facts of this case. Erath stated repeatedly that he was counting the frequency with which FPIs apply to become BIs. However, he did not do that. Instead, he tallied the number of times people who were FPIs at some time between FY 2005 and the present applied to take the construction inspector tests at any time in their lives compared to the number of times they applied to take other tests administered by DCAS.

Erath has included four types of irrelevant applications in his counts, making up over 90% of his spreadsheet. First, Erath includes applications made before FY 2005. Ex. 24 at 132:16-135:15. But the record contains no evidence about the relative compensation of FPIs and BIs before FY 2005, making pre-2005 applications completely irrelevant to his hypothesis that if the jobs were similar and BI jobs paid more, FPIs would have applied to take the tests for the BI jobs. 1,709 applications included in his spreadsheet were made before July 1, 2004, and 11 applications were made by individuals who were not employed as an FPI between FY 2005 and the present. Ex. 35 at ¶ 9. In total, he should have excluded 1,720 of the 4,761 applications, about 36%, on this basis. *Id*.

Second, Erath includes applications made before persons became FPIs. Ex. 24 at 135:16-136:19, 141:7-142:17. Those applications are irrelevant to his thesis that *FPIs* would have applied to take the construction inspector tests if the jobs were similar and the BIs were better paid. Erath

does not know whether those applicants possessed the qualifications to be either FPIs or BIs when the applications were made. *Id.* at 136:20-138:10. 1,872 applications submitted between FY 2005 and the present were made before the applicant was employed as an FPI. Ex. 35 at ¶ 9.

Third, Erath includes applications made after applicants were no longer entry-level FPIs. An associate FPI almost certainly would not apply to become an entry-level BI. Someone who had left the FPI job category entirely might have incurred an injury or otherwise might not have been able to perform either job. Forty-one of the 4,761 applications were submitted by applicants who no longer were entry-level FPIs. *Id.*

Finally, as Erath himself recognizes, the 706 applications to take the promotion to associate FPI exam should be excluded. Ex. 23 at 3 ("Nearly 80 percent of FPls applied for an exam other than FPI or Associate FPI.").

If Erath's methodology of looking at the extent to which FPIs applied to take the construction inspector test as an indicator of job similarity were valid, he should have included only 422 of the 4,761 applications (about 9%) in his analysis. Ex. 35 at ¶¶ 9-10. Put differently, a staggering 4,339 of the 4,761 applications (91%) should not have been included in his analysis because they do not show what he claims to be measuring.

Similarly, after limiting the data to applications made by entry-level FPIs in FY 2005 or later and excluding applications to take an FPI test, only 152 of the 669 FPIs in Dr. Erath's data (23%) – not the nearly 80% that Erath claims – applied to take a test for another City position. Ex. 35 at ¶ 10. 61 of these 152 FPIs (40%) applied to take a test for another City position only once. *Id.* In sum, entry-level FPIs did not repeatedly apply for City jobs other than BI jobs.

For all these reasons, the section of Erath's report challenging whether the FPI and BI jobs were similar does not meet the requirements of Rule 702 and should not be considered in connection with Plaintiffs' class certification motion.

2.    *Erath's discussion of the compensation paid to FPIs and BIs should be excluded under Rule 702.*

a.    *The compensation section of Erath's report will not help the Court determine any facts in issue on class certification.*

Erath's efforts to poke holes in G&S's compensation analysis similarly are not helpful to the Court in deciding class certification, especially because he fails to provide any alternative compensation analysis. As Judge Engelmayer stated in denying a Rule 702 motion filed against plaintiffs' expert's estimate of damages in a wage and hour case:

> [S]trikingly, defendants, for their part, have not come forward with any alternative method for calculating damages. Defendants' expert … instead devotes his expert report to criticizing Dr. Crawford's methodology and his client's own Clubtrax data.… [T]he absence of any alternative methodology is a telling indication that defendants, in attacking Dr. Crawford's report, can do no more than spot imperfections that would exist in any damages methodology given the imperfect Clubtrax data.

*Hart v. Rick's Cabaret Int'l, Inc.,* 60 F. Supp. 3d 447, 467 (S.D.N.Y. 2014).

Each of Erath's four criticisms identifies an additional analysis that G&S supposedly should have performed and implies that the additional analysis might have changed their conclusions that FPIs were paid less than BIs. The implication is utterly speculative because Erath did not try to determine if the additional analysis would have made a difference. Ex. 11 at 11. Speculative testimony is not helpful to the Court and should be excluded. *See Electra v. 59 Murray Enters.,* 987 F.3d 233, 254 (2d Cir. 2021) (explaining that "expert testimony should be excluded if it is speculative or conjectural" and affirming exclusion of expert report "as speculative and methodologically unreliable"); *United States v. Asare,* No. 15 Civ. 3556 (AT), 2019 U.S. Dist.

LEXIS 233984, at *19-20 (S.D.N.Y. June 17, 2019) (Torres, J.) (excluding "speculative" testimony about the probable standard of medical care in New York).

In addition to these bases for excluding the entirety of Erath's compensation discussion, none of his criticisms of G&S's report is helpful to the Court for reasons specific to each criticism.

Erath first criticizes G&S for not factoring into their compensation analysis additional payments that FPIs and BIs received for reaching specified levels of longevity in those titles. But including those payments would not have altered G&S's conclusion that FPIs were paid less than BIs each year and that the disparities were statistically significant. These longevity payments averaged about $25 per paycheck while the average regular gross pay per paycheck was roughly $1,500. Ex. 49 at 100:9-102:3. The longevity increases were less than 2% of the average paycheck. Including such a small component of pay would not have affected G&S's conclusions. Ex. 24 at 57:23-64:2; Ex. 49 at 102:7-20. While the small longevity payments may need to be included in a merits or damages analysis, they are extraneous for purposes of class certification where Plaintiffs need to show only that common evidence can prove the existence of the alleged pay disparities.

Erath's second criticism, that G&S did not use appropriate independent variables in their multiple regression analyses, took considerable chutzpah. Erath was the plaintiff's expert in *Forte v. Liquidnet Holdings, Inc.,* No. 14 Civ. 2185 (AT), 2015 U.S. Dist. LEXIS 136474 (S.D.N.Y. Sep. 30, 2015) before this Court. Your Honor excluded his testimony because he "fail[ed] to control for any possible confounding variables that could potentially provide a nondiscriminatory explanation for the observed compensation discrepancies, including tenure, position, or organizational level." *Id.* at *21-22. By contrast, G&S controlled for organizational level by performing separate regressions for entry-level inspectors and associates; they controlled for tenure (both by distinguishing between new hires and incumbents and by controlling for years in

31

the job); and they controlled for position among BIs (the FPIs do not have separate job titles) by making them independent variables. They controlled for exactly the variables the Court identified as important, which Erath totally failed to do several years ago in *Forte.*

As for education and experience, which Erath states that G&S failed to take into account, he did not account for them either. The City does not maintain adequate electronic records of either factor. Ex. 9 at 46-47; Ex. 11 at 13. Erath suggested during his deposition that G&S could have drawn the necessary information from applicants' paper records yet he does not know the extent to which the records exist or how, if at all, they would have altered any of G&S's conclusions. Ex. 24 at 65:13-69:20, 71:6-72:7.

Erath's third criticism – that G&S should have valued FPIs' additional leisure time because they were scheduled for fewer hours per week than BIs and otherwise valued intangible, non-pecuniary attributes of the FPI job – is also speculative. Erath did not attempt to value them in this case, *id.* at 95:20-96:7, 102:10-104:19, and has not attempted to place a specific value on them in any other case. *Id.* at 96:8-99:14. He never looked at overtime records in this case to determine whether FPIs actually worked less than BIs. *Id.* at 106:2-107:19. Even if FPIs did work less, by calculating the pay of FPIs and BIs on an hourly basis, G&S have negated the effect of differences in hours scheduled; attributing value to the hypothetical extra leisure time of FPIs would be double-counting. Erath has proposed no means to value the other non-pecuniary aspects of work that he mentions, such as working conditions and reputation. *Id.* at 100:19-102:9. Plaintiffs are unaware of any decision recognizing differences in pay between two groups of employees but discounting them because of differences in non-pecuniary attributes of the jobs. But again, critically, Erath doesn't suggest that the value is individualized. If the City persuades the Court that value must be

attributed to some or all of these non-pecuniary aspects of the FPI and BI jobs, that speculative valuation apparently would be done on a common basis.

Finally, Erath contends that G&S should have analyzed whether FPIs received promotions earlier in their careers than BIs. In the only inferential analysis in his report, Erath concluded that FPIs receive more promotions than BIs. But this criticism is just as speculative as his others for two reasons: Erath hasn't attempted to quantify the value of the promotions, and more important, as discussed in the section below, he fails to consider other types of personnel actions that provide a compensation boost exclusively to BIs. And again, Erath's analysis of whether inspectors had received a promotion was performed on a common basis and does not suggest the presence of an individualized issue. *Id.* at 87:25-90:11.

> b.   *Erath has not reliably applied his principles and methods to the facts of the case in his analysis of the timing of pay increases.*

Erath performed three statistical tests showing that a higher percentage of FPIs than BIs received at least one promotion.  He postulated that if one job permitted applicants to be promoted sooner than did its comparator job its compensation would be superior, all other things being equal. But he has not reliably applied economic principles to his analysis. First, he ignored discretionary increases, which also increase employees' pay. As Erath admitted, the DOB accorded discretionary increases to inspectors but FDNY did not.  Ex. 24 at 90:12-93:6. Thirty-three percent of BIs, but no FPIs, with at least three years of tenure including at least some time in the entry level position (the same parameters used by Erath) received such a raise.  Ex. 35 at ¶ 13. Second, he did not measure how quickly individuals receive promotions but instead measured whether they received promotions at any time while working as FPIs or BIs. FPIs have longer tenure than BIs on average. Ex. 9 at 42, 118-24. As a result, they have more years in which to receive a promotion or, in the case of BIs, a discretionary pay increase. Revising his analysis to focus on time until first

promotion or discretionary pay increase yields statistically significantly disparities, *adverse to FPIs*, measured by more than four standard deviations. Ex. 35 at ¶ 14.

This Court has excluded expert testimony that similarly focused on one piece of ambiguous data and did not examine other relevant data. *See United States CFTC v. Wilson*, No. 13 Civ. 7884 (AT), 2016 U.S. Dist. LEXIS 177705, at *21-22 (S.D.N.Y. Sep. 30, 2016) (Torres, J.) (excluding testimony when data on which damages expert relied was ambiguous and "he had not examined any other profit and loss data"). The same should be true here.

Erath's pay discussion is neither helpful to the Court as factfinder on class certification nor reliable in its application of the one bit of inferential statistical analysis that he attempted. Accordingly, this discussion should be excluded as well.

### 3. Erath's Discussion of the Racial Composition of the FPI and BI Workforces Should Be Excluded Under Rule 702.

Erath's brief criticisms of G&S's analyses of the racial composition of the FPI and BI workforces are no more helpful to the Court in addressing class certification than were his discussions of job similarity and compensation and should be excluded for that reason.

His criticism that G&S should have changed the race field for people with an unidentified race in certain years to the race shown in that field for other years is not helpful because it also is speculative. *See Electra,* 987 F.3d at 254 (2d Cir. 2021); *Asare,* 2019 U.S. Dist. LEXIS 233984, at *19-20. Neither expert knows whether the designated race was correct, especially for people whose records showed a race that was later changed to unidentified. Ex. 24 at 42:10-47:5. But even if Erath is correct that all records should be changed to the employee's identified race, he did not try to calculate the impact (if any) that the changes would have had on G&S's calculations. *Id.* In fact, the racial designation changed in only 38 FPI and BI inspector records (combined). Ex. 35 at

¶ 16. Revising the records as Erath suggests would not materially change the calculations and, indeed, would make the racial disparities slightly larger. *Id.*

The Court does not need the help of an expert to inform it that in 2018-20 over 50% of BIs were racial minorities. The figures are contained in G&S's report. G&S's characterization of the BI workforce as "predominately white" is based on the entire 16-year period: in ten years the minority percentage of BIs was under 40%, in three years between 40% and 50%, and in three years above 50%. Ex. 11 at 19.

Finally, Erath misses the point in his criticism that G&S's statistical analyses assume that the workforces should have identical racial compositions. Ex. 24 at 48:9-49:23. The experts are not using the tests to evaluate a claim that DOB favored white candidates in its hiring decisions. Rather, they are evaluating the FPI and BI workforce compositions because of the claim that the lower pay for FPIs had a disparate impact on racial minorities and the claim that the City paid FPIs less because of their largely minority composition. G&S's tests evaluating whether the racial demographics of the FPI and BI workforces are statistically significantly different each year provide useful information given their intended purpose. And, even if it were critical to the tests that the pools of qualified FPI and BI applicants had substantially equal percentages of racial minorities, Erath does not have any evidence countering that assumption. *Id.* at 50:8-51:7.

For all these reasons, Erath's report and deposition testimony should be excluded and not considered at all in connection with class certification.

**B.    The Court Should Certify the Proposed Class and Subclass Because They Satisfy All the Requirements of Rule 23(a) and (b)(3).**

To proceed as a class action, Plaintiffs must satisfy all the requirements under Rule 23(a) and qualify the proposed class and subclass under one of the categories in Rule 23(b), in this case Rule 23(b)(3). Plaintiffs must meet each of these requirements by a "preponderance of the

evidence." *Aziz v. City of New York*, No. 1:18cv2334, 2021 U.S. Dist. LEXIS 28536, at *6 (S.D.N.Y. Feb. 16, 2021) (Torres, J.) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008)).

> 1.    *The Proposed Class and Subclass Satisfy the Implied Ascertainability Requirement.*

Courts read into Rule 23 a requirement that the class be defined so that "its members can be ascertained by reference to objective criteria." *Katz v. Prof'l Billing Collections, LLC*, No. 20 Civ. 3043 (AT), 2021 U.S. Dist. LEXIS 111188, at *5 (S.D.N.Y. June 14, 2021) (Torres, J.) (quoting *Stinson v. City of New York*, 282 F.R.D. 360, 367 (S.D.N.Y. 2012)). That requirement is satisfied in this case. The City's records allow ascertainment of all members of the proposed class and subclass except, with respect to the subclass, for the small number of FPIs whose records do not reveal racial self-identification.

FPIs with unidentified race may be asked to provide an affidavit stating their racial identification in order to become a subclass member. Courts in this Circuit have divided on the use of affidavits to create ascertainability but denials generally have been based on lack of administrative feasibility. *Compare Goldemberg v. Johnson & Johnson Consumer Cos.,* 317 F.R.D. 374, 399 (S.D.N.Y. 2016) (holding that "ascertainability requirement of Rule 23 can, at minimum, be met on the basis of sworn statements indicating class members purchased the products at issue in the necessary state during the necessary limitations period"), *with Brown v. Sega Amusements, U.S.A., Inc.,* No. 13 Civ. 7558 (RMB)(HBP), 2015 U.S. Dist. LEXIS 171925, at *8-9 (S.D.N.Y. Nov. 30, 2015) (denying class of people who have played a particular arcade game without receiving a prize because "submission of 'Claim Forms,' which state, 'under penalty of perjury,' that the claimant meets the definition of a class member is both unpersuasive and administratively untenable"). This Court denied certification without prejudice in *Katz*, 2021 U.S.

Dist. LEXIS 111188, at *6-7, because plaintiffs had not proposed a feasible means for class members to self-identify. Here, where the City's records contain racial information for all but a small number of persons, use of affidavits will be feasible and ascertainability is not an obstacle to certification.

### 2. The Proposed Class and Subclass Satisfy the Numerosity Requirement.

A proposed class with more than 40 members presumably satisfies the numerosity requirement of Fed. R. Civ. P. 23(a)(1). *See Evans v. New York City Transit Auth.,* 19 Civ. 1404 (AT) (BCM), 2020 U.S. Dist. LEXIS 180623, at *10 (S.D.N.Y. Sep. 30, 2020) (Torres, J.) (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)). That requirement is easily satisfied in this case. G&S calculated that the proposed class had 507 members through June 30, 2020. Ex. 9 at 11. Erath "may not have gotten precisely 507 but something quite close to that if not." Ex. 24 at 34:13-35:3.

The record does not contain a figure for subclass members but because racial minorities have comprised 70% or more of FPIs during FY 2017 through FY 2020, it follows that the subclass has over 350 members. Ex. 9 at 13. Such an estimate of class size is sufficient. *See Evans*, 2020 U.S. Dist. LEXIS 180623, at *10-11 ("Evidence of exact class size or identity of class members is not required to satisfy the numerosity requirement. Rather, a district court must make a factual finding as to the approximate size of the class based on the evidence presented, and then 'apply the legal standard governing numerosity.'" (citations omitted)).

### 3. The Proposed Class and Subclass Satisfy the Commonality Requirement.

To satisfy the commonality requirement of Rule 23(a)(2), Plaintiffs must show not only that their claims raise one or more questions on liability and/or damages common to all class members, but also "'the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)

(quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. REV. 97, 132 (2009)). "The *Dukes* court identified two ways that a class may, as relevant here, demonstrate commonality: (1) the employer's use of 'biased testing procedure[s],' and (2) 'significant proof' that the employer 'operated under a general policy of discrimination.'" *Chen-Oster*, 325 F.R.D. at 72 (quoting *Dukes*, 564 U.S at 353).[10] And, as in *Chen-Oster*, Plaintiffs meet the requirements of this second standard—significant proof of a general policy of discrimination established through common evidence—for both their disparate impact and disparate treatment claims. Put alternatively, Plaintiffs will prove, or the City will rebut, "in one stroke" a "central" part or all of Plaintiffs' claims that the City's policies or intentions discriminated generally against all class members. *Dukes*, 564 U.S. at 350.

The requirement that Plaintiffs provide "significant proof" that the City's practices had a disparate impact against racial minorities or that it had a common intention of discriminating does not mean that the parties should "debat[e] the merits of the claims" or that the Court has a "license to engage in free-ranging merits inquiries." *Chen-Oster*, 325 F.R.D. at 76 (second quotation quoting *Hill v. City of New York*, 136 F. Supp. 3d 304, 352 (E.D.N.Y. 2015)). Instead, Plaintiffs need offer only some evidence in support of their class-wide claims. *See Dukes v. Wal-Mart Stores, Inc.,* 964 F. Supp. 2d 1115, 1122 (N.D. Cal. 2013) ("some evidence"); *Boelk v. AT&T Teleholdings, Inc.,* No. 12-cv-40-bbc, 2013 U.S. Dist. LEXIS 178476, at *10 (W.D. Wis. Mar. 11, 2013) ("some evidence"); *Jermyn v. Best Buy Stores, L.P.*, 276 F.R.D. 167, 172 (S.D.N.Y. 2011) ("some proof").

---

[10]    The Supreme Court did not identify these as the only methods of demonstrating commonality in employment discrimination cases, but the "significant proof" standard suffices here.

*Disparate Impact.* Plaintiffs in this case have identified three related policies or practices that have contributed to the disparate impact: (a) FDNY's practice of paying FPIs only the minimums authorized under their CBAs together with DOB's practice of paying many BIs more than the minimums under their CBAs; (b) the City's refusal to accord FPIs in CBA pattern bargaining the percentage pay increases paid to other uniformed employees, foreclosing any ability of FPIs to narrow the pay differences with BIs through negotiations; and (c) the City's failure, at least until recently, to monitor the pay accorded to employees at different agencies who perform similar job duties to ensure that occupational segregation does not result in adverse impact against members of a protected group.

To satisfy the commonality requirement, Plaintiffs must provide significant proof that one or more of these practices are responsible for a disparate impact against members of the protected group, *i.e.*, that they are a "common mode" for discrimination. *Chen-Oster*, 325 F.R.D. at 73 (citing *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988)); *Davis v. Dist. of Columbia*, 246 F. Supp. 3d 367, 393 (D.D.C. 2017). This case far more readily satisfies the common mode requirement than did the claims in *Chen-Oster*, in which the defendant could contend that "the challenged processes 'contained [only] general criteria' that 'individual managers applied … in highly individualized ways.'" *Id.* at 73 (quoting defendants' objections). Instead, this case is more like *Evans*, in which "all of the policies, customs, and practices that plaintiffs seek to challenge— both written and unwritten—are centralized within [the Defendant] … and apply to all [subclass members] …." *Evans*, 2020 U.S. Dist. LEXIS 180623, at *12; *see Aziz*, 2021 U.S. Dist. LEXIS 28536, at *11 ("The commonality requirement may be satisfied where plaintiffs' various alleged injuries 'derive from a unitary course of conduct by a single system.'") (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)).

Each of these policies or practices are centralized within the City; none involves criteria that subclass members' managers could apply in individualized ways. The policies apply equally to all subclass members. *See Aziz*, 2021 U.S. Dist. LEXIS 28536, at *11-12 (holding that claims of class of arrestees forced pursuant to City policy to remove any religious head covering for a booking photograph raised common questions because all were subject to same policy even though they were members of different religions); *Chen-Oster*, 325 F.R.D. at 74 (distinguishing *Dukes* because "each of the class members was subject to" the three challenged performance appraisal and promotion processes). Together the policies create a "unitary course of conduct" that resulted in lower pay for FPIs than BIs.

Also as in *Chen-Oster*, Plaintiffs have presented "'significant proof' that these 'common modes' were discriminatory," primarily through expert testimony which will be common to all class members. *Id.* at 75. G&S have shown: the job duties of and the knowledge, skills, and abilities required of FPIs and BIs are similar;[11] for the last 16 years, the percentage of white employees in the BI workforce has been at least 60% greater than the corresponding percentage in the FPI workforce; and for the past 16 years, the City has paid BIs salaries that were statistically significantly higher than those paid to FPIs at both the entry and associate levels. Because FPIs are uniformly paid less than BIs and have a statistically significantly higher percentage of racial minorities, it follows that these differences create an adverse impact for racial minorities. Even if Erath's report and testimony is not excluded from the case, none of his criticisms have merit.

---

[11]     The similarity of the job duties means that the claims are not based on the rejected theory of comparable worth. *See Scotti v. New York*, Nos. 84 Civ. 3503 (DNE), 84 Civ. 4529 (DNE), 84 Civ. 5462 (DNE), 1990 U.S. Dist. LEXIS 19417, at *60 (S.D.N.Y. Feb. 28, 1990) (denying summary judgment because plaintiffs are asserting pay discrimination claims based on substantial equality of their job, which is primarily performed by female racial minorities, and a comparator job performed primarily by white males, rather than on a comparable worth theory).

Among other things, the criticisms are all speculative because Erath never attempted to determine whether the suggested changes would have altered G&S's conclusions in any way and he did not attempt to perform his own analyses of job similarity, racial composition, or compensation. G&S's opinions are unrebutted regardless of whether Erath's report is excluded.

Indeed, the main criticism that defendants leveled at plaintiffs' statistical expert in *Chen-Oster*, that he did not control for business units (just as plaintiffs' statistical expert in *Dukes* did not control for stores, *see Dukes*, 564 U.S. at 356-57) does not exist in this case. *Chen-Oster*, 325 F.R.D. at 75-76. All FPIs worked in the same unit: the BFP. Erath did not criticize G&S for not controlling for sub-units of the BFP and his limited attempts at analysis, just like the extensive analyses performed by G&S, applied across the board to all FPIs. Ex. 24 at 90:6-11.

Even the question of how much damages each subclass member has suffered can be answered through common evidence in this case. *Cf. Fonseca v. Dircksen & Talleyrand Inc.,* No. 13 Civ. 5124 (AT), 2015 U.S. Dist. LEXIS 136427, at *9 (S.D.N.Y. Sep. 28, 2015) (Torres, J.) (rejecting challenge to commonality based on need to calculate damages individually). Once it is established based on BI compensation how much FPIs at each level should have been paid each year, calculation of damages will involve simply subtracting actual compensation from expected compensation and factoring in other damages such as lost overtime pay, lost pension benefits, and pre-judgment interest. *See Tyson Foods, Inc. v. Bouaphakeo,* 136 S. Ct. 1036, 1048 (2016) (affirming class certification based largely on use of statistical sampling evidence when "each employee worked in the same facility, did similar work, and was paid under the same policy").

*Disparate Treatment.* Unlike for their disparate impact claims, in showing commonality Plaintiffs do not need to identify a particular practice through which the City implemented a pattern of discrimination "because, if Plaintiffs can prove at the merits stage that Defendants had a

common intention to discriminate, it is of no moment whether Defendants carried out their intention through a 'common mode.'" *Chen-Oster*, 325 F.R.D. at 73 (citing *Hill*, 136 F. Supp. 3d at 354). The "'evidence of intent can be circumstantial, including evidence that is entirely statistical in nature.'" *Id.* (quoting *Davis*, 246 F. Supp. 3d at 393).

*Hill* involves remarkably similar facts. The plaintiffs, who were 911 call operators working for the City's Police Department, alleged that their job duties and those of their proposed class were similar to the duties of dispatchers employed by the City in other agencies. *Hill*, 136 F. Supp. 3d at 324-25. They claimed that onerous policies concerning matters such as overtime, breaks, leave, and accommodations discriminatorily were imposed on them but not the other dispatchers. *Id.* at 324-28. The 911 call operators allegedly were primarily racial minorities, while the other dispatchers were not. *Id.* at 323, 335-36. Judge Chen acknowledged that "Plaintiffs' claim is perhaps an atypical discrimination claim, in that it does not rely on a comparator group of 'co-employees,' *i.e.*, non-minority 911 Operators,"[12] but concluded that the other dispatchers plausibly were similarly situated to the plaintiffs primarily because "the 911 Operators and FDNY and EMS dispatchers work together and in tandem to perform the same function of answering public emergency calls and dispatching the appropriate emergency resources, sometimes conducting these calls jointly." *Id.* at 335-36. He held that the plaintiffs had established the existence of common issues, including "whether the City Defendants' discriminatory intent can be inferred from statistical evidence, anecdotal evidence, or evidence that a similarly-situated group was not subjected to the same policies." *Id.* at 354.

---

[12]    While atypical, *Hill* and this case are not alone. The City agreed to pay $32 million in backpay to settle a class action lawsuit on behalf of about 5,200 school safety agents, who were primarily female and allegedly were paid less than the primarily male employees performing similar work who had the title of special officers. *Andrews v. City of New York*, 118 F. Supp. 3d 630, 633-34 (S.D.N.Y. Aug. 3, 2015).

Plaintiffs have provided significant proof of intentional discrimination common to all class members through the same three types of evidence as in *Hill.* The BIs, a similarly situated group, were not subject to the compensation-restraining practice of confining pay to the CBA minimums that the City directed at FPIs. Plaintiffs have presented unrebutted evidence of statistically significant pay disparities, as did the *Chen-Oster* plaintiffs. 325 F.R.D. at 76. Finally, they have presented three types of anecdotal evidence supporting an inference of intentional discrimination. Spadafora blurted out that the FDNY was racist in the context of a discussion of its refusal to back his step pay plan to increase the pay of FPIs. The City has refused to accord FPIs uniform pattern increases during collective bargaining, insisting that they receive only civilian increases, even though the City Council passed a statute recognizing FPIs as uniformed. And the City has repeatedly slighted the FPIs on uniforms and in awards and ceremonies.

And here, there are two additional types of evidence not present in *Hill.* First, the City Council's pay equity report singles out FDNY as engaging in occupational segregation resulting in pay disparities. Ex. 1 at PLFPI-GEN003078. Second, the City's failure to monitor the differences between FPI and BI pay even though it knew the adverse impact the pay was having on FPIs, and therefore on a largely minority workforce – the third practice for purposes of the disparate impact claim – also supports the disparate treatment claim, as this Court explained in *Chen-Oster*. 325 F.R.D. at 82 n.16. While awareness of the consequences of a practice does not establish "discriminatory purpose" by itself, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979), this "is not to say that the inevitability or foreseeability of consequences of a neutral rule has no bearing upon the existence of discriminatory intent." *Id.* at 279 n.25; *see United States v. City of New York*, 717 F.3d 72, 94 (2d Cir. 2013) ("the failure of senior officials to act [with

awareness of the consequences] … can support an inference of discriminatory intent in some circumstances").

In short, every significant issue in this case can and should be resolved on a common basis, and Plaintiffs have presented significant proof that the issues may be resolved in their favor.[13] The Court should conclude that the proposed class and subclass satisfy the commonality requirement.

> 4.    *The Claims of the Five Plaintiffs Are Typical of the Claims of Class and Subclass Members They Seek to Represent.*

The typicality requirement of Rule 23(a)(3) "'is satisfied when the lead plaintiffs' claims arise from the same series of events and find support in the same legal theories as the claims of all of the remaining class members.'" *Chen-Oster*, 325 F.R.D. at 77 (quoting *Houser v. Pritzker*, 28 F. Supp. 3d 222, 245 (S.D.N.Y. 2014)). "[T]he commonality and typicality requirements tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3)." *Aziz,* 2021 U.S. Dist. LEXIS 28536, at *12 (quoting *Marisol A.*, 126 F.3d at 376); *accord Evans,* 2020 U.S. Dist. LEXIS 180623, at *13-14.

Each Plaintiff's claims are typical of the class, and each except for Connors has claims typical of the subclass's claims. Connors cannot be a representative of the subclass because it is composed exclusively of racial minorities and he is white. The Plaintiffs' claims are typical of the members of the class or subclass whom they represent because (a) they are all current FPIs who have been subject to the City's policy of paying FPIs only the minimums authorized by their CBAs while paying most of their BI comparators more than the minimums, (b) they all have been subject

---

[13]    Another common question is whether the disparate impact or disparate treatment claim constitutes a continuing violation under the New York City Human Rights Law giving rise to liability and damages preceding May 1, 2017 (three years before the Complaint was filed). *See Richardson v. City of New York*, No. 17-CV-9447 (JPO), 2018 U.S. Dist. LEXIS 168208, at *37-41 (S.D.N.Y. Sep. 28, 2018) (denying motion to dismiss disparate impact and disparate treatment racial discrimination class claims under NYCHRL for which plaintiffs sought damages for over a decade under the continuing violation doctrine). The same answer should be reached for all FPIs.

to the City's refusal to agree to percentage compensation increases for FPIs in accordance with those accorded to other uniformed employees, and (c) they all have been subject to the City's failure to compare and adjust as necessary the compensation of employees in different job titles performing similar job duties. None of them has unique claims that might render the totality of their claims atypical. *See Chen-Oster*, 325 F.R.D. at 79-80 (rejecting challenge to typicality of two of the four plaintiffs based on their retaliation claims).

       5.    *The Five Plaintiffs Are Adequate Representatives of the Class and Subclass Members.*

Courts evaluate the adequacy of class representatives, which is the requirement of Rule 23(a)(4), in two ways: "by looking to the qualifications of plaintiffs' counsel and by examining the interests of the named plaintiffs." *Aziz*, 2021 U.S. Dist. LEXIS 28536, at *13; *Evans*, 2020 U.S. Dist. LEXIS 180623, at *14-15. The Plaintiffs' interests do not conflict with those of the class and subclass and they understand their duties as class representatives. Ex. 6 at 35:22-38:11; Ex. 7 at 42:12-43:13; Ex. 8 at 54:21-55:13; Ex. 4 at 26:2-27:5; Ex. 5 at 75:24-77:8. They have shown their commitment to the case by answering interrogatories, producing documents in response to the City's requests, and sitting for a deposition. Ex. 12 at ¶ 14. Plaintiffs also have retained counsel experienced in employment discrimination class action cases. *Id.* at ¶¶ 15-22; Ex. 50, Valli Decl. at ¶¶ 6-9.

       6.    *The Proposed Class and Subclass Satisfy the Requirements of Rule 23(b)(3).*

A district court should certify a proposed class under Rule 23(b)(3) if all the 23(a) requirements are met and if

> (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

*Chen-Oster*, 325 F.R.D. at 80 (quoting Fed. R. Civ. P. 23(b)(3)). Both requirements are satisfied in this case.

> a.    *Questions of law common to all class and subclass members predominate over individualized questions (if any).*

Plaintiffs meet the predominance "requirement 'if resolution of *some* of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.'" *Id.* (quoting *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002)) (emphasis added in *Chen-Oster*). Plaintiffs contend that all of the material issues are subject to generalized proof in this case, but if the Court disagrees, the assessment whether the issues subject to generalized proof are more substantial than the remaining issues "is 'more qualitative than quantitative, and must account for the nature and significance of the material common and individual issues in the case.'" *Id.* (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 462 (S.D.N.Y. 2018)).

In *Chen-Oster,* the Court analyzed whether generalized proof would predominate using the three-step *McDonnell Douglas* burden-shifting framework for both the disparate impact and disparate treatment claims. *Id.* at 81. While *McDonnell Douglas* is not the exclusive means of proving either type of claim, *see, e.g.*, *Chertkova v. Conn. Gen. Life Ins. Co*., 92 F.3d 81, 91 (2d Cir. 1996), the framework suffices to show that common issues predominate for both. The analysis closely tracks the Court's analysis in *Chen-Oster.*

*Disparate impact*. At trial, plaintiffs first will have to establish a prima facie case by "(1) 'identify[ing] a specific employment practice' or policy; (2) 'demonstrat[ing] that a disparity exists; and (3) establish[ing] a causal relationship between the two.'" *Chen-Oster*, 325 F.R.D. at 81 (quoting *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012)). Plaintiffs have

identified three related policies or practices and provided strong evidence supporting a prima facie case. Plaintiffs' statistical evidence, equally applicable to all subclass members, supports the existence of compensation disparities each year and a causal relationship between the practices and the disparities. "Whether Plaintiffs' evidence actually makes out a prima facie case is a question left for trial, but, at this first step of *McDonnell Douglas*, it is clear that the generalized proof of statistical evidence is sufficient for the predominance inquiry." *Chen-Oster*, 325 F.R.D. at 81.

   If Plaintiffs establish a prima facie case, the burden shifts to the City to show that its policies and practices were "job related … and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). This would require the City "to explain the business necessity of *the processes*, and, therefore, require proof on a general level.… This is an issue capable of generalized proof." *Chen-Oster*, 325 F.R.D. at 82 (emphasis in original). If the City made this showing, the burden would shift back to Plaintiffs to identify a less discriminatory alternative that also satisfies the business need. 42 U.S.C. § 2000e-2(k)(1)(A)(ii). This showing also would be made by generalized evidence. *See Chen-Oster*, 325 F.R.D. at 82 ("The Court sees no reason, and the Defendants have presented none, why this step would not be subject to generalized proof as well.").

   *Disparate treatment.* Plaintiffs make out a prima facie disparate treatment case by showing that discrimination against the proposed class "was the company's standard operating procedure[,] the regular rather than unusual practice." *Id.* at 82 (quoting *City of New York*, 717 F.3d at 83).[14] As explained in *Chen-Oster*, the same statistical evidence presented in support of Plaintiffs'

---

[14]    In *City of New York*, the United States and intervenor the Vulcan Society claimed that the FDNY discriminated against African Americans and Hispanics in the testing and hiring process. 717 F.3d at 76. Judge Garaufis granted summary judgment to the plaintiffs on both claims. *Id.* The Second Circuit remanded the disparate treatment claims and the parties reached a class settlement.

disparate impact claims may suffice at trial to satisfy Plaintiffs' disparate treatment prima facie case and, for class certification purposes, constitutes generalized proof. *Id.* at 82-83 (citing *City of New York*, 717 F.3d at 88). If additional generalized proof is needed, Plaintiffs' evidence concerning the similarity of the job duties and required attributes, and the anecdotal evidence from which discriminatory intent may be inferred, are generalized as well.

The City may rebut the presumption created by the prima facie case by "attacking the accuracy or adequacy of Plaintiffs' statistics, or, alternatively, 'by accepting plaintiff's statistics and producing non-statistical evidence to show that it lacked such an intent.'" *Id.* at 83 (quoting *City of New York*, 717 F.3d at 85). Because Plaintiffs' claims focus on the City's intent in adopting its policies and practices, any "rebuttal evidence … would be the subject of generalized proof." *Id.* If the City does rebut, the case will proceed to trial, and there is no reason to think that trial "would alter the balance of the evidence any further." *Id.*

### b.    A class action is the best means of resolving the dispute.

A class action also is superior to any other means of resolving the dispute. Very few if any class members have claims worth even $40,000 during the liability period. Even with the continuing violation doctrine potentially stretching claims back to FY 2005, very few class members have claims worth even $100,000. With such relatively small claims, few lawyers would offer to represent an individual FPI on contingency and few FPIs could afford to pay lawyers on an hourly basis. Plaintiffs are unaware of any lawsuit by an individual FPI asserting the type of claims advanced in this case.

If, however, the Court denied class certification, Local 2507 probably would encourage individual members to file claims and many would seek to intervene. Surely it is better for the judicial system and even the City to resolve the dispute in one class action than in an action with scores, possibly hundreds, of individual Plaintiffs. *See Chen-Oster*, 325 F.R.D. at 84 ("it would be

nonsensical to disaggregate the claims into hundreds … of individual proceedings"). A class action also is critical because Plaintiffs seek injunctive relief ordering the City to increase the pay of FPIs so that collectively FPIs are paid as much as BIs.

Finally, a class action would be manageable. The common nature of each of the major issues means that the case could be litigated efficiently. If the class and subclass are certified, Plaintiffs anticipate that, after an attempt to reach a negotiated settlement, the parties would engage in a brief, possibly four-month, period of additional non-expert discovery followed by liability and damages expert reports. If the Court agrees that damages can be determined formulaically, a trial of liability and damages should last no more than two to three weeks. And if the jury issues a verdict for plaintiffs on liability but the Court were to conclude – we believe incorrectly – that damages issues are individualized, the Supreme Court has held that the Court should order injunctive relief and the individualized issues should be addressed in a series of mini-trials that would follow the resolution of the trial of the common issues. *See Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 362 (1977); *Taylor v. D.C. Water & Sewer Auth.*, 205 F.R.D. 43, 51 (D.D.C. 2002) (explaining use of *Teamsters* minitrials in employment discrimination cases).

### C.    The Court Should Appoint Plaintiffs' Lawyers as Class Counsel.

Rule 23(c)(1)(B) requires a Court certifying a class also to appoint class counsel under Rule 23(g). The latter identifies several criteria to consider in the appointment. Plaintiffs' counsel, the undersigned lawyers from the firms of Mehri & Skalet PLLC and Valli Kane & Vagnini LLP, satisfy all the criteria and should be appointed as class counsel. No other lawyers have come forward to represent the class or subclass.

Plaintiffs' counsel identified and investigated the claims in this case. Ex. 12 at ¶¶ 4-12; *see* Fed. R. Civ. P. 23(g)(1)(A)(i). Among them, the lawyers have over 100 years of experience in

handling employment, and particularly employment discrimination, class action litigation. Ex. 12 at ¶¶ 18-22; Ex. 50 at ¶¶ 6-23; *see* Fed. R. Civ. P. 23(g)(1)(A)(ii). Counsel have litigated numerous other cases under 42 U.S.C. §§ 1981 and 1983 and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 *et seq.* and litigated other cases under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*. Ex. 12 at ¶¶ 21-23; Ex. 50 at ¶¶ 6-23; *see* Fed. R. Civ. P. 23(g)(1)(A)(iii). Plaintiffs' counsel's engagement of expert witnesses who prepared the reports attached as Exhibits 1 and 3 and the declaration attached as Exhibit 7, their conduct of the discovery, and their preparation of this filing testify to their ability to commit sufficient resources to the litigation.  Ex. 12 at ¶¶ 23-25; *see* Fed. R. Civ. P. 23(g)(1)(A)(iii). The same work product shows Plaintiffs' counsel's ability to fairly and adequately represent the interest of the proposed class and subclass. *See also* Ex. 12 at ¶¶ 26-27.

## IV.    CONCLUSION

The facts of this case exemplify the City's problem of occupational segregation resulting in substantial race-based pay disparities. The pay differences between FPIs and BIs cannot be explained by differences in job duties. Rather, the pay differences arise because the City responded to recruitment and retention difficulties by raising wages for the primarily white job while rejecting that course for the primarily minority job. The Court should exclude the report and testimony of Dr. Christopher Erath, certify the proposed class to litigate the disparate treatment claims and the proposed subclass to litigate the disparate impact claims, and appoint the undersigned to act as counsel for the class and subclass.

Dated: August 30, 2021                    Respectfully submitted,


                                          */s/ Michael D. Lieder*


**VALLI KANE & VAGNINI LLP**              **MEHRI & SKALET PLLC**

Robert J. Valli, Jr.                      Michael D. Lieder (*pro hac vice*)
Sara Wyn Kane                             Aisha Rich (*pro hac vice*)
Matthew Berman                            Ellen Eardley (*pro hac vice*)

Valli Kane & Vagnini LLP                  Mehri & Skalet PLLC
600 Old Country Road, Suite 519           1250 Connecticut Ave., NW, Suite 300
Garden City, New York 11530               Washington, DC 20036
Telephone: (516) 203-7180                 Telephone: (202) 822-5100
Facsimile: (516)706-0248                  Facsimile: (202) 822-4997
rvalli@vkvlawyers.com                     mlieder@findjustice.com
skane@vkvlawyers.com                      arich@findjustice.com
mberman@vkvlawyers.com                    eeardley@findjustice.com


                                          *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I herby certify that on August 30, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, and I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Dominic Charles*
Dominic Charles