# EXHIBIT 5

Page 1

1   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

2   ------------------------------------------------------------X

    CHALMERS, DARRYL; CONNORS, DARREN; MENDEZ, GLENN; NOVA,

3   JAMES; ROSEMOND, FATIMA & AFSCME DISTRICT COUNCIL,

4                                   PLAINTIFFS,

5

              -against-            Case No.:

6                                 1:20-cv-03389

7

    CITY OF NEW YORK,

8

                                  DEFENDANT.

9   ------------------------------------------------------------X

10

11                      DATE:  April 27, 2021

12                      TIME:  10:00 A.M.

13

14              VIRTUAL DEPOSITION of the Plaintiff,

15  FATIMA ROSEMOND, taken by the respective parties, pursuant

16  to a Court Order and to the Federal Rules of Civil

17  Procedure, held at the above date and time, before Enrique

18  Alvarado and Lisa O'Leary, Notaries Public of the State of

19  New York.

20

21

22

23

24

25

F. ROSEMOND

Page 10

1       A.      1961.

2       Q.      Have you ever used any other social security

3   number?

4       A.      No, ma'am.

5       Q.      What race or ethnicity do you identify as?

6       A.      African-American.

7       Q.      Have you always identified as African-American?

8       A.      Yes, ma'am.

9       Q.      When was the last time you recall being asked to

10  self identify your race on any forms connected to your City

11  employment?

12      A.      When I initially got hired.

13      Q.      When you initially got hired at the FDNY?

14      A.      Yes, ma'am.

15      Q.      When would that have been?

16      A.      March 2019.

17      Q.      And do you recall whether you put down your race

18  in your application before you were hired or once you were

19  hired?

20      A.      I always usually identified myself.

21      Q.      And what do you mean by that?

22      A.      I always put that I'm African-American in all my

23  applications so before I was hired.

24      Q.      What is the highest level of education that

25  you've received?

F. ROSEMOND

Page 59

1    sent them a letter.  I sent my investigator my doctor's

2    note stating that my doctor is allowing me to come back to

3    work, and then I completed my process, my investigating,

4    giving my investigator all my paperwork, and doing the drug

5    screening.

6        Q.    And when you say you returned to work you

7    returned to work at the Post Office; is that correct?

8        A.    Yes.

9        Q.    When you say investigator, who was that?

10       A.    I'm sorry, I can't even recall his name at this

11   time.  It was an FDNY personnel.

12       Q.    Was this personnel assigned to your application?

13       A.    I believe so.

14       Q.    So it was someone who was overseeing your

15   application as they went through the FDNY; is that correct?

16       A.    Right.

17       Q.    And when you say the process had been put on

18   hold, did you inform the FDNY that you had been injured?

19       A.    Yes.

20       Q.    And what did they say in response?

21       A.    They said okay.  It was, you know, it was an

22   unfortunate accident that happened.

23       Q.    And when did you get hired with the FDNY

24   officially?

25       A.    Official start date was April 1, 2019.

F. ROSEMOND

Page 60

1      Q.      And what was your title when you were hired?

2      A.      Fire protection inspector.

3      Q.      And if I refer to that as an FPI, will you

4   understand that I'm referring to a fire protection

5   inspector?

6      A.      Yes.

7      Q.      Is FPI still your title today?

8      A.      Yes, ma'am.

9      Q.      And what is your current salary?

10     A.      About 54,000.

11     Q.      54,000 a year?

12     A.      Yes.

13     Q.      And then you get overtime; is that correct?

14     A.      Occasionally.

15     Q.      And was this the salary when you first began as

16  an FPI in April 2019?

17     A.      No.

18     Q.      What was your first salary when you first began?

19     A.      About 46,000.

20     Q.      So how did your salary come to change from 46,000

21  to 54,000?

22     A.      After two years of employment.

23     Q.      So after two years of employment you were bumped

24  up to 54,000; is that correct?

25     A.      Yes.

F. ROSEMOND

Page 75

```
1            tabling the name of this person so I'll just ask
2            and you can let me know if she can answer.
3      Q.    Do you remember the position of this person?  Do
4  you know what his role was or his title was?
5      A.    He was an FPI like myself.
6      Q.    Was he the same level as you?
7      A.    Yes.
8      Q.    And the other person you referred to, the other
9  woman that you referred to that file a complaint, was she
10 also an FPI?
11     A.    Yes.
12     Q.    Was she also in your unit?
13     A.    Yes.
14     Q.    To your knowledge, has anyone at FDNY filed a EEO
15 complaint against you?
16     A.    No, not to my knowledge.
17     Q.    Have you ever filed a charge of discrimination
18 against anyone other than in this case?
19     A.    No.
20     Q.    And when you made this prior EEO complaint, was
21 your complaint one of sexual harassment or did you also
22 complain of any type of discrimination?
23     A.    It was just for sexual harassment.
24     Q.    I'm going to shift gears a little bit.  I want to
25 speak about this case specifically.  Are you aware that
```

Page 76

```
 1    this lawsuit is a potential class action?
 2         A.     Yes.
 3         Q.     What is your understanding of what a class action
 4    is?
 5         A.     When a group of people come together and file a
 6    lawsuit on an organization.
 7         Q.     Do you understand that you're a named plaintiff
 8    in this lawsuit?
 9         A.     Yes, ma'am.
10         Q.     And so you understand that you will be potential
11    representing hundreds of other plaintiffs?
12         A.     Yes, ma'am.
13         Q.     Have you ever done that before?
14         A.     No, ma'am.
15         Q.     What do you understand about the other people who
16    you are representing?
17                MS. LANGLEY:  Objection, form.
18         Q.     You can answer if you understand.
19         A.     Can you ask it a different way?
20         Q.     Sure.  So of the group of people that you're
21    representing, you mentioned you understand you might be
22    representing hundreds of other plaintiffs.  What is your
23    understanding of who those other plaintiffs are, not by
24    name but generally?
25         A.     The majority of them is African-American.  The
```

Page 77

1    majority of the people I work with is African-American so I

2    can't -- a lot of males, yeah.

3        Q.     Do you know any reason that you should not be a

4    class representative?

5        A.     No.

6        Q.     Is there anything that would make it difficult

7    for you to be a class representative?

8        A.     No.

9        Q.     Have you ever discussed with anyone, other than

10   lawyers, whether you should be a class representative?

11       A.     I was approached by Darryl.

12       Q.     And who is Darryl?

13       A.     Chief Chalmers.

14       Q.     He's also a named plaintiff in this case,

15   correct?

16       A.     Yes.

17       Q.     Tell me about when he approached you?  When did

18   he approach you?

19       A.     He just asked me would I like to be a part of the

20   lawsuit because of X, Y and Z, because of we are being

21   discriminated against due to race and pay, and I told him

22   being the person that I am, that I would definitely put

23   myself on the line for my fellow coworkers.

24       Q.     When Mr. Chalmers approached you, did you know

25   about the lawsuit at all?

F. ROSEMOND

Page 78

1      A.      No, I don't think so.

2      Q.      So the first time you learned about the lawsuit

3  was through him, correct?

4      A.      Right.

5      Q.      And what did he tell you about the lawsuit?

6      A.      That FPIs was being discriminated against for

7  race, pay, uniform, transportation, and at this time it was

8  the height of the COVID and I got why he said those things.

9      Q.      Why is that?

10      A.      Prior to this, I was on a -- prior to COVID, I

11  was on a joint task force working with DOB every day, every

12  night, and we are doing the same exact work as them and not

13  getting the same pay.

14      Q.      Can you tell me more about that particular joint

15  task force.  You mentioned that it's every day?

16      A.      Yeah.  HPD, DOB and FDNY will get together every

17  Wednesday and we would do a joint task force of buildings

18  around the city.  So each department would write violations

19  for buildings that were violating either the building code

20  or the fire code.

21      Q.      And when you mentioned that you would do the task

22  force every Wednesday, was this during your initial

23  schedule where I think you worked 1:00 p.m. to 9:00 p.m.,

24  Mondays, Tuesdays, Thursdays, Fridays and then Wednesdays

25  you were doing the joint task force; is that right?

1       A.      Right, and then we had a regular joint task force

2     for DOB, Tuesday through Friday.

3       Q.      So for the Wednesday joint task force, I think

4     previously you mentioned that you began working on it on

5     Wednesdays, that 8:00 or 9:00 a.m.; is that correct?

6       A.      Right.

7       Q.      So did you have a regular shift at work with the

8     FDNY on those Wednesdays, or your shift that day was just

9     to be on the task force?

10      A.      You're with the task force every day except I

11    think Monday but Tuesday through Friday is two task force.

12    It's the morning task force that happened once a week with

13    HPD, DOB and FDNY.

14      Q.      So I think I could use some help understanding

15    this completely.  So how do you have a joint task force

16    every day and also are able to complete your regular shift

17    with FDNY?

18      A.      So every day was our job to go out to be with the

19    Department of Buildings, and go and inspect buildings.

20    That was our everyday task.

21      Q.      And was that just your unit to the extent you

22    know?

23      A.      For the joint task force, yes, but I know other

24    units who works with DOB as well.

25      Q.      So if every day on your shift you are part of a

F. ROSEMOND

Page 80

1    joint task force with the DOB, what's different about

2    Wednesdays?

3         A.    Wednesday HPD is there and it starts earlier.  It

4    starts at 8:00 a.m.

5         Q.    So on Wednesdays, when it starts earlier, are you

6    paid overtime?

7         A.    Yes.

8         Q.    And I think you mentioned that when you're on the

9    joint task force, the FDNY inspectors and the DOB are doing

10   the same thing.  What did you observe that makes you

11   believe that?

12        A.    We are going into the same location, we are going

13   from top to bottom inspecting the buildings and writing

14   violations.

15        Q.    Is DOB responsible, if you know, for identifying

16   different kinds of violations than an FPI would be?

17        A.    During this task force, no, we all did it

18   together, from the roof all the way to the basement.

19        Q.    Are the DOB inspectors looking for different

20   types of violations?

21        A.    They may look at the pipes of the plumbing for

22   the most part we looking for egress issues, safety issues,

23   fire escape issues, you know, whether the place is safe,

24   you know.

25        Q.    So looking at the pipes or the plumbing, that's

F. ROSEMOND

Page 81

1    something that the DOB inspector would do, correct?

2        A.    Yes.

3        Q.    And would an FPI also look at the pipes and

4    plumbing?

5        A.    That would be a different unit from my unit.

6        Q.    What unit would that be?

7        A.    That would be suppression, sprinkler standpipe

8    suppression unit.

9        Q.    And when you're on the joint task force with the

10   DOB, are you also enforcing the building code?

11       A.    We enforce the fire code and some building codes,

12   yes.

13       Q.    Do you enforce the same codes that the DOB

14   inspectors would be enforcing?

15       A.    We have similar codes.  They have their

16   violations and we have our violations so we have a fire

17   code book and they have a building code book, but for the

18   most part, I would say we are citing some of their codes as

19   well in our violation.

20       Q.    So it's fair to say that the DOB is referring to

21   a different code book than the FDNY is, correct?

22       A.    Yes.

23       Q.    And it's fair to say that the DOB inspector is

24   identifying violations of different code provisions than

25   the FDNY inspector would be; is that correct?

F. ROSEMOND

Page 82

1      A.      No, not all the time.

2      Q.      When you say not all the time, are there

3   circumstances where they are, in fact, enforcing violations

4   of different code provisions than the FDNY inspector would

5   be doing?

6      A.      Only if we go out with them on Wednesday.  Our

7   regular day-to-day joint task force, we are doing the same

8   exact job.

9      Q.      And the basis for your belief that you're doing

10  the same exact job is that you are both inspecting the same

11  building from top to bottom; is that correct?

12     A.      Yes.

13     Q.      And what is different about the Wednesday tasks

14  forces?

15     A.      Because again, HPD is there so it's -- you're

16  actually going into the people's apartments as well, you

17  know, I will be allowed to go into someone's apartment.

18  The Department of Buildings is allowed to go into someone's

19  apartment and the inspector from HPD is allowed to go into

20  someone's apartment.  It's basically a complaint against a

21  bad landlord and we just all go and see how can we make the

22  building safe.

23     Q.      Are DOB inspectors, if you know, allowed to go

24  into a residential apartment building?

25     A.      Yes.

F. ROSEMOND

Page 83

1    Q.    And they can do that without the HPD present,

2    correct?

3    A.    Yes.

4    Q.    And is an FDNY inspector allowed to go into a

5    residential apartment building without the HPD or the DOB

6    inspectors?

7    A.    Yes.

8    Q.    Under what circumstances is the FDNY permitted to

9    go into a residential apartment building without the HPD or

10   the DOB inspectors?

11   A.    For fire safety reasons, for safety reasons.

12   Q.    So why is it that on Wednesdays you would need to

13   be with the HPD or DOB inspectors to go to a residential

14   apartment building?

15   A.    Because it's basically a class action complaint.

16   Maybe if it's 40 apartments in the building, maybe 20

17   apartments had a complaint against this building so we will

18   all, you know, go in and do a joint inspection.

19   Q.    And how often do you, in your daily

20   responsibilities, go into a residential apartment building

21   or a unit?

22   A.    I go into buildings every day.

23   Q.    And that includes residential units, correct?

24   A.    Right.

25   Q.    I think earlier we were talking about your

F. ROSEMOND

Page 115

1      A.      Yes, if they take it to court yes.

2      Q.      And has it been taken to court one time?

3      A.      Yes, just one time.

4      Q.      And what was the outcome of that?

5      A.      Honestly, I didn't go back in and review.  They

6    just asked me -- it was a corridor issue.  They had garbage

7    blocking the corridor and they wanted basically what did I

8    see, why did I write it.

9      Q.      And why did you write it?

10     A.      Because they had garbage cans blocking the

11   corridor.  So just in case of a fire, the residents of that

12   location, it was blocking the egress for them to go out.

13     Q.      And was that a fire code violation?

14     A.      Yes.

15     Q.      Was it also a building code violation?

16     A.      That can be also a building code violation so it

17   goes hand in hand but I know in that specific one I cited

18   them a fire code violation.

19     Q.      If you were to cite them a building code

20   violation, do you know what code it would be?

21     A.      Not off the top of my head, no.

22     Q.      So I'd like to speak more about joint task

23   forces.  I understand that you have been on joint task

24   forces with the DOB and the HPD; is that correct?

25     A.      Yes.

F. ROSEMOND

Page 116

1      Q.      And so currently you work an

2   8:00-a.m.-to-9:00-p.m. schedule, three to four days a week;

3   is that correct?

4      A.      Yes.

5      Q.      And of the three to four days that you're

6   working, how many of those are on a joint task force with

7   the DOB or the HPD?

8      A.      Well, since COVID happened last year, the task

9   force has stopped but out the weeks, we -- so the other

10  night we had, we did a joint task force in Queens due to an

11  illegal structure, so DOB was called out and so was the

12  illegal conversion called out.

13     Q.      And from what time to what time were you on this

14  assignment last night?

15     A.      It wasn't last night.  Last night was Monday; it

16  was last Thursday.

17     Q.      So what time did you go on this assignment last

18  Thursday?

19     A.      It was about 7:00 and I think we didn't leave

20  until about 12:00 midnight.

21     Q.      And am I correct then that your regular shift

22  would have ended around 9:00 p.m.?

23     A.      Yes.

24     Q.      And so you didn't leave until 12:00 a.m. whenever

25  this ended?

F. ROSEMOND

Page 117

1      A.      We didn't actually -- because we have to do

2    paperwork.   You have to submit your paperwork, you have to

3    submit your fines, and violations, and summonses.   So you

4    have to go back to the office and submit all your paperwork

5    so we actually didn't get off until about 1:15 in the

6    morning.

7      Q.      So from 9:00 p.m. to 1:15 in the morning, that

8    would've been overtime for you?

9                   (Whereupon, at 2:15 P.M., a technical issue

10                  occurred.)

11                  (Whereupon, at 3:12 P.M., Enrique Alvarado,

12                  the Court Reporter, was relieved by Lisa

13                  O'Leary.)

14   F A T I M A     R O S E M O N D, called as a witness,

15   having been first duly sworn by a Notary Public of the

16   State of New York, was examined and further testified as

17   follows:

18   CONTINUED EXAMINATION BY

19   MS. HADAGHIAN:

20     Q.      Please state your name for the record.

21     A.      Fatima Rosemand.

22                  MS. HADAGHIAN:  I will just make one note

23                  for the record, because our prior court reporter

24                  had some technical difficulties, we are uncertain

25                  of where exactly he stopped transcribing for the

F. ROSEMOND

Page 136

1    was here, it was every day, four days out of the week.

2              So I can say maybe a hundred times, maybe more.

3        Q.     Most of the time that you have been on the joint

4    task forces with the DOB, are you going from room to room

5    with them?

6        A.     Yes.

7        Q.     And have you asked them what specifically they

8    were inspecting?

9        A.     No.

10              Pretty much we know exactly what we are there

11   for.

12              We have the complaint right in front of us and we

13   just all go together, from, like I said, from top to

14   bottom.

15              Only time we usually separate is when we go into

16   the car and they issue their violations and we have to

17   write our violations.

18       Q.     If you know, what are joint task forces used for?

19       A.     For safety matters.

20              From what I heard, I don't know whether this is

21   hearsay or not, but before DOB wasn't getting into a lot of

22   buildings, without the Fire Department.

23              So that's why they did the joint task force,

24   because 95 percent of the time, you know, why I was there,

25   we were getting into, into residences or businesses, you

F. ROSEMOND

Page 137

1    know, for inspection.

2        Q.      And from whom did you hear that the task forces

3    were used, because the DOB wasn't getting into buildings?

4        A.      From the senior guys, senior guys who were

5    already in the unit.

6        Q.      Do you remember their names?

7        A.      Kevin Bumford, Amir.

8        Q.      Amir who?

9        A.      Amir Hassan, Angel Aiella.

10       Q.      And these are all FPIs?

11       A.      Aiella is a supervising FPI.

12       Q.      And in your experience on task forces, generally,

13   are you ever told what to do by the DOB inspectors?

14       A.      No.

15       Q.      And do you ever tell the DOB inspectors what to

16   do?

17       A.      No.

18       Q.      Who typically is in charge, of the work that

19   you're doing on a joint task force?

20       A.      We usually come up with a game plan.

21               We usually just really stick together and inspect

22   from top to bottom.

23       Q.      So --

24       A.      We just pull together.

25       Q.      So the person in charge would be, whoever within

F. ROSEMOND

Page 138

1    the group of FPIs that are going; is that fair?

2        A.    Right.

3        Q.    And you just decide amongst yourselves what to do

4    as FPIs; is that correct?

5        A.    Right.

6        Q.    But that doesn't -- that decision-making does not

7    bleed over into what the DOBs are doing.

8              They're doing something different; is that

9    correct?

10       A.    As far as the inspection goes?

11       Q.    As far as how they decide what to do and who is

12   in charge of them.

13       A.    Again, like I said, we all do the inspection

14   together.

15             It's never, you know, okay, you guys go here, you

16   guys go there and we are going to do this and you guys are

17   going to do that.

18             It's we go from top to bottom.

19             If it's two of us and two of them or four of us

20   go from the top to the bottom or from the bottom up.  We

21   don't leave each other.

22       Q.    Do you mean that the FPIs and the DOB inspectors

23   decide together where to start and which rooms to go to

24   next?

25       A.    Right.

F. ROSEMOND

Page 139

1          Again we usually go from top to bottom, work our

2    way down.

3          The only time we split up is when we're going

4    into our individual cars and going to write violations.

5          Other than that, we are together throughout the

6    whole inspection.

7    Q.    During your time on the joint task forces, have

8    you ever observed a DOB inspector inspect anything

9    differently than you would?

10   A.    No.

11   Q.    Have you ever observed them inspect anything,

12   that you wouldn't inspect yourself, for instance, plumbing

13   in the building?

14   A.    Only time that happens is when we're on the

15   Wednesday morning task force.

16          So those will be specific inspectors.

17   Q.    Can you explain to me a little bit more then how

18   the Wednesday morning task forces differ?

19   A.    The Wednesday morning task force, like I stated

20   before, is with HPD, HPD, DOB and FDNY.

21          That, I believe that task force, because a group

22   of tenants made a complaint about a residential building.

23   It's been several complaints about this one particular

24   building.

25          So the task force will meet up at 9 o'clock in

F. ROSEMOND

Page 140

1    the morning, in front of the location, and inspect the

2    location together.

3        Q.      And so in this circumstance on the Wednesday

4    morning task forces, the DOB inspector, they're checking

5    plumbing as well?

6        A.      They may, yes, they may have a DOB inspector

7    there for plumbing and an electrician.

8        Q.      If there's a DOB inspector inspecting plumbing,

9    you are not also inspecting plumbing, are you?

10       A.      We all start from the top and work ourself down.

11               So it's not like if he's going off to the side

12   and doing the inspection, it will be all through the

13   inspection, from top to bottom, and then when he gets to

14   the bottom, that's when he starts, okay, well, you know, he

15   looks around at the plumbing, but for the most part we are

16   all together all day.

17       Q.      Do you issue violations, for issues with

18   plumbing?

19       A.      No.

20       Q.      And the DOB inspector who does electric, what is

21   he looking at?

22       A.      He's looking at the emergency lights, which we do

23   have, the fire code has a violation for that, and he's

24   looking at, I guess, the circuit box.

25       Q.      Would you issue violations, for anything wrong

F. ROSEMOND

Page 141

1    with the circuit box?

2        A.      If it didn't have a cover, if the wires were

3    hanging out, things of that nature, yes.

4        Q.      Have you observed DOB inspectors, specific to

5    electric, inspect the circuit box?

6        A.      Yes.

7        Q.      And how does he or she inspect it?

8        A.      Basically like I would do, just look at it.

9                They wouldn't fix anything.

10               They would just basically do an inspection, the

11   same thing, look at it, oh, you know, this is faulty, I'm

12   going to give them a violation to fix it, and basically we

13   do the same thing too, to basically cover the inspection

14   box, fix the wires, things of that nature.

15       Q.      Do you know whether he would cite different code

16   provisions?

17       A.      No, I don't know what code provision that he

18   would use.

19       Q.      Something I want to learn a little bit more about

20   is that on these Wednesday morning inspections, you

21   mentioned that there are specific DOB inspectors.

22               Do you mean DOB inspectors with like a specific

23   focus, like plumbing or electric?

24       A.      I believe, yes, I believe that they maybe

25   specialize in one thing and not the other.

Page 142

1      Q.      Have you worked on any other task forces, where

2   you're working with similarly specialized DOB inspectors,

3   like plumbing, like electric?

4      A.      No.

5      Q.      How often were you on the Wednesday morning task

6   force?

7      A.      Every Wednesday.

8      Q.      And this was when your shift was, from 1:00 p.m.

9   to 9:00 p.m., Mondays through Fridays; is that correct?

10     A.      Yes.

11     Q.      And so on Wednesdays when you started at 9 --

12  sorry, on Wednesday when you started at 9 a.m., for that

13  task force, were you getting overtime from 9 a.m. to 1:00

14  p.m.?

15     A.      We were coming at 8, meet up at headquarters,

16  which is 9 Metro Tech, and then drive out to wherever the

17  location, the first location was at.

18     Q.      Were you getting overtime from 8:00 a.m. then

19  until 1:00 p.m.?

20     A.      Yes.

21     Q.      Have you ever turned down the opportunity to work

22  on a joint task force?

23     A.      No.

24     Q.      Have you ever requested to work on a joint task

25  force and have that request be denied?