# EXHIBIT 8

Page 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
DARRYL CHALMERS, DARREN CONNORS, GLENN MENDEZ, JAMES NOVA
and FATIMA Q. ROSEMOND, on behalf of themselves and all
other similarly situated, and AFSCME DISTRICT COUNCIL 37
LOCAL 2507, on behalf of its members,
                              PLAINTIFFS,

        -against-            Case No.:
                             1:20-CV-03389(AT)

CITY OF NEW YORK,

                              DEFENDANT.
-------------------------------------------------------------X

                    DATE:  April 9, 2021
                    TIME:  10:07 A.M.


            VIRTUAL DEPOSITION of the Plaintiff, GLENN
MENDEZ, taken by the Defendant, pursuant to a Court Order
and to the Federal Rules of Civil Procedure, held at the
above date and time, before Jamie Willis, a Notary Public
of the State of New York.
```

1    A.    Yes.
2    Q.    What are the last four digits of your Social
3    Security number?
4    A.    2651.
5          MR. BERMAN:  Again we request that portion
6          of the transcript be marked confidential.
7    Q.    Have you ever used any other Social Security
8    number?
9    A.    No.
10   Q.    Mr. Mendez, what race or ethnicity do you
11   identify as?
12   A.    I'm Puerto Rican.
13   Q.    Have you always identified as this ethnicity?
14   A.    Yes.
15   Q.    Do you recall being asked to identify your race
16   or ethnicity on any forms connected to your City
17   employment?
18   A.    Yes.
19   Q.    Do you recall how you self-identified on those
20   forms?
21   A.    More than likely, it would have been Puerto
22   Rican, Hispanic, Latino.
23   Q.    Mr. Mendez, what is the highest level of
24   education that you've received?
25   A.    Some college.

1   the FDNY?
2        A.     Yes.
3        Q.     What is your current civil service title?
4        A.     I'm an associate fire protection inspector level
5   2.
6        Q.     Do you have any other titles?
7        A.     I do not.
8        Q.     What was your civil service title when you first
9   started; was it FPI?
10       A.     FPI, fire protection inspector.
11       Q.     When did you become an AFPI level 2?
12       A.     In 2016.  Level 2?  I'm sorry.  In 2018.
13       Q.     Fair to say that before you were a level 2, you
14  were a level 1?
15       A.     Yes.
16       Q.     And when did you become a level 1?
17       A.     In 2016.
18       Q.     So in 2016, is it fair to say you were promoted
19  from an FPI to an associate FPI level 1?
20       A.     Correct.
21       Q.     How did you come to get that promotion?
22       A.     I took the supervisory DCAS.  I passed it and I
23  was put on a list.  And when the job title was available, I
24  went for the interview and it was provided to me.
25       Q.     And do you recall whether your salary changed

1    A.    No.
2    Q.    Are you aware if anyone has ever filed a charge
3  of discrimination against you?
4    A.    No.
5    Q.    Mr. Squillaro's complaint; did he make a claim of
6  age discrimination?
7    A.    The complaint was just basically he says -- I
8  guess it would fall under age discrimination, because he
9  said that I called him old.  But the case was dropped,
10 because it was not enough information or evidence to prove
11 that.
12   Q.    Were you given some type of notice that this case
13 has been closed?
14   A.    That I can recall, no.
15   Q.    Were you given any type of notice that the other
16 case involving Mr. Leon was closed?
17   A.    That I can recall, no.
18   Q.    Other than everything we've discussed, have you
19 dealt with any other complaints with the EEO?
20   A.    No.
21   Q.    Mr. Mendez, do you know that this lawsuit is a
22 potential class action?
23   A.    Yes.
24   Q.    What is your understanding of a class action?
25   A.    That I'm a representative within a lawsuit that

1  I'm representing myself and a group of others involved in
2  the case.
3      Q.   Have you ever been a named plaintiff in any other
4  class action?
5      A.   No.
6      Q.   What do you understand about the other people who
7  you might be representing?
8      A.   That they're a diverse group of minority
9  inspectors, who are fire inspectors like myself, and
10 associate fire protection inspectors like myself.
11     Q.   Do you know of any reason why you should not be a
12 class representative?
13     A.   I do not.
14     Q.   Is there anything that would make it difficult
15 for you to be a class representative?
16     A.   No.
17     Q.   Have you discussed with anyone, other than any
18 attorneys, whether you should represent other members of
19 the class?
20     A.   No.
21     Q.   Are you aware of who your lawyers are in this
22 case?
23     A.   Yes.
24     Q.   And who are they?
25     A.   Matthew Berman and Michael Leader.

Page 90

1    A.    No.
2    Q.    And you don't recommend legislative changes or
3    review proposed legislation; do you?
4    A.    No.
5    Q.    Do you review applications for things like
6    boilers in your current duties?
7    A.    No.
8    Q.    As an AFPI 1 or 2, do you find yourself in
9    dangerous situations?
10   A.    No.  All the inspections are all the same, even
11   from FPI to where I'm at now.
12   Q.    And I believe we've discussed the process of
13   issuing tickets for building code violations and the like.
14   Do you also issue stop work orders?
15   A.    No, my unit doesn't.  I don't know if any other
16   units do.  That may be something that occurs within the
17   construction and demolition unit and abatement unit.
18   Q.    Do you verify licenses of on site workers?
19   A.    We do not.
20   Q.    Is that something you've ever done in your unit?
21   A.    No, it's not protocol in our unit.
22   Q.    I think we've touched on task forces a bit
23   earlier today.  I want to talk about them a bit more.  One
24   of the allegations in the complaint is that sometimes FPIs
25   and AFPI's work on joint task forces with other inspectors

Page 91

1  with other agencies.  Are you familiar with that
2  allegation?
3      A.    Yes.
4      Q.    Have you ever worked on a joint traffic force,
5  where it was people from the FDNY and let's say people from
6  the DOB?
7      A.    Yes, I have worked on -- like I mentioned
8  earlier, the illegal conversion task force.  That's
9  alongside other FPIs and AFPIs from other units.  We work
10 evenings and we also worked alongside Department of
11 Building inspectors during those inspections.
12     Q.    How often have you worked on the illegal
13 conversion task force?
14     A.    Throughout my whole career, I only actually
15 worked three nights.
16     Q.    When would that have been around?
17     A.    It was sporadic.  I would say in 2019 was
18 probably when those occurred.
19     Q.    And what did you did on the illegal conversion
20 task force?
21     A.    So there would be complaints that came in through
22 that unit.  I was just directed by the supervisors of those
23 units where to appear after my normal 8 to 4 schedule,
24 because it was an evening thing.  We would meet at certain
25 locations.  They would have complaints.  They would have a

1  list. They'd have the inspectors who were assigned and we
2  would meet at that location with the DOB inspectors on site
3  and make the attempt to enter the building or the apartment
4  or the house to find out if it was really illegally
5  converted.
6     Q.   And can you describe to me how the work is
7  divided between you and the FDNY members and anyone from
8  another agency, such as the DOB?
9     A.   Part of it is because the fire inspectors are a
10 warrantless inspecting bureau. I think that that's part of
11 why we were part of that task force. Normally, we don't do
12 inspections of one and two family homes. So I guess enough
13 complaints starting coming in to the City about one and two
14 family homes being converted into multiple units, so the
15 Department of Buildings and the Fire Department arranged
16 where we had this illegal conversion task force to utilize
17 our warrantless power to get into these places.
18    Q.   Can you describe to me what that power is?
19    A.   So if we would show up at a house that had a
20 complaint, we would look at the details of the complaint.
21 We would attempt to knock on the door. If they opened and
22 the owner of the house was there, then we represent ourself
23 as fire protection inspectors with the Fire Department,
24 part of the illegal conversion task force unit. And we
25 would ask that we could come in. At that point, we would

1   try to do our inspection and see that the complaint was
2   valid enough.  DOB would do their thing, because they're
3   basically looking to enforce any building codes that are
4   noncompliant.  And we issue our Fire Department summonses
5   for any discrepancies we may find due to fire safety.
6       Q.      When you mention DOB doing their thing; can you
7   describe what you would observe them doing?
8       A.      Just doing a full walkthrough of the house -- of
9   the apartments that were converted.  Looking for gas lines,
10  potential boilers within the house, locked doors, exits.
11  Everything that we at the Fire Department would look for,
12  as well.
13      Q.      On the task force would yourself and the other
14  people from the Fire Department do the same thing as the
15  DOB or --
16      A.      Yes, we would do the same inspection.  If we
17  found anything that was not compliant to the New York City
18  fire code, then we would issue the appropriate violation
19  orders or FDNY summonses or criminal court summonses.
20      Q.      On the three occasions that you were on the
21  illegal conversion task force, do you remember whether
22  there was anyone in charge of it?
23      A.      I do remember that there was a supervisor at one
24  location.  I can't remember the other two.  They may have
25  been the same supervisor.

1  task force?
2     A.    No.
3     Q.    How do you come to work on the illegal conversion
4  task force?
5     A.    It was mentioned through the grapevine of being
6  in the office and they asked for inspectors and I came and
7  asked if I could join.
8     Q.    They asked if you could join?
9     A.    I asked if I could join.  Once I found out they
10 developed that and they were looking for inspectors to
11 work.  So I asked if I could work.
12    Q.    Why did you want to work on the joint task force?
13    A.    Just to gain a little experience on a different
14 insight of what other inspectors did.  It also helps to see
15 kind of what the DOB did, as well, when I found out the DOB
16 was involved.  It helped to see what they did during those
17 inspections.
18    Q.    Why is that?
19    A.    Just curiosity.  As a fire inspector I wanted to
20 know what was their role in that.  Then you get a better
21 understanding of what goes on in New York City.
22    Q.    I just want to get a little more clarity on the
23 joint task force.  I think you explained that both the FDNY
24 and DOB inspectors, they both go and walkthrough the area
25 and look for any types of violations; is that correct?

Page 96

1   A.   Yes.
2   Q.   To your knowledge, are the DOB inspectors looking
3   for violations of different codes than yourself and the
4   FDNY inspectors would be looking?
5   A.   They would only be enforcing their code, which
6   would be the New York City building code.  While we're
7   there, we'll be enforcing the New York City fire code and
8   the building code, as well, because we do reference the
9   building code, and any other codes that is we may find that
10  have any discrepancies within the inspection.
11  Q.   It's fair to say the DOB inspectors are
12  fulfilling a different role then the FDNY inspectors on the
13  joint task force?
14          MR. BERMAN:  Objection to form.
15  A.   I wouldn't say that they were there to do
16  anything different from what we were doing.  It's something
17  we have a big concern of illegal conversions.  Even though
18  we're not sort of in charge of doing one and two family
19  home inspections.  But for the safety of our firefighters,
20  we like to know what illegal conversions are happening, so
21  that way we can address it in the case there is a fire or
22  mishap like that, the firefighters are not walking into
23  something blindly.
24  Q.   Ultimately, you would agree that the FDNY is
25  looking specifically for the fire code?

1               MR. BERMAN:  Objection to form.  You can
2         answer if you understand.
3       A.    We're not looking specifically for the fire code.
4    It's part of the inspection.  Because we have jurisdiction
5    to issue violations on all New York City codes, then we
6    incorporate that throughout all of our inspections.
7       Q.    One of the allegations in the complaint is that
8    building inspectors receive less training than fire
9    protection inspectors; are you aware of that claim?
10      A.    I'm aware of the claim.  But I don't know that
11   information to be factual or I've never heard of that
12   information outside of through the complaint.
13      Q.    So you have no factual knowledge of whether
14   building inspectors receive more or less training than fire
15   protection?
16      A.    Correct.  I don't know to what length their
17   training is.
18      Q.    Do you know at all what type of training they
19   get?
20      A.    I do not.
21      Q.    Do you know any building inspectors?
22      A.    I do not.
23      Q.    Have you ever looked at the notices of
24   examination for building inspectors?
25      A.    I've seen the notice of examination.  I know that