# EXHIBIT 24

1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
DARRYL CHALMERS, DARREN CONNORS, GLENN
MENDEZ, JAMES NOVA, and FATIMA Q. ROSEMOND,
On behalf of themselves and all others
similarly situated, and AFSCME DISTRICT
COUNCIL 37 LOCAL 2507, on behalf of its
Members,

                    Plaintiffs,


          -against-        Case No.:
                           1:20-cv-03389


CITY OF NEW YORK,

                    Defendant.
----------------------------------------X



                    July 19, 2021
                    10:05 A.M.
```

DEPOSITION of the

CHRISTOPHER ERATH, a Non-Party Witness

herein, taken by the Plaintiffs, pursuant

to Notice and to the Federal Rules of Civil

Procedure, held via Zoom videoconference at

the above date and time, before Judy

Rosenberg, a Notary Public of the State of

New York.

2

 1

 2   A P P E A R A N C E S :

 3

 4   MEHRI & SKALET, PLLC
        Attorneys for the Plaintiffs
 5      1250 Connecticut Avenue, NW, Suite 300
        Washington, D.C. 20036
 6
     BY: MICHAEL LIEDER, ESQ.
 7   File #: 19109

 8

 9   NEW YORK CITY LAW DEPARTMENT
     OFFICE OF THE CORPORATION COUNSEL
10      Attorneys for the Defendant and Non-Party Witness
        100 Church Street
11      New York, New York 10007-2601

12   BY: AMANDA CROUSHORE, ESQ.,
          Assistant Corporation Counsel
13   File #: 2020-020833

14
     ALSO PRESENT:
15      AISHA RICH, ESQ.

16

17                    *         *         *

18

19

20

21

22

23

24

25

3

```
 1
 2      F E D E R A L   S T I P U L A T I O N S
 3
 4
 5      IT IS HEREBY STIPULATED AND AGREED by and
 6   between the counsel for the respective
 7   parties herein that the sealing, filing and
 8   certification of the within deposition be
 9   waived; that the original of the deposition
10   may be signed and sworn to by the witness
11   before anyone authorized to administer an
12   oath, with the same effect as if signed
13   before a Judge of the Court; that an
14   unsigned copy of the deposition may be used
15   with the same force and effect as if signed
16   by the witness, 30 days after service of
17   the original & 1 copy of same upon counsel
18   for the witness.
19
20      IT IS FURTHER STIPULATED AND AGREED that
21   all objections except as to form, are
22   reserved to the time of trial.
23
24              *    *    *    *
25
```

4

1

2          (Whereupon, documents were

3      deemed marked as Plaintiffs' Exhibits

4      1 through 5 and 7 through 13 for

5      identification as of this date by the

6      Reporter.)

7          MS. CROUSHORE:  I would like to

8      order a copy of the transcript,

9      please, for the City of New York.

10         THE STENOGRAPHER:  It is hereby

11     stipulated and agreed by and between

12     counsel for all parties present that

13     pursuant to CPLR Section 3113(d) this

14     deposition is being conducted

15     remotely by videoconference, and that

16     the court reporter, witness and all

17     counsel are in separate remote

18     locations and participating via Zoom

19     or any web conference meeting

20     platform under the control of Bee

21     Reporting Agency, Inc.

22         It is further stipulated that

23     this videoconference will not be

24     recorded in any manner and that any

25     recording without the express written

5

1

2      consent of all parties shall be

3      considered unauthorized, in violation

4      of law and shall not be used for any

5      purpose in this litigation or

6      otherwise.

7           Before I swear in the witness,

8      I will ask each counsel to stipulate

9      on the record that I, the court

10     reporter, may swear in the witness

11     even though I am not physically in

12     the presence of the witness and that

13     there is no objection to that at this

14     time, nor will there be an objection

15     at a future date.

16          MS. CROUSHORE:  No objection.

17          MR. LIEDER:  No objection from

18     plaintiffs.

19          THE STENOGRAPHER:  Counsel, can

20     you represent to the best of your

21     knowledge and belief that the witness

22     appearing today via web conference

23     is, in fact, Christopher Erath?

24          MS. CROUSHORE:  Yes, I can.  I

25     do.

6

1

2   C H R I S T O P H E R   E R A T H, called

3   as a witness, having been first duly sworn

4   by a Notary Public of the State of New

5   York, was examined and testified as

6   follows:

7

8   EXAMINATION BY

9   MR. LIEDER:

10      Q.    Please state your name for the

11   record.

12      A.    Christopher Erath.

13      Q.    What is your address?

14      A.    BLDS, LLC, 264 North Main

15   Street, Natick, Massachusetts 01760.

16      Q.    Good morning, Dr. Erath.

17      A.    Good morning.

18      Q.    As you know, since I deposed

19   you in one other case, my name is Michael

20   Lieder.  I am a lawyer with the law firm of

21   Mehri & Skalet in Washington, D.C., and I

22   and Aisha Rich represent the plaintiffs in

23   this case.

24          Dr. Erath, you have testified

25   many times before, is that right?

7

1                    C. ERATH

2      A.    Yes.

3      Q.    Because of that, I will forgo

4  the normal instructions that attorneys

5  often give to witnesses.

6            Just reminding you that this is

7  not an endurance contest, and if at any

8  time you wish to take a break, please let

9  us know, and we will take a break, the only

10  caveat being if there is a question

11  pending, I ask that you answer.  Is that

12  okay?

13      A.    Sure.

14      Q.    Dr. Erath, do you have in front

15  of you documents that I have designated as

16  exhibits to be used in this deposition?

17      A.    I don't have physical copies,

18  but I have them on the screen right over

19  there where I can pull them up with a

20  moment's notice (indicating).

21      Q.    We have designated as Exhibit 1

22  a document entitled expert report of

23  Christopher Erath, Ph.D.

24            Did you, in fact, prepare a

25  ten-page report with an eleventh page

8

1                    C. ERATH

2   entitled "materials relied upon"?

3       A.    Sounds right.

4       Q.    We have also designated as

5   Erath Exhibit 2 a CV of Christopher Erath,

6   Ph.D.  It is a three-page document that has

7   your name at the top, and under your name

8   the word director, contact information and

9   then the word summary.

10              In this case, did you prepare a

11  CV that is as I describe?

12      A.    I don't think I prepared it for

13  this case, but you sound like you're

14  describing my CV.

15      Q.    I have designated as Exhibit 3

16  a document entitled expert report of

17  Dr. Harold W. Goldstein and Dr. Charles A.

18  Scherbaum that then has the title of the

19  case, Darryl Chalmers, et al, versus City

20  of New York, case number 1:20-cv-03389-AT,

21  and it is dated 6/9/2021.

22              Have you reviewed a document

23  that is so described?

24      A.    Yes, I have that expert report.

25      Q.    And then finally, because of my

9

1                    C. ERATH

2    own error, the next document that I wanted

3    to call to your attention has been marked

4    as Exhibit 13 instead of four, but it is

5    entitled expert rebuttal report of Dr.

6    Harold W. Goldstein, Dr. Charles A.

7    Scherbaum, again, has the name of the case

8    and the case number and is dated 7/9/2021.

9            Do you have such a report?

10    A.    Yes.

11    Q.    Could you turn back to Exhibit

12    1, your expert report, to Page 11, the

13    materials relied upon?  I want to go

14    through some of these to make sure I

15    understand what they are.

16    A.    Okay.  I'm there.

17    Q.    Yes, good.

18            You will see that the second

19    item listed is described as exam applicant

20    data for FPIs, 6/21/21 dot xlsx.

21            Is this a spreadsheet, Excel

22    spreadsheet, that shows each exam for which

23    persons who were fire protection inspectors

24    for the City of New York at any time

25    between 2005 and 2020 applied?

10

1                    C. ERATH

2        A.    That is my understanding.

3        Q.    And did you prepare this

4    spreadsheet or did someone prepare it for

5    you?

6        A.    I did not prepare it.

7        Q.    Do you know who did prepare it?

8        A.    I received it from counsel.

9        Q.    Other than that, you don't know

10   who prepared it or have no idea who

11   prepared it?

12       A.    Not off the top of my head.

13       Q.    And this is the spreadsheet

14   that is first referred to on Page 2 of your

15   report near the bottom of Page 2?  You will

16   see in the last paragraph on Page 2, the

17   second sentence begins:  I obtained data

18   showing exams applied for by those who held

19   an FPI position during the 2005 to 2020

20   period studied by G&S.

21            Do you see that?

22       A.    I do see that, and that does

23   appear to be the first reference.

24       Q.    And when you refer to G&S,

25   that's referring to Drs. Goldstein and

11

                    C. ERATH

1

2   Scherbaum?

3        A.    Not Gilbert and Sullivan.

4        Q.    Are you a Gilbert and Sullivan

5   fan?

6        A.    Not their entire cannon, but I

7   am partial to Pirates of Penzance.

8        Q.    Could we go down to item six of

9   the materials relied upon?  Do you have it?

10       A.    Yes.

11       Q.    It is described as OES data for

12  fire inspectors and investigators, NS

13  construction inspectors, accessed at

14  bls.gov.

15             Do you see that?

16       A.    Yes.

17       Q.    Is this the data that you

18  referred to on Page 9 of your report?

19       A.    Yes.

20       Q.    Let's go back to item ten.  It

21  says it is inspector title employee data

22  spreadsheet.  What is this?

23       A.    I'm drawing a complete blank on

24  what this is.

25       Q.    Well, could this be the data

1                    C. ERATH

2    produced in this case showing human

3    resources actions affecting inspectors from

4    2005 to '20?

5        A.    Yes.

6        Q.    And then above it, item nine

7    says DCAS supplement for associate

8    inspector construction spreadsheet.

9              Is that a supplement that was

10   produce separately from the spreadsheet

11   that is item ten?

12       A.    Yes.

13       Q.    Is it your understanding that

14   this supplement was produced in June of

15   2021?

16       A.    I don't know when it was

17   produced.

18       Q.    The 11th item refers to Ronald

19   Ehrenberg and Robert Smith, Modern Labor

20   Economics, 8th edition.

21             Dr. Erath, I went online and

22   found an Ehrenberg and Smith book called

23   Modern Labor Economics Theory and Public

24   Policy.  Is that what you are referring to?

25       A.    I suspect it's the same.  I

13

                          C. ERATH
1
2    don't recall the subtitle one way or the
3    other, but they -- their textbook is
4    certainly called Modern Labor Economics.
5         Q.    And the version that you have
6    available is the 8th edition?
7         A.    It's the one that I had at
8    arm's reach.
9         Q.    I assume that there are lots of
10   labor economics textbooks out there in the
11   world.  Is there some reason that you
12   referred to Ehrenberg and Smith, as opposed
13   to other textbooks?
14        A.    No overpowering reason.  I
15   mean, you're right, there are several
16   textbooks.  I've all been of the opinion
17   that Ehrenberg and Smith is among the
18   normally considered books, not the only one
19   by any stretch of the imagination, but it's
20   a mainstream labor text, so that's what I
21   was looking for.
22        Q.    And as far as you know, it
23   reliably sets out labor economics
24   principles?
25        A.    That's awfully broad.  You just

14

1                    C. ERATH

2    asked me to -- to agree with everything in

3    it.  So I'm sure the principles are

4    accurately stated, but, you know, it's --

5    it's certainly a generally-used text in

6    labor and economics.

7          Q.    The 12th item is called FDNY

8    fire inspection inspector flier.  Do you

9    see that?

10         A.    Yes.

11         Q.    And is this the flier that you

12   referenced near the bottom of Page 5 of

13   your report, the last paragraph?

14         A.    Yes.

15         Q.    Do you know the date of this

16   flier, or do you have a copy of it at the

17   end?

18         A.    I don't know the date, although

19   it has to be relatively recent, since it's

20   talking about a 37-and-a-half-hour

21   workweek, and that wasn't the case from the

22   beginning of the time period.  I perhaps

23   could find a copy if you -- if you give me

24   a minute.

25         Q.    Sure, if you think you could

15

```
 1                    C. ERATH
 2    find it shortly.
 3              MS. CROUSHORE:  I can try to
 4         find it too, Chris and Mike.
 5              MR. LIEDER:  It is just that
 6         there are a number of fliers and so I
 7         don't know which one he is talking
 8         about.
 9    A.    I found it.
10    Q.    If you could send it to Amanda.
11              MR. LIEDER:  And Amanda, if you
12         could send it to me, I'd appreciate
13         it.
14              MS. CROUSHORE:  Sure.
15    Q.    Let's go back to your materials
16    relied upon.  The number 13 is a document
17    that is described as
18    Cbu004-engineering-and-scientific dash
19    agreement, it goes on.
20              I will represent to you, I put
21    that into a search engine, and it appears
22    to be a collective bargaining agreement
23    covering fire protection inspectors and
24    associate fire protection inspectors, along
25    with lots of others from 2008 to '10, is
```

16

                            C. ERATH

1

2    that correct?

3         A.    Yes.

4         Q.    And how did you use that

5    document in your report or in reaching your

6    opinions?

7         A.    One thing I used it for was the

8    existence of longevity pay.

9         Q.    Did you use it for any other

10   purposes?

11        A.    I can't recall anything

12   specifically, although I certainly reviewed

13   it.  There may have been other things that

14   I gleaned from it.

15        Q.    The 14th item is a URL that at

16   the end refers to inspector boilers.  And I

17   put that into a search engine or clicked on

18   it and found that it is a notice of

19   examination for inspector boilers from

20   2003.

21             How did you use this particular

22   document in forming your opinions in this

23   case?

24        A.    I was interested in looking at

25   the differences in sought-after

17

1                         C. ERATH

2    qualifications for some of the more

3    specialized Department of Buildings

4    positions.  So this was an example of that.

5         Q.    Finally, there is a reference

6    to an e-mail concerning FPI applicants to

7    inspector construction position.

8              Do you know what e-mail you are

9    referring to here?

10        A.    The content of it is a

11   description of the, I believe, 12

12   individuals who applied who were FPIs

13   applied to the inspector construction and

14   what happened to their applications, the

15   outcomes.

16        Q.    Does it contain the actual

17   files for those individuals or merely a

18   description?

19        A.    The latter.

20        Q.    The latter?

21        A.    Yes.

22        Q.    Do you know who prepared this

23   particular e-mail?

24        A.    I don't recall.

25        Q.    Do you know what source of

18

1                        C. ERATH

2    information they used in preparing this

3    e-mail?

4         A.    I don't.

5         Q.    Were there any other documents

6    on which you relied that are not listed on

7    Page 11?

8         A.    I don't believe so.

9         Q.    Now, you state in your report

10   that the city engaged you to review the

11   report of Drs. Goldstein and Scherbaum in

12   this case.  When did the city engage you?

13        A.    I don't recall.

14        Q.    Do you have an approximate

15   date?

16        A.    Not really.

17        Q.    When did you start doing work

18   that contributed to the report that you

19   ultimately prepared?

20        A.    Probably shortly after the -- I

21   received the report.

22        Q.    So you hadn't done some

23   preliminary work before you received the

24   report?

25        A.    I had taken a look at some of

19

1                          C. ERATH

2    the data that I understood to be produced.

3    But your previous question said ended up in

4    my report, which is critique.

5          Q.    When you say had done some

6    preliminary review of the data beforehand,

7    about how long did you spend with that

8    preliminary review of the data?

9          A.    I don't know.

10         Q.    So is it fair to say that other

11   than that preliminary review of the data,

12   that you had no more than three weeks to

13   work on the report?

14         A.    I certainly didn't have a long

15   time to work on the actual critique, since

16   I needed to see what I was critiquing.

17   I'll certainly agree with that.  I had -- I

18   had the data, as we've discussed, prior to

19   that point.

20         Q.    Had you done any analysis of

21   the data prior to that point?

22         A.    I would say what I was doing

23   was more trying to make sure I understood

24   what was there.

25         Q.    Prior to receiving

20

                    C. ERATH

1

2    Drs. Goldstein's and Scherbaum's report,

3    had you attempted any analysis of the data

4    that you had received?

5            MS. CROUSHORE:  Objection.

6            You can answer.

7        A.    What do you mean by analysis?

8        Q.    Had you done more than simply

9    look at the data to see what type of

10    information was there?

11        A.    I had spent some time trying to

12    make sure I understood what appeared to be

13    anomalies in the data, just so I could, you

14    know -- when I got the report, I would know

15    what I was working with.

16        Q.    Aside from making that effort

17    to identify and understand any anomalies in

18    the data, had you done additional work?

19        A.    I don't think so.

20        Q.    Dr. Erath, do you remember that

21    I deposed you in the case of Richardson

22    versus City of New York in April of 2020?

23        A.    I don't have the date set in

24    mind, but I have a general recollection.

25        Q.    Roughly a year ago?

21

C. ERATH

1

2    A.    Sounds right.

3    Q.    Do you recall testifying at

4  that time that roughly half of your

5  billable work was as a testifying expert

6  and approximately half as a consultant?

7    A.    Sounds right.

8    Q.    And would you make that same

9  rough estimate?

10    A.    As long as we agree on the word

11  rough, yeah.

12    Q.    So let's focus on what is

13  roughly half of your billable work in which

14  you serve as a testifying expert, as

15  opposed to a consultant.  And then could

16  you turn to what was marked as Exhibit 2,

17  your CV?

18    A.    I have it.

19    Q.    And could you turn to Page 3 of

20  the CV under testimony?

21    A.    I'm there.

22    Q.    Good, thank you.

23        Is this testimony arranged at

24  least roughly in reverse chronological

25  order?

22

1                    C. ERATH

2       A.    Again, roughly.

3       Q.    And so that at least roughly,

4    Foster versus City of New York would have

5    been the most recent case in which you had

6    given testimony at the time that you

7    prepared this CV or updated it?

8       A.    We can -- we can take roughly

9    out of that sentence.  That was the last

10   one.  With the understanding that that

11   deposition was actually taken

12   simultaneously with the De La Cruz, which

13   was next, so you have to flip a coin to see

14   which one was later.

15      Q.    And approximately when were you

16   deposed in the Foster and De La Cruz

17   matters?

18      A.    Maybe a month ago.

19      Q.    You will notice that of the

20   first ten listings starting with Foster and

21   De La Cruz, nine of them involve litigation

22   against the City of New York?

23      A.    Yes.

24      Q.    In each of those cases, were

25   you retained by the city?

23

1                          C. ERATH

2        A.    Yes.

3        Q.    So of those ten, at least

4    roughly, Worley would have been the one

5    that was earliest in time?

6        A.    Roughly.

7        Q.    And approximately when did you

8    testify in the Worley case?

9        A.    I can guess.  I don't recall.

10       Q.    Two years ago?

11       A.    I'm -- I was going to guess

12   three but not with a lot of confidence.

13       Q.    So in the last roughly three

14   years, you have testified in at least nine

15   cases for the City of New York, is that

16   right?

17       A.    Roughly.

18       Q.    Now, you said that the Foster

19   and De La Cruz deposition occurred

20   simultaneously, right?

21       A.    That's right.

22       Q.    Were the cases brought as

23   related cases, do you know?

24       A.    I don't know.

25       Q.    In any of the other of the nine

24

                        C. ERATH

1

2    cases through Worley for which you were

3    testifying for the City of New York, were

4    the depositions simultaneous, as they were

5    in De La Cruz and Foster?

6         A.    Only the fourth entry there

7    where they're all on the same line.

8         Q.    Before the deposition testimony

9    in each of these cases, did you prepare a

10   written report?

11        A.    I think so.

12        Q.    Have any of the cases gone to

13   trial yet?  Let me ask that differently.

14   Have you testified at trial in any of these

15   cases?

16        A.    No.

17        Q.    Do you know, are there plans

18   for you to testify at trial in any of these

19   cases?

20        A.    I don't know.

21        Q.    In each of these cases for

22   which you have been retained by the City of

23   New York in the last three or so years, and

24   I know that that's a rough estimate, have

25   you billed the city for your work at your

25

1                    C. ERATH

2    normal billing rate?

3        A.    No.

4        Q.    In some of them you have billed

5    the city at a rate that's other than your

6    normal billing rate?

7        A.    Correct.

8        Q.    Have you billed the city at

9    lower or higher rates than you normally do?

10        A.    Lower.

11        Q.    And in which of these cases

12    have you billed the city at a lower billing

13    rate?

14        A.    To the best of my recollection,

15    all of them.

16        Q.    What is your normal billing

17    rate?

18        A.    575.

19        Q.    And what do you bill the city

20    at?

21        A.    500.

22        Q.    And are you also billing the

23    city at $500 an hour for your work in this

24    case?

25        A.    Yes.

26

1                          C. ERATH

2        Q.    Have you currently been

3    retained by the city in any other matters

4    in which you have not yet given testimony?

5        A.    Yes.

6        Q.    Which other matters are they?

7        A.    I don't know that I've been

8    identified, so I'm hesitant to answer that

9    question.

10        Q.    One case where I saw your name

11    in a Lexis report is Local 3621, EMS

12    Officers Union, versus City of New York.

13    Have you been retained in that case?

14        A.    Doesn't ring a bell, but I

15    might not know the formal caption.

16        Q.    This is a case alleging racial

17    and gender discrimination by officers of

18    the emergency medical service, EMS.

19        A.    Okay.  Yes is the answer to

20    your question.  I have worked on that.

21        Q.    Is this list of testimony in

22    your Exhibit 2 testimony given within the

23    last four years?

24        A.    Roughly.  Probably goes a

25    little farther in.

27

1                          C. ERATH

2        Q.    Are there any other cases as

3    you look at this list in which the city has

4    engaged you in the past four years and you

5    have given testimony that is not listed on

6    this CV?

7        A.    The only one I can think of is,

8    I have worked on a lawsuit where the named

9    plaintiff is Gulino, G-U-L-I-N-O, and I

10   don't have it listed here because the case

11   is before a special master.  And we've met

12   and talked to him, and it never was clear

13   to me what counted as testimony and what

14   wasn't, since it was not in -- even before

15   the pandemic was not in a formal setting.

16       Q.    About what percentage of your

17   expert work within over the past four years

18   would you say was done for the City of New

19   York?

20       A.    I don't have a number, but if

21   you'd like me to take a guess, I can do

22   that.

23       Q.    Okay, please do.  Best

24   estimate.

25       A.    Around half.

28

                          C. ERATH

1

2       Q.    How about in the last three

3    years where you show nine of the ten cases

4    listed at the top of your testimony list as

5    being for the City of New York, is it more

6    than half?

7       A.    I would say around half.

8       Q.    In addition to your expert

9    witness work for the City of New York, do

10   you do any consulting work for the City of

11   New York?

12      A.    I don't believe so.

13      Q.    Dr. Erath, could you turn back

14   to your expert report, first page?  You say

15   in the first paragraph, I think third

16   sentence:  I received a Ph.D. in economics

17   from the University of Wisconsin where my

18   fields of interest included labor

19   economics, econometrics, and industrial

20   organization.

21           Do you see that?

22      A.    Yes.

23      Q.    What do you mean by the

24   reference to industrial organization?  Do

25   you mean industrial, biopsychology or

                         C. ERATH

1

2    something else?

3         A.    I do not mean psychology.

4         Q.    What do you mean by the phrase

5    "industrial organization"?

6         A.    It's a field within economics,

7    generally understood to be the interplay

8    between firms in the competitive market.

9         Q.    What do you mean by interplay

10   between firms in the competitive market?

11        A.    You could think of it as the

12   study of firm behavior, how your firm might

13   respond to a new product introduction by my

14   firm, for instance.

15        Q.    It doesn't get down to the

16   level of personnel decisions by a firm?

17        A.    It could, although we're sort

18   of crossing into labor economics at that

19   juncture.

20        Q.    You say that you did not mean

21   to include industrial organizational

22   psychology in the phrase industrial

23   organization, is that right?

24        A.    That is right.

25        Q.    In your graduate work, did you

30

                         C. ERATH

1

2    take any courses in industrial

3    organizational psychology?

4         A.    No.

5         Q.    In your undergraduate work, did

6    you take any courses in that area, if you

7    remember?

8         A.    I did not.

9         Q.    Have you ever instructed a

10   course in IO psychology?

11        A.    No.

12        Q.    Since your graduation, have you

13   written at all in the field of IO

14   psychology?

15        A.    No.

16        Q.    Have you given any testimony as

17   an expert witness in the field of IO

18   psychology?

19        A.    No.

20        Q.    Have you done any consulting

21   work in the field of IO psychology?

22        A.    No.

23        Q.    So is it fair to say you don't

24   hold yourself out as an expert in the field

25   of IO psychology?

31

1                    C. ERATH

2       A.    Yes.

3       Q.    You do consider yourself an

4  expert in the field of labor economics, is

5  that right?

6       A.    Yes.

7       Q.    Are there any other fields that

8  you consider yourself an expert in?

9       A.    Statistics.

10      Q.    Anything else?

11      A.    You can throw econometrics in

12  there, which is the crossover between the

13  two.

14      Q.    Have you ever performed a job

15  analysis?

16      A.    What do you mean by that?

17      Q.    As an IO psychologist would

18  define the term, have you ever performed a

19  job analysis?

20            MS. CROUSHORE:  Objection.

21      A.    I -- that doesn't help me with

22  the clarification I sought.

23      Q.    Had you ever performed an

24  analysis of a particular job to determine

25  the job duties and knowledge, skills and

32

```
 1                    C. ERATH
 2    abilities needed to perform those job
 3    duties?
 4         A.    I have not.
 5         Q.    Would you turn to Page 2 of
 6    your report, footnote one.  The footnote
 7    starts out:  I am not a job content expert.
 8              What do you mean by job
 9    content?
10         A.    The specific tasks performed by
11    one job as opposed to another.
12         Q.    And you then say you take no
13    position on the nature of the work portion
14    of the report of Drs. Goldstein and
15    Scherbaum beyond the labor market evidence
16    that you describe in your report.
17              By the nature of the work
18    portion, do you mean the section of their
19    report that begins on Page 20, if you look
20    at Exhibit 3?
21         A.    That looks right.
22         Q.    So you are taking no position
23    on whether the inspector jobs at the fire
24    department and the Department of Buildings
25    are similar except to the extent of the
```

33

```
 1                    C. ERATH
 2   labor market evidence that is presented in
 3   your report, is that correct?
 4             MS. CROUSHORE:  Objection.
 5        A.    Apart from what I discuss in my
 6   report, that's correct.
 7        Q.    And I think it's pretty clear
 8   from what I asked.  Is the labor market
 9   evidence that you present in your report
10   presented in your capacity as a labor
11   economist, rather than as an IO
12   psychologist?
13        A.    Yes.
14             I can use a bathroom break,
15   whenever you have a moment.
16        Q.    I actually was thinking I need
17   to get some water, so why don't we take a
18   five-minute break.
19        A.    That would be great.  Thank
20   you.
21        Q.    Okay, see you soon.
22             (Whereupon, a short recess was
23        taken.)
24        Q.    Dr. Erath, at the bottom of
25   Page 2 of your report, Exhibit 1, you said
```

34

```
 1                      C. ERATH
 2   that the data that you obtained about exams
 3   for which people holding an FPI position by
 4   2005 to '20 covered 669 fire protection
 5   inspectors.
 6              Do you see that?
 7        A.   Yes.
 8        Q.   Did you make any attempt to
 9   determine the number of FPIs during the
10   period of May 2017 through the end of the
11   data?
12        A.   No.
13        Q.   You may have noted that on Page
14   11 of their report, Drs. Goldstein and
15   Scherbaum state that there were a total of
16   507 unique individuals during that period
17   of 2017 to 2020.  Do you see that?
18        A.   I'm sorry, which page?
19        Q.   Page 11, second paragraph.
20        A.   I see it.
21        Q.   Did you attempt to replicate
22   that number?
23        A.   Yes.
24        Q.   And were you able to do so?
25        A.   I may not have gotten precisely
```

35

1                         C. ERATH

2    507 but something quite close to that if

3    not.

4         Q.    Could you turn to Drs.

5    Goldstein and Scherbaum's report, original

6    report on pages nine to ten, Table 1?

7         A.    I'm there.

8         Q.    And you will see that this

9    table presents their counts of the number

10   of fire protection inspectors and the

11   number of Department of Building inspectors

12   with various job titles.  Is that what it

13   purports to do?

14        A.    That is how they describe it,

15   yes.

16        Q.    And then you state in your

17   report on Page 8 that you could replicate

18   some of their numbers but not all of them,

19   is that correct?

20        A.    It is correct that I could

21   replicate some of them, yes.

22        Q.    Were you able to replicate the

23   numbers that they gave for fire protection

24   inspectors?

25        A.    Some of them.

36

                              C. ERATH

1

2        Q.    Do you know which ones for the

3    fire protection inspectors you were not

4    able to replicate?

5        A.    I didn't make specific note of

6    it, but the recollection I have is, it was

7    more problematic for the later years.

8        Q.    Here I am asking just about the

9    fire protection inspectors, not the DOB

10   inspectors.  You are saying even for the

11   fire protection inspectors, it was

12   problematic in the later years?

13       A.    That's my recollection,

14   although I did preface it by saying I did

15   not take notes as to which years matched

16   and which did not.

17       Q.    Even if you didn't take notes

18   on which years, did you note how many of

19   the years you had a disagreement on their

20   counts of fire protection inspectors?

21       A.    No.

22       Q.    Again limited to fire

23   protection inspectors, were any of the

24   disagreements in numbers where you weren't

25   able to replicate by more than five

37

                           C. ERATH

1

2    percent?

3          A.    I don't recall specifically,

4    but my guess would be no.

5          Q.    You said your guess would be

6    no?

7          A.    Yes.

8          Q.    Now, you go on to state at Page

9    8 that their counts are off for associate

10   construction inspectors in 2020 when they

11   report 98 people with that title, even

12   though the title was eliminated in 2019.

13               Do you see that?

14         A.    I see that example of a

15   mistake, yes.

16         Q.    Have you reviewed their

17   rebuttal report?

18         A.    Yes.

19         Q.    And they explain that they did

20   double count where construction inspectors

21   moved in a year between the associate and

22   the non-associate level position, is that

23   right?

24         A.    Frankly, I found their

25   explanation somewhat confusing.  You're

38

1                     C. ERATH

2      right that they did admit to double

3      counting and particularly in regard to the

4      2020 associate inspector construction, but

5      it wasn't clear to me if that was the

6      extent of the double counting they were

7      admitting to.

8          Q.    Let's look at their rebuttal

9      report, which was marked as Exhibit 13, and

10     look at the appendix A, which is a series

11     of tables, and the first of them, which is

12     Table 1.

13              Now, you will see in Table 1

14     that there are for four years numbers in

15     bold below numbers in regular type.  Do you

16     see that for 2007, 2008, 2019, and '20?

17         A.    Yes.

18         Q.    And do you understand from the

19     report that Drs. Goldstein and Scherbaum

20     considered the bolded numbers the corrected

21     numbers?

22         A.    That sounds right.

23         Q.    Did you attempt to replicate

24     the bolded numbers to see if you agreed

25     with those bolded numbers?

39

                         C. ERATH

1

2       A.     No.

3       Q.     Do you have any understanding

4   as you sit here today whether you think

5   that the numbers as they appear in bold are

6   correct or incorrect?

7       A.     Like I said, I haven't checked

8   them.

9       Q.     Could you turn to the next page

10  of the rebuttal report, Table 2?  And --

11      A.     I'm sorry, the rebuttal report?

12      Q.     Yes.

13      A.     Okay.

14      Q.     And you will again see numbers

15  in bold for 2007, '08, '19 and '20.

16             Did you attempt to replicate

17  the numbers in bold?

18      A.     No.

19      Q.     You will see that under

20  associate inspector construction, it now

21  shows zero individuals in 2020.  Do you see

22  that?

23      A.     Yes.

24      Q.     Is that your understanding of

25  what the numbers should be in 2020?

40

1                    C. ERATH

2        A.    Yes.

3        Q.    I asked you generally, but to

4    be specific, did you check the number in

5    2019 to see if you agreed with it?

6        A.    I did not.

7        Q.    You said that you didn't

8    understand part of Drs. Goldstein and

9    Scherbaum's explanation for the changes in

10   numbers.  What didn't you understand about

11   it?

12       A.    As I said, it was clear they

13   were saying there was double counting in

14   their original report, just the extent of

15   it wasn't clear to me.

16       Q.    Could you turn to Drs.

17   Goldstein and Scherbaum's original report,

18   and then to Page 13, which contains

19   Table 3?

20       A.    I have it.

21       Q.    If you have the ability to have

22   two documents open at once, I am also going

23   to be asking you about their rebuttal

24   report, Table 3, which is the revised

25   version of that.

41

```
 1                    C. ERATH

 2             Do you have that?

 3      A.    Yeah.

 4      Q.    Table 3 lists the percentage of

 5  minority and white inspectors in the fire

 6  department and the Department of Buildings

 7  in each fiscal year, is that correct?

 8      A.    I believe it's intended to be

 9  as of the end of each fiscal year.

10      Q.    I believe you are correct in

11  that.

12             In your report, you do not

13  identify any of these percentages in Table

14  3 that were incorrect?  Is it correct that

15  you have not identified any numbers or

16  percentages that were incorrect?

17      A.    I think you are right.  I

18  didn't specifically talk about the

19  percentages, although obviously if the

20  counts are wrong, the percentages are going

21  to be affected as well.

22      Q.    Did you attempt to replicate

23  the percentages that are shown in Table 3?

24      A.    No.

25      Q.    If you look at rebuttal report,
```

42

1                    C. ERATH

2    Table 3, which are what they purport to be,

3    the corrected numbers, did you attempt to

4    replicate those?

5        A.    No.

6        Q.    So you have no basis as you sit

7    here now for saying whether these

8    percentages are correct or incorrect?

9        A.    I have not checked them.

10       Q.    You do report in your report on

11   Page 8 about halfway down the page that --

12   have you found it?

13       A.    I'm looking at Page 8.

14       Q.    Okay.  The report about halfway

15   down the page that the listed race in the

16   spreadsheet for a single individual can be

17   reported in one year but not another, and

18   you see no indication that Drs. Goldstein

19   and Scherbaum used that information to fill

20   in this race.  Do you see that?

21       A.    Yes.

22       Q.    How did you determine that the

23   listed race in the spreadsheet for a single

24   individual can be reported in one year but

25   not in another?

43

                         C. ERATH

1

2        A.    Reviewing the data.

3        Q.    And you are not saying that the

4    spreadsheet was blank in a given year,

5    rather, what you are saying is that the

6    race was unidentified in one year and that

7    it might be identified in another, is that

8    correct?

9        A.    That's correct.

10       Q.    So did you use the race

11   information from one year to fill in the

12   missing race information in other years?

13       A.    No.

14       Q.    Do you know how filling in that

15   information would have changed Drs.

16   Goldstein and Scherbaum's counts by race?

17       A.    I do not.

18       Q.    Or how it would have impacted

19   the percentages that they report in that

20   rebuttal Table 3?

21       A.    I have not performed that

22   calculation.

23       Q.    Did you make any assessment of

24   how often that type of change occurred?

25       A.    No formal assessment.  It's

44

```
 1                    C. ERATH

 2   something that I saw happening a number of

 3   times, but I did not render it to a figure.

 4        Q.    Does it seem right to you that

 5   there were a total of only 38 such changes

 6   over all the years?

 7        A.    That seems low, but like I

 8   said, I did not do a count.

 9        Q.    Did you attempt to assess in

10   what direction the changes were?

11        A.    What do you mean?

12        Q.    Well --

13        A.    Excuse me, sorry.

14        Q.    Are you okay?

15        A.    I think so.

16        Q.    Do you want to take a break for

17   a couple of minutes?

18        A.    I'm fine.

19        Q.    We went back and looked, and to

20   the best of our knowledge, there were a

21   total of 21 changes among DOB inspectors,

22   and 15 of them went from unknown to white.

23   Does that sound right to you, that that was

24   the predominant change among DOB

25   inspectors?
```

45

1                    C. ERATH

2       A.    I did not investigate

3    predominants.

4       Q.    If Dr. Scherbaum had gone back

5    and changed the race of those 15

6    individuals from unknown to white, it would

7    have increased the white percentage among

8    DOB inspectors, is that right?

9       A.    If that's the only change he

10   made, yes.

11      Q.    Do you know whether most of the

12   changes at fire department were from a one

13   or more minority designations to unknown?

14      A.    I'm sorry, most of what?

15      Q.    That most of the changes went

16   from a designation of someone as a racial

17   minority, whether black or Hispanic, to

18   unknown race?

19      A.    I don't know one way or the

20   other.

21      Q.    Where someone was changed from

22   a designation as a racial minority or white

23   to unknown, what do you believe that Drs.

24   Goldstein and Scherbaum should have done?

25      A.    Given that the individual has

46

```
 1                    C. ERATH
 2   an identified race at some point, they
 3   should have taken a look at what the effect
 4   would have been if they didn't use that
 5   identified race for that person rather than
 6   dropping it.
 7         Q.    So if they had done that where
 8   someone had been designated as minority and
 9   then it was changed to unknown and they had
10   counted them as minority, that would have
11   increase the minority percentages at FDNY,
12   is that correct?
13         A.    If that's the only change that
14   was made.
15         Q.    Let's assume that there were
16   only these 38 changes.  Do you believe this
17   would have had any impact on the opinions
18   that Drs. Goldstein and Scherbaum reached
19   about the differences in race between the
20   two work forces?
21         A.    I'm not going to speak for
22   them.
23         Q.    Do you believe it would have
24   had any change in the outcome of the
25   analyses that they did concerning
```

47

```
 1                    C. ERATH

 2   compensation?

 3            MS. CROUSHORE:  Objection.

 4       A.    Again, not my place to speak

 5   for them.

 6       Q.    Could you look again at

 7   rebuttal, Table 3?  You will see that the

 8   last column in the table purports to show

 9   the percentage of the DOB inspectors who

10   were white divided by the percentage of the

11   fire department inspectors who were white.

12            Do you see that?

13       A.    I see the column, yes.

14       Q.    Did you attempt to replicate

15   these numbers to determine whether they

16   were calculated correctly?

17       A.    No.

18       Q.    It purports to show that in

19   every year between 2005 and 2020, the

20   percentage of white inspectors at the

21   Department of Buildings was at least 60

22   percent higher than the percentage of white

23   fire protection inspectors, is that

24   correct?

25       A.    That is what it purports to
```

48

1                       C. ERATH

2    show.

3         Q.    Do you have any basis for

4    disputing that that ratio was always at

5    least 60 percent higher during the period

6    2005 through '20?

7         A.    I have not attempted to

8    calculate any such ratios.

9         Q.    Could you turn back to Page 8

10   of your report?  You state in the next to

11   last paragraph, the last sentence, that

12   every statistical test G&S report rests

13   upon the assumption that inspectors at FDNY

14   and DOB should have identical racial

15   composition.

16              Do you see that?

17        A.    Yes.

18        Q.    And are you referring to by

19   statistical tests to the Z score test and

20   the Fishers Exact Test that they report in

21   their Tables 4 and 5?

22        A.    I believe that is the case,

23   yes.

24        Q.    Were you referring to any other

25   tasks other than those two types of tests?

49

```
 1                    C. ERATH

 2      A.    Table 4 has a two standard

 3   deviation test.  If that's what you're

 4   referring to as Z score, then yes, we've

 5   covered that one.

 6      Q.    Yes, that's what I was

 7   referring to.

 8      A.    Then we've got it.

 9      Q.    Are there any tests that you

10   believe they could have performed to

11   properly compare the racial makeup of the

12   FDNY and DOB inspectors?

13           MS. CROUSHORE:  Objection.

14      A.    To do a proper test, they would

15   have had to take the applicant pools into

16   account.

17      Q.    Do you know whether information

18   about the racial composition of the

19   applicant pools has been made available in

20   this case?

21           MS. CROUSHORE:  Objection.

22      A.    I don't -- I don't believe it

23   has.

24      Q.    You believe that the

25   requirements to be minimal requirements to
```

50

```
 1                    C. ERATH
 2   be a DOB inspector are more difficult to
 3   meet than the minimum requirements to be a
 4   Fire Protection Inspector?
 5             MS. CROUSHORE:  Objection.
 6       A.    Difficult is a subjective term.
 7   They are certainty different.
 8       Q.    Do you have any reason to
 9   believe that the percentage of
10   African-Americans who would meet the
11   minimum requirements to be a DOB inspector
12   are different than the percentage of -- I
13   said African.  Let me start over.
14             Do you have any reasons to
15   believe that the percentage of individuals
16   who were racial minorities and applied to
17   become a Department of Buildings inspector
18   are any different than the percentage of
19   minorities among the poor who applied to
20   become a Fire Protection Inspector?
21             MS. CROUSHORE:  Objection.
22       A.    I have not studied those data,
23   but you wouldn't just want to look at
24   people who apply.  You want to look at
25   people who were -- who met the minimum
```

51

1                        C. ERATH

2    qualifications.

3         Q.    And do you have any reason to

4    think that those who met the minimum

5    qualifications among the applicants were

6    different in racial composition?

7         A.    I have not studied the data.

8         Q.    In the absence of that data to

9    study, is the most that you believe that an

10   expert who wanted to compare the racial

11   makeup of the fire department and

12   Department of Building inspectors do is to

13   report the percentages of white and

14   minority inspectors in each agency?

15              MS. CROUSHORE:  Objection.

16        A.    I mean, you say the most you

17   can do.  I mean, without looking at who met

18   the qualifications, I don't think it's a

19   terribly useful exercise one way or the

20   other.

21              You know, if you're asking me

22   if you have data only on head counts then,

23   you know, perhaps you shouldn't take that

24   next step without having the correct data

25   to do this sort of analysis.

52

                          C. ERATH

1

2          Q.    Could you turn to Table 17 of

3    the Goldstein Scherbaum report, which is at

4    Page 43, and the corrected table and the

5    rebuttal report, which is Table 6.  Have

6    you found them?

7          A.    I am looking at Table 6 in the

8    rebuttal report.  The -- I'm sorry, you

9    said -- oh, Table 17?

10         Q.    Yes.

11         A.    Got you, yeah, I have them.

12   Sorry.

13         Q.    Okay.  These tables report the

14   average salary per hour of fire department

15   and Department of Building inspectors, both

16   new hires and incumbents, is that right?

17         A.    That's what it says.

18         Q.    In your report, you don't state

19   any disagreements with any of these

20   numbers, is that correct?

21         A.    I think I have a fairly large

22   disagreement with the entire concept.

23         Q.    And we will get to that.  But

24   in terms of the math, did you have a

25   disagreement with any of the numbers?

53

1                    C. ERATH

2        A.    I did not try to replicate

3    them.

4        Q.    Did you look at their coding

5    that was produced to you or produced to the

6    city and presumably given to you to see if

7    you thought their coding was incorrect?

8        A.    Generally, yes.  In this part,

9    I don't recall looking specifically at this

10   part.

11       Q.    When you say "generally, yes,"

12   what do you mean by generally, yes?  You

13   looked at the coding generally?

14       A.    Yes.  I mean, that's where I

15   gleaned, for instance, the double counting

16   problem.

17       Q.    But you didn't look at the

18   coding for this one, you are saying?

19       A.    I don't have any recollection

20   of it.  I may have.

21       Q.    So as far as you know now, the

22   differences per hour between the average

23   salary of fire department and Department of

24   Building inspectors, new hire inspectors,

25   that they report are correct?

54

1                    C. ERATH

2              MS. CROUSHORE:  Objection.

3      A.    I don't know one way or the

4   other.

5      Q.    And the same is true for what

6   they report in terms of incumbent

7   inspectors, that you don't know one way or

8   another whether the figures are correct?

9      A.    I did not attempt to verify

10  them.

11     Q.    Now, part of your critique is

12  that Drs. Goldstein and Scherbaum did not

13  consider the value to fire protection

14  inspectors if they did not work a 40-hour

15  week, is that correct?

16     A.    Part of it, yes.

17     Q.    And I am going to discuss that

18  later, but I want to focus for now on their

19  efforts to compare pay, salary.

20          Do you agree that in comparing

21  salaries, it was proper for them to convert

22  salaries to their hourly rates?

23     A.    So in answering that question,

24  contingent on some value being given to

25  that sort of comparison, you're asking me

55

C. ERATH

1    would -- if I have to do that, would I use

2    salary or an hourly rate?

3    Q.    Yes.

4    A.    In -- with that constraint, the

5    hourly rate is superior, although you would

6    want to look at what people are actually

7    paid, which is not what they do.

8    Q.    And by what people are actually

9    paid, including other types of pay beyond

10   salary, is that right?

11   A.    Yes.

12   Q.    But if I understood your

13   answer, if you were to try to compare

14   salaries, you believe it would be

15   appropriate to convert to hourly rate, as

16   they did?

17   A.    You omitted both of my caveats

18   there.  But putting them back in, it is

19   better to look at an hourly rate than

20   salaried rate -- than a salary.  But again,

21   subject to what we -- what I mentioned in

22   my previous answer.

23   Q.    With the caveats that you have

24   expressed, in this case, did Drs. Goldstein

56

                        C. ERATH

1

2      and Scherbaum do the conversion from salary

3      to hourly rates correctly?

4           A.    I did not check that.

5           Q.    If you look at rebuttal report,

6      Table 6 you will see that Drs. Scherbaum

7      and Goldstein present the average salary

8      for new hires, then incumbents for the fire

9      department and Department of Buildings in a

10     difference per hour and then finally

11     statistical significance.  Do you see that?

12          A.    Those are the column heads.

13          Q.    And did you attempt to

14     replicate their calculations of whether the

15     differences were statistically significant?

16          A.    No.

17          Q.    They determined statistical

18     significance using T-tests, one for new

19     hires and one for incumbents, is that

20     correct?

21          A.    I see them talking about an

22     analysis of variants.

23          Q.    Was that the discussion of the

24     analysis of variants in connection with

25     rebuttal Table 6 or the analogous Table 17

57

```
 1                    C. ERATH
 2   in the original report?
 3        A.    Yeah, I'm looking at the
 4   original report.
 5        Q.    Is an analysis of variants a
 6   T-test?
 7        A.    It's a relative of T-tests.
 8        Q.    Is that an appropriate type of
 9   methodology to compare average salaries of
10   two groups, given your caveats?
11        A.    A T-test?
12        Q.    Yes.
13        A.    If you're not trying to take
14   any other characteristics into account, if
15   you're -- you're basically assuming there
16   are no other relevant factors, so I should
17   just compare average A to average B, then
18   yes, a T-test is fine.
19        Q.    Did you review their
20   programming to determine whether they
21   performed the T-test correctly?
22        A.    No.
23        Q.    One of your caveats, one of
24   your criticisms, is that they were asked to
25   analyze compensation, and they analyzed
```

58

1                    C. ERATH

2    only differences in base salary, is that

3    correct?

4        A.    I'm not sure what you're asking

5    me, but I do say, yes, they should have

6    looked beyond base salary.

7        Q.    And you refer in your report to

8    length of service as length of service,

9    bumps in pay as one of those other types of

10   payment, is that correct?

11       A.    That is correct.

12       Q.    And you don't identify any

13   others, but you say there are some other

14   lesser payments, is that also right?

15       A.    I believe so.

16       Q.    You don't include in your

17   report any analysis of these other pay

18   components, do you?

19       A.    I do not.

20       Q.    Did you form any analysis on

21   these other types of pay components to see

22   if there were disparities between FDNY and

23   DOB inspectors in the amount they received?

24       A.    No.

25       Q.    Both fire department and

59

1                         C. ERATH

2    Department of Building inspectors can

3    qualify for length of service and other

4    types of bumps in pay, is that right?

5         A.    Yes.

6         Q.    Do you know as you sit here

7    today whether fire department or Department

8    of Building inspectors on average

9    receive -- which of these received more in

10   these types of pay components?

11        A.    I do not.

12        Q.    So if Department of Building

13   inspectors will now receive more than fire

14   department inspectors in these types of

15   increases on average, it would increase the

16   compensation differentials, whereas if it

17   went the other way it would decrease them,

18   is that right?

19        A.    I'm struggling with your use of

20   compensation differentials.  If you're

21   talking about increasing or decreasing what

22   Goldstein and Scherbaum find, yes, then I

23   agree.

24        Q.    So if you had been asked to

25   analyze whether there were disparities in

60

1                    C. ERATH

2    pay between fire protection inspectors and

3    Department of Building inspectors, you

4    certainly would have looked at salary as

5    stated, isn't that correct?

6        A.    Yes, salary would be a

7    component of -- of a proper analysis.

8        Q.    And you also would have looked

9    at these other components, is that right?

10       A.    These other components being?

11       Q.    Length of service and these

12   other lesser pay implements.

13       A.    I certainly would have

14   considered all elements of compensation.

15            MS. CROUSHORE:  I object to the

16        form of that question.

17       Q.    So if you were tasked with

18   doing this, how could you have integrated

19   the differences in pay with these -- I'm

20   sorry, differences in salary with these

21   other types of pay increments?

22            MS. CROUSHORE:  Objection.

23       A.    Not sure what -- I'm not sure

24   what you're asking.

25       Q.    If you had been asked to

61

```
  1                      C. ERATH
  2   analyze whether fire protection inspectors
  3   or Department of Building inspectors were
  4   paid more or whether they were paid the
  5   same, and you knew that both of them
  6   received salaries and both received these
  7   other types of increments in pay, how would
  8   you have gone about integrating these
  9   different types of pay to determine whether
 10   fire protection inspectors or Department of
 11   Building inspectors were paid more?
 12            MS. CROUSHORE:  Objection.
 13       A.    Presuming you saw some value in
 14   such an analysis, you could take a look at
 15   each of the other components of pay beyond
 16   salary and make a decision whether those
 17   should be included or not.
 18       Q.    And what would you base your
 19   decision on whether they should be included
 20   or not?
 21       A.    Hard to say in abstract.
 22   Something like longevity differentials that
 23   are, as I understand it, automatic per the
 24   collective bargaining agreement.  I think
 25   if there's an assignment differential that
```

62

```
 1                      C. ERATH
 2   a small fraction of people in one job
 3   receive for, you know, a very different
 4   sign-up than everybody else does, perhaps
 5   not.  But, you know, you would have to take
 6   a look at each one.
 7        Q.    Did you look at all the
 8   relative importance of salary compared to
 9   these other components in total
10   compensation?
11             MS. CROUSHORE:  Objection.
12        A.    No.
13        Q.    So you don't know whether these
14   other components comprise ten percent of
15   total compensation or one percent or what
16   it might be?
17        A.    I mean, we would have to talk
18   about defining what you mean by total
19   compensation in -- to answer that question.
20   But I didn't perform any sort of
21   mathematical calculation to say, you know,
22   there's this much in differentials, that
23   much in salary, that much in benefits or
24   anything along those lines.
25        Q.    Do you know whether the average
```

63

                    C. ERATH

1

2    length of service and other pay components

3    was less than two percent of the average

4    compensation and salary?

5              MS. CROUSHORE:  Objection.

6         A.   I do not.

7         Q.   You do agree though, don't you,

8    that salary was a much larger component of

9    pay than these other forms of compensation?

10        A.   If you're speaking of the

11   differential such as the longevity

12   differential, yes, salary is certainly

13   larger than those differentials.

14        Q.   But again, you don't know how

15   much larger?

16        A.   Correct.

17        Q.   Do you have any basis for

18   believing that if Drs. Goldstein and

19   Scherbaum have factored in longevity and

20   other differentials into their salary

21   analysis, that their findings of

22   statistically significant pay differences

23   between fire department and DOB inspectors

24   would have changed?

25        A.   I don't know one way or the

64

1                         C. ERATH

2    other.

3         Q.    Let's turn to Table 8 in the

4    rebuttal report.

5              Did you attempt to replicate

6    any of the numbers in Table 8?

7         A.    No.

8         Q.    Or to determine whether

9    Drs. Goldstein's and Scherbaum's

10   calculations at the disparities were

11   statistically significant were correct?

12        A.    I did not attempt to replicate

13   the numbers in this table.

14        Q.    Or the statistical significance

15   determinations?

16        A.    That's right.

17        Q.    In their original report,

18   starting at Page 46, don't Drs. Goldstein

19   and Scherbaum start to describe a multiple

20   regression analysis that they performed?

21        A.    They say so, yes.

22        Q.    And they report the results of

23   that multiple regression analysis in Table

24   20 on Pages 47 and 48?

25        A.    That is what they say.

65

C. ERATH

1

2      Q.     And they also have corrected

3   numbers for that multiple regression

4   analysis in Table 9 of their rebuttal

5   report, is that correct?

6      A.     Yes.

7      Q.     Did you review the programming

8   for the multiple regression analysis?

9      A.     No.

10     Q.     Did you attempt to replicate

11  any of the figures?

12     A.     No.

13     Q.     Now, you state in your report

14  that they made no attempt to take education

15  or pre-New York City or pre-FDNY DOB

16  experience into account, is that right?

17     A.     Yes.

18     Q.     Did you perform a multiple

19  regression that did take education into

20  account?

21     A.     No.

22     Q.     Or take pre-New York City

23  experience into account?

24     A.     No.

25     Q.     To the best of your knowledge,

66

```
 1                    C. ERATH
 2   does New York City maintain a fully
 3   populated electronic record of educational
 4   achievements of FDNY and DOB inspectors?
 5              MS. CROUSHORE:  Objection.
 6        A.    I have not seen it.
 7        Q.    Given your work in other cases
 8   for the City of New York, including the
 9   Richardson case, do you have any knowledge
10   as to whether they -- the city maintains a
11   fully calculated record of educational
12   achievements?
13              MS. CROUSHORE:  Objection.
14        A.    I don't know of such a
15   database.
16        Q.    Or even one that's halfway --
17   are you aware of any electronic database
18   that the city maintains concerning
19   education that's even halfway populated?
20              MS. CROUSHORE:  Objection.
21        A.    I am not.
22        Q.    How do you propose that
23   Drs. Goldstein and Scherbaum should have
24   taken educational achievements into
25   account?
```

67

1                          C. ERATH

2       A.    They should have included it in

3    their model.

4       Q.    And without electronic data,

5    how were they supposed to include it in

6    their model?

7             MS. CROUSHORE:  Objection.

8       A.    They could have sought the

9    information from hard copy for a random

10   sample of the people involved, for

11   instance.

12      Q.    Short of that type of effort,

13   are you aware of any other means that they

14   could have employed to include education in

15   their model?

16            MS. CROUSHORE:  Objection.

17      A.    I believe the city does have

18   partial information on education, as you've

19   alluded to, so they could have sought to do

20   something along -- using those data.

21      Q.    What types of controls does the

22   city have to determine whether the

23   information in that electronic record or

24   set of electronic records is correct?

25            MS. CROUSHORE:  Objection.

68

1                      C. ERATH

2        A.    I don't know.

3        Q.    Does New York City maintain an

4    electronic record of pre fire department or

5    DOB experience for fire department and

6    Department of Building inspectors?

7              MS. CROUSHORE:  Objection.

8        A.    They certainly have a record of

9    their New York City experience prior to

10   joining either of those two agencies.

11       Q.    Do they have a record of their

12   pre New York State experience?

13             MS. CROUSHORE:  Objection.

14       A.    I don't know.

15       Q.    How do you propose that

16   Drs. Goldstein and Scherbaum should have

17   taken pre New York City experience into

18   account?

19       A.    My criticism is twofold.  First

20   is, if we were to accept that those data

21   don't exist, that does not absolve them

22   from leaving out relevant factors.  But

23   secondary, again, they could have attempted

24   to calculate the -- to collect it for a

25   random sample of the people involved from

69

1                          C. ERATH

2    some hard copy records.

3         Q.    Do you know if the DOB

4    inspectors have greater educational

5    accomplishments measured by degrees on

6    average than do fire department inspectors?

7               MS. CROUSHORE:  Objection.

8         A.    I have not studied that

9    question one way or the other.  The

10   educational requirements are certainly

11   different on the NOEs.

12        Q.    Do DOB inspectors have more

13   relevant pre New York City employment

14   experience than do fire department

15   inspectors?

16              MS. CROUSHORE:  Objection.

17        A.    I have not studied the

18   question, but the experience requirements

19   on the NOEs are certainly different for the

20   two positions.

21        Q.    Can you look at rebuttal

22   report, Table 9.  There is a column

23   entitled R squared.  Do you see that?

24        A.    Yes.

25        Q.    In a multiple regression

70

                          C. ERATH

1

2    analysis, what does R squared signify?

3         A.    The percentage of the variation

4    independent variable that aligns with

5    variation in independent variables.

6         Q.    And what does a value of point

7    zero indicate?

8         A.    No relation.

9         Q.    And what does a value of one

10   indicate?

11        A.    Perfect correlation.

12        Q.    If one were to look at Table 9,

13   the R squareds vary from a low of point 438

14   in 2013 to a high of point 848 in 2019, is

15   that right?

16        A.    No.

17        Q.    And in what way was that

18   incorrect?

19        A.    Point 881 is bigger than point

20   848.

21        Q.    Oh, you are correct.  It is

22   point 881, yes.

23             And if you turn to Table 10,

24   which you will see that the R squareds

25   range from a low of point 660 up to a high

71

```
 1                    C. ERATH
 2   of point 933, does that look correct?
 3        A.    You have recited the low and
 4   the high correctly, but the numbers are
 5   largely meaningless.
 6        Q.    Given these levels of
 7   R squared, do you believe that including in
 8   education and pre New York City experience
 9   would likely change the results of whether
10   the disparities were statistically
11   significant?
12             MS. CROUSHORE:  Objection.
13        A.    So the levels of R squared, as
14   I just said, are largely meaningless
15   because they're reviewing data coming out
16   of people that are paid per the terms of
17   the collective bargaining agreement, so
18   it's not really telling you very much.
19             So we know that the
20   requirements are different for -- you know,
21   both in terms of education and experience.
22   So while I haven't done the analysis, it's
23   certainly possible it would make a
24   difference.
25        Q.    When you say it's certainly
```

72

1                          C. ERATH

2      possible that it would have made a

3      difference, do you believe that it is

4      probable more likely than not that it could

5      make a difference?

6           A.    I have not done the analysis,

7      so I don't know.

8           Q.    As you sit here, since you

9      haven't done the analysis, you have no way

10     of knowing whether that possibility is

11     point 001 or point 99, is that correct?

12          A.    Well, if I had done it, I would

13     know one way or the other, so we -- it

14     would be in the realm of possibilities.

15     Since I haven't done it, I don't know the

16     answer.

17          Q.    And you don't have any

18     understanding of how likely it is that it

19     would make a difference?

20          A.    I mean, I know there's likely

21     to be a difference in education and

22     experience given the difference in

23     requirements.  So would it make a

24     difference?  Almost certainly, I would say.

25     How much of a difference is much harder to

73

```
 1                    C. ERATH
 2    quantify.
 3         Q.    And whether it would make a
 4    difference in the completion that the
 5    results were statistically significant you
 6    do not know?
 7         A.    I do not know.
 8              I wouldn't mind another break
 9    when you reach a convenient stopping point.
10         Q.    Why don't we take a break now.
11    It is 12:10.  Did we want to break until
12    12:20?
13              MS. CROUSHORE:  That's fine
14         with me.
15              THE WITNESS:  Sure.
16              MR. LIEDER:  Okay.
17              MS. CROUSHORE:  Thanks.
18              MR. LIEDER:  Off the record.
19              (Whereupon, a short recess was
20         taken.)
21         Q.    Dr. Erath, before we took a
22    break, we were talking about the multiple
23    regression analyses that are reported in
24    Tables 20 and 21 in the original report and
25    Tables 9 and 10 in the rebuttal report.
```

74

```
 1                      C. ERATH

 2              In the analysis reported in

 3    Table 9, it's correct that Drs. Goldstein

 4    and Scherbaum controlled for whether

 5    someone was a new hire or incumbent and

 6    time in job, is that right?

 7         A.    So they said.

 8         Q.    And in the analysis as

 9    reflected in rebuttal Table 10, they also

10    include indicators for job title among the

11    Department of Building jobs, is that right?

12         A.    Yup, so they say.

13         Q.    In your report, you state that

14    time and current job has little relevance

15    under the collective bargaining agreements

16    other than they move from new hire to

17    incumbent after two years, is that right?

18         A.    Yes.

19         Q.    Although you say it has little

20    relevance, do you see something wrong in

21    controlling for time and job?

22         A.    It's not specified in that it's

23    leaving out things that are relevant and

24    putting in things known not to be relevant,

25    so I think that's the major problem.
```

75

C. ERATH

1

2    Q.   And when you say it's leaving

3  out things known to be relevant, are you

4  talking about education and pre New York

5  City experience?

6    A.   We could talk about that, but

7  what I had specifically in mind was, we

8  know the form of -- or the way in which

9  time and title matters.  It matters to the

10  longevity.  We discussed differentials,

11  we've been discussing.

12         So there's no debate about how

13  longevity affects compensation.  We can

14  read it right out of the collective

15  bargaining agreement.  So to specify

16  otherwise as if there's a combined effect

17  across the -- the -- the two jobs is a

18  misspecification and therefore an error.

19    Q.   Now, isn't it the case that at

20  the Department of Buildings, people may get

21  pay increases that are not specified in the

22  collective bargaining agreement?

23    A.   Yes.

24        MS. CROUSHORE:  Objection.

25    Q.   And isn't it likely that the

76

1                              C. ERATH

2      longer that one is there, the more likely

3      it is that someone will have received such

4      an increase?

5           A.    I don't know if that's true or

6      not.

7           Q.    Isn't it likely that someone

8      who has been there eight years is more

9      likely to have received an increase than

10     someone who's been there two years?

11               MS. CROUSHORE:  Objection.

12          A.    I assume we're not talking

13     about longevity increases here.  I would

14     certainly agree with you for longevity

15     increases.  The other increases, I don't

16     know the basis for which they are granted

17     and whether it has anything to do with the

18     length of service.

19          Q.    Well, the dependent variable

20     here -- and I know that you disagree with

21     this -- but the dependent variable is

22     salary, isn't that right?

23          A.    That is right.

24          Q.    So the longevity increments

25     aren't relevant, are they, to salary?

77

                            C. ERATH

1

2       A.    You are correct.  I had

3    forgotten that the Goldstein and Scherbaum

4    model omitted that component of pay, which

5    makes the misspecification more severe.

6       Q.    Given that the dependent

7    variable was salary or actually hourly pay

8    rather than salary, it wouldn't have made

9    sense to specify when the longevity

10   increments were realized, isn't that true?

11      A.    Conditional on ignoring them

12   then yes, you don't need to specify.  But

13   again, the model remains misspecified by

14   including something that has little or

15   nothing to do with the salary.

16      Q.    During your career, have you

17   analyzed pay disparities between two groups

18   of employees in situations where there

19   wasn't a collective bargaining agreement?

20      A.    Where there was not a

21   collective bargaining agreement?

22      Q.    Yes.

23      A.    Yes, I have.

24      Q.    And in any of these analyses,

25   have you controlled for time and job?

78

1                    C. ERATH

2        A.    I have.

3        Q.    Even though there is no

4   collective bargaining agreement, so there

5   is no time where it is dictated when an

6   increase will occur, is that right?

7        A.    In the absence of a collective

8   bargaining agreement, I suppose it's

9   possible there could be such a time, but

10  it's not typical.

11       Q.    Other than the increase after

12  two years from new hire to incumbent, the

13  collective bargaining agreements in this

14  case do not specify when individuals are to

15  receive increases in salary, do they?

16       A.    Setting the longevity

17  differentials aside, that's right.

18       Q.    Where the collective bargaining

19  agreement does not specify when someone may

20  get a discretionary increase, why is the

21  collective bargaining agreement situation

22  any different than the types of cases where

23  you control for time and job where there

24  was no collective bargaining agreement?

25       A.    I think the chief difference

79

1                          C. ERATH

2    here is for the fire protection inspectors,

3    most of them are paid per the collective

4    bargaining agreement at one of the two

5    rates, and therefore, a control for time

6    and title, particularly one that's mandated

7    to be the same across the two agencies, is

8    wrong.

9          Q.    While the fire protection

10   inspectors typically are paid the

11   contractually mandated minimums, you have

12   agreed that the Department of Building

13   inspectors are not, isn't that right?

14              MS. CROUSHORE:  Objection.

15         A.    I agree that the building

16   inspectors are not always but sometimes

17   paid an amount above the minimum listed in

18   the collective bargaining agreement.

19         Q.    And don't you think it's likely

20   that someone who has been there six years

21   is more likely to have received such an

22   increase than someone who's been there

23   three years?

24              MS. CROUSHORE:  Objection.

25         A.    I --

80

C. ERATH

1

2      Q.    Any time within their career,

3   someone who's been there six years is more

4   likely to have received an increase on

5   average than someone who's only been there

6   three years on average, isn't that right?

7           MS. CROUSHORE:  Objection.

8      A.    I don't know one way or the

9   other.  Doesn't change the fundamental in

10  the specification.

11     Q.    And what's the fundamental in

12  this specification?

13     A.    Failing to note that the -- for

14  fire protection inspectors, the time and

15  title is largely meaningless, and yet

16  setting up the model affects the mandate

17  for it to be the same for both agencies.

18     Q.    So you believe it was a

19  misspecification and therefore incorrect

20  for them to have controlled for time and

21  job beyond the two-year increment where

22  there was the increase from new hire to

23  incumbent, is that correct?

24     A.    As they have put it in the

25  model, it's clearly a misspecification.

81

C. ERATH

1

2    Q.    When you say as they have put

3    it in the model, what could they have done

4    differently that you think would not have

5    been a misspecification?

6    A.    For this particular issue we've

7    been discussing, time and title, they could

8    have used an interaction in turn between

9    the agency and the time and title.

10    Q.    Is it your understanding that

11    the Goldstein and Scherbaum Tables 22

12    through 26 are analogous for

13    associate-level inspectors to Tables 17

14    through 21 for inspectors?

15         MS. CROUSHORE:  I'm sorry,

16      Mike, could you please repeat that?

17      I'm not sure I followed the question.

18      Thanks.

19         MR. LIEDER:  Yes.

20    Q.    Did you understand that

21    Drs. Goldstein and Scherbaum ran the

22    analogous analyses for associate-level

23    inspectors that they did for inspectors and

24    that they report the results in Tables 22

25    through 26?

82

1                    C. ERATH

2        A.    That appears to be the case.

3    We know there's some issues with the title

4    designations that -- we're talking about

5    the original report, right?

6        Q.    Right.

7        A.    So -- but yes, it appears that

8    they are going through the same sequence.

9        Q.    And they then report the

10   corrected tables at 11 through 15 to take

11   into account the double counting, is that

12   right, Tables 11 through 15 of the rebuttal

13   report?

14       A.    It's a little hard to tell.

15   Eleven doesn't have a heading on it as to

16   whether it's associates or not, but I will

17   take your word for it.

18       Q.    Do you have any issues with the

19   Tables 22 through 26 for associate-level

20   inspectors for -- in the rebuttal report 11

21   through 15 that are unique to the

22   associate-level inspectors and weren't

23   raised also with respect to inspectors?

24       A.    Well, in the original report,

25   we have a counting issue that compounds

83

1                          C. ERATH

2    certainly the last few years and affects a

3    couple of other years as well.  But my

4    understanding is that they're using the

5    same methodology, so the same criticisms

6    apply.

7         Q.    Then we don't need to go

8    through those.

9              You criticize, Page 6 of your

10   report, their analyses for being static.

11   Do you remember that?

12        A.    Yes, I do.

13        Q.    And is it correct that you

14   raise two different types of critiques of

15   their report as being static; one is that

16   they haven't considered the number of years

17   it takes to qualify for the inspector

18   position, and the second is they haven't

19   taken into account the likelihood of being

20   promoted to the associate level, is that

21   correct?

22        A.    Yeah, broadly.

23        Q.    When you say broadly, did I

24   misstate it in some way?

25        A.    No, the second I think you're

84

                              C. ERATH

 1

 2   right, that the likelihood of promotion is

 3   certainly what I was thinking of there.

 4   You know, the first is what I had in mind

 5   when I said broadly, which is more we're

 6   just talking about the -- the timing given,

 7   their qualifications.  If that's what you

 8   meant, then we should be fine.

 9        Q.    Let's start with the first.

10   You state that in the first paragraph on

11   Page 6 there are obvious differences in the

12   time required to meet the listed

13   qualifications.  From the first listed

14   qualifications, construction inspectors

15   require five years of experience and FPIs

16   three.  Meeting requirements in three years

17   instead of five allows a candidate to begin

18   earning sooner and move to the incumbent

19   rate sooner.

20              In your report, earlier in your

21   report, don't you show that the amount of

22   time it takes to meet the minimum

23   qualification changed for construction

24   inspectors?

25        A.    I think both -- both positions

85

1                      C. ERATH

2    changed the requirements relatively late in

3    the time period under consideration.

4         Q.    In 2019 the construction

5    inspector notice reduced the years of

6    experience from five years to two years, is

7    that correct?

8         A.    That's --

9         Q.    This is on Page 4 of your

10   report.

11        A.    Yeah, that sounds right.

12        Q.    And the FDNY requirements of

13   three years of experience was not changed,

14   was not reduced, is that correct?

15        A.    I think that's right.

16        Q.    So at least since 2019, you are

17   saying that it is at least with respect to

18   this particular requirement, it now takes

19   less time to meet the construction

20   inspector requirement than the fire

21   protection inspector requirement, is that

22   right?

23        A.    You're right, it's two years

24   versus three.  I'm not sure -- you know, we

25   have to consider that more fully 'cause the

86

1                           C. ERATH

2    construction inspector is two years of work

3    experience as a carpenter, et cetera.

4              And I'm going to guess there's

5    some requirements ahead of time to getting

6    work as a carpenter, that no one would hire

7    me as a carpenter right now, for instance,

8    so -- but if you're asking if two is less

9    than three, the answer is yes.

10        Q.    There are actually multiple

11   ways to meet the minimum educational

12   experience or requirements for both jobs,

13   isn't there?

14        A.    Correct.

15        Q.    And you don't know how most

16   candidates who meet the requirements do so,

17   whether it is the experimental one or one

18   of the other requirements?

19        A.    I do not.

20        Q.    So you don't know, really know,

21   do you, whether it takes longer on average

22   for candidates to satisfy the fire

23   protection inspector or construction

24   inspector requirements?

25        A.    I haven't done the study.  If

87

                              C. ERATH

1

2    you're looking at the -- you know, the

3    listed requirements that were in place for

4    most of the period under consideration, it

5    seems pretty clear that requirements are

6    greater for the construction inspector.

7         Q.    At least the first requirement

8    was?

9         A.    And the others as well.

10        Q.    We will be talking about that.

11   Now I want to switch to promotions.  And

12   first I want to make sure I understand what

13   you did.

14              First you state that you use

15   the Goldstein and Scherbaum data file, is

16   that correct?

17        A.    I don't -- I didn't use the

18   file they produced.  I used the same data

19   upon which they relied.  So I wouldn't call

20   it the Goldstein and Scherbaum data file.

21        Q.    Okay.  So you used the same

22   file that was produced by the city but not

23   any manipulations of it that they had made?

24        A.    That is right.

25        Q.    And from that file, you

88

1                          C. ERATH

2    identified persons who were at some time at

3    the non-associate or lower level FPI or

4    Department of Building inspector position,

5    is that right?

6          A.    The -- that's the starting

7    point.

8          Q.    And this is limited to the

9    fiscal year 2005 to '20 period?

10         A.    That's right.

11         Q.    So they needed to have been at

12   the lower level at some time during the

13   2005 to '20 period?

14         A.    That's right.

15         Q.    And then you further limited

16   the universe to those who were observed for

17   at least three years, whether at the entry

18   level or associate.  And I know there's

19   also a footnote saying you could also do it

20   at one and five years but let's use the

21   three years.

22         A.    Right.  So you're exactly

23   right.  I used three in the text, relaxed

24   that assumption in other variations to see

25   if it made any difference.

89

1                          C. ERATH

2        Q.    So they had to have been either

3   entry level or associate for at least three

4   years, and they had to be an associate -- I

5   mean a lower level -- for at some point

6   during those three years?

7        A.    That's right.

8        Q.    If someone was hired at the

9   associate construction inspector level,

10  worked for the Department of Buildings for

11  more than three years and then in the 2019

12  reorganization were reclassified as a

13  construction inspector because they

14  abolished the associate construction

15  inspector position, were those people

16  included in your universe or not?

17       A.    I don't believe so.

18       Q.    You think you excluded them?

19       A.    Yes.

20       Q.    That would have been your

21  intent anyway?

22       A.    Yes.

23       Q.    And then what you did once you

24  had created this universe is, is you

25  calculated the percentage of people in the

90

1                          C. ERATH

2    universe who advanced to the associate

3    level?

4         A.    We classified people by whether

5    or not they advanced.

6         Q.    Now, this analysis that you did

7    applied to all fire protection inspectors

8    who meet your criteria, you didn't do, for

9    instance, separate analyses by unit within

10   the Bureau of Fire Protection?

11        A.    That's correct.

12        Q.    Your reason for looking at the

13   motions was to analyze increases in pay,

14   longitudinally or over time, is that right?

15        A.    Yes.

16        Q.    But why not also factor in

17   salary changes?  Why look just at motions?

18   Why not look at salary increases?

19        A.    The changes to salary were

20   already captured in a salary analysis, so

21   I'm not sure what you're asking.

22        Q.    Well, if the issue was whether

23   employees would think that they had greater

24   opportunities to get pay increase, why not

25   include both promotional increases and

91

1                    C. ERATH

2    salary increases?

3         A.    You can certainly do so.

4         Q.    The information in those files

5    included not only promotions but also

6    nonmanagerial salary changes, is that

7    right?

8         A.    What do you mean by

9    nonmanagerial?  You mean other salary

10   changes aside from becoming associate?

11        Q.    Yes, so aside from a promotion.

12        A.    I think that we had all changes

13   to salary.

14        Q.    And they had a code for

15   nonmanagerial salary change, didn't they?

16        A.    I don't recall specifically

17   what it said, but my understanding is we

18   had all of the salary changes shown there.

19        Q.    Isn't it true that the files

20   reflect only two salary rate changes for

21   fire protection inspectors?

22        A.    In 15 years, there's only two

23   changes?

24        Q.    For nonpromotional salary

25   changes for fire protection inspectors?

92

1                          C. ERATH

2          A.     I don't know.

3          Q.     And weren't there hundreds of

4    salary changes for building inspectors,

5    Department of Building inspectors?

6                 MS. CROUSHORE:  Objection.

7          A.     I didn't count them, but I will

8    agree that they are more prevalent for

9    building inspectors.

10         Q.     If you had included in both

11   promotional changes in salary and

12   nonpromotional increases in salary, what

13   would that have done to your outcome?  Do

14   you think that fire protection inspectors

15   would have received a higher percentage

16   than did building inspectors?

17         A.     When you say outcome, the only

18   analysis I'm presenting here is, you know,

19   were you promoted, yes or no.  So are you

20   asking me if I had redefined promotion to

21   include any salary increase that's not

22   managerial?

23         Q.     Instead of looking just at

24   promotions, if you had looked at both

25   promotional increases and nonpromotional

93

1                          C. ERATH

2     salary increases, do you believe that the

3     fire protection inspectors would have

4     received a higher percentage of such

5     increases than did building inspectors?

6          A.    I don't know.

7          Q.    If one were looking at

8     opportunities over time, wouldn't it be

9     appropriate also to look at the possibility

10    of a promotion beyond associate inspector

11    to administrative inspector?

12         A.    One can do so.

13         Q.    If one had done so, do you know

14    whether there would have been more

15    promotions at the Department of Building to

16    the administrative level than at the FDNY

17    to the administrative level?

18         A.    I don't know.

19         Q.    Do you know whether there are

20    more administrative inspectors at the

21    Department of Buildings than at the fire

22    department?

23         A.    No.

24         Q.    You don't know one way or the

25    other?

94

1                          C. ERATH

2         A.    I do not.

3         Q.    If I were to tell you that in

4    every year except 2018 there were fewer

5    than ten administrative fire protection

6    inspectors but between 37 and 52

7    administrative inspectors, would you

8    believe that there would probably be more

9    promotions to administrative inspector at

10   the Department of Buildings than the fire

11   department?

12              MS. CROUSHORE:   Objection.

13        A.    Then you would also have to

14   tell me to assume that there would be --

15   those promotions only come from

16   associate -- respective associate category;

17   otherwise, I can't answer it one way or the

18   other.  But as I said, I don't know the

19   numbers.

20        Q.    You also criticize

21   Drs. Goldstein and Scherbaum for not

22   factoring into compensation nonpecuniary

23   aspects of their jobs.  Do you remember

24   that?

25        A.    Yes.

95

                        C. ERATH

1

2      Q.    Did you attempt to value

3   nonpecuniary aspects of the job of fire

4   department inspectors or building

5   inspectors in this case?

6      A.    No.

7      Q.    Have you ever attempted to do

8   so in any case?

9      A.    The one that comes up with some

10  frequency is valuing time off -- actually,

11  that's not right.  There are various fringe

12  benefits that come up as well.

13     Q.    What types of fringe benefits

14  are you thinking of that are nonpecuniary

15  in nature?

16     A.    Generally speaking, insurance

17  benefits would be the primary benefit

18  there.

19     Q.    And you would consider that

20  nonpecuniary?

21     A.    Yes.

22     Q.    How do you go about valuing

23  time off?  Let me rephrase that.  Have you

24  ever valued time off?

25     A.    Not with a specific value, more

96

```
 1                    C. ERATH
 2    of bounding approach.
 3         Q.    What do you mean by bounding
 4    approach?
 5         A.    Setting an upper and a lower
 6    bound on possible value, putting a
 7    reasonable range upon it.
 8         Q.    And how do you go about putting
 9    reasonable ranges on the value of time off?
10         A.    You look at -- at economic
11    studies that address that question.  So
12    they are most typically done through,
13    willing to pay for certain activities or
14    for time off where they will look at how
15    people face choices and the outcomes of
16    those choices and try to quantify it based
17    on -- on that sort of approach.
18         Q.    Can you identify for me cases
19    in which you have valued or determined a
20    range of values for time off, as you were
21    just describing?
22         A.    Not off the top of my head.
23         Q.    Do you know whether you have
24    included such an analysis in a written
25    report?
```

97

1                    C. ERATH

2       A.    Ever?

3       Q.    Yes.

4       A.    I'm sure it's come up.

5       Q.    Have you ever done such an

6    analysis in a case in which you were

7    representing the City of New York, not

8    representing, engaged as an expert for the

9    City of New York?

10      A.    I do not believe so.

11      Q.    Could you go back to your CV

12   and the list of cases shown on Page 3 of

13   your CV and look through that list of cases

14   and tell me whether in any of those cases

15   you have done such an analysis determining

16   the bounds of the value of time off?

17      A.    I don't believe so.  Most of

18   the ones listed here are FLSA cases where

19   it wouldn't be relevant consideration,

20   along with a couple of ways to speed

21   arbitrations where again, it wouldn't come

22   up.

23            So it would really only be the

24   economic loss cases we're looking at here,

25   and I don't think any of these involved

98

```
 1                    C. ERATH
 2   time off.
 3        Q.    And when you say time off, what
 4   do you encompass within the phrase "time
 5   off"?
 6        A.    It could either be paid time
 7   off, you know, something like a vacation
 8   benefit, or a shorter work schedule, so
 9   either formal or informal time off.
10        Q.    If you look at your third case
11   down, Pfeil versus LabCorp, you describe
12   the case as dealing with economic loss in a
13   wrongful termination matter.
14              Do you see that?
15        A.    Yes.
16        Q.    And in that case, were you
17   representing or working as the expert for
18   the plaintiff or the defendant?
19        A.    Defendant.
20        Q.    And termination is in effect
21   the ultimate time off.  Did you in that
22   case attempt to place a value on the time
23   off of the plaintiff?
24        A.    I do not believe so.
25        Q.    Why not?
```

99

1                          C. ERATH

2        A.    I think there's a difference

3    between working a shorter schedule and

4    losing your job.

5        Q.    Losing your job would give you

6    a lot of time off, wouldn't it?

7        A.    In the short run.

8        Q.    Aside from time off or fringe

9    benefits, such as insurance, have you

10    attempted to place a value or a range of

11    value on nonpecuniary aspects of employees'

12    jobs?

13        A.    I can't think of an example

14    beyond those.

15        Q.    Are you aware of any labor

16    economist who has proposed a means of

17    valuing the nonpecuniary aspects of an

18    employee's job other than time off or

19    fringe benefits, such as insurance?

20        A.    I mean, the most direct

21    examples you would find in any textbook is

22    the danger of the job that you find all

23    over the compensating differentials

24    literature.

25                    And then there are analogous

100

C. ERATH

```
 1                       C. ERATH
 2    studies looking at, you know, various
 3    safety aspects as well as, you know,
 4    looking at the other way the, you know,
 5    positive benefits where you're trying to
 6    put a value on the -- based on the, you
 7    know -- the difference in the market wage.
 8         Q.    You quote testimony from
 9    plaintiff Darren Connors in which he
10    testified about reluctance to work as a
11    building inspector because of inspectors'
12    reputations of taking bribes.
13              Do you remember that?
14         A.    I remember -- I don't remember
15    if he was the one who said about the
16    bribes, but he certainly said there was a
17    difference in the reputation, I think was
18    his word, of the two agencies.
19         Q.    How would you go about trying
20    to value that difference in reputation of
21    the two agencies?
22         A.    I mean, it's difficult in the
23    context of this lawsuit because -- which I
24    assume is your question, you know, because
25    you would expect those sorts of things to
```

101

1                    C. ERATH

2    be included in a wage rate.  So we end up

3    in a circular mess if we try to do it here,

4    you know, in the abstract.

5              You know, if we're not engaged

6    in litigation, then you could look at the

7    relative wage rates, you know, akin to the

8    Adam Smith quote I have where he says the

9    wages are expected to vary with the

10   honorableness, in a word, of the

11   employment.

12       Q.    But that would involve simply

13   assuming that any difference in wages was

14   that you couldn't otherwise attribute

15   values to, was attributable to these types

16   of nonpecuniary aspects of the job?

17       A.    I mean, presumably if you're

18   doing a scientific study you're -- you're

19   trying to look at a number of different

20   occurrences.  You wouldn't just look at,

21   you know, A versus B.  You would try to get

22   an idea of what is typical -- you know,

23   what is the typical market differential for

24   these sorts of reputational events.

25       Q.    Are you aware of any such

102

```
 1                    C. ERATH
 2   analysis?
 3        A.    No, but I haven't looked for
 4   it.
 5        Q.    And you certainly aren't aware
 6   of any analysis based on reputation of the
 7   fire department and the Department of
 8   Buildings, is that right?
 9        A.    That is right.
10        Q.    So one of the nonsalaried
11   differences you mentioned or nonpecuniary
12   differences you mentioned, as we talked
13   about, is that FPIs have enjoyed either
14   five or two and a half additional hours per
15   week off from work, is that right?
16        A.    Yes, five for much of the time,
17   two and a half at the end.
18        Q.    And you state that
19   Drs. Goldstein and Scherbaum are
20   understating the compensation of fire
21   protection inspectors by not valuing those
22   hours.  That would be at the bottom of Page
23   5, the last sentence of the second-to-last
24   paragraph.
25        A.    I see it.
```

103

1                    C. ERATH

2       Q.    So in this case, how should

3  they have gone about putting a value on

4  that two and a half to five additional

5  hours of time off per week?

6       A.    Again, they could have appealed

7  to the literature on the value of free

8  time.

9       Q.    Does that literature place a

10 value on free time that is equal to the

11 value of the extra compensation that the

12 employees would have received if they had

13 worked the two and a half or five hours?

14      A.    I'm not sure what you're

15 asking.

16      Q.    Well, let's say that if the

17 fire protection inspectors had worked an

18 additional two and a half or five hours per

19 week, they would have been paid at the same

20 hourly rate that they had been earning but

21 now get that in addition, so they get an

22 increase in their pay.

23            How does the literature compare

24 that additional value in terms of money

25 paid against the value of the time off?  Is

104

1                        C. ERATH

2    the time off equal to that value?

3        A.    I'd have to look back and be

4    sure, but my -- I don't know.  I haven't

5    looked recently, so I had better not answer

6    it.  I mean, the point I'm making here is

7    there's obviously some value to the

8    flexibility of not having to work those

9    hours on a week-to-week basis.

10       Q.    But you aren't opining as to

11   what that value is?

12       A.    That's right.

13       Q.    And you aren't opining as to

14   whether it's equal to the extra money that

15   the individuals might have received if they

16   had worked that extra two and a half or

17   five hours?

18       A.    I am not opining as to the

19   value.

20       Q.    Would it change your analysis

21   in this case if hypothetically the union

22   for the fire protection inspectors had

23   bargained for a 40-hour week in 2015 to '16

24   and the 37 and a half hours represented a

25   compromise?

105

```
 1                    C. ERATH
 2        A.    No.
 3        Q.    Would it change your analysis
 4   in this case if hypothetically the pay of
 5   the FPIs increased in 2016 at the rate
 6   equal to the extra hours times their hourly
 7   rate?
 8        A.    You're talking about the salary
 9   here?
10        Q.    Yes.
11        A.    I mean, that has nothing to do
12   with the value of the flexibility of the
13   additional time off.
14        Q.    If the union were bargaining
15   for a full 40-hour week, wouldn't it
16   indicate to you that at least the union
17   representing the workers thought that there
18   was more value to actually having the
19   people working and getting more salary than
20   having more time off?
21             MS. CROUSHORE:  Objection.
22        A.    Impossible to say from what
23   you've told me 'cause, you know, collective
24   bargaining is rarely a one-issue
25   proposition.
```

106

                    C. ERATH

1

2      Q.    Now I asked you near the start

3  of the deposition as we were going through

4  your reliance material about the

5  recruitment brochure that you mention in

6  the last paragraph on Page 5.

7            And you say in that paragraph

8  that the brochure for FPIs advertises that

9  FPIs work only 37.5 hours and are not

10  required to work weekends?

11            Does the brochure include the

12  word only?

13      A.    I don't think so.

14      Q.    So do you think that the

15  brochure is trying to advertise 37.5 hours

16  as a good thing, something to be desired,

17  or merely a statement of what their regular

18  schedule is?

19      A.    We have the next clause that

20  you don't have to work weekends.  That

21  would indicate that whoever wrote the

22  brochure has in mind the -- that your work

23  schedule will be a good one.  But I can't

24  speak to what the author had in mind beyond

25  that.

107

1                    C. ERATH

2       Q.    And does the brochure use the

3    words "you're not required to work

4    weekends"?

5       A.    That I don't remember.

6             MS. CROUSHORE:  Objection.

7       Q.    You said you don't remember?

8       A.    I don't remember the specific

9    wording, but I recall the weekends not

10   on -- on the schedule part of it.

11      Q.    Do you know whether FPIs do, in

12   fact, work weekends sometimes?

13      A.    I'm not certain.  I believe I

14   saw that in there but I would have to

15   double-check.

16      Q.    And do you know whether they

17   work weekends more or less frequently than

18   DOB inspectors?

19      A.    I don't know.

20      Q.    And I take it you have no idea

21   what percentage of FPIs would have

22   preferred the higher pay associated with

23   the 40-hour week over having either a 37.5

24   or a 35-hour week?

25      A.    I don't know.

108

                    C. ERATH

1

2          MR. LIEDER:  I see Amanda just

3      sent me the brochure, so let's look

4      at it.  Did you also send this to

5      Dr. Erath or does Dr. Erath have it?

6          MS. CROUSHORE:  He has it, but

7      I will send it to you again just so

8      we are all looking at the right one.

9      Q.    Dr. Erath, do you have a copy

10  of this brochure?

11      A.    It just came through.

12      Q.    Okay.

13      A.    I just opened it up.

14      Q.    You will see at the bottom of

15  the first page that there is a copyright of

16  2020?

17      A.    Yes.

18      Q.    So from that you would infer

19  that this was issued in 2020?

20      A.    I would.

21      Q.    And then above that, in best in

22  class benefits, it says 37.5 hour workweek

23  with paid holidays.  Inspectors are not

24  required to work on weekends.

25              That's what you were looking

109

                    C. ERATH

1

2  at?

3       A.    That's right.

4       Q.    And on 37.5 hours, it doesn't

5  say only, does it?

6       A.    It does not.

7             MR. LIEDER:  Okay.  Why don't

8        we take a lunch break.  Let's go off

9        the record and figure out when we

10        should get back.

11             (Whereupon, a luncheon recess

12        was taken at 1:20 p.m.)

13

14     A F T E R N O O N   S E S S I O N

15

16  CONTINUED EXAMINATION BY

17  MR. LIEDER:

18       Q.    Dr. Erath, before we go to the

19  next topic, I wanted to revisit one area

20  from this morning.

21             If you remember, we looked at

22  the fact that nine of the ten cases that

23  you list as the most recent in which you

24  have testified were for the City of New

25  York.

110

C. ERATH

1

2          And I asked you about what type

3    of division you thought there was in your

4    testifying work between your work for the

5    city and your work for other clients, and

6    you said roughly 50/50.

7          Do you remember that?

8     A.    I don't remember you asking

9    about testifying work.  I remember you

10   asking me about expert work.

11    Q.    Okay.  You are right.  I guess

12   there could be expert work that's

13   nontestifying.  That's what I wanted to

14   know.

15          Without necessarily revealing

16   your clients, what other type of expert

17   work are you doing that balances out the

18   testifying work that you are doing for the

19   city?

20    A.    So the -- the distinction I was

21   drawing -- and I apologize if that wasn't

22   what you were looking for -- was there are

23   a number of cases for which I'm hired as an

24   expert, perhaps even intended to be a

25   testifying expert, but it never gets there

111

                           C. ERATH

1

2   because the case revolves in one way or the

3   other.

4            So that's the preponderance of

5   what I'm talking about that, at least as

6   far as I know.

7            It's also the case that a

8   number of assignments I'm engaged and

9   nobody ever says specifically, you know,

10  you are going to testify or we intend for

11  you to testify, and I may -- it may seem

12  that way to me, but that doesn't seem to be

13  the necessary question to address in the

14  first conversation.

15       Q.   So when you testified that your

16  expert work was roughly 50/50 between the

17  city and other clients, you were including

18  among the work for other clients these

19  types were situations where you are engaged

20  but are never testifying?

21       A.   Right, there's some pieces of

22  litigation involved, but for whatever

23  reason I don't end up testifying.

24       Q.   And in some of those cases, do

25  you prepare reports and then you don't

112

1                      C. ERATH

2    testify in a deposition, or does it never

3    even get to a report?

4        A.    Some of those.  You know,

5    frequently I do a report, but that's the

6    last I'll hear of it.  Others there is

7    actually a -- a deposition.  But not at all

8    uncommon to not reach that stage.

9        Q.    I would like you to go back to

10   your report, Exhibit 1, Page 2.  At the

11   bottom of Page 2, you write that you

12   obtained data showing exams applied for by

13   those who held an FPI position during the

14   2005 to '20 period studied by

15   Drs. Goldstein and Scherbaum.

16           And we talked a little bit

17   about this this morning in connection with

18   your list of materials on which you rely.

19   I know you said you don't know who prepared

20   data.  Was it in the form of a spreadsheet?

21       A.    Yes.

22       Q.    And even if you don't know who

23   prepared it, do you know what type of

24   methodology they used to prepare it?

25       A.    Not sure what you're asking.

113

1                          C. ERATH

2          Q.     From what records did they

3    obtain this information?

4          A.     I don't know.

5          Q.     What type of training did the

6    persons have in obtaining or extracting

7    this data from what may have been a larger

8    database or spreadsheet?

9          A.     I don't know.

10         Q.     Did you request that this type

11   of data be provided to you or was it

12   provided without a request from you?

13         A.     I requested it.

14         Q.     Did you request that the data

15   be provided before or after you received

16   Dr. Goldstein and Scherbaum's initial

17   report?

18         A.     I believe after.

19         Q.     How long after you requested

20   the information did it take for the city to

21   send it to you?

22         A.     I don't recall.

23         Q.     What type of confidence do you

24   have that the spreadsheet data is complete?

25         A.     What type of confidence?

114

```
 1                    C. ERATH
 2        Q.    Yes, what is your basis for any
 3   confidence that the records are complete?
 4        A.    I know counsel made the request
 5   to the keeper of the records.  I assume
 6   they would know.  Beyond that, I don't know
 7   one way or the other.
 8        Q.    What would be your basis for
 9   believing that the information that was
10   provided was accurate?
11             MS. CROUSHORE:  Objection.
12        A.    I mean, if you're asking if I
13   looked at the underlying data from which
14   they drew what's in the spreadsheet, I did
15   not.  So I used the spreadsheet as it was
16   provided to me.
17        Q.    Looking at the last full
18   paragraph of Page 2 of your report, which
19   is, actually there's a partial paragraph
20   below it.  You will see that the first
21   sentence says:
22             If, as plaintiffs allege, the
23   FPI and DOB inspector jobs are similar and
24   the DOB positions are paid more, we should
25   observe those in the FPI position
```

115

```
 1                    C. ERATH
 2    attempting to switch jobs and become DOB
 3    inspectors.
 4           So your focus here, as I
 5    understand it, is on people who are FPIs at
 6    the time and are seeking -- or and whether
 7    or not they attempt to switch jobs to
 8    become DOB inspectors, is that right?
 9    A.    Yes.
10    Q.    And your theory is that if the
11    jobs are similar but the DOB inspectors are
12    paid more, then as a matter of commission
13    rationality, FPI should apply to become DOB
14    inspectors, is that right?
15    A.    Absent other differentiating
16    factors between the two jobs.
17    Q.    If the FPIs don't apply or
18    apply infrequently for the DOB positions,
19    what you would infer is that either the
20    jobs are not similar in one or more ways,
21    or that the DOB inspectors are not paid
22    more in compensation, is that correct?
23    A.    When the entire compensation
24    package is considered.
25    Q.    At any point, did you reach a
```

116

```
 1                    C. ERATH
 2   conclusion whether what you believe is
 3   relative lack of movement from the FPIs to
 4   the DOB inspector positions is because of
 5   lack of similarity of jobs or no real
 6   difference in total compensation or both?
 7        A.    In your question, you said
 8   relative lack of movement.  Relative to
 9   what?
10        Q.    Well, you don't say that there
11   is no effort to move.  You identified 12
12   people who applied, so I don't want to say
13   no attempt to move.  But given the numbers,
14   is your conclusion that those numbers and
15   only those numbers of FPIs applied because
16   the jobs are dissimilar because there's no
17   real difference in total compensation or
18   both?
19        A.    I don't reach a conclusion one
20   way or the other.  Both of those are
21   possible hypotheses.
22        Q.    There could be other
23   explanations as well, couldn't there?
24        A.    Conceivably.
25        Q.    You don't cite in your report
```

117

                         C. ERATH
1
2    any treatise or other authority for the
3    proposition that job A either must not be
4    similar to job B or job B must not be
5    compensated better than job A.  The persons
6    in job A don't apply for positions in job
7    B.
8              Is there some type of authority
9    that you would support for that
10   proposition?
11        A.    For the proposition that people
12   would want the higher paying of two similar
13   jobs?
14        Q.    Yes.
15        A.    Sure.  I mean, I think the
16   Ehrenberg and Smith book we talked about
17   this morning has a sentence saying all
18   other things equal, if two jobs pay the
19   same, people will flock to the higher pay.
20        Q.    Have you advanced the same
21   theory in any other cases in which you have
22   testified?
23        A.    The theory that people would
24   want the higher paying of two identical
25   jobs?

118

1                    C. ERATH

2        Q.    Yes.

3        A.    It's such a basic concept, I

4    think you wouldn't even advance it.  You

5    would just assume it.

6        Q.    Okay.

7        A.    Given a choice between more

8    money and less money, and everything else

9    is the same, I'll take the money.

10       Q.    The EEOC and other federal

11   agencies issued almost 50 years ago the

12   Uniform Guidelines of Employees Selection

13   Procedures, correct?

14       A.    I don't know the timing.

15       Q.    You are familiar though with

16   the Uniform Guidelines?

17       A.    Yes.

18       Q.    Doesn't it state that the

19   primary means of determining whether two

20   jobs are similar is job content?

21            MS. CROUSHORE:  Objection.

22       A.    I -- I haven't read them

23   recently enough to agree or disagree.

24       Q.    Do you recall in the Uniform

25   Guidelines any discussion of determining

119

1                          C. ERATH

2    whether jobs are similar by whether there

3    is a movement between the jobs or at least

4    applications to move between the jobs?

5         A.    Again, I haven't read them

6    recently enough to remember one way or the

7    other.

8         Q.    Now, one possible explanation

9    for lack of movement from one job to

10   another job that pays more, even if they're

11   similar, is whether there are barriers to

12   movement that have been erected, isn't that

13   correct?

14        A.    Theoretically, sure.

15        Q.    And what did you do in this

16   case to determine whether there were any

17   barriers to movement from one job to the

18   next?

19        A.    I don't recall any specific

20   discussion on that topic.

21        Q.    I wasn't limiting it to

22   discussion.  Just did you do anything to

23   try to determine if there were any barriers

24   to movement from the FPI position to the

25   Department of Building inspector positions?

120

1                    C. ERATH

2           MS. CROUSHORE:  Objection.

3      A.    I certainly looked at the NOEs

4  for both jobs, which didn't rule anybody

5  out or suggest that there was any barrier

6  other than the experience and education

7  requirements we've already discussed.  So

8  it appears the application for building

9  inspector is open to anyone who meets the

10  minimum requirements enumerated there.

11      Q.    In addition to the NOEs, did

12  you look at any other types of documents to

13  determine whether the jobs were similar?

14      A.    Well, we have the analysis of

15  the lack of movement we've been discussing.

16  That's certainly on point there.  I -- I

17  read the Scherbaum and Goldstein reports

18  that discuss it.

19           Beyond that, no.  Let me amend

20  that.  I should say I also spent a little

21  bit of time looking at the O*NET database

22  that they signed.

23      Q.    Have you ever looked at the

24  O*NET database before?

25      A.    Yes, but seldom.

121

1                    C. ERATH

2      Q.    Is it fair to say that

3    Drs. Goldstein and Scherbaum tried to

4    analyze the similarity of the job duties

5    and of the KSAs by examining analyses and

6    descriptions of those while you tried to

7    infer whether jobs were similar for your

8    mobility study and the minimum requirements

9    in the NOEs?

10              MS. CROUSHORE:  Objection.

11     A.    I think to answer that requires

12   me to be in the head of Scherbaum and

13   Goldstein, so I don't again want to speak

14   for them.

15     Q.    Is it fair to say that based on

16   their report, Drs. Goldstein and Scherbaum

17   analyzed the similarity of the job duties

18   and the KSAs by examining job analyses and

19   descriptions of the duties directly while

20   you tried to infer whether the jobs were

21   similar to the mobility studies and develop

22   minimum requirements and in the NOEs?

23              MS. CROUSHORE:  Objection.

24     A.    So the part of that question

25   that pertained to me, I analyzed what would

122

1                          C. ERATH

2    have to be the direct implication of the

3    claim that they are making in the report

4    and found evidence to the contrary.

5              In terms of the part of the

6    question that applied to them, it appeared

7    to me that the O*NET-based analysis is not

8    actually looking at the functions performed

9    but rather broad categories of tasks rather

10   than the specifics of what fire inspectors

11   or building inspectors do.

12        Q.   Let's focus on you.  You are

13   trying to infer whether the jobs are

14   similar primarily through your mobility

15   analysis and the minimum requirements set

16   forth in the NOEs, is that right?

17        A.   I'm not trying to infer whether

18   they're similar.  I'm looking at a direct

19   implication of the claim that they are

20   similar and noting evidence to the

21   contrary.

22        Q.   Dr. Erath, do you have copies

23   of the notices of examination that were

24   previously marked Exhibits 9, 10, 11 and

25   12?

123

1                         C. ERATH

2          A.    Electronically, yes.

3          Q.    If you look at Page 11, your

4    list of reliance materials, you will see

5    under item seven, item or inspector

6    construction NOEs for exams 1011, 5008,

7    0115 and 1164.  Do you see that?

8          A.    Yes.

9          Q.    Are the documents that have

10   been marked as Exhibits 9, 10, 11, and 12

11   those four exams?

12         A.    I can go through them one by

13   one.  I will take your word for it if

14   they're the same ones, same examiners.  12,

15   6049.

16         Q.    Twelve is not right, I'm sorry.

17   So Exhibit 9 is 5,008, which is one of

18   those that you list, is that correct?

19         A.    Which one, Exhibit 8 you said?

20         Q.    Exhibit 9 is 5,008, which is

21   one of those that you list in Item 7?

22         A.    That looks to be the case, yes.

23         Q.    And Exhibit 10 is exam number

24   0115, which is also listed in Item 7, is

25   that correct?

124

1                    C. ERATH

2        A.    Exhibit 10 is 115, yes.

3        Q.    And Exhibit 11 was 1164, which

4    is also one of those listed in Item 7?

5        A.    Exhibit 11 is 1164.

6        Q.    But somehow I have messed up

7    and 6049 is not listed.  The one that I am

8    missing is 1011, 1011?

9        A.    Looks that way.

10       Q.    Do you know what year 1011 was

11   issued?

12       A.    No.

13       Q.    You make a reference on Page 4

14   of your report to a construction inspector

15   notice for 2010.  Could 1,011 have been

16   issued in 2010, do you know?

17       A.    I'm sure it could have been.

18       Q.    And you believe that you have

19   accurately described the minimum

20   requirements that are set out in the

21   various NOEs for the construction inspector

22   position?

23       A.    I mean, I only -- I list the

24   requirements that were in place before the

25   change, so I actually enumerate one, two,

125

1                    C. ERATH

2    three, four, five for the earlier time

3    period -- sorry, one, two, three, four.

4    You asked about construction inspectors.

5    That specifically is talking about 2010 and

6    2014.

7         Q.    And then in 2019 you show

8    certain changes to that?

9         A.    That's right.

10         Q.    And as far as you know, the

11    changes in 2019 are a complete set of the

12    changes that were made?

13         A.    Made in 2019?

14         Q.    Yes.

15         A.    I believe so.  I mean, I think

16    I may have taken -- I didn't reproduce the

17    text, obviously, so I wasn't attempting to

18    say it verbatim so it may be my shorthand

19    for what the change was, but yes, with that

20    caveat.

21         Q.    And if you go back to the

22    bottom of Page 3 through the top of Page 4,

23    you list five requirements in order to take

24    the FPI exam for the period of 2009 to '15,

25    is that correct?

126

1                          C. ERATH

2        A.    That's right.

3        Q.    Is that taken verbatim?

4        A.    That was my intention.

5        Q.    And it was the same each year

6   during that period?

7        A.    I believe so.

8        Q.    And then in 2017, you

9   describe -- this is on Page 4, the middle

10  paragraph.  You describe a change that was

11  made to the FPI exam NOE, is that right?

12       A.    Right, that's a change to the

13  education requirement.

14       Q.    And you have accurately

15  described what that change is?

16       A.    That's probably my paraphrase

17  again, but that was the intent.

18       Q.    And as far as you know, the

19  requirements have not changed for the FPI

20  exam since 2017, is that right?

21       A.    That's right.

22       Q.    And I should have asked you,

23  with respect to the construction inspector

24  exam, as far as you know, the requirements

25  have not changed since 2019?

127

```
 1                    C. ERATH
 2      A.    I -- the 2021 is different.
 3      Q.    In what way is the 2021
 4  different?
 5      A.    I do not believe there is a
 6  multiple-choice test anymore.
 7      Q.    Other than that, the 2021 you
 8  believe is the same as the 2019?
 9      A.    I believe so.
10            MS. CROUSHORE:  Objection.
11      Q.    If you turn to Page 5, you
12  conclude in the first full sentence that
13  knowledge, experience and education
14  requirements clearly differ between the
15  positions.  Do you see that?
16      A.    I do.
17      Q.    And concerning the difference,
18  are you talking primarily in terms of the
19  focus of the experience and education
20  that's required?
21      A.    Focus in amount that it was the
22  time period of the study, so five years
23  versus three years there.  But you're
24  right, there are differences in the areas
25  of experience that are sought after as
```

128

```
 1                    C. ERATH
 2    well.
 3         Q.    But as we discussed, at least
 4    in the last two years, it's now three years
 5    for FPI, two years for construction
 6    inspectors?
 7         A.    Yes, in that first requirement.
 8    And we talked about my caveat there, and
 9    your point still holds that there's a
10    different type of experience, obviously.
11         Q.    You say in the last sentence of
12    the paragraph, we were just looking at the
13    first full paragraph of five, that lack of
14    movement directly contradicts plaintiffs'
15    maintained hypothesis that the jobs are
16    similar.  Do you see that?
17         A.    Yes.
18         Q.    You had said I thought earlier
19    that you haven't reached an opinion about
20    whether the reason for the lack of movement
21    was, that the jobs were similar or whether
22    there was no difference in compensation.
23    So here are you saying that it's because
24    the jobs are dissimilar?
25              MS. CROUSHORE:  Objection.
```

129

1                        C. ERATH

2        A.    I'm saying that the direct

3    implication of the plaintiffs' assumption

4    should be that we see movement between the

5    two jobs and we do not, so that is a direct

6    contradiction.

7        Q.    So have you actually concluded

8    based on the lack of movement that the jobs

9    are not similar?

10        A.    That's one possible reason for

11    the lack of movement.

12        Q.    But again, there are other

13    possible reasons?

14        A.    That's right.

15        Q.    So the jobs might be similar,

16    and there might be other reasons for lack

17    of movement?

18        A.    It's theoretically possible.

19    Plaintiffs have not advanced such.

20        Q.    Is your opinion that the lack

21    of movement directly contradicts

22    plaintiffs' maintained hypothesis that the

23    jobs are similar given your role as a labor

24    economist?

25        A.    Yes.

130

1                      C. ERATH

2        Q.    Let's go back to Page 3 of your

3    report.  In the roughly middle paragraph,

4    the one that begins the nearly complete

5    absence, have you found that paragraph?

6        A.    Yes.

7        Q.    You will see in the third line

8    that you see that FPIs applied for roughly

9    250 different jobs with said jobs ranging

10    from forester to crime specialist to bus

11    operator.

12             Does the 250 mean that they

13    applied for 250 different job titles?

14        A.    That I had seen, 250 different

15    exam titles in the data.

16        Q.    So you weren't saying that 250

17    FPIs submitted applications for a job, is

18    that right?

19        A.    That's right, it's just a

20    number of different exams I observed in

21    that database.

22        Q.    And then you say that one

23    individual applied for 47 exams.  Do you

24    see that?

25        A.    Yes.

131

```
 1                      C. ERATH
 2        Q.    If you could call or look at
 3   what I have marked as Exhibit 4?
 4        A.    I have it.
 5        Q.    I will represent to you that
 6   this was extracted from the spreadsheet
 7   that you provided to us.  And if you
 8   counted up, this person Katawba DeLarosa
 9   applied for 47 different exams.
10             Is this the person to whom you
11   were referring?
12        A.    Seems likely.  I think there
13   was only one with 47.  Thank you for not
14   making me count these.
15        Q.    Now, I want to make sure that I
16   correctly understand this.
17             Each line here represents an
18   application, is that correct?
19        A.    For an exam, yes.
20        Q.    And there is a column that is
21   headed "exam type."  You will see that all
22   but one of these is a C and the one
23   exception is a P.  Do you see that?
24        A.    Yes.
25        Q.    And is it your understanding
```

132

```
 1                    C. ERATH
 2   that P stands for promotional exam?
 3        A.    That would be my assumption.
 4        Q.    You haven't checked to confirm
 5   that?
 6        A.    That's my belief.  I didn't say
 7   I confirmed it one way or the other.
 8        Q.    The last column is headed
 9   "application day."  Is it your
10   understanding that that's when the
11   individual actually applied to take the
12   exam?
13        A.    I did not specifically ask what
14   that is but that seemed like a reasonable
15   interpretation of the application date.
16        Q.    You will see that his first
17   exam that he applied for was dated January
18   19, 1999.  Do you see that?
19        A.    Yes.
20        Q.    That's obviously before 2005.
21   So were you looking at applications that
22   were submitted before fiscal year 2005 when
23   you were doing your analysis?
24        A.    So when I counted the number of
25   applications for this individual, I was
```

133

1                          C. ERATH

2    looking at all of them.

3        Q.    When you were counting the

4    number of different job titles applied for,

5    were you counting all of them or just the

6    ones from 2005 forward?

7        A.    I don't recall.

8        Q.    We are going to come back to

9    this, but I want to go to what's been

10   marked as Exhibit 5.  And I will represent

11   to you that these were the entries for the

12   first looks like five, if I count right,

13   five persons in your spreadsheet.

14            You will see that the first

15   individual, Lionel Hudson, all of his

16   applications were made before 2005.  Do you

17   see that?

18       A.    Yes.

19       Q.    Do you know, would any

20   applications that he made have been

21   considered in your statement about the

22   type, the number of different types of

23   tests that were taken?

24       A.    So if you're asking

25   specifically when I said there were 250

134

1                    C. ERATH

2    different exams that somebody applied for?

3    Is that what you're asking about?

4         Q.    Yes.

5         A.    So as I said, I don't recall

6    whether I put a date limitation on that.

7    It would only matter to the count of 250

8    if, for instance, Mr. Hudson were the only

9    bus operator 'cause I'm not -- I'm not

10   counting individual bus operator

11   applications but rather just looking at

12   okay, bus operator was one that was on the

13   list.

14             So I don't know whether that

15   250 would become 249 in that instance, so I

16   was merely attempting to illustrate that

17   there are a lot of different jobs for which

18   these folks apply.

19        Q.    You also had a count that we

20   looked at earlier that there were 669 fire

21   protection inspectors in the analysis that

22   you performed.

23             Do you know whether Mr. Hudson

24   would or would not be in that count of 669?

25        A.    I assume he would, but I don't

135

```
 1                    C. ERATH
 2   know for sure.
 3        Q.   So you think you may not have
 4   excluded people like him who had applied
 5   before 2005?
 6        A.   Well, the analysis that's being
 7   done here, remember, is whether we see
 8   people moving from FPI to an inspector job
 9   in the -- in the Department of Buildings.
10   So, you know, to be on this list, he would
11   have had to be an FPI of 2005 or later, and
12   therefore, you know, it's a valid
13   observation for someone who did not put his
14   hat in the Department of Buildings' ring
15   during the relevant period.
16        Q.   Let's go back to Exhibit 4,
17   Mr. DeLarosa.  If you go through this list,
18   you will see that about two-thirds of the
19   way down is when he applies to become a
20   fire protection inspector.  Do you see
21   that?
22        A.   Yes.
23        Q.   And you will see the
24   application date is from 2017?
25        A.   Yes, I see that.
```

136

                              C. ERATH

1

2       Q.    So he couldn't become an FPI

3   before he took that exam, correct?

4       A.    I believe that's true.

5       Q.    The exams that he applied for

6   before March 19, 2017, do they indicate

7   anything about the types of jobs for which

8   FPIs were applying?

9       A.    Again, the -- what I'm using

10  this for is merely to illustrate that these

11  individuals who were FPIs also considered a

12  wide variety of jobs.

13           So Mr. DeLarosa, who did become

14  an FPI, as we can see here, Exhibit 4,

15  considered a wide variety of positions.

16      Q.    But many of them, the majority

17  were considered before he became an FPI,

18  right?

19      A.    Yes.

20      Q.    Now, do you know, did he have

21  the minimum qualifications to become a fire

22  protection inspector in 2009 let's say when

23  he was applying for other jobs?

24      A.    I don't know.

25      Q.    Or the minimum qualifications

137

```
 1                      C. ERATH
 2    to become a building inspector in 2017?
 3         A.   I don't know anything about his
 4    qualifications.
 5         Q.   So you are not really analyzing
 6    whether FPIs were applying to become
 7    building inspectors, you are analyzing
 8    whether people who at some time became an
 9    FPI were applying for other types of jobs
10    or building inspector jobs, is that right?
11         A.   No, I don't think that's right.
12         Q.   And what is wrong about that?
13         A.   You -- the beginning of your
14    question was -- said that I wasn't
15    considering whether FPIs became building
16    inspectors.  That was the primary focus of
17    the analysis.  So that is the basis of my
18    disagreement.
19         Q.   But in 2009, for instance, he
20    was not an FPI, correct?
21         A.   That's correct.
22         Q.   And you don't know what his
23    qualifications were in 2009?
24         A.   That is correct.
25         Q.   So if he were applying to other
```

138

                         C. ERATH

1

2    types of positions, then it doesn't reflect

3    whether FPIs were applying for other types

4    of positions, it reflects whether people

5    who at some time became FPIs were applying?

6         A.    I mean, as I say in the report,

7    I'm looking at people who were FPIs and

8    whether they moved to building inspector.

9    And the answer is, no one has.

10   Mr. DeLarosa is one such example.

11        Q.    Even after Mr. DeLarosa applied

12   to become an FPI, he wouldn't become an FPI

13   immediately, correct?

14        A.    Yes, that's correct.

15        Q.    He would have to take the test,

16   have the test graded, and then there would

17   have to be openings that reached him before

18   he would be called, is that right?

19        A.    He would clearly be hired at

20   some subsequent time to the exam.

21        Q.    Would you look at what was

22   marked as Exhibit 7.

23        A.    I have it.

24        Q.    Have you ever heard of the

25   database SeeThroughNY?

139

```
 1                    C. ERATH
 2      A.    Not under that name, no.
 3      Q.    I will represent that this is a
 4  publicly available database.  You will see
 5  it is addressed www.SeeThroughNY.net.  That
 6  shows for certain information about the
 7  position and pay of all New York State
 8  employees.  And you will see that until
 9  fiscal year 2020, he does not show as a
10  fire protection inspector.
11            MS. CROUSHORE:  I will just
12         note an objection to the use of this
13         document, which is not any sort of
14         official city document or anything.
15      A.    I see an entry for FPI pay year
16  2020, if that's what you're asking.
17      Q.    Do you know whether
18  Mr. DeLarosa wasn't hired until year 2020
19  as a fire protection inspector?
20      A.    I have not committed his
21  employment history to memory.
22      Q.    Let's assume that that is
23  correct, that he became a fire protection
24  inspector at some time in fiscal year 2020.
25  If we go back to Exhibit 4, doesn't it
```

140

1                    C. ERATH

2   reflect that he applied for only three

3   tests after he became a fire protection

4   inspector?

5          MS. CROUSHORE:  Objection.

6      A.    Sorry.  Are you asking me to

7   assume he became fire protection inspector

8   when?

9      Q.    In fiscal year 2020.

10     A.    Yes.  And there are -- there

11  are three entries in 2020 or later, if

12  that's what you're asking.

13     Q.    And one of those is for a

14  promotional exam to associate fire

15  protection inspector?

16     A.    That's correct.

17     Q.    So Mr. DeLarosa applied for

18  only two other positions, if you exclude

19  the fire protection inspector chain, after

20  he became and while he was a fire

21  protection inspector, is that right?

22     A.    As of the date of this

23  document, yes.

24          MS. CROUSHORE:  I am sorry this

25      is late, but I would like to object

141

                          C. ERATH

1

2        to that last question, please.

3        A.    Is now a good time for a break?

4        Q.    Sure.

5              (Whereupon, a short recess was

6         taken.)

7        Q.    Dr. Erath, you identify in the

8   same sentence that we looked at where you

9   referred to the 250 different jobs, three

10  specific ones.  I believe they were bus

11  operator, forester and crime specialist?

12       A.    Yes.

13       Q.    Do you see that?

14       A.    Yes, I do.

15       Q.    I looked at the spreadsheet and

16  found that only one application for

17  forester in the data.  And if you pull up

18  Exhibit 8, you will see where that occurs,

19  a Mr. Charles Lyons.

20             MR. LIEDER:  And Judy, Lyons is

21        spelled, L-Y-O-N-S.

22       A.    I see Mr. Lyons applying for

23  forester in 2013.

24       Q.    Yes.  And he doesn't apply for

25  a fire protection inspector position until

142

1                          C. ERATH

2      2017, is that correct?

3          A.    So this says.

4          Q.    And if the spreadsheet is

5      correct, the only applications for a

6      forester position was before the candidate

7      became fire protection inspector?

8          A.    If your representation is

9      accurate, that this is the only forester

10     application, 2013 is before 2017.

11         Q.    So again, Mr. Lyons did not

12     apply for a forester position in an effort

13     to move from fire protection inspector to

14     another type of job, is that correct?

15         A.    The forester application is

16     before he became a fire protection

17     inspector.

18         Q.    I also looked for the job of

19     prime specialist, which you include, and I

20     didn't find any prime specialist in the

21     spreadsheet.  If you want to search, you

22     could.  I did find two instances of someone

23     applying for the job of crime analyst.  Is

24     that what you meant?

25         A.    I would hope I wrote the job

143

```
 1                    C. ERATH
 2   down correctly, but I don't remember one
 3   way or the other.
 4       Q.    If you go back to the paragraph
 5   that refers to 250 different jobs, you will
 6   see that the last sentence says nearly 80
 7   percent of FPIs applied for an exam other
 8   than FPI or associate FPI.
 9             Do you know how many of those
10   applications were submitted exclusively
11   either before 2004 or before the applicant
12   actually became an FPI or associate FPI?
13       A.    No.
14             MS. CROUSHORE:  Objection.
15       A.    All I'm trying to do here is
16   demonstrate that this group of individuals
17   has a wide range of potential interests.
18       Q.    Would it surprise you that the
19   majority of the applications in the
20   spreadsheet are from either before 2004 or
21   before the candidate became an FPI?
22       A.    I don't have any basis to be
23   surprised or unsurprised.
24       Q.    And that if you eliminate
25   applications for an associate FPI position
```

144

                              C. ERATH

1      from those who were already FPIs, that that

2      eliminates another roughly two-thirds of

3      the applications?

4              MS. CROUSHORE:  Objection.

5        A.    I have not studied that

6      question.

7        Q.    Dr. Erath, we looked earlier at

8      the NOEs for the construction inspector

9      position.  Do you remember that?

10       A.    I do.

11       Q.    And the NOEs that I marked as

12     exhibits were from 2021, 2019 and 2014 and

13     then also one from 2006.  Do you remember

14     that?

15       A.    That sounds right.

16       Q.    And you refer to an NOE in your

17     report from 2010, is that right?

18       A.    Yes.

19       Q.    Well, let me back up and ask a

20     different question first.

21               Are you aware of any other NOEs

22     for construction inspector positions

23     bearing the 2005 to a period forward?

24       A.    Am I aware of any?  No.  But I

145

```
 1                    C. ERATH
 2   haven't attempted to commit an exhaustive
 3   list to memory.
 4        Q.    Do you know whether the
 5   spreadsheet that you were relying on shows
 6   applications from FPIs only in those years,
 7   2006, '10, '14, '19 and '21?
 8             MS. CROUSHORE:  Objection.
 9        A.    Are you asking do I see
10   applications from FPIs for building
11   construct or exams other than those?
12        Q.    Yes.
13        A.    I don't know that I
14   cross-referenced those two sources.
15        Q.    Let's assume for now that there
16   were just those five during the period from
17   2005 to '21, 2006, '10, '14, '19, '21.  So
18   I know between '19 and '21 it is shorter
19   and between 2014 and 2019 is a little
20   longer but essentially every four years,
21   right?
22        A.    It's not really every four
23   years, but it is what it is.
24        Q.    How long do individuals have
25   under the NOEs to apply for an exam?  Or
```

146

                          C. ERATH

1

2    let me narrow it, apply for a construction

3    inspector exam?

4         A.    How long from what?  How long

5    is the exam period?

6         Q.    How long is the application

7    period?

8         A.    I don't recall.

9         Q.    I think if you look at the

10   exams, it is three weeks.

11        A.    Would you like me to do that?

12        Q.    Sure.

13        A.    I opened the 2019 one up.  You

14   are correct there.  Do you want me to keep

15   going or --

16        Q.    No, that's fine.  So if there

17   were five exams and each time there was a

18   three-week application period, the five

19   protection inspectors could apply only for

20   15 weeks out of the 16-week period or

21   16-year period, is that correct?

22        A.    If those are the only exams and

23   they're all three weeks, five times three

24   is certainly 15 to take the exam.

25        Q.    Do you have any idea how many

147

1                          C. ERATH

2    exams were offered for other types of jobs

3    during the 2005 to '20 period?

4         A.    Any other type of job?

5         Q.    Yes.

6         A.    No.

7         Q.    The opportunity to apply for

8    other types of jobs was much greater than

9    the opportunity of FPIs to apply for

10   building inspector jobs, is that correct?

11              MS. CROUSHORE:  Objection.

12        A.    I don't have a list of other

13   jobs in front of me, but I would not be

14   surprised were that the case.

15        Q.    Did you look at all at the

16   types of jobs for which FPIs applied most

17   frequently?

18        A.    I don't believe I did.

19        Q.    I will represent to you that

20   for applications for people who were at the

21   time of the application FPIs, the most

22   frequent was for firefighter.

23              Do you know, was the average

24   compensation of firefighters more than the

25   average compensation of FPIs?

148

1                      C. ERATH

2       A.    I believe so.

3       Q.    Is it more than the average

4    compensation of construction inspectors?

5       A.    That I don't know.

6       Q.    Did you look at the minimum

7    qualifications to take the test for

8    firefighters?

9       A.    No.

10      Q.    If the average compensation of

11   firefighters was greater than the average

12   compensation of construction inspectors and

13   if the individuals, the fire protection

14   inspectors could meet the minimum

15   qualifications, would it make sense for

16   them to apply for firefighters' positions

17   than for the construction manager

18   positions?

19            MS. CROUSHORE:   Objection.

20      A.    You mean construction

21   inspector?

22      Q.    Yes, I'm sorry, construction

23   inspector, sorry.

24      A.    Would it make more sense?   I

25   mean, your question presupposes that they

149

                          C. ERATH

1

2    can only apply for one.  It depends on the

3    likelihood of getting them.  That's

4    impossible to answer from the information

5    provided.

6         Q.    So one of the factors that

7    presumably an economically rational actor

8    or fire protection inspector should

9    consider is the likelihood of getting the

10   job?

11        A.    In what content?

12        Q.    Well, I thought that that was

13   in your answer, that you said that you

14   didn't know what the likelihood of getting

15   the job would be.

16        A.    I was attempting to.  I didn't

17   know you were following along with your

18   previous question.  Perhaps we should start

19   over.

20        Q.    Okay.

21             From the point of view of an

22   economically rational actor, if a fire

23   protection inspector could meet the minimum

24   requirements for a construction inspector

25   position and a firefighter position, and if

150

                        C. ERATH

1
2    the firefighter position paid more on

3    average than the construction inspector

4    position, would it make more sense for them

5    to apply for the firefighter position than

6    the construction inspector position?

7              MS. CROUSHORE:  Objection.

8        A.    Make more sense?  I mean, I

9    assume they could apply for both and have

10   two avenues open to them, but very hard to

11   answer that question from what you said.

12       Q.    Do you know whether other jobs

13   in the top five jobs for which fire

14   protection inspectors applied offered more

15   pay than did the construction inspector

16   position?

17             MS. CROUSHORE:  Objection.

18       A.    As I mentioned, I did not study

19   what those jobs are.

20       Q.    Or what the pay of those jobs

21   are either, is that right?

22       A.    Since I don't know what the

23   jobs are, I don't know what they pay.

24       Q.    In the file that you received

25   of the HR actions involving both the fire

151

1                    C. ERATH

2    protection inspectors and the building

3    inspectors, do you recall a field called

4    civil service code description?

5         A.    Not with specificity, but

6    wouldn't surprise me were it there.

7         Q.    And do you recall seeing a

8    field, even if you don't remember the name

9    of it, that contained information

10   identifying the process by which fire

11   protection inspectors and building

12   inspectors were selected?

13        A.    What do you mean by process?

14        Q.    Well, whether it was through a

15   competitive process or a provisional

16   appointment or a noncompetitive process?

17        A.    That sounds familiar.

18        Q.    Did you look at that particular

19   field to evaluate which process was used

20   primarily in the selection of fire

21   protection inspectors and building or

22   construction inspectors?

23        A.    No.

24        Q.    So do you have any idea whether

25   fire protection inspectors were selected

152

1                          C. ERATH

2    primarily through a different mechanism

3    than construction inspectors and building

4    inspectors?

5          A.    I don't know.

6          Q.    You don't know that under 30

7    percent of construction inspectors were

8    selected through provisional appointments

9    rather than the competitive process?

10         A.    I don't know the figure.

11         Q.    Even if you didn't know the

12   figure, did you know that a large

13   percentage of construction inspectors were

14   selected provisionally rather than through

15   the competitive process?

16         A.    I did not attempt to calibrate

17   that number.

18         Q.    Could you turn to Page 7 of

19   your report?

20         A.    I have it.

21         Q.    And you will see that you are

22   quoting extensively from the testimony of

23   plaintiff Darren Connors?

24         A.    Yes.

25         Q.    And you will see that his

153

```
 1                    C. ERATH
 2   second answer references that he did apply
 3   for a position as a buildings inspector
 4   provisional -- I assume it meant
 5   provisionally -- and he received a job
 6   offer from the Department of Buildings?  Do
 7   you see that?
 8        A.    Yes.
 9        Q.    And if you go down about
10   two-thirds of the way through the colloquy,
11   you will get to an answer:  Yes, after
12   seeing the inner office and speaking to the
13   person who was in charge of hiring a
14   provisional, it was not worth it for me.
15            Do you see that?
16        A.    Yes.
17        Q.    Did you infer from this
18   dialogue or that testimony that you
19   prescribed that he at least was offered a
20   position provisionally?
21        A.    He says he received a job offer
22   from the Department of Buildings.
23        Q.    And did that prompt you at all
24   to look at how the Department of Buildings
25   was filling positions?
```

154

```
 1              C. ERATH
 2     A.    Not sure what you mean.
 3     Q.    Did that cause you to look at
 4   the field we were talking about that
 5   identifies whether employees are being
 6   hired through a competitive process or
 7   provisionally?
 8          MS. CROUSHORE:  Objection.
 9     A.    I knew there were provisional
10   hires to building inspectors.  I knew there
11   were competitive hires and that those who
12   were hired provisionally would eventually
13   have to take the exam to keep their job.
14   So either way, the exam would be a
15   requirement.
16     Q.    Do you know whether FPIs
17   generally knew that the Department of
18   Buildings hired most of its inspectors
19   provisionally outside the competitive
20   process?
21     A.    I don't know that the latter
22   part of your statement's true, and I also
23   don't know what is in the mind of FPIs.
24     Q.    Let's assume that for purposes
25   of this question hypothetically that fire
```

155

C. ERATH

1

2    protection inspectors generally knew that

3    the Department of Buildings hired most of

4    its inspectors provisionally rather than

5    through the examination process.

6              Do you have an opinion as a

7    labor economist as to whether it would

8    affect their interest in applying to take

9    the construction inspector test?

10    A.    Well, that depends on what

11    other information.  We are assuming that,

12    you know, if they knew, that they could

13    take the job provisionally and then would

14    have to pass the test, that puts them in

15    largely the same position of needing to

16    pass that test in order to be -- to remain

17    a building inspector.

18              So you know, either way, yeah,

19    you're gonna need to face that exam at some

20    point.  So if you want to make the move,

21    you should take it.

22    Q.    You quote from the testimony of

23    Darren Connors and of Darryl Chalmers.  Did

24    you read the deposition testimony of the

25    other three plaintiffs?

156

1                      C. ERATH

2       A.    The other three named

3   plaintiffs?

4       Q.    Yes.

5       A.    Yes, I did.

6       Q.    You are aware then that the

7   fire protection inspectors frequently work

8   on joint task forces with the Department of

9   Buildings inspectors?

10      A.    I don't know about frequently.

11  I know I -- I do recall a reference to

12  joint task forces.

13      Q.    Wouldn't that provide an avenue

14  for fire protection inspectors to learn

15  about the processes by which the Department

16  of Buildings hired its inspectors?

17           MS. CROUSHORE:  Objection.

18      A.    Because they could talk to

19  construction inspectors?  Is that your --

20      Q.    Yes.

21      A.    -- hypothesis?

22      Q.    Yes, while they're working.

23      A.    I don't know one way or the

24  other if being on a joint task force meant

25  you were standing next to the person or

```
 1                    C. ERATH
 2   were three floors away or, I mean, what
 3   opportunity you had for communication.
 4   I -- I don't know.
 5            MR. LIEDER:  I have no other
 6       questions.
 7            MS. CROUSHORE:  I just have a
 8       couple of really quick ones
 9       hopefully.  Famous last words, I
10       know.
11   EXAMINATION BY
12   MS. CROUSHORE:
13       Q.   Dr. Erath, you were talking
14   earlier about your note in your report that
15   FPIs applied for roughly 250 different
16   jobs, right?
17       A.   Yes.
18       Q.   If 50 people applied for the
19   associate FPI position, would that count as
20   50 in that 250 or as one?
21       A.   That's one.  Those are
22   different jobs.
23       Q.   And then when we were just
24   talking about Department of Buildings
25   hiring provisionally, when you were looking
```

158

```
 1                    C. ERATH
 2    at whether FPIs moved to Department of
 3    Buildings, I know you looked at the exams
 4    that they took.
 5              Did you also look at the larger
 6    data set of sort of HR information about
 7    all of the FPIs and building inspectors to
 8    see whether anybody actually did move from
 9    FPI to Buildings?
10              MR. LIEDER:  Objection.
11         A.   I did.  I'm sorry.  I did look
12    at those data and -- and no one made that
13    move.
14         Q.   Had somebody applied for the
15    job provisionally and gotten the job
16    provisionally and taken the job through
17    that process, would they have appeared in
18    that data as having moved?
19         A.   That is my assumption.
20              MS. CROUSHORE:  Okay.  Thank
21         you.  That's all my questions.
22              MR. LIEDER:  I have no other
23         questions.  Thank you very much,
24         Dr. Erath.
25              MS. CROUSHORE:  Yes, thank you.
```

159

1                    C. ERATH

2          THE WITNESS:  Thank you.

3          (Whereupon, at 4:10 P.M., the

4     Examination of this witness was

5     concluded.)

6

7          °          °          °          °

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

160

1

2          D E C L A R A T I O N

3

4      I hereby certify that having been

5  first duly sworn to testify to the truth, I

6  gave the above testimony.

7

8      I FURTHER CERTIFY that the foregoing

9  transcript is a true and correct transcript

10  of the testimony given by me at the time

11  and place specified hereinbefore.

12

13

14

15          _____

                       CHRISTOPHER ERATH
16

17

18

   Subscribed and sworn to before me
19
   this _____ day of _____ 2021.
20

21

22  _____

23      NOTARY PUBLIC

24

25

161

```
 1
 2                  E X H I B I T S
 3
 4   PLAINTIFF EXHIBITS
 5
 6   EXHIBIT   EXHIBIT
 7             DESCRIPTION                  PAGE
 8    1 - 5    Documents                     4
 9    7 - 13   Documents                     4
10   (Exhibits retained by Counsel.)
11
12                  I N D E X
13   EXAMINATION BY                         PAGE
14   Mr. Lieder                             6
15   Ms. Croushore                         157
16
17   INFORMATION AND/OR DOCUMENTS REQUESTED
18   INFORMATION AND/OR DOCUMENTS          PAGE
19
20   (None)
21
22            QUESTIONS MARKED FOR RULINGS
23   QUESTION                         PAGE LINE
24   (None)
25
```

162

1

2               C E R T I F I C A T E

3

4    STATE OF NEW YORK    )
                         :   SS.:
5    COUNTY OF ROCKLAND   )

6

7         I, JUDY ROSENBERG, a Notary Public

8    for and within the State of New York, do

9    hereby certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 10th day of August, 2021.

21

22

23   _____
                                    *Judy Rosenberg*

24              JUDY ROSENBERG

25

**A**

**A.M** 1:14
**abilities** 32:2
**ability** 40:21
**able** 34:24 35:22 36:4,25
**abolished** 89:14
**absence** 51:8 78:7 130:5
**Absent** 115:15
**absolve** 68:21
**abstract** 61:21 101:4
**accept** 68:20
**accessed** 11:13
**accomplishments** 69:5
**account** 49:16 57:14 65:16,20,23
    66:25 68:18 82:11 83:19
**accurate** 114:10 142:9
**accurately** 14:4 124:19 126:14
**achievements** 66:4,12,24
**action** 162:16
**actions** 12:3 150:25
**activities** 96:13
**actor** 149:7,22
**actual** 17:16 19:15
**Adam** 101:8
**addition** 28:8 103:21 120:11
**additional** 20:18 102:14 103:4,18
    103:24 105:13
**address** 6:13 96:11 111:13
**addressed** 139:5
**administer** 3:11
**administrative** 93:11,16,17,20 94:5
    94:7,9
**admit** 38:2
**admitting** 38:7
**advance** 118:4
**advanced** 90:2,5 117:20 129:19
**advertise** 106:15
**advertises** 106:8
**affect** 155:8
**African** 50:13
**African-Americans** 50:10
**AFSCME** 1:5
**against-** 1:8
**agencies** 68:10 79:7 80:17 100:18
    100:21 118:11
**agency** 4:21 51:14 81:9
**ago** 20:25 22:18 23:10 118:11
**agree** 14:2 19:17 21:10 54:20 59:23
    63:7 76:14 79:15 92:8 118:23
**agreed** 3:5,20 4:11 38:24 40:5
    79:12
**agreement** 15:19,22 61:24 71:17
    75:15,22 77:19,21 78:4,8,19,21
    78:24 79:4,18
**agreements** 74:15 78:13
**ahead** 86:5
**Aisha** 2:15 6:22
**akin** 101:7

**al** 8:19
**aligns** 70:4
**allege** 114:22
**alleging** 26:16
**allows** 84:17
**alluded** 67:19
**Amanda** 2:12 15:10,11 108:2
**amend** 120:19
**amount** 58:23 79:17 84:21 127:21
**analogous** 56:25 81:12,22 99:25
**analyses** 46:25 73:23 77:24 81:22
    83:10 90:9 121:5,18
**analysis** 19:20 20:3,7 31:15,19,24
    51:25 56:22,24 57:5 58:17,20
    60:7 61:14 63:21 64:20,23 65:4,8
    70:2 71:22 72:6,9 74:2,8 90:6,20
    92:18 96:24 97:6,15 102:2,6
    104:20 105:3 120:14 122:7,15
    132:23 134:21 135:6 137:17
**analyst** 142:23
**analyze** 57:25 59:25 61:2 90:13
    121:4
**analyzed** 57:25 77:17 121:17,25
**analyzing** 137:5,7
**AND/OR** 161:17,18
**anomalies** 20:13,17
**answer** 7:11 20:6 26:8,19 55:14,23
    62:19 72:16 86:9 94:17 104:5
    121:11 138:9 149:4,13 150:11
    153:2,11
**answering** 54:23
**anybody** 120:4 158:8
**anymore** 127:6
**anyway** 89:21
**Apart** 33:5
**apologize** 110:21
**appealed** 103:6
**appear** 10:23 39:5
**appeared** 20:12 122:6 158:17
**appearing** 5:22
**appears** 15:21 82:2,7 120:8
**appendix** 38:10
**applicant** 9:19 49:15,19 143:11
**applicants** 17:6 51:5
**application** 8:18 131:18 132:9,15
    135:24 141:16 142:10,15 146:6
    146:18 147:21
**applications** 17:14 119:4 130:17
    132:21,25 133:16,20 134:11
    142:5 143:10,19,25 144:4 145:6
    145:10 147:20
**applied** 9:25 10:18 17:12,13 50:16
    50:19 90:7 112:12 116:12,15
    122:6 130:8,13,23 131:9 132:11
    132:17 133:4 134:2 135:4 136:5
    138:11 140:2,17 143:7 147:16
    150:14 157:15,18 158:14
**applies** 135:19

**apply** 50:24 83:6 115:13,17,18
    117:6 134:18 141:24 142:12
    145:25 146:2,19 147:7,9 148:16
    149:2 150:5,9 153:2
**applying** 136:8,23 137:6,9,25 138:3
    138:5 141:22 142:23 155:8
**appointment** 151:16
**appointments** 152:8
**appreciate** 15:12
**approach** 96:2,4,17
**appropriate** 55:16 57:8 93:9
**approximate** 18:14
**approximately** 21:6 22:15 23:7
**April** 20:22
**arbitrations** 97:21
**area** 30:6 109:19
**areas** 127:24
**arm's** 13:8
**arranged** 21:23
**aside** 20:16 78:17 91:10,11 99:8
**asked** 14:2 33:8 40:3 57:24 59:24
    60:25 106:2 110:2 125:4 126:22
**asking** 36:8 40:23 51:21 54:25 58:4
    60:24 86:8 90:21 92:20 103:15
    110:8,10 112:25 114:12 133:24
    134:3 139:16 140:6,12 145:9
**aspects** 94:23 95:3 99:11,17 100:3
    101:16
**assess** 44:9
**assessment** 43:23,25
**assignment** 61:25
**assignments** 111:8
**Assistant** 2:12
**associate** 12:7 15:24 37:9,21 38:4
    39:20 83:20 88:18 89:3,4,9,14
    90:2 91:10 93:10 94:16,16 140:14
    143:8,12,25 157:19
**associate-level** 81:13,22 82:19,22
**associated** 107:22
**associates** 82:16
**assume** 13:9 46:15 76:12 94:14
    100:24 114:5 118:5 134:25
    139:22 140:7 145:15 150:9 153:4
    154:24
**assuming** 57:15 101:13 155:11
**assumption** 48:13 88:24 129:3
    132:3 158:19
**attempt** 34:8,21 38:23 39:16 41:22
    42:3 44:9 47:14 54:9 56:13 64:5
    64:12 65:10,14 95:2 98:22 115:7
    116:13 152:16
**attempted** 20:3 48:7 68:23 95:7
    99:10 145:2
**attempting** 115:2 125:17 134:16
    149:16
**attention** 9:3
**attorneys** 2:4,10 7:4
**attributable** 101:15

attribute 101:14
**August** 162:20
**author** 106:24
**authority** 117:2,8
**authorized** 3:11
**automatic** 61:23
**available** 13:6 49:19 139:4
**avenue** 2:5 156:13
**avenues** 150:10
**average** 52:14 53:22 56:7 57:9,17
  57:17 59:8,15 62:25 63:3 69:6
  80:5,6 86:21 147:23,25 148:3,10
  148:11 150:3
**aware** 66:17 67:13 99:15 101:25
  102:5 144:22,25 156:6
**awfully** 13:25

**B**

**B** 57:17 101:21 117:4,4,7 161:2
**back** 9:11 11:20 15:15 28:13 44:19
  45:4 48:9 55:19 97:11 104:3
  109:10 112:9 125:21 130:2 133:8
  135:16 139:25 143:4 144:20
**balances** 110:17
**bargained** 104:23
**bargaining** 15:22 61:24 71:17
  74:15 75:15,22 77:19,21 78:4,8
  78:13,18,21,24 79:4,18 105:14,24
**barrier** 120:5
**barriers** 119:11,17,23
**base** 58:2,6 61:18
**based** 96:16 100:6 102:6 121:15
  129:8
**basic** 118:3
**basically** 57:15
**basis** 42:6 48:3 63:17 76:16 104:9
  114:2,8 137:17 143:22
**bathroom** 33:14
**bearing** 144:24
**becoming** 91:10
**Bee** 4:20
**beginning** 14:22 137:13
**begins** 10:17 32:19 130:4
**behalf** 1:4,5
**behavior** 29:12
**belief** 5:21 132:6
**believe** 17:11 18:8 28:12 41:8,10
  45:23 46:16,23 48:22 49:10,22,24
  50:9,15 51:9 55:15 58:15 67:17
  71:7 72:3 80:18 89:17 93:2 94:8
  97:10,17 98:24 107:13 113:18
  116:2 124:18 125:15 126:7 127:5
  127:8,9 136:4 141:10 147:18
  148:2
**believing** 63:18 114:9
**bell** 26:14
**benefit** 95:17 98:8
**benefits** 62:23 95:12,13,17 99:9,19

100:5 108:22
**best** 5:20 25:14 27:23 44:20 65:25
  108:21
**better** 55:20 104:5 117:5
**beyond** 32:15 55:10 58:6 61:15
  80:21 93:10 99:14 106:24 114:6
  120:19
**bigger** 70:19
**bill** 25:19
**billable** 21:5,13
**billed** 24:25 25:4,8,12
**billing** 25:2,6,12,16,22
**biopsychology** 28:25
**bit** 112:16 120:21
**black** 45:17
**blank** 11:23 43:4
**BLDS** 6:14
**blood** 162:16
**bls.gov** 11:14
**boilers** 16:16,19
**bold** 38:15 39:5,15,17
**bolded** 38:20,24,25
**book** 12:22 117:16
**books** 13:18
**bottom** 10:15 14:12 33:24 102:22
  108:14 112:11 125:22
**bound** 96:6
**bounding** 96:2,3
**bounds** 96:7
**break** 7:8,9 33:14,18 44:16 73:8,10
  73:11,22 109:8 141:3
**bribes** 100:12,16
**broad** 13:25 122:9
**broadly** 83:22,23 84:5
**brochure** 106:5,8,11,15,22 107:2
  108:3,10
**brought** 23:22
**building** 35:11 51:12 52:15 53:24
  59:2,8,12 60:3 61:3,11 68:6 74:11
  79:12,15 88:4 92:4,5,9,16 93:5,15
  95:4 100:11 119:25 120:8 122:11
  137:2,7,10,15 138:8 145:10
  147:10 151:2,11,21 152:3 154:10
  155:17 158:7
**buildings** 17:3 32:24 41:6 47:21
  50:17 56:9 75:20 89:10 93:21
  94:10 102:8 135:9 153:3,6,22,24
  154:18 155:3 156:9,16 157:24
  158:3,9
**Buildings'** 135:14
**bumps** 58:9 59:4
**Bureau** 90:10
**bus** 130:10 134:9,10,12 141:10

**C**

**C** 2:2 6:2 7:1 8:1 9:1 10:1 11:1 12:1
  13:1 14:1 15:1 16:1 17:1 18:1
  19:1 20:1 21:1 22:1 23:1 24:1

25:1 26:1 27:1 28:1 29:1 30:1
  31:1 32:1 33:1 34:1 35:1 36:1
  37:1 38:1 39:1 40:1 41:1 42:1
  43:1 44:1 45:1 46:1 47:1 48:1
  49:1 50:1 51:1 52:1 53:1 54:1
  55:1 56:1 57:1 58:1 59:1 60:1
  61:1 62:1 63:1 64:1 65:1 66:1
  67:1 68:1 69:1 70:1 71:1 72:1
  73:1 74:1 75:1 76:1 77:1 78:1
  79:1 80:1 81:1 82:1 83:1 84:1
  85:1 86:1 87:1 88:1 89:1 90:1
  91:1 92:1 93:1 94:1 95:1 96:1
  97:1 98:1 99:1 100:1 101:1 102:1
  103:1 104:1 105:1 106:1 107:1
  108:1 109:1 110:1 111:1 112:1
  113:1 114:1 115:1 116:1 117:1
  118:1 119:1 120:1 121:1 122:1
  123:1 124:1 125:1 126:1 127:1
  128:1 129:1 130:1 131:1,22 132:1
  133:1 134:1 135:1 136:1 137:1
  138:1 139:1 140:1 141:1 142:1
  143:1 144:1 145:1 146:1 147:1
  148:1 149:1 150:1 151:1 152:1
  153:1 154:1 155:1 156:1 157:1
  158:1 159:1 160:2 162:2,2
**calculate** 48:8 68:24
**calculated** 47:16 66:11 89:25
**calculation** 43:22 62:21
**calculations** 56:14 64:10
**calibrate** 152:16
**call** 9:3 87:19 131:2
**called** 6:2 12:22 13:4 14:7 138:18
  151:3
**candidate** 84:17 142:6 143:21
**candidates** 86:16,22
**cannon** 11:6
**capacity** 33:10
**caption** 26:15
**captured** 90:20
**career** 77:16 80:2
**carpenter** 86:3,6,7
**case** 1:8 6:19,23 8:10,13,19,20 9:7,8
  12:2 14:21 16:23 18:12 20:21
  22:5 23:8 25:24 26:10,13,16
  27:10 48:22 49:20 55:25 66:9
  75:19 78:14 82:2 95:5,8 97:6
  98:10,12,16,22 103:2 104:21
  105:4 111:2,7 119:16 123:22
  147:14
**cases** 22:24 23:15,22,23 24:2,9,12
  24:15,19,21 25:11 27:2 28:3 66:7
  78:22 96:18 97:12,13,14,18,24
  109:22 110:23 111:24 117:21
**categories** 122:9
**category** 94:16
**cause** 85:25 105:23 134:9 154:3
**caveat** 7:10 125:20 128:8
**caveats** 55:18,24 57:10,23

**Cbu004-engineering-and-scientific** 15:18
**certain** 96:13 107:13 125:8 139:6
**certainly** 13:4 14:5 16:12 19:14,17 60:4,13 63:12 68:8 69:10,19 71:23,25 72:24 76:14 83:2 84:3 91:3 100:16 102:5 120:3,16 146:24
**certainty** 50:7
**certification** 3:8
**certify** 160:4,8 162:9,14
**cetera** 86:3
**chain** 140:19
**Chalmers** 1:3 8:19 155:23
**change** 43:24 44:24 45:9 46:13,24 71:9 80:9 91:15 104:20 105:3 124:25 125:19 126:10,12,15
**changed** 43:15 45:5,21 46:9 63:24 84:23 85:2,13 126:19,25
**changes** 40:9 44:5,10,21 45:12,15 46:16 90:17,19 91:6,10,12,18,20 91:23,25 92:4,11 125:8,11,12
**characteristics** 57:14
**charge** 153:13
**Charles** 8:17 9:6 141:19
**check** 40:4 56:4
**checked** 39:7 42:9 132:4
**chief** 78:25
**choice** 118:7
**choices** 96:15,16
**Chris** 15:4
**Christopher** 1:19 5:23 6:12 7:23 8:5 160:15
**chronological** 21:24
**Church** 2:10
**circular** 101:3
**cite** 116:25
**city** 1:10 2:9 4:9 8:19 9:24 18:10,12 20:22 22:4,22,25 23:15 24:3,22 24:25 25:5,8,12,19,23 26:3,12 27:3,18 28:5,9,10 53:6 65:15,22 66:2,8,10,18 67:17,22 68:3,9,17 69:13 71:8 75:5 87:22 97:7,9 109:24 110:5,19 111:17 113:20 139:14
**civil** 1:21 151:4
**claim** 122:3,19
**clarification** 31:22
**class** 108:22
**classified** 90:4
**clause** 106:19
**clear** 27:12 33:7 38:5 40:12,15 87:5
**clearly** 80:25 127:14 138:19
**clicked** 16:17
**clients** 110:5,16 111:17,18
**close** 35:2
**code** 91:14 151:4
**coding** 53:4,7,13,18

**coin** 22:13
**collect** 68:24
**collective** 15:22 61:24 71:17 74:15 75:14,22 77:19,21 78:4,7,13,18 78:21,24 79:3,18 105:23
**colloquy** 153:10
**column** 47:8,13 56:12 69:22 131:20 132:8
**combined** 75:16
**come** 94:15 95:12 97:4,21 133:8
**comes** 95:9
**coming** 71:15
**commission** 115:12
**commit** 145:2
**committed** 139:20
**communication** 157:3
**compare** 49:11 51:10 54:19 55:14 57:9,17 103:23
**compared** 62:8
**comparing** 54:20
**comparison** 54:25
**compensated** 117:5
**compensating** 99:23
**compensation** 47:2 57:25 59:16,20 60:14 62:10,15,19 63:4,9 75:13 94:22 102:20 103:11 115:22,23 116:6,17 128:22 147:24,25 148:4 148:10,12
**competitive** 29:8,10 151:15 152:9 152:15 154:6,11,19
**complete** 11:23 113:24 114:3 125:11 130:4
**completion** 73:4
**component** 60:7 63:8 77:4
**components** 58:18,21 59:10 60:9,10 61:15 62:9,14 63:2
**composition** 48:15 49:18 51:6
**compounds** 82:25
**comprise** 62:14
**compromise** 104:25
**Conceivably** 116:24
**concept** 52:22 118:3
**concerning** 17:6 46:25 66:18 127:17
**conclude** 127:12
**concluded** 129:7 159:5
**conclusion** 116:2,14,19
**Conditional** 77:11
**conducted** 4:14
**conference** 4:19 5:22
**confidence** 23:12 113:23,25 114:3
**confirm** 132:4
**confirmed** 132:7
**confusing** 37:25
**Connecticut** 2:5
**connection** 56:24 112:17
**Connors** 1:3 100:9 152:23 155:23
**consent** 5:2

**consider** 31:3,8 54:13 85:25 95:19 149:9
**consideration** 85:3 87:4 97:19
**considered** 5:3 13:18 38:20 60:14 83:16 115:24 133:21 136:11,15 136:17
**considering** 137:15
**constraint** 55:5
**construct** 145:11
**construction** 11:13 12:8 17:7,13 37:10,20 38:4 39:20 84:14,23 85:4,19 86:2,23 87:6 89:9,13,14 123:6 124:14,21 125:4 126:23 128:5 144:9,23 146:2 148:4,12,17 148:20,22 149:24 150:3,6,15 151:22 152:3,7,13 155:9 156:19
**consultant** 21:6,15
**consulting** 28:10 30:20
**contact** 8:8
**contain** 17:16
**contained** 151:9
**contains** 40:18
**content** 17:10 32:7,9 118:20 149:11
**contest** 7:7
**context** 100:23
**contingent** 54:24
**CONTINUED** 109:16
**contractually** 79:11
**contradiction** 129:6
**contradicts** 128:14 129:21
**contrary** 122:4,21
**contributed** 18:18
**control** 4:20 78:23 79:5
**controlled** 74:4 77:25 80:20
**controlling** 74:21
**controls** 67:21
**convenient** 73:9
**conversation** 111:14
**conversion** 56:2
**convert** 54:21 55:16
**copies** 7:17 122:22
**copy** 3:14,17 4:8 14:16,23 67:9 69:2 108:9
**copyright** 108:15
**Corporation** 2:9,12
**correct** 16:2 25:7 33:3,6 35:19,20 39:6 41:7,10,14 42:8 43:8,9 46:12 47:24 51:24 52:20 53:25 54:8,15 56:20 58:3,10,11 60:5 63:16 64:11 65:5 67:24 70:21 71:2 72:11 74:3 77:2 80:23 83:13,21 85:7,14 86:14 87:16 90:11 115:22 118:13 119:13 123:18,25 125:25 131:18 136:3 137:20,21,24 138:13,14 139:23 140:16 142:2,5 142:14 146:14,21 147:10 160:9
**corrected** 38:20 42:3 52:4 65:2 82:10

**correctly** 47:16 56:3 57:21 71:4
  131:16 143:2
**correlation** 70:11
**COUNCIL** 1:5
**counsel** 2:9,12 3:6,17 4:12,17 5:8
  5:19 10:8 114:4 161:10
**count** 37:20 44:8 92:7 131:14
  133:12 134:7,19,24 157:19
**counted** 27:13 46:10 131:8 132:24
**counting** 38:3,6 40:13 53:15 82:11
  82:25 133:3,5 134:10
**counts** 35:9 36:20 37:9 41:20 43:16
  51:22
**COUNTY** 162:5
**couple** 44:17 83:3 97:20 157:8
**course** 30:10
**courses** 30:2,6
**court** 1:2 3:13 4:16 5:9
**covered** 34:4 49:5
**covering** 15:23
**CPLR** 4:13
**created** 89:24
**crime** 130:10 141:11 142:23
**criteria** 90:8
**criticism** 68:19
**criticisms** 57:24 83:5
**criticize** 83:9 94:20
**critique** 19:4,15 54:11
**critiques** 83:14
**critiquing** 19:16
**cross-referenced** 145:14
**crossing** 29:18
**crossover** 31:12
**Croushore** 2:12 4:7 5:16,24 15:3,14
  20:5 31:20 33:4 47:3 49:13,21
  50:5,21 51:15 54:2 60:15,22
  61:12 62:11 63:5 66:5,13,20 67:7
  67:16,25 68:7,13 69:7,16 71:12
  73:13,17 75:24 76:11 79:14,24
  80:7 81:15 92:6 94:12 105:21
  107:6 108:6 114:11 118:21 120:2
  121:10,23 127:10 128:25 139:11
  140:5,24 143:14 144:5 145:8
  147:11 148:19 150:7,17 154:8
  156:17 157:7,12 158:20,25
  161:15
**Cruz** 22:12,16,21 23:19 24:5
**current** 74:14
**currently** 26:2
**CV** 8:5,11,14 21:17,20 22:7 27:6
  97:11,13

────────── **D** ──────────

**D** 3:2 160:2 161:12
**D.C** 2:5 6:21
**danger** 99:22
**Darren** 1:3 100:9 152:23 155:23
**Darryl** 1:3 8:19 155:23

**dash** 15:18
**data** 9:20 10:17 11:11,17,21,25
  19:2,6,8,11,18,21 20:3,9,13,18
  34:2,11 43:2 50:22 51:7,8,22,24
  67:4,20 68:20 71:15 87:15,18,20
  112:12,20 113:7,11,14,24 114:13
  130:15 141:17 158:6,12,18
**database** 66:15,17 113:8 120:21,24
  130:21 138:25 139:4
**date** 1:23 4:5 5:15 14:15,18 18:15
  20:23 132:15 134:6 135:24
  140:22
**dated** 8:21 9:8 132:17
**day** 132:9 160:19 162:20
**days** 3:16
**DCAS** 12:7
**De** 22:12,16,21 23:19 24:5
**dealing** 98:12
**debate** 75:12
**decision** 61:16,19
**decisions** 29:16
**decrease** 59:17
**decreasing** 59:21
**deemed** 4:3
**defendant** 1:11 2:10 98:18,19
**define** 31:18
**defining** 62:18
**degrees** 69:5
**DeLarosa** 131:8 135:17 136:13
  138:10,11 139:18 140:17
**demonstrate** 143:16
**department** 2:9 17:3 32:24,24
  35:11 41:6,6 45:12 47:11,21
  50:17 51:11,12 52:14,15 53:23,23
  56:9,9 58:25 59:2,7,7,12,14 60:3
  61:3,10 63:23 68:4,5,6 69:6,14
  74:11 75:20 79:12 88:4 89:10
  92:5 93:15,21,22 94:10,11 95:4
  102:7,7 119:25 135:9,14 153:6,22
  153:24 154:17 155:3 156:8,15
  157:24 158:2
**dependent** 76:19,21 77:6
**depends** 149:2 155:10
**deposed** 6:18 20:21 22:16
**deposition** 1:18 3:8,9,14 4:14 7:16
  22:11 23:19 24:8 106:3 112:2,7
  155:24
**depositions** 24:4
**describe** 8:11 32:16 35:14 64:19
  98:11 126:9,10
**described** 8:23 9:19 11:11 15:17
  124:19 126:15
**describing** 8:14 96:21
**description** 17:11,18 151:4 161:7
**descriptions** 121:6,19
**designated** 7:15,21 8:4,15 46:8
**designation** 45:16,22
**designations** 45:13 82:4

**desired** 106:16
**determinations** 64:15
**determine** 31:24 34:9 42:22 47:15
  57:20 61:9 64:8 67:22 119:16,23
  120:13
**determined** 56:17 96:19
**determining** 97:15 118:19,25
**develop** 121:21
**deviation** 49:3
**dialogue** 153:18
**dictated** 78:5
**differ** 127:14
**difference** 56:10 71:24 72:3,5,19,21
  72:22,24,25 73:4 78:25 88:25
  99:2 100:7,17,20 101:13 116:6,17
  127:17 128:22
**differences** 16:25 46:19 53:22
  56:15 58:2 60:19,20 63:22 84:11
  102:11,12 127:24
**different** 50:7,12,18 51:6 61:9 62:3
  69:11,19 71:20 78:22 83:14
  101:19 127:2,4 128:10 130:9,13
  130:14,20 131:9 133:4,22 134:2
  134:17 141:9 143:5 144:21 152:2
  157:15,22
**differential** 61:25 63:11,12 101:23
**differentials** 59:16,20 61:22 62:22
  63:13,20 75:10 78:17 99:23
**differentiating** 115:15
**differently** 24:13 81:4
**difficult** 50:2,6 100:22
**direct** 99:20 122:2,18 129:2,5
**direction** 44:10
**directly** 121:19 128:14 129:21
**director** 8:8
**disagree** 76:20 118:23
**disagreement** 36:19 52:22,25
  137:18
**disagreements** 36:24 52:19
**discretionary** 78:20
**discrimination** 26:17
**discuss** 33:5 54:17 120:18
**discussed** 19:18 75:10 120:7 128:3
**discussing** 75:11 81:7 120:15
**discussion** 56:23 118:25 119:20,22
**disparities** 58:22 59:25 64:10 71:10
  77:17
**disputing** 48:4
**dissimilar** 116:16 128:24
**distinction** 110:20
**DISTRICT** 1:2,2,5
**divided** 47:10
**division** 110:3
**DOB** 36:9 44:21,24 45:8 47:9 48:14
  49:12 50:2,11 58:23 63:23 65:15
  66:4 68:5 69:3,12 107:18 114:23
  114:24 115:2,8,11,13,18,21 116:4
**document** 7:22 8:6,16,22 9:2 15:16

16:5,22 139:13,14 140:23
**documents** 4:2 7:15 18:5 40:22
  120:12 123:9 161:8,9,17,18
**doing** 18:17 19:22 60:18 101:18
  110:17,18 132:23
**dot** 9:20
**double** 37:20 38:2,6 40:13 53:15
  82:11
**double-check** 107:15
**Dr** 6:16,24 7:14 8:17,17 9:5,6 12:21
  20:20 28:13 33:24 45:4 73:21
  108:5,5,9 109:18 113:16 122:22
  141:7 144:8 157:13 158:24
**drawing** 11:23 110:21
**drew** 114:14
**dropping** 46:6
**Drs** 10:25 18:11 20:2 32:14 34:14
  35:4 38:19 40:8,16 42:18 43:15
  45:23 46:18 54:12 55:25 56:6
  63:18 64:9,18 66:23 68:16 74:3
  81:21 94:21 102:19 112:15 121:3
  121:16
**duly** 6:3 160:5 162:11
**duties** 31:25 32:3 121:4,17,19

**E**

**E** 2:2,2 3:2,2 6:2,2 109:14,14 160:2
  161:2,12 162:2,2
**e-mail** 17:6,8,23 18:3
**earlier** 84:20 125:2 128:18 134:20
  144:8 157:14
**earliest** 23:5
**earning** 84:18 103:20
**econometrics** 28:19 31:11
**economic** 96:10 97:24 98:12
**economically** 149:7,22
**economics** 12:20,23 13:4,10,23 14:6
  28:16,19 29:6,18 31:4
**economist** 33:11 99:16 129:24
  155:7
**edition** 12:20 13:6
**education** 65:14,19 66:19 67:14,18
  71:8,21 72:21 75:4 120:6 126:13
  127:13,19
**educational** 66:3,11,24 69:4,10
  86:11
**EEOC** 118:10
**effect** 3:12,15 46:3 75:16 98:20
**effort** 20:16 67:12 116:11 142:12
**efforts** 54:19
**Ehrenberg** 12:19,22 13:12,17
  117:16
**eight** 76:8
**either** 68:10 89:2 98:6,9 102:13
  107:23 115:19 117:3 143:11,20
  150:21 154:14 155:18
**electronic** 66:3,17 67:4,23,24 68:4
**Electronically** 123:2

**elements** 60:14
**Eleven** 82:15
**eleventh** 7:25
**eliminate** 143:24
**eliminated** 37:12
**eliminates** 144:3
**emergency** 26:18
**employed** 67:14
**employee** 11:21
**employee's** 99:18
**employees** 77:18 90:23 103:12
  118:12 139:8 154:5
**employees'** 99:11
**employment** 69:13 101:11 139:21
**EMS** 26:11,18
**encompass** 98:4
**ended** 19:3
**endurance** 7:7
**engage** 18:12
**engaged** 18:10 27:4 97:8 101:5
  111:8,19
**engine** 15:21 16:17
**enjoyed** 102:13
**entire** 11:6 52:22 115:23
**entitled** 7:22 8:2,16 9:5 69:23
**entries** 133:11 140:11
**entry** 24:6 88:17 89:3 139:15
**enumerate** 124:25
**enumerated** 120:10
**equal** 103:10 104:2,14 105:6
  117:18
**Erath** 1:19 5:23 6:12,16,24 7:1,14
  7:23 8:1,5,5 9:1 10:1 11:1 12:1,21
  13:1 14:1 15:1 16:1 17:1 18:1
  19:1 20:1,20 21:1 22:1 23:1 24:1
  25:1 26:1 27:1 28:1,13 29:1 30:1
  31:1 32:1 33:1,24 34:1 35:1 36:1
  37:1 38:1 39:1 40:1 41:1 42:1
  43:1 44:1 45:1 46:1 47:1 48:1
  49:1 50:1 51:1 52:1 53:1 54:1
  55:1 56:1 57:1 58:1 59:1 60:1
  61:1 62:1 63:1 64:1 65:1 66:1
  67:1 68:1 69:1 70:1 71:1 72:1
  73:1,21 74:1 75:1 76:1 77:1 78:1
  79:1 80:1 81:1 82:1 83:1 84:1
  85:1 86:1 87:1 88:1 89:1 90:1
  91:1 92:1 93:1 94:1 95:1 96:1
  97:1 98:1 99:1 100:1 101:1 102:1
  103:1 104:1 105:1 106:1 107:1
  108:1,5,5,9 109:1,18 110:1 111:1
  112:1 113:1 114:1 115:1 116:1
  117:1 118:1 119:1 120:1 121:1
  122:1,22 123:1 124:1 125:1 126:1
  127:1 128:1 129:1 130:1 131:1
  132:1 133:1 134:1 135:1 136:1
  137:1 138:1 139:1 140:1 141:1,7
  142:1 143:1 144:1,8 145:1 146:1
  147:1 148:1 149:1 150:1 151:1

152:1 153:1 154:1 155:1 156:1
  157:1,13 158:1,24 159:1 160:15
**erected** 119:12
**error** 9:2 75:18
**ESQ** 2:6,12,15
**essentially** 145:20
**estimate** 21:9 24:24 27:24
**et** 8:19 86:3
**evaluate** 151:19
**events** 101:24
**eventually** 154:12
**everybody** 62:4
**evidence** 32:15 33:2,9 122:4,20
**Exact** 48:20
**exactly** 88:22
**exam** 9:19,22 123:23 125:24 126:11
  126:20,24 130:15 131:19,21
  132:2,12,17 136:3 138:20 140:14
  143:7 145:25 146:3,5,24 154:13
  154:14 155:19
**examination** 6:8 16:19 109:16
  122:23 155:5 157:11 159:4
  161:13 162:10,12
**examined** 6:5
**examiners** 123:14
**examining** 121:5,18
**example** 17:4 37:14 99:13 138:10
**examples** 99:21
**exams** 10:18 34:2 112:12 123:6,11
  130:20,23 131:9 134:2 136:5
  145:11 146:10,17,22 147:2 158:3
**Excel** 9:21
**exception** 131:23
**exclude** 140:18
**excluded** 89:18 135:4
**exclusively** 143:10
**Excuse** 44:13
**exercise** 51:19
**exhaustive** 145:2
**Exhibit** 7:21 8:5,15 9:4,11 21:16
  26:22 32:20 33:25 38:9 112:10
  123:17,19,20,23 124:2,3,5 131:3
  133:10 135:16 136:14 138:22
  139:25 141:18 161:6,6
**exhibits** 4:3 7:16 122:24 123:10
  144:13 161:4,10
**exist** 68:21
**existence** 16:8
**expect** 100:25
**expected** 101:9
**experience** 65:16,23 68:5,9,12,17
  69:14,18 71:8,21 72:22 75:5
  84:15 85:6,13 86:3,12 120:6
  127:13,19,25 128:10
**experimental** 86:17
**expert** 7:22 8:16,24 9:5,12 21:5,14
  27:17 28:8,14 30:17,24 31:4,8
  32:7 51:10 97:8 98:17 110:10,12

110:16,24,25 111:16
**explain** 37:19
**explanation** 37:25 40:9 119:8
**explanations** 116:23
**express** 4:25
**expressed** 55:25
**extensively** 152:22
**extent** 32:25 38:6 40:14
**extra** 103:11 104:14,16 105:6
**extracted** 131:6
**extracting** 113:6

**F**

**F** 3:2 109:14 162:2
**face** 96:15 155:19
**fact** 5:23 7:24 107:12 109:22
**factor** 90:16
**factored** 63:19
**factoring** 94:22
**factors** 57:16 68:22 115:16 149:6
**Failing** 80:13
**fair** 19:10 30:23 121:2,15
**fairly** 52:21
**familiar** 118:15 151:17
**Famous** 157:9
**fan** 11:5
**far** 13:22 53:21 111:6 125:10
126:18,24
**farther** 26:25
**FATIMA** 1:4
**FDNY** 14:7 46:11 48:13 49:12
58:22 66:4 85:12 93:16
**federal** 1:21 118:10
**fewer** 94:4
**field** 29:6 30:13,17,21,24 31:4
151:3,8,19 154:4
**fields** 28:18 31:7
**figure** 44:3 109:9 152:10,12
**figures** 54:8 65:11
**file** 2:7,13 87:15,18,20,22,25 150:24
**files** 17:17 91:4,19
**filing** 3:7
**fill** 42:19 43:11
**filling** 43:14 153:25
**finally** 8:25 17:5 56:10
**find** 14:23 15:2,4 59:22 99:21,22
142:20,22
**findings** 63:21
**fine** 44:18 57:18 73:13 84:8 146:16
**fire** 9:23 11:12 14:8 15:23,24 32:23
34:4 35:10,23 36:3,9,11,20,22
41:5 45:12 47:11,23 50:4,20
51:11 52:14 53:23 54:13 56:8
58:25 59:7,13 60:2 61:2,10 63:23
68:4,5 69:6,14 79:2,9 80:14 85:20
86:22 90:7,10 91:21,25 92:14
93:3,21 94:5,10 95:3 102:7,20
103:17 104:22 122:10 134:20

135:20 136:21 139:10,19,23
140:3,7,14,19,20 141:25 142:7,13
142:16 148:13 149:8,22 150:13
150:25 151:10,20,25 154:25
156:7,14
**firefighter** 147:22 149:25 150:2,5
**firefighters** 147:24 148:8,11
**firefighters'** 148:16
**firm** 6:20 29:12,12,14,16
**firms** 29:8,10
**first** 6:3 10:14,23 22:20 28:14,15
38:11 68:19 84:4,9,10,13 87:7,12
87:14 108:15 111:14 114:20
127:12 128:7,13 132:16 133:12
133:14 144:21 160:5
**fiscal** 41:7,9 88:9 132:22 139:9,24
140:9
**Fishers** 48:20
**five** 36:25 84:15,17 85:6 88:20
102:14,16 103:4,13,18 104:17
125:2,23 127:22 128:13 133:12
133:13 145:16 146:17,18,23
150:13
**five-minute** 33:18
**flexibility** 104:8 105:12
**flier** 14:8,11,16
**fliers** 15:6
**flip** 22:13
**flock** 117:19
**floors** 157:2
**FLSA** 97:18
**focus** 21:12 54:18 115:4 122:12
127:19,21 137:16
**folks** 134:18
**followed** 81:17
**following** 149:17
**follows** 6:6
**footnote** 32:6,6 88:19
**force** 3:15 156:24
**forces** 46:20 156:8,12
**foregoing** 160:8
**forester** 130:10 141:11,17,23 142:6
142:9,12,15
**forgo** 7:3
**forgotten** 77:3
**form** 3:21 58:20 60:16 75:8 112:20
**formal** 26:15 27:15 43:25 98:9
**forming** 16:22
**forms** 63:9
**forth** 122:16 162:11
**forward** 133:6 144:24
**Foster** 22:4,16,20 23:18 24:5
**found** 12:22 15:9 16:18 37:24 42:12
52:6 122:4 130:5 141:16
**four** 9:4 26:23 27:4,17 38:14
123:11 125:2,3 145:20,22
**fourth** 24:6
**FPI** 10:19 17:6 34:3 88:3 112:13

114:23,25 115:13 119:24 125:24
126:11,19 128:5 135:8,11 136:2
136:14,17 137:9,20 138:12,12
139:15 143:8,8,12,12,21,25
157:19 158:9
**FPIs** 9:20 17:12 34:9 84:15 102:13
105:5 106:8,9 107:11,21 115:5,17
116:3,15 130:8,17 136:8,11 137:6
137:15 138:3,5,7 143:7 144:2
145:6,10 147:9,16,21,25 154:16
154:23 157:15 158:2,7
**fraction** 62:2
**Frankly** 37:24
**free** 103:7,10
**frequency** 95:10
**frequent** 147:22
**frequently** 107:17 112:5 147:17
156:7,10
**fringe** 95:11,13 99:8,19
**front** 7:14 147:13
**full** 105:15 114:17 127:12 128:13
**fully** 66:2,11 85:25
**functions** 122:8
**fundamental** 80:9,11
**further** 3:20 4:22 88:15 160:8
162:14
**future** 5:15

**G**

**G-U-L-I-N-O** 27:9
**G&S** 10:20,24 48:12
**gender** 26:17
**general** 20:24
**generally** 29:7 40:3 53:8,11,12,13
95:16 154:17 155:2
**generally-used** 14:5
**getting** 86:5 105:19 149:3,9,14
**Gilbert** 11:3,4
**give** 7:5 14:23 99:5
**given** 22:6 26:4,22 27:5 30:16 43:4
45:25 53:6 54:24 57:10 66:7 71:6
72:22 77:6 84:6 116:13 118:7
129:23 160:10 162:13
**gleaned** 16:14 53:15
**GLENN** 1:3
**go** 9:13 11:8,20 15:15 37:8 83:7
95:22 96:8 97:11 100:19 109:8,18
112:9 123:12 125:21 130:2 133:9
135:16,17 139:25 143:4 153:9
**goes** 15:19 26:24
**going** 23:11 40:22 41:20 46:21
54:17 82:8 86:4 106:3 111:10
133:8 146:15
**Goldstein** 8:17 9:6 10:25 18:11
32:14 34:14 35:5 38:19 40:8,17
42:18 43:16 45:24 46:18 52:3
54:12 55:25 56:7 59:22 63:18
64:18 66:23 68:16 74:3 77:3

81:11,21 87:15,20 94:21 102:19
  112:15 113:16 120:17 121:3,13
  121:16
**Goldstein's** 20:2 64:9
**gonna** 155:19
**good** 6:16,17 9:17 21:22 106:16,23
  141:3
**gotten** 34:25 158:15
**graded** 138:16
**graduate** 29:25
**graduation** 30:12
**granted** 76:16
**great** 33:19
**greater** 69:4 87:6 90:23 147:8
  148:11
**group** 143:16
**groups** 57:10 77:17
**guess** 23:9,11 27:21 37:4,5 86:4
  110:11
**Guidelines** 118:12,16,25
**Gulino** 27:9

**H**

**H** 6:2,2,2 161:2
**half** 21:4,6,13 27:25 28:6,7 102:14
  102:17 103:4,13,18 104:16,24
**halfway** 42:11,14 66:16,19
**hand** 162:20
**happened** 17:14
**happening** 44:2
**hard** 61:21 67:9 69:2 82:14 150:10
**harder** 72:25
**Harold** 8:17 9:6
**hat** 135:14
**head** 10:12 51:22 96:22 121:12
**headed** 131:21 132:8
**heading** 82:15
**heads** 56:12
**hear** 112:6
**heard** 138:24
**held** 1:22 10:18 112:13
**help** 31:21
**hereinbefore** 160:11 162:11
**hereunto** 162:19
**hesitant** 26:8
**high** 70:14,25 71:4
**higher** 25:9 47:22 48:5 92:15 93:4
  107:22 117:12,19,24
**hire** 53:24 74:5,16 78:12 80:22 86:6
**hired** 89:8 110:23 138:19 139:18
  154:6,12,18 155:3 156:16
**hires** 52:16 56:8,19 154:10,11
**hiring** 153:13 157:25
**Hispanic** 45:17
**history** 139:21
**hold** 30:24
**holding** 34:3
**holds** 128:9

**holidays** 108:23
**honorableness** 101:10
**hope** 142:25
**hopefully** 157:9
**hour** 25:23 52:14 53:22 56:10
  108:22
**hourly** 54:22 55:3,6,16,20 56:3 77:7
  103:20 105:6
**hours** 102:14,22 103:5,13,18 104:9
  104:17,24 105:6 106:9,15 109:4
**HR** 150:25 158:6
**Hudson** 133:15 134:8,23
**human** 12:2
**hundreds** 92:3
**hypotheses** 116:21
**hypothesis** 128:15 129:22 156:21
**hypothetically** 104:21 105:4 154:25

**I**

**idea** 10:10 101:22 107:20 146:25
  151:24
**identical** 48:14 117:24
**identification** 4:5
**identified** 26:8 41:15 43:7 46:2,5
  88:2 116:11
**identifies** 154:5
**identify** 20:17 41:13 58:12 96:18
  141:7
**identifying** 151:10
**ignoring** 77:11
**illustrate** 134:16 136:10
**imagination** 13:19
**immediately** 138:13
**impact** 46:17
**impacted** 43:18
**implements** 60:12
**implication** 122:2,19 129:3
**importance** 62:8
**impossible** 105:22 149:4
**include** 29:21 58:16 67:5,14 74:10
  90:25 92:21 106:11 142:19
**included** 28:18 61:17,19 67:2 89:16
  91:5 92:10 96:24 101:2
**including** 55:10 66:8 71:7 77:14
  111:17
**incorrect** 39:6 41:14,16 42:8 53:7
  70:18 80:19
**increase** 46:11 59:15 76:4,9 78:6,11
  78:20 79:22 80:4,22 90:24 92:21
  103:22
**increased** 45:7 105:5
**increases** 59:15 75:21 76:13,15,15
  78:15 90:13,18,25 91:2 92:12,25
  93:2,5
**increasing** 59:21
**increment** 80:21
**increments** 60:21 61:7 76:24 77:10
**incumbent** 54:6 74:5,17 78:12

80:23 84:18
**incumbents** 52:16 56:8,19
**independent** 70:4,5
**indicate** 70:7,10 105:16 106:21
  136:6
**indicating** 7:20
**indication** 42:18
**indicators** 74:10
**individual** 42:16,24 45:25 130:23
  132:11,25 133:15 134:10
**individuals** 17:12,17 34:16 39:21
  45:6 50:15 78:14 104:15 136:11
  143:16 145:24 148:13
**industrial** 28:19,24,25 29:5,21,22
  30:2
**infer** 108:18 115:19 121:7,20
  122:13,17 153:17
**informal** 98:9
**information** 8:8 18:2 20:10 42:19
  43:11,12,15 49:17 67:9,18,23
  91:4 113:3,20 114:9 139:6 149:4
  151:9 155:11 158:6 161:17,18
**infrequently** 115:18
**initial** 113:16
**inner** 153:12
**inspection** 14:8
**inspector** 11:21 12:8 14:8 16:16,19
  17:7,13 32:23 38:4 39:20 50:2,4
  50:11,17,20 83:17 85:5,20,21
  86:2,23,24 87:6 88:4 89:9,13,15
  93:10,11 94:9 100:11 114:23
  116:4 119:25 120:9 123:5 124:14
  124:21 126:23 135:8,20 136:22
  137:2,10 138:8 139:10,19,24
  140:4,7,15,19,21 141:25 142:7,13
  142:17 144:9,23 146:3 147:10
  148:21,23 149:8,23,24 150:3,6,15
  153:3 155:9,17
**inspectors** 9:23 11:12,13 12:3 15:23
  15:24 34:5 35:10,11,24 36:3,9,10
  36:11,20,23 37:10,20 41:5 44:21
  44:25 45:8 47:9,11,20,23 48:13
  49:12 51:12,14 52:15 53:24,24
  54:7,14 58:23 59:2,8,13,14 60:2,3
  61:2,3,10,11 63:23 66:4 68:6 69:4
  69:6,12,15 79:2,10,13,16 80:14
  81:13,14,23,23 82:20,22,23 84:14
  84:24 90:7 91:21,25 92:4,5,9,14
  92:16 93:3,5,20 94:6,7 95:4,5
  102:21 103:17 104:22 107:18
  108:23 115:3,8,11,14,21 122:10
  122:11 125:4 128:6 134:21 137:7
  137:16 146:19 148:4,12,14
  150:14 151:2,3,11,12,21,22,25
  152:3,4,7,13 154:10,18 155:2,4
  156:7,9,14,16,19 158:7
**inspectors'** 100:11
**instance** 29:14 53:15 67:11 86:7

90:9 134:8,15 137:19
**instances** 142:22
**instructed** 30:9
**instructions** 7:4
**insurance** 95:16 99:9,19
**integrated** 60:18
**integrating** 61:8
**intend** 111:10
**intended** 41:8 110:24
**intent** 89:21 126:17
**intention** 126:4
**interaction** 81:8
**interest** 28:18 155:8
**interested** 16:24 162:17
**interests** 143:17
**interplay** 29:7,9
**interpretation** 132:15
**introduction** 29:13
**investigate** 45:2
**investigators** 11:12
**involve** 22:21 101:12
**involved** 67:10 68:25 97:25 111:22
**involving** 150:25
**IO** 30:10,13,17,21,25 31:17 33:11
**issue** 81:6 82:25 90:22
**issued** 108:19 118:11 124:11,16
**issues** 82:3,18
**item** 9:19 11:8,20 12:6,11,18 14:7
    16:15 123:5,5,21,24 124:4

## J

**JAMES** 1:4
**January** 132:17
**job** 31:14,19,24,25 32:2,7,8,11
    35:12 62:2 74:6,10,14,21 77:25
    78:23 80:21 95:3 99:4,5,18,22
    101:16 117:3,4,4,5,6,6 118:20
    119:9,10,17 121:4,17,18 130:13
    130:17 133:4 135:8 142:14,18,23
    142:25 147:4 149:10,15 153:5,21
    154:13 155:13 158:15,15,16
**jobs** 32:23 74:11 75:17 86:12 94:23
    99:12 114:23 115:2,7,11,16,20
    116:5,16 117:13,18,25 118:20
    119:2,3,4 120:4,13 121:7,20
    122:13 128:15,21,24 129:5,8,15
    129:23 130:9,9 134:17 136:7,12
    136:23 137:9,10 141:9 143:5
    147:2,8,10,13,16 150:12,13,19,20
    150:23 157:16,22
**joining** 68:10
**joint** 156:8,12,24
**Judge** 3:13
**Judy** 1:23 141:20 162:7,24
**July** 1:14
**juncture** 29:19
**June** 12:14

## K

**Katawba** 131:8
**keep** 146:14 154:13
**keeper** 114:5
**knew** 61:5 154:9,10,17 155:2,12
**know** 6:18 7:9 10:7,9 12:16 13:22
    14:4,15,18 15:7 17:8,22,25 19:9
    20:14,14 23:23,24 24:17,20,24
    26:7,15 36:2 43:14 45:11,19
    49:17 51:21,23 53:21 54:3,7 59:6
    62:3,5,13,21,25 63:14,25 66:14
    68:2,14 69:3 71:19,20 72:7,13,15
    72:20 73:6,7 75:8 76:5,16,20 80:8
    82:3 84:4 85:24 86:15,20,20 87:2
    88:18 92:2,18 93:6,13,18,19,24
    94:18 96:23 98:7 100:2,3,4,7,24
    101:4,5,7,21,22 104:4 105:23
    107:11,16,19,25 110:14 111:6,9
    112:4,19,19,22,23 113:4,9 114:4
    114:6,6 118:14 124:10,16 125:10
    126:18,24 133:19 134:14,23
    135:2,10,12 136:20,24 137:3,22
    139:17 143:9 145:4,13,18 147:23
    148:5 149:14,17 150:12,22,23
    152:5,6,10,11,12 154:16,21,23
    155:12,18 156:10,11,23 157:4,10
    158:3
**knowing** 72:10
**knowledge** 5:21 31:25 44:20 65:25
    66:9 127:13
**known** 74:24 75:3
**KSAs** 121:5,18

## L

**L** 3:2,2 160:2
**L-Y-O-N-S** 141:21
**La** 22:12,16,21 23:19 24:5
**LabCorp** 98:11
**labor** 12:19,23 13:4,10,20,23 14:6
    28:18 29:18 31:4 32:15 33:2,8,10
    99:15 129:23 155:7
**lack** 116:3,5,8 119:9 120:15 128:13
    128:20 129:8,11,16,20
**large** 52:21 152:12
**largely** 71:5,14 80:15 155:15
**larger** 63:8,13,15 113:7 158:5
**late** 85:2 140:25
**law** 2:9 5:4 6:20
**lawsuit** 27:8 100:23
**lawyer** 6:20
**learn** 156:14
**leaving** 68:22 74:23 75:2
**length** 58:8,8 59:3 60:11 63:2 76:18
**lesser** 58:14 60:12
**let's** 11:20 15:15 21:12 38:8 46:15
    64:3 84:9 88:20 103:16 108:3
    109:8 122:12 130:2 135:16
    136:22 139:22 145:15 154:24

**level** 29:16 37:22 83:20 88:3,12,18
    89:3,5,9 90:3 93:16,17
**levels** 71:6,13
**Lexis** 26:11
**Lieder** 2:6 5:17 6:9,20 15:5,11
    73:16,18 81:19 108:2 109:7,17
    141:20 157:5 158:10,22 161:14
**likelihood** 83:19 84:2 149:3,9,14
**limitation** 134:6
**limited** 36:22 88:8,15
**limiting** 119:21
**line** 24:7 130:7 131:17 161:23
**lines** 62:24
**Lionel** 133:15
**list** 26:21 27:3 28:4 97:12,13 109:23
    112:18 123:4,18,21 124:23
    125:23 134:13 135:10,17 145:3
    147:12
**listed** 9:19 18:6 27:5,10 28:4 42:15
    42:23 79:17 84:12,13 87:3 97:18
    123:24 124:4,7
**listings** 22:20
**lists** 41:4
**literature** 99:24 103:7,9,23
**litigation** 5:5 22:21 101:6 111:22
**little** 26:25 74:14,19 77:14 82:14
    112:16 120:20 145:19
**LLC** 6:14
**Local** 1:5 26:11
**locations** 4:18
**long** 19:7,14 21:10 113:19 145:24
    146:4,4,6
**longer** 76:2 86:21 145:20
**longevity** 16:8 61:22 63:11,19
    75:10,13 76:13,14,24 77:9 78:16
**longitudinally** 90:14
**look** 18:25 20:9 27:3 32:19 38:8,10
    41:25 46:3 47:6 50:23,24 53:4,17
    55:7,20 56:5 61:14 62:6,7 69:21
    70:12 71:2 90:17,18 93:9 96:10
    96:14 97:13 98:10 101:6,19,20
    104:3 108:3 120:12 123:3 131:2
    138:21 146:9 147:15 148:6
    151:18 153:24 154:3 158:5,11
**looked** 44:19 53:13 58:6 60:4,8
    92:24 102:3 104:5 109:21 114:13
    120:3,23 134:20 141:8,15 142:18
    144:8 158:3
**looking** 13:21 16:24 42:13 51:17
    52:7 53:9 57:3 87:2 90:12 92:23
    93:7 97:24 100:2,4 108:8,25
    110:22 114:17 120:21 122:8,18
    128:12 132:21 133:2 134:11
    138:7 157:25
**looks** 32:21 123:22 124:9 133:12
**losing** 99:4,5
**loss** 97:24 98:12
**lot** 23:12 99:6 134:17

**lots** 13:9 15:25
**low** 44:7 70:13,25 71:3
**lower** 25:9,10,12 88:3,12 89:5 96:5
**lunch** 109:8
**luncheon** 109:11
**Lyons** 141:19,20,22 142:11

**M**

**Main** 6:14
**mainstream** 13:20
**maintain** 66:2 68:3
**maintained** 128:15 129:22
**maintains** 66:10,18
**major** 74:25
**majority** 136:16 143:19
**makeup** 49:11 51:11
**making** 20:16 104:6 122:3 131:14
**manager** 148:17
**managerial** 92:22
**mandate** 80:16
**mandated** 79:6,11
**manipulations** 87:23
**manner** 4:24
**March** 136:6
**marked** 4:3 9:3 21:16 38:9 122:24
    123:10 131:3 133:10 138:22
    144:12 161:22
**market** 29:8,10 32:15 33:2,8 100:7
    101:23
**marriage** 162:16
**Massachusetts** 6:15
**master** 27:11
**matched** 36:15
**material** 106:4
**materials** 8:2 9:13 11:9 15:15
    112:18 123:4
**math** 52:24
**mathematical** 62:21
**matter** 98:13 115:12 134:7 162:18
**matters** 22:17 26:3,6 75:9,9
**mean** 13:15 20:7 28:23,25 29:3,4,9
    29:20 31:16 32:8,18 44:11 51:16
    51:17 53:12,14 62:17,18 72:20
    89:5 91:8,9 96:3 99:20 100:22
    101:17 104:6 105:11 114:12
    117:15 124:23 125:15 130:12
    138:6 148:20,25 150:8 151:13
    154:2 157:2
**meaningless** 71:5,14 80:15
**means** 67:13 99:16 118:19
**meant** 84:8 142:24 153:4 156:24
**measured** 69:5
**mechanism** 152:2
**medical** 26:18
**meet** 50:3,10 84:12,22 85:19 86:11
    86:16 90:8 148:14 149:23
**meeting** 4:19 84:16
**meets** 120:9

**Mehri** 2:4 6:21
**Members** 1:6
**memory** 139:21 145:3
**MENDEZ** 1:4
**mention** 106:5
**mentioned** 55:22 102:11,12 150:18
**merely** 17:17 106:17 134:16 136:10
**mess** 101:3
**messed** 124:6
**met** 27:11 50:25 51:4,17
**methodology** 57:9 83:5 112:24
**Michael** 2:6 6:19
**middle** 126:9 130:3
**Mike** 15:4 81:16
**mind** 20:24 73:8 75:7 84:4 106:22
    106:24 154:23
**minimal** 49:25
**minimum** 50:3,11,25 51:4 79:17
    84:22 86:11 120:10 121:8,22
    122:15 124:19 136:21,25 148:6
    148:14 149:23
**minimums** 79:11
**minorities** 50:16,19
**minority** 41:5 45:13,17,22 46:8,10
    46:11 51:14
**minute** 14:24
**minutes** 44:17
**missing** 43:12 124:8
**misspecification** 75:18 77:5 80:19
    80:25 81:5
**misspecified** 77:13
**misstate** 83:24
**mistake** 37:15
**mobility** 121:8,21 122:14
**model** 67:3,6,15 77:4,13 80:16,25
    81:3
**Modern** 12:19,23 13:4
**moment** 33:15
**moment's** 7:20
**money** 103:24 104:14 118:8,8,9
**month** 22:18
**morning** 6:16,17 109:20 112:17
    117:17
**motions** 90:13,17
**move** 74:16 84:18 116:11,13 119:4
    142:13 155:20 158:8,13
**moved** 37:21 138:8 158:2,18
**movement** 116:3,8 119:3,9,12,17
    119:24 120:15 128:14,20 129:4,8
    129:11,17,21
**moving** 135:8
**multiple** 64:19,23 65:3,8,18 69:25
    73:22 86:10
**multiple-choice** 127:6

**N**

**N** 2:2 3:2 109:14,14,14 160:2
    161:12

**name** 6:10,19 8:7,7 9:7 26:10 139:2
    151:8
**named** 27:8 156:2
**narrow** 146:2
**Natick** 6:15
**nature** 32:13,17 95:15
**near** 10:15 14:12 106:2
**nearly** 130:4 143:6
**necessarily** 110:15
**necessary** 111:13
**need** 33:16 77:12 83:7 155:19
**needed** 19:16 32:2 88:11
**needing** 155:15
**never** 27:12 110:25 111:20 112:2
**new** 1:2,10,25 2:9,11,11 4:9 6:4
    8:20 9:24 20:22 22:4,22 23:15
    24:3,23 26:12 27:18 28:5,9,11
    29:13 52:16 53:24 56:8,18 66:2,8
    68:3,9,12,17 69:13 71:8 74:5,16
    75:4 78:12 80:22 97:7,9 109:24
    139:7 162:4,8
**nine** 12:6 22:21 23:14,25 28:3 35:6
    109:22
**NOE** 126:11 144:17
**NOEs** 69:11,19 120:3,11 121:9,22
    122:16 123:6 124:21 144:9,12,22
    145:25
**non-associate** 37:22 88:3
**Non-Party** 1:19 2:10
**noncompetitive** 151:16
**nonmanagerial** 91:6,9,15
**nonpecuniary** 94:22 95:3,14,20
    99:11,17 101:16 102:11
**nonpromotional** 91:24 92:12,25
**nonsalaried** 102:10
**nontestifying** 110:13
**normal** 7:4 25:2,6,16
**normally** 13:18 25:9
**North** 6:14
**Notary** 1:24 6:4 160:23 162:7
**note** 36:5,18 80:13 139:12 157:14
**noted** 34:13
**notes** 36:15,17
**notice** 1:21 7:20 16:18 22:19 85:5
    124:15
**notices** 122:23
**noting** 122:20
**NOVA** 1:4
**NS** 11:12
**number** 8:20 9:8 15:6,16 27:20
    34:9,22 35:9,11 40:4 44:2 83:16
    101:19 110:23 111:8 123:23
    130:20 132:24 133:4,22 152:17
**numbers** 35:18,23 36:24 38:14,15
    38:20,21,24,25 39:5,14,17,25
    40:10 41:15 42:3 47:15 52:20,25
    64:6,13 65:3 71:4 94:19 116:13
    116:14,15

**NW** 2:5

**O**

**O** 3:2 6:2 109:14,14,14 160:2
**O*NET** 120:21,24
**O*NET-based** 122:7
**oath** 3:12
**object** 60:15 140:25
**objection** 5:13,14,16,17 20:5 31:20
  33:4 47:3 49:13,21 50:5,21 51:15
  54:2 60:22 61:12 62:11 63:5 66:5
  66:13,20 67:7,16,25 68:7,13 69:7
  69:16 71:12 75:24 76:11 79:14,24
  80:7 92:6 94:12 105:21 107:6
  114:11 118:21 120:2 121:10,23
  127:10 128:25 139:12 140:5
  143:14 144:5 145:8 147:11
  148:19 150:7,17 154:8 156:17
  158:10
**objections** 3:21
**observation** 135:13
**observe** 114:25
**observed** 88:16 130:20
**obtain** 113:3
**obtained** 10:17 34:2 112:12
**obtaining** 113:6
**obvious** 84:11
**obviously** 41:19 104:7 125:17
  128:10 132:20
**occur** 78:6
**occurred** 23:19 43:24
**occurrences** 101:20
**occurs** 141:18
**OES** 11:11
**offer** 153:6,21
**offered** 147:2 150:14 153:19
**office** 2:9 153:12
**officers** 26:12,17
**official** 139:14
**oh** 52:9 70:21
**okay** 7:12 9:16 26:19 27:23 33:21
  39:13 42:14 44:14 52:13 73:16
  87:21 108:12 109:7 110:11 118:6
  134:12 149:20 158:20
**omitted** 55:18 77:4
**once** 40:22 89:23
**one-issue** 105:24
**ones** 36:2 97:18 123:14 133:6
  141:10 157:8
**online** 12:21
**open** 40:22 120:9 150:10
**opened** 108:13 146:13
**openings** 138:17
**operator** 130:11 134:9,10,12
  141:11
**opining** 104:10,13,18
**opinion** 13:16 128:19 129:20 155:6
**opinions** 16:6,22 46:17

**opportunities** 90:24 93:8
**opportunity** 147:7,9 157:3
**opposed** 13:12 21:15 32:11
**order** 4:8 21:25 125:23 155:16
**organization** 28:20,24 29:5,23
**organizational** 29:21 30:3
**original** 3:9,17 35:5 40:14,17 57:2,4
  64:17 73:24 82:5,24
**outcome** 46:24 92:13,17 162:17
**outcomes** 17:15 96:15
**outside** 154:19
**overpowering** 13:14

**P**

**P** 2:2,2 3:2 6:2 131:23 132:2
**p.m** 109:12 159:3
**package** 115:24
**page** 7:25 9:12 10:14,15,16 11:18
  14:12 18:7 21:19 28:14 32:5,19
  33:25 34:13,18,19 35:17 37:8
  39:9 40:18 42:11,11,13,15 48:9
  52:4 64:18 83:9 84:11 85:9 97:12
  102:22 106:6 108:15 112:10,11
  114:18 123:3 124:13 125:22,22
  126:9 127:11 130:2 152:18 161:7
  161:13,18,23
**pages** 35:6 64:24
**paid** 55:8,10 61:4,4,11 71:16 79:3
  79:10,17 98:6 103:19,25 108:23
  114:24 115:12,21 150:2
**pandemic** 27:15
**paragraph** 10:16 14:13 28:15
  34:19 48:11 84:10 102:24 106:6,7
  114:18,19 126:10 128:12,13
  130:3,5 143:4
**paraphrase** 126:16
**part** 40:8 53:8,10 54:11,16 107:10
  121:24 122:5 154:22
**partial** 11:7 67:18 114:19
**participating** 4:18
**particular** 16:21 17:23 31:24 81:6
  85:18 151:18
**particularly** 38:3 79:6
**parties** 3:7 4:12 5:2 162:15
**pass** 155:14,16
**pay** 16:8 54:19 55:10 58:9,17,21
  59:4,10 60:2,12,19,21 61:7,9,15
  63:2,9,22 75:21 77:4,7,17 90:13
  90:24 96:13 103:22 105:4 107:22
  117:18,19 139:7,15 150:15,20,23
**paying** 117:12,24
**payment** 58:10
**payments** 58:14
**pays** 119:10
**pending** 7:11
**Penzance** 11:7
**people** 34:3 37:11 50:24,25 55:7,9
  62:2 67:10 68:25 71:16 75:20

  89:15,25 90:4 96:15 105:19 115:5
  116:12 117:11,19,23 135:4,8
  137:8 138:4,7 147:20 157:18
**percent** 37:2 47:22 48:5 62:14,15
  63:3 143:7 152:7
**percentage** 27:16 41:4 45:7 47:9,10
  47:20,22 50:9,12,15,18 70:3
  89:25 92:15 93:4 107:21 152:13
**percentages** 41:13,16,19,20,23 42:8
  43:19 46:11 51:13
**Perfect** 70:11
**perform** 32:2 62:20 65:18
**performed** 31:14,18,23 32:10 43:21
  49:10 57:21 64:20 122:8 134:22
**period** 10:20 14:22 34:10,16 48:5
  85:3 87:4 88:9,13 112:14 125:3
  125:24 126:6 127:22 135:15
  144:24 145:16 146:5,7,18,20,21
  147:3
**person** 46:5 131:8,10 153:13
  156:25
**personnel** 29:16
**persons** 9:23 88:2 113:6 117:5
  133:13
**pertained** 121:25
**Pfeil** 98:11
**Ph.D** 7:23 8:6 28:16
**phrase** 29:4,22 98:4
**physical** 7:17
**physically** 5:11
**pieces** 111:21
**Pirates** 11:7
**place** 47:4 87:3 98:22 99:10 103:9
  124:24 160:11
**plaintiff** 27:9 98:18,23 100:9
  152:23 161:4
**plaintiffs** 1:7,20 2:4 5:18 6:22
  114:22 129:19 155:25 156:3
**plaintiffs'** 4:3 128:14 129:3,22
**plans** 24:17
**platform** 4:20
**please** 4:9 6:10 7:8 27:23 81:16
  141:2
**PLLC** 2:4
**point** 19:19,21 46:2 70:6,13,14,19
  70:19,22,25 71:2 72:11,11 73:9
  88:7 89:5 104:6 115:25 120:16
  128:9 149:21 155:20
**Policy** 12:24
**pools** 49:15,19
**poor** 50:19
**populated** 66:3,19
**portion** 32:13,18
**position** 10:19 17:7 32:13,22 34:3
  37:22 83:18 88:4 89:15 112:13
  114:25 119:24 124:22 139:7
  141:25 142:6,12 143:25 144:10
  149:25,25 150:2,4,5,6,16 153:3

153:20 155:15 157:19
**positions** 17:4 69:20 84:25 114:24
  115:18 116:4 117:6 119:25
  127:15 136:15 138:2,4 140:18
  144:23 148:16,18 153:25
**positive** 100:5
**possibilities** 72:14
**possibility** 72:10 93:9
**possible** 71:23 72:2 78:9 96:6
  116:21 119:8 129:10,13,18
**potential** 143:17
**pre** 68:4,12,17 69:13 71:8 75:4
**pre-FDNY** 65:15
**pre-New** 65:15,22
**precisely** 34:25
**predominant** 44:24
**predominants** 45:3
**preface** 36:14
**preferred** 107:22
**preliminary** 18:23 19:6,8,11
**prepare** 7:24 8:10 10:3,4,6,7 24:9
  111:25 112:24
**prepared** 8:12 10:10,11 17:22
  18:19 22:7 112:19,23
**preparing** 18:2
**preponderance** 111:4
**prescribed** 153:19
**presence** 5:12
**present** 2:14 4:12 33:9 56:7
**presented** 33:2,10
**presenting** 92:18
**presents** 35:9
**presumably** 53:6 101:17 149:7
**Presuming** 61:13
**presupposes** 148:25
**pretty** 33:7 87:5
**prevalent** 92:8
**previous** 19:3 55:23 149:18
**previously** 122:24
**primarily** 122:14 127:18 151:20
  152:2
**primary** 95:17 118:19 137:16
**prime** 142:19,20
**principles** 13:24 14:3
**prior** 19:18,21,25 68:9
**probable** 72:4
**probably** 18:20 26:24 94:8 126:16
**problem** 53:16 74:25
**problematic** 36:7,12
**Procedure** 1:22
**Procedures** 118:13
**process** 151:10,13,15,16,19 152:9
  152:15 154:6,20 155:5 158:17
**processes** 156:15
**produce** 12:10
**produced** 12:2,14,17 19:2 53:5,5
  87:18,22
**product** 29:13

**programming** 57:20 65:7
**promoted** 83:20 92:19
**promotion** 84:2 91:11 92:20 93:10
**promotional** 90:25 92:11,25 132:2
  140:14
**promotions** 87:11 91:5 92:24 93:15
  94:9,15
**prompt** 153:23
**proper** 49:14 54:21 60:7
**properly** 49:11
**propose** 66:22 68:15
**proposed** 99:16
**proposition** 105:25 117:3,10,11
**protection** 9:23 15:23,24 34:4
  35:10,23 36:3,9,11,20,23 47:23
  50:4,20 54:13 60:2 61:2,10 79:2,9
  80:14 85:21 86:23 90:7,10 91:21
  91:25 92:14 93:3 94:5 102:21
  103:17 104:22 134:21 135:20
  136:22 139:10,19,23 140:3,7,15
  140:19,21 141:25 142:7,13,16
  146:19 148:13 149:8,23 150:14
  151:2,11,21,25 155:2 156:7,14
**provide** 156:13
**provided** 113:11,12,15 114:10,16
  131:7 149:5
**provisional** 151:15 152:8 153:4,14
  154:9
**provisionally** 152:14 153:5,20
  154:7,12,19 155:4,13 157:25
  158:15,16
**psychologist** 31:17 33:12
**psychology** 29:3,22 30:3,10,14,18
  30:21,25
**Public** 1:24 6:4 12:23 160:23 162:7
**publicly** 139:4
**pull** 7:19 141:17
**purport** 42:2
**purports** 35:13 47:8,18,25
**purpose** 5:5
**purposes** 16:10 154:24
**pursuant** 1:20 4:13
**put** 15:20 16:17 80:24 81:2 100:6
  134:6 135:13
**puts** 155:14
**putting** 55:19 74:24 96:6,8 103:3

**Q**

**qualification** 84:23
**qualifications** 17:2 51:2,5,18 84:7
  84:13,14 136:21,25 137:4,23
  148:7,15
**qualify** 59:3 83:17
**quantify** 73:2 96:16
**question** 7:10 19:3 26:9,20 54:23
  60:16 62:19 69:9,18 81:17 96:11
  100:24 111:13 116:7 121:24
  122:6 137:14 141:2 144:7,21

148:25 149:18 150:11 154:25
  161:23
**questions** 157:6 158:21,23 161:22
**quick** 157:8
**quite** 35:2
**quote** 100:8 101:8 155:22
**quoting** 152:22

**R**

**R** 2:2 3:2 6:2,2,2 69:23 70:2,13,24
  71:7,13 109:14 160:2 162:2
**race** 42:15,20,23 43:6,10,12,16 45:5
  45:18 46:2,5,19
**racial** 26:16 45:16,22 48:14 49:11
  49:18 50:16 51:6,10
**raise** 83:14
**raised** 82:23
**ran** 81:21
**random** 67:9 68:25
**range** 70:25 96:7,20 99:10 143:17
**ranges** 96:9
**ranging** 130:9
**rarely** 105:24
**rate** 25:2,5,6,13,17 55:3,6,16,20,21
  84:19 91:20 101:2 103:20 105:5,7
**rates** 25:9 54:22 56:3 79:5 101:7
**ratio** 48:4
**rational** 149:7,22
**rationality** 115:13
**ratios** 48:8
**reach** 13:8 73:9 112:8 115:25
  116:19
**reached** 46:18 128:19 138:17
**reaching** 16:5
**read** 75:14 118:22 119:5 120:17
  155:24
**real** 116:5,17
**realized** 77:10
**really** 18:16 71:18 86:20 97:23
  137:5 145:22 157:8
**realm** 72:14
**reason** 13:11,14 50:8 51:3 90:12
  111:23 128:20 129:10
**reasonable** 96:7,9 132:14
**reasons** 50:14 129:13,16
**rebuttal** 9:5 37:17 38:8 39:10,11
  40:23 41:25 43:20 47:7 52:5,8
  56:5,25 64:4 65:4 69:21 73:25
  74:9 82:12,20
**recall** 13:2 16:11 17:24 18:13 21:3
  23:9 37:3 53:9 91:16 107:9
  113:22 118:24 119:19 133:7
  134:5 146:8 151:3,7 156:11
**receive** 59:9,13 62:3 78:15
**received** 10:8 18:21,23 20:4 28:16
  58:23 59:9 61:6,6 76:3,9 79:21
  80:4 92:15 93:4 103:12 104:15
  113:15 150:24 153:5,21

receiving 19:25
recess 33:22 73:19 109:11 141:5
recited 71:3
reclassified 89:12
recollection 20:24 25:14 36:6,13
    53:19
record 5:9 6:11 66:3,11 67:23 68:4
    68:8,11 73:18 109:9 162:12
recorded 4:24
recording 4:25
records 67:24 69:2 113:2 114:3,5
recruitment 106:5
redefined 92:20
reduced 85:5,14
refer 10:24 58:7 144:17
reference 10:23 17:5 28:24 124:13
    156:11
referenced 14:12
references 153:2
referred 10:14 11:18 13:12 141:9
referring 10:25 12:24 17:9 48:18
    48:24 49:4,7 131:11
refers 12:18 16:16 143:5
reflect 91:20 138:2 140:2
reflected 74:9
reflects 138:4
regard 38:3
regression 64:20,23 65:3,8,19 69:25
    73:23
regular 38:15 106:17
related 23:23 162:15
relation 70:8
relative 57:7 62:8 101:7 116:3,8,8
relatively 14:19 85:2
relaxed 88:23
relevance 74:14,20
relevant 57:16 68:22 69:13 74:23
    74:24 75:3 76:25 97:19 135:15
reliably 13:23
reliance 106:4 123:4
relied 8:2 9:13 11:9 15:16 18:6
    87:19
reluctance 100:10
rely 112:18
relying 145:5
remain 155:16
remains 77:13
remember 20:20 30:7 83:11 94:23
    100:13,14,14 107:5,7,8 109:21
    110:7,8,9 119:6 135:7 143:2
    144:10,14 151:8
reminding 7:6
remote 4:17
remotely 4:15
render 44:3
reorganization 89:12
repeat 81:16
rephrase 95:23

replicate 34:21 35:17,21,22 36:4,25
    38:23 39:16 41:22 42:4 47:14
    53:2 56:14 64:5,12 65:10
report 7:22,25 8:16,24 9:5,9,12
    10:15 11:18 14:13 16:5 18:9,11
    18:18,21,24 19:4,13 20:2,14
    24:10 26:11 28:14 32:6,14,16,19
    33:3,6,9,25 34:14 35:5,6,17 37:11
    37:17 38:9,19 39:10,11 40:14,17
    40:24 41:12,25 42:10,10,14 43:19
    48:10,12,20 51:13 52:3,5,8,13,18
    53:25 54:6 56:5 57:2,4 58:7,17
    64:4,17,22 65:5,13 69:22 73:24
    73:25 74:13 81:24 82:5,9,13,20
    82:24 83:10,15 84:20,21 85:10
    96:25 112:3,5,10 113:17 114:18
    116:25 121:16 122:3 124:14
    130:3 138:6 144:18 152:19
    157:14
reported 42:17,24 73:23 74:2
reporter 4:6,16 5:10
Reporting 4:21
reports 111:25 120:17
represent 5:20 6:22 15:20 131:5
    133:10 139:3 147:19
representation 142:8
represented 104:24
representing 97:7,8 98:17 105:17
represents 131:17
reproduce 125:16
reputation 100:17,20 102:6
reputational 101:24
reputations 100:12
request 113:10,12,14 114:4
requested 113:13,19 161:17
require 84:15
required 84:12 106:10 107:3
    108:24 127:20
requirement 85:18,20,21 87:7
    126:13 128:7 154:15
requirements 49:25,25 50:3,11
    69:10,18 71:20 72:23 84:16 85:2
    85:12 86:5,12,16,18,24 87:3,5
    120:7,10 121:8,22 122:15 124:20
    124:24 125:23 126:19,24 127:14
    149:24
requires 121:11
reserved 3:22
resources 12:3
respect 82:23 85:17 126:23
respective 3:6 94:16
respond 29:13
rests 48:12
results 64:22 71:9 73:5 81:24
retained 22:25 24:22 26:3,13
    161:10
revealing 110:15
reverse 21:24

review 18:10 19:6,8,11 57:19 65:7
reviewed 8:22 16:12 37:16
reviewing 43:2 71:15
revised 40:24
revisit 109:19
revolves 111:2
Rich 2:15 6:22
Richardson 20:21 66:9
right 6:25 7:18 8:3 13:15 21:2,7
    23:16,20,21 29:23,24 31:5 32:21
    37:23 38:2,22 41:17 44:4,23 45:8
    52:16 55:11 58:14 59:4,18 60:9
    64:16 65:16 70:15 74:6,11,17
    75:14 76:22,23 78:6,17 79:13
    80:6 82:5,6,12 84:2 85:11,15,22
    85:23 86:7 87:24 88:5,10,14,22
    88:23 89:7 90:14 91:7 95:11
    102:8,9,15 104:12 108:8 109:3
    110:11 111:21 115:8,14 122:16
    123:16 125:9 126:2,11,12,20,21
    127:24 129:14 130:18,19 133:12
    136:18 137:10,11 138:18 140:21
    144:16,18 145:21 150:21 157:16
ring 26:14 135:14
Robert 12:19
ROCKLAND 162:5
role 129:23
Ronald 12:18
ROSEMOND 1:4
Rosenberg 1:24 162:7,24
rough 21:9,11 24:24
roughly 20:25 21:4,13,24 22:2,3,8
    23:4,6,13,17 26:24 110:6 111:16
    130:3,8 144:3 157:15
rule 120:4
Rules 1:21
RULINGS 161:22
run 99:7

                    S

S 2:2 3:2,2 6:2 109:14,14,14 161:2
safety 100:3
salaried 55:21
salaries 54:21,22 55:15 57:9 61:6
salary 52:14 53:23 54:19 55:3,11
    55:21 56:2,7 58:2,6 60:4,6,20
    61:16 62:8,23 63:4,8,12,20 76:22
    76:25 77:7,8,15 78:15 90:17,18
    90:19,20 91:2,6,9,13,15,18,20,24
    92:4,11,12,21 93:2 105:8,19
sample 67:10 68:25
satisfy 86:22
saw 26:10 44:2 61:13 107:14
saying 36:10,14 40:13 42:7 43:3,5
    53:18 85:17 88:19 117:17 128:23
    129:2 130:16
says 11:21 12:7 52:17 101:8 108:22
    111:9 114:21 142:3 143:6 153:21

schedule 98:8 99:3 106:18,23
    107:10
Scherbaum 8:18 9:7 11:2 18:11
    32:15 34:15 38:19 42:19 45:4,24
    46:18 52:3 54:12 56:2,6 59:22
    63:19 64:19 66:23 68:16 74:4
    77:3 81:11,21 87:15,20 94:21
    102:19 112:15 120:17 121:3,12
    121:16
Scherbaum's 20:2 35:5 40:9,17
    43:16 64:9 113:16
scientific 101:18
score 48:19 49:4
screen 7:18
sealing 3:7
search 15:21 16:17 142:21
second 9:18 10:17 34:19 83:18,25
    153:2
second-to-last 102:23
secondary 68:23
section 4:13 32:18
see 9:18 10:16,21,22 11:15 14:9
    19:16 20:9 22:13 28:21 33:21
    34:6,17,20 35:8 37:13,14 38:13
    38:16,24 39:14,19,21 40:5 42:18
    42:20 47:7,12,13 48:16 53:6 56:6
    56:11,21 58:21 69:23 70:24 74:20
    88:24 98:14 102:25 108:2,14
    114:20 123:4,7 127:15 128:16
    129:4 130:7,8,24 131:21,23
    132:16,18 133:14,17 135:7,18,20
    135:23,25 136:14 139:4,8,15
    141:13,18,22 143:6 145:9 152:21
    152:25 153:7,15 158:8
seeing 151:7 153:12
seeking 115:6
seen 66:6 130:14
SeeThroughNY 138:25
seldom 120:25
selected 151:12,25 152:8,14
selection 118:12 151:20
send 15:10,12 108:4,7 113:21
sense 77:9 148:15,24 150:4,8
sent 108:3
sentence 10:17 22:9 28:16 48:11
    102:23 114:21 117:17 127:12
    128:11 141:8 143:6
separate 4:17 90:9
separately 12:10
sequence 82:8
series 38:10
serve 21:14
service 3:16 26:18 58:8,8 59:3
    60:11 63:2 76:18 151:4
set 20:23 67:24 122:15 124:20
    125:11 158:6 162:11,20
sets 13:23
setting 27:15 78:16 80:16 96:5

seven 123:5
severe 77:5
short 33:22 67:12 73:19 99:7 141:5
shorter 98:8 99:3 145:18
shorthand 125:18
shortly 15:2 18:20
show 28:3 47:8,18 48:2 84:21 125:7
    139:9
showing 10:18 12:2 112:12
shown 41:23 91:18 97:12
shows 9:22 39:21 139:6 145:5
sign-up 62:4
signed 3:10,12,15 120:22
significance 56:11,18 64:14
significant 56:15 63:22 64:11 71:11
    73:5
signify 70:2
similar 32:25 114:23 115:11,20
    117:4,12 118:20 119:2,11 120:13
    121:7,21 122:14,18,20 128:16,21
    129:9,15,23
similarity 116:5 121:4,17
similarly 1:5
simply 20:8 101:12
simultaneous 24:4
simultaneously 22:12 23:20
single 42:16,23
sit 39:4 42:6 59:6 72:8
situated 1:5
situation 78:21
situations 77:18 111:19
six 11:8 79:20 80:3
Skalet 2:4 6:21
skills 31:25
small 62:2
Smith 12:19,22 13:12,17 101:8
    117:16
somebody 134:2 158:14
somewhat 37:25
soon 33:21
sooner 84:18,19
sorry 34:18 39:11 44:13 45:14 52:8
    52:12 60:20 81:15 123:16 125:3
    140:6,24 148:22,23 158:11
sort 29:17 51:25 54:25 62:20 96:17
    139:13 158:6
sorts 100:25 101:24
sought 31:22 67:8,19 127:25
sought-after 16:25
sound 8:13 44:23
sounds 8:3 21:2,7 38:22 85:11
    144:16 151:17
source 17:25
sources 145:14
SOUTHERN 1:2
speak 46:21 47:4 106:24 121:13
speaking 63:10 95:16 153:12
special 27:11

specialist 130:10 141:11 142:19,20
specialized 17:3
specific 32:10 36:5 40:4 95:25
    107:8 119:19 141:10
specifically 16:12 37:3 41:18 53:9
    75:7 91:16 111:9 125:5 132:13
    133:25
specification 80:10,12
specificity 151:5
specifics 122:10
specified 74:22 75:21 160:11
specify 75:15 77:9,12 78:14,19
speed 97:20
spelled 141:21
spend 19:7
spent 20:11 120:20
spreadsheet 9:21,22 10:4,13 11:22
    12:8,10 42:16,23 43:4 112:20
    113:8,24 114:14,15 131:6 133:13
    141:15 142:4,21 143:20 145:5
squared 69:23 70:2 71:7,13
squareds 70:13,24
SS 162:4
stage 112:8
standard 49:2
standing 156:25
stands 132:2
start 18:17 50:13 64:19 84:9 106:2
    149:18
starting 22:20 64:18 88:6
starts 32:7
state 1:24 6:4,10 18:9 34:15 35:16
    37:8 48:10 52:18 65:13 68:12
    74:13 84:10 87:14 102:18 118:18
    139:7 162:4,8
stated 14:4 60:5
statement 106:17 133:21
statement's 154:22
STATES 1:2
static 83:10,15
statistical 48:12,19 56:11,17 64:14
statistically 56:15 63:22 64:11
    71:10 73:5
Statistics 31:9
STENOGRAPHER 4:10 5:19
step 51:24
stipulate 5:8
stipulated 3:5,20 4:11,22
stopping 73:9
Street 2:10 6:15
stretch 13:19
struggling 59:19
studied 10:20 50:22 51:7 69:8,17
    112:14 144:6
studies 96:11 100:2 121:21
study 29:12 51:9 86:25 101:18
    121:8 127:22 150:18
subject 55:22

subjective 50:6
submitted 130:17 132:22 143:10
Subscribed 160:18
subsequent 138:20
subtitle 13:2
suggest 120:5
Suite 2:5
Sullivan 11:3,4
summary 8:9
superior 55:6
supplement 12:7,9,14
support 117:9
suppose 78:8
supposed 67:5
sure 7:13 9:14 14:3,25 15:14 19:23
    20:12 58:4 60:23,23 73:15 81:17
    85:24 87:12 90:21 97:4 103:14
    104:4 112:25 117:15 119:14
    124:17 131:15 135:2 141:4
    146:12 154:2
surprise 143:18 151:6
surprised 143:23 147:14
suspect 12:25
swear 5:7,10
switch 87:11 115:2,7
sworn 3:10 6:3 160:5,18 162:11

T

T 3:2,2 6:2,2 109:14 160:2 161:2
    162:2,2
T-test 57:6,11,18,21
T-tests 56:18 57:7
table 35:6,9 38:12,13 39:10 40:19
    40:24 41:4,13,23 42:2 43:20 47:7
    47:8 49:2 52:2,4,5,7,9 56:6,25,25
    64:3,6,13,23 65:4 69:22 70:12,23
    74:3,9
tables 38:11 48:21 52:13 73:24,25
    81:11,13,24 82:10,12,19
take 7:8,9 22:8 27:21 30:2,6 32:12
    33:17 36:15,17 44:16 49:15 51:23
    57:13 61:14 62:5 65:14,19,22
    73:10 82:10,17 107:20 109:8
    113:20 118:9 123:13 125:23
    132:11 138:15 146:24 148:7
    154:13 155:8,13,21
taken 1:20 18:25 22:11 33:23 46:3
    66:24 68:17 73:20 83:19 109:12
    125:16 126:3 133:23 141:6
    158:16
takes 83:17 84:22 85:18 86:21
talk 41:18 62:17 75:6 156:18
talked 27:12 102:12 112:16 117:16
    128:8
talking 14:20 15:7 56:21 59:21
    73:22 75:4 76:12 82:4 84:6 87:10
    105:8 111:5 125:5 127:18 154:4
    157:13,24

task 156:8,12,24
tasked 60:17
tasks 32:10 48:25 122:9
tell 82:14 94:3,14 97:14
telling 71:18
ten 11:20 12:11 22:20 23:3 28:3
    35:6 62:14 94:5 109:22
ten-page 7:25
term 31:18 50:6
termination 98:13,20
terms 52:24 54:6 71:16,21 103:24
    122:5 127:18
terribly 51:19
test 48:12,19,20 49:3,14 127:6
    138:15,16 148:7 155:9,14,16
testified 6:5,24 23:14 24:14 100:10
    109:24 111:15 117:22
testify 23:8 24:18 111:10,11 112:2
    160:5
testifying 21:3,5,14 24:3 110:4,9,18
    110:25 111:20,23
testimony 21:20,23 22:6 24:8 26:4
    26:21,22 27:5,13 28:4 30:16
    100:8 152:22 153:18 155:22,24
    160:6,10 162:13
tests 48:19,25 49:9 133:23 140:3
text 13:20 14:5 88:23 125:17
textbook 13:3 99:21
textbooks 13:10,13,16
thank 21:22 33:19 131:13 158:20
    158:23,25 159:2
Thanks 73:17 81:18
theoretically 119:14 129:18
theory 12:23 115:10 117:21,23
thing 16:7 106:16
things 16:13 74:23,24 75:3 100:25
    117:18
think 8:12 14:25 20:19 24:11 27:7
    28:15 29:11 33:7 39:4 41:17
    44:15 51:4,18 52:21 61:24 74:25
    78:25 79:19 81:4 83:25 84:25
    85:15 89:18 90:23 91:12 92:14
    97:25 99:2,13 100:17 106:13,14
    117:15 118:4 121:11 125:15
    131:12 135:3 137:11 146:9
thinking 33:16 84:3 95:14
third 28:15 98:10 130:7
thought 53:7 105:17 110:3 128:18
    149:12
three 19:12 23:12,13 24:23 28:2
    79:23 80:6 84:16,16 85:13,24
    86:9 88:17,21,23 89:3,6,11 125:2
    125:3 127:23 128:4 140:2,11
    141:9 146:10,23,23 155:25 156:2
    157:2
three-page 8:6
three-week 146:18
throw 31:11

time 1:23 3:22 5:14 7:8 9:24 14:22
    19:15 20:11 21:4 22:6 23:5 74:6
    74:14,21 75:9 77:25 78:5,9,23
    79:5 80:2,14,20 81:7,9 84:12,22
    85:3,19 86:5 88:2,12 90:14 93:8
    95:10,23,24 96:9,14,20 97:16
    98:2,3,4,6,9,21,22 99:6,8,18
    102:16 103:5,8,10,25 104:2
    105:13,20 115:6 120:21 125:2
    127:22 137:8 138:5,20 139:24
    141:3 146:17 147:21 160:10
times 6:25 44:3 105:6 146:23
timing 84:6 118:14
title 8:18 11:21 37:11,12 74:10 75:9
    79:6 80:15 81:7,9 82:3
titles 35:12 130:13,15 133:4
today 5:22 39:4 59:7
told 105:23
top 8:7 10:12 28:4 96:22 125:22
    150:13
topic 109:19 119:20
total 34:15 44:5,21 62:9,15,18
    116:6,17
training 113:5
transcript 4:8 160:9,9
treatise 117:2
trial 3:22 24:13,14,18
tried 121:3,6,20
true 54:5 76:5 77:10 91:19 136:4
    154:22 160:9 162:12
truth 160:5
try 15:3 53:2 55:14 96:16 101:3,21
    119:23
trying 19:23 20:11 57:13 100:5,19
    101:19 106:15 122:13,17 143:15
turn 9:11 21:16,19 28:13 32:5 35:4
    39:9 40:16 48:9 52:2 64:3 70:23
    81:8 127:11 152:18
Twelve 123:16
two 23:10 31:13 40:22 46:20 48:25
    49:2 57:10 63:3 68:10 69:20
    74:17 75:17 76:10 77:17 78:12
    79:4,7 83:14 85:6,23 86:2,8 91:20
    91:22 100:18,21 102:14,17 103:4
    103:13,18 104:16 115:16 117:12
    117:18,24 118:19 124:25 125:3
    128:4,5 129:5 140:18 142:22
    145:14 150:10
two-thirds 135:18 144:3 153:10
two-year 80:21
twofold 68:19
type 20:9 38:15 43:24 57:8 67:12
    110:2,16 112:23 113:5,10,23,25
    117:8 128:10 131:21 133:22
    142:14 147:4
types 48:25 55:10 58:9,21 59:4,10
    59:14 60:21 61:7,9 67:21 78:22
    83:14 95:13 101:15 111:19

120:12 133:22 136:7 137:9 138:2
138:3 147:2,8,16
**typical** 78:10 101:22,23
**typically** 79:10 96:12

**U**

**U** 3:2
**ultimate** 98:21
**ultimately** 18:19
**unauthorized** 5:3
**uncommon** 112:8
**undergraduate** 30:5
**underlying** 114:13
**understand** 9:15 20:17 38:18 40:8
40:10 61:23 81:20 87:12 115:5
131:16
**understanding** 10:2 12:13 22:10
39:3,24 72:18 81:10 83:4 91:17
131:25 132:10
**understating** 102:20
**understood** 19:2,23 20:12 29:7
55:13
**unidentified** 43:6
**Uniform** 118:12,16,24
**union** 26:12 104:21 105:14,16
**unique** 34:16 82:21
**unit** 90:9
**UNITED** 1:2
**universe** 88:16 89:16,24 90:2
**University** 28:17
**unknown** 44:22 45:6,13,18,23 46:9
**unsigned** 3:14
**unsurprised** 143:23
**updated** 22:7
**upper** 96:5
**URL** 16:15
**use** 16:4,9,21 33:14 43:10 46:4 55:2
59:19 87:14,17 88:20 107:2
139:12
**useful** 51:19

**V**

**vacation** 98:7
**valid** 135:12
**value** 54:13,24 61:13 70:6,9 95:2,25
96:6,9 97:16 98:22 99:10,11
100:6,20 103:3,7,10,11,24,25
104:2,7,11,19 105:12,18
**valued** 95:24 96:19
**values** 96:20 101:15
**valuing** 95:10,22 99:17 102:21
**variable** 70:4 76:19,21 77:7
**variables** 70:5
**variants** 56:22,24 57:5
**variation** 70:3,5
**variations** 88:24
**variety** 136:12,15
**various** 35:12 95:11 100:2 124:21

**vary** 70:13 101:9
**verbatim** 125:18 126:3
**verify** 54:9
**version** 13:5 40:25
**versus** 8:19 20:22 22:4 26:12 85:24
98:11 101:21 127:23
**videoconference** 1:22 4:15,23
**view** 149:21
**violation** 5:3

**W**

**W** 8:17 9:6
**wage** 100:7 101:2,7
**wages** 101:9,13
**waived** 3:9
**want** 9:13 44:16 50:23,24 54:18
55:7 73:11 87:11,12 116:12
117:12,24 121:13 131:15 133:9
142:21 146:14 155:20
**wanted** 9:2 51:10 109:19 110:13
**Washington** 2:5 6:21
**wasn't** 14:21 27:14 38:5 40:15
77:19 110:21 119:21 125:17
137:14 139:18
**water** 33:17
**way** 13:2 45:19 51:19 54:3,7 59:17
63:25 69:9 70:17 72:9,13 75:8
80:8 83:24 93:24 94:17 100:4
111:2,12 114:7 116:20 119:6
124:9 127:3 132:7 135:19 143:3
153:10 154:14 155:18 156:23
162:17
**ways** 86:11 97:20 115:20
**we're** 29:17 76:12 82:4 84:5 97:24
101:5
**we've** 19:18 27:11 49:4,8 75:11
81:6 120:7,15
**web** 4:19 5:22
**week** 54:15 102:15 103:5,19 104:23
105:15 107:23,24
**week-to-week** 104:9
**weekends** 106:10,20 107:4,9,12,17
108:24
**weeks** 19:12 146:10,20,23
**went** 12:21 44:19,22 45:15 59:17
**weren't** 36:24 82:22 92:3 130:16
**WHEREOF** 162:19
**white** 41:5 44:22 45:6,7,22 47:10,11
47:20,22 51:13
**wide** 136:12,15 143:17
**willing** 96:13
**Wisconsin** 28:17
**wish** 7:8
**witness** 1:19 2:10 3:10,16,18 4:16
5:7,10,12,21 6:3 28:9 30:17 73:15
159:2,4 162:10,13,19
**witnesses** 7:5
**word** 8:8,9 21:10 82:17 100:18

101:10 106:12 123:13
**wording** 107:9
**words** 107:3 157:9
**work** 18:17,23 19:13,15 20:18 21:5
21:13 24:25 25:23 27:17 28:9,10
29:25 30:5,21 32:13,17 46:20
54:14 66:7 86:2,6 98:8 100:10
102:15 104:8 106:9,10,20,22
107:3,12,17 108:24 110:4,4,5,9
110:10,12,17,18 111:16,18 156:7
**worked** 26:20 27:8 89:10 103:13,17
104:16
**workers** 105:17
**working** 20:15 98:17 99:3 105:19
156:22
**workweek** 14:21 108:22
**world** 13:11
**Worley** 23:4,8 24:2
**worth** 153:14
**wouldn't** 50:23 73:8 77:8 87:19
93:8 97:19,21 99:6 102:10 105:15
118:4 138:12 151:6 156:13
**write** 112:11
**written** 4:25 24:10 30:13 96:24
**wrong** 41:20 74:20 79:8 137:12
**wrongful** 98:13
**wrote** 106:21 142:25
**www.SeeThroughNY.net** 139:5

**X**

**X** 1:3,12 161:2,12
**xlsx** 9:20

**Y**

**yeah** 21:11 41:3 52:11 57:3 83:22
85:11 155:18
**year** 20:25 37:21 41:7,9 42:17,24
43:4,6,11 47:19 88:9 94:4 124:10
126:5 132:22 139:9,15,18,24
140:9
**years** 23:10,14 24:23 26:23 27:4,17
28:3 36:7,12,15,18,19 38:14
43:12 44:6 74:17 76:8,10 78:12
79:20,23 80:3,6 83:2,3,16 84:15
84:16 85:5,6,6,13,23 86:2 88:17
88:20,21 89:4,6,11 91:22 118:11
127:22,23 128:4,4,5 145:6,20,23
**York** 1:2,10,25 2:9,11,11 4:9 6:5
8:20 9:24 20:22 22:4,22 23:15
24:3,23 26:12 27:19 28:5,9,11
65:15,22 66:2,8 68:3,9,12,17
69:13 71:8 75:4 97:7,9 109:25
139:7 162:4,8
**Yup** 74:12

**Z**

**Z** 48:19 49:4
**zero** 39:21 70:7

**Zoom** 1:22 4:18

---

**0**

**001** 72:11
**0115** 123:7,24
**01760** 6:15
**08** 39:15

---

**1**

**1** 3:17 4:4 7:21 9:12 33:25 35:6
  38:12,13 112:10 161:8
**1,011** 124:15
**1:20** 109:12
**1:20-cv-03389** 1:9
**1:20-cv-03389-AT** 8:20
**10** 15:25 70:23 73:25 74:9 122:24
  123:10,23 124:2 145:7,17
**10:05** 1:14
**100** 2:10
**10007-2601** 2:11
**1011** 123:6 124:8,8,10
**10th** 162:20
**11** 9:12 18:7 34:14,19 82:10,12,20
  122:24 123:3,10 124:3,5
**115** 124:2
**1164** 123:7 124:3,5
**11th** 12:18
**12** 17:11 116:11 122:25 123:10,14
**12:10** 73:11
**12:20** 73:12
**1250** 2:5
**12th** 14:7
**13** 4:4 9:4 15:16 38:9 40:18 161:9
**14** 145:7,17
**14th** 16:15
**15** 44:22 45:5 82:10,12,21 91:22
  125:24 146:20,24
**157** 161:15
**16** 104:23
**16-week** 146:20
**16-year** 146:21
**17** 52:2,9 56:25 81:13
**19** 1:14 39:15 132:18 136:6 145:7
  145:17,18
**19109** 2:7
**1999** 132:18

---

**2**

**2** 8:5 10:14,15,16 21:16 26:22 32:5
  33:25 39:10 112:10,11 114:18
**20** 12:4 32:19 34:4 38:16 39:15
  48:6 64:24 73:24 88:9,13 112:14
  147:3
**2003** 16:20
**20036** 2:5
**2004** 143:11,20
**2005** 9:25 10:19 12:4 34:4 47:19
  48:6 88:9,13 112:14 132:20,22

---

133:6,16 135:5,11 144:24 145:17
  147:3
**2006** 144:14 145:7,17
**2007** 38:16 39:15
**2008** 15:25 38:16
**2009** 125:24 136:22 137:19,23
**2010** 124:15,16 125:5 144:18
**2013** 70:14 141:23 142:10
**2014** 125:6 144:13 145:19
**2015** 104:23
**2016** 105:5
**2017** 34:10,17 126:8,20 135:24
  136:6 137:2 142:2,10
**2018** 94:4
**2019** 37:12 38:16 40:5 70:14 85:4
  85:16 89:11 125:7,11,13 126:25
  127:8 144:13 145:19 146:13
**2020** 9:25 10:19 20:22 34:17 37:10
  38:4 39:21,25 47:19 108:16,19
  139:9,16,18,24 140:9,11
**2020-020833** 2:13
**2021** 1:14 12:15 127:2,3,7 144:13
  160:19 162:20
**21** 44:21 73:24 81:14 145:7,17,17
  145:18
**22** 81:11,24 82:19
**249** 134:15
**250** 130:9,12,13,14,16 133:25 134:7
  134:15 141:9 143:5 157:15,20
**2507** 1:5
**26** 81:12,25 82:19
**264** 6:14

---

**3**

**3** 8:15 21:19 32:20 40:19,24 41:4,14
  41:23 42:2 43:20 47:7 97:12
  125:22 130:2
**30** 3:16 152:6
**300** 2:5
**3113(d)** 4:13
**35-hour** 107:24
**3621** 26:11
**37** 1:5 94:6 104:24
**37-and-a-half-hour** 14:20
**37.5** 106:9,15 107:23 108:22 109:4
**38** 44:5 46:16

---

**4**

**4** 48:21 49:2 85:9 124:13 125:22
  126:9 131:3 135:16 136:14
  139:25 161:8,9
**4:10** 159:3
**40-hour** 54:14 104:23 105:15
  107:23
**43** 52:4
**438** 70:13
**46** 64:18
**47** 64:24 130:23 131:9,13

---

**48** 64:24

---

**5**

**5** 4:4 14:12 48:21 102:23 106:6
  127:11 133:10 161:8
**5,008** 123:17,20
**50** 118:11 157:18,20
**50/50** 110:6 111:16
**500** 25:21,23
**5008** 123:6
**507** 34:16 35:2
**52** 94:6
**575** 25:18

---

**6**

**6** 52:5,7 56:6,25 83:9 84:11 161:14
**6/21/21** 9:20
**6/9/2021** 8:21
**60** 47:21 48:5
**6049** 123:15 124:7
**660** 70:25
**669** 34:4 134:20,24

---

**7**

**7** 4:4 123:21,24 124:4 138:22
  152:18 161:9
**7/9/2021** 9:8

---

**8**

**8** 35:17 37:9 42:11,13 48:9 64:3,6
  123:19 141:18
**80** 143:6
**848** 70:14,20
**881** 70:19,22
**8th** 12:20 13:6

---

**9**

**9** 11:18 65:4 69:22 70:12 73:25
  74:3 122:24 123:10,17,20
**933** 71:2
**98** 37:11
**99** 72:11

---