# EXHIBIT 27

1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

DARRYL CHALMERS, DARREN CONNORS,
GLENN MENDEZ, JAMES NOVA, and
FATIMA Q. ROSEMOND,                        1:20-cv-03389
On behalf of themselves and all
others similarly situated, and
AFSCME DISTRICT COUNCIL 37
LOCAL 2507, on behalf of its
Members

                  Plaintiffs,

      v.

CITY OF NEW YORK,

                  Defendant.

------------------------------------x

                  April 29, 2021
                  11:52 a.m.

          DEPOSITION of CITY OF NEW YORK, the

Defendant herein, by STEVEN BANKS, taken by the

attorneys for the Plaintiffs, pursuant to Notice,

held via Web conference at the above date and

time, before Maureen McCormick, a Notary Public of

the State of New York.

15

```
 1                        S. Banks
 2     the legal division, and I oversaw the attorneys
 3     who represented the city in various legal
 4     proceedings.
 5               And then as I mentioned in February of
 6     2019, I maintained the general counsel role and
 7     added first deputy commissioner where I oversaw
 8     the city's negotiations, as well as, you know, all
 9     the operations of our agency, which includes
10     health benefits, deferred compensation and various
11     other units and divisions.
12          Q.    Is it correct that in these duties you
13     have become familiar with contract negotiations
14     with the various unions from at least 2011
15     forward?
16          A.    Yes.
17          Q.    During the period from 2009 to 2011,
18     were you familiar with and involved in the
19     negotiations with labor unions?
20          A.    I was on a more limited basis.  I
21     would attend bargaining sessions as a legal
22     representative, and in preparation for arbitration
23     cases or improper labor practice cases, I would
24     become familiar with specific negotiations that
25     were relevant to those litigations.
```

16

1                          S. Banks

2          Q.    And we identified the six topics a

3     little bit earlier.

4                Do you feel like your positions have

5     provided you with information about these topics

6     for the entire period of 2009 forward?

7          A.    Yes, to varying degrees.  I mean, my

8     primary involvement in these areas has been since

9     2014.  I've been the city's lead negotiator for

10    the EMS collective bargaining unit, which includes

11    fire protection inspectors, so that's the area

12    that I'm most knowledgeable about.

13         Q.    Have you done anything to prepare for

14    the deposition today?

15         A.    Yes.

16         Q.    And have you talked with counsel?

17                I don't want to know anything about

18    what you said, but have you talked with counsel

19    about it?

20         A.    Yes.

21         Q.    Have you talked with anyone else about

22    the deposition today to prepare for it?

23         A.    Yes.

24         Q.    With whom else have you talked?

25         A.    Daniel Pollak, who is currently an

17

1                          S. Banks

2      associate commissioner in my office.

3             Q.    And what did you talk with Mr. Pollak

4      about?

5             A.    The building inspector collective

6      bargaining in the last round of bargaining which

7      would have been covering the 2010 to 2017 period.

8             Q.    And have you talked with anyone else

9      in addition to counsel and Mr. Pollak?

10            A.    No.

11            Q.    Have you reviewed any documents to

12     prepare for your deposition today?

13            A.    Yes.

14            Q.    What documents have you reviewed?

15            MS. CROUSHORE:  Objection to the

16            extent it calls for documents that we

17            discussed together.

18            Q.    I'm not asking for any specification

19     about why you reviewed them, when you reviewed

20     them.  Just what documents you reviewed.

21            MS. CROUSHORE:  I maintain my

22            objection in terms of the selection of

23            documents that I presented to Mr. Banks.

24            MR. LIEDER:  Are you instructing him

25            not to answer?

1                              S. Banks

2     something called a new hire minimum salary?

3         A.    So, I mean, the end of the

4     negotiations is a collective bargaining agreement,

5     which may cover issues related to a new hire

6     minimum salary or may not.

7         Q.    What is meant by a new hire minimum

8     salary?

9         A.    So that term, as I understand it, many

10    of our civilian employees throughout the city have

11    what's called a salary range where there's a

12    minimum to a maximum rate of pay that are

13    permissible under the collective bargaining

14    agreement, and then most titles also have what we

15    call a new hire rate, which would be in place for

16    the first two years of employment, and would

17    generally be 15 percent below what we call the

18    incumbent minimum rate.

19        Q.    Does that incumbent minimum apply to

20    individuals who have worked two years in one of

21    the titles that is covered by that particular

22    agreement or does it apply to people who have

23    worked two years for the city in any title?

24        A.    The latter.  Continuously, right?  At

25    least two years continuously at any level.

23

1                               S. Banks

2      bargaining agreement, we have, you know, discrete

3      terms of art, and the base salary is the base

4      salary, and those other economic items that you

5      mentioned, which are common, are additional forms

6      of compensation that we just distinguish from

7      salary, you know, for the -- as it's defined in

8      the collective bargaining agreement.

9           Q.    But if there is a term that, for

10     instance, after five years of service someone gets

11     an increase of $1,000, that increase would be

12     reflected in the compensation that they receive

13     every two weeks or however often they're paid?

14          A.    Certainly, yes.

15          Q.    Are you familiar with the term pattern

16     bargaining?

17          A.    Yes.

18          Q.    What is meant by pattern bargaining?

19          A.    So in the City of New York, we have

20     over 150 separate collective bargaining units, so

21     our approach to -- the city's approach going back

22     to at least the late 1960s has been to offer and

23     settle on contracts with similar or the same

24     economic value for similarly situated units of

25     employees.

24

1                          S. Banks

2          Q.    And when you say same economic value,

3    are you talking in terms of percentage increases

4    or are you talking in terms of absolute number of

5    dollars being paid?

6          A.    Percentage increases over the term of

7    the contract, not -- not overall dollars spent,

8    because there's a wide variation in the size,

9    right?  We have a teachers' unit that's over

10   100,000 employees, and there's a union of

11   horseshoers where there's three people who work

12   for the Police Department putting the shoes on the

13   horses, so it's not about the total dollars spent.

14         Q.    And when you talk about the pattern

15   percentage increase, would that also apply to

16   other factors that influence salary, such as a

17   longevity or recurring increment bump?

18         A.    So it depends.  The two examples that

19   you gave in general are longevity differentials

20   would not automatically go up by a percentage

21   increase, whereas the recurring increment payment

22   would, so that's the main difference between those

23   two items, so it would depend on the nature of the

24   item and what the CBA says as to whether it would

25   go up by whatever the percentage, what we call the

25

```
 1                        S. Banks
 2    general wage increase.
 3        Q.    I want to make sure I understand here.
 4            Let's say that the pattern increase
 5    from one year to the next is 2 percent, and a
 6    particular local that does not currently have a
 7    recurring increment adjustment bargains for a
 8    recurring increment adjustment.
 9            Would that, if that were agreed to --
10    would that be factored into the 2 percent so that,
11    for instance, the city might say, you only get a
12    one and a half percent increase in salary, because
13    we're also going to give you this, or is that
14    something that is not factored in in that type of
15    scenario?
16        A.    I think it would be factored in.  In
17    your example, if the pattern was a one-year
18    contract worth 2 percent, we might have one unit
19    that gets a 2 percent general wage increase, and
20    we might have another unit that gets a one and a
21    half percent general wage increase and a recurring
22    increment payment that we value at a half a
23    percent, and that would -- you know, we would
24    work -- we have analysts who work very closely on
25    the math, but assuming that those are equivalent,
```

26

1                          S. Banks

2       they would both be pattern performing contracts in

3       that example.

4            Q.    And let's say that -- change the

5       scenario just slightly.  You've got a local that

6       did not have -- I'm sorry, that did have a

7       recurring increment provision in their plan, and

8       there is a 2 percent pattern bargaining increase.

9                 In that type of scenario, would the 2

10      percent apply to both the salary increase and the

11      recurring increment?

12                MS. CROUSHORE:  Objection.

13           A.    I think I can answer.

14                So if we agreed on a one-year contract

15      for a 2 percent general wage increase and did

16      nothing else, that title RIPs, recurrent increment

17      payments, would go up by 2 percent.

18                Alternatively, we could also agree

19      that the general wage increase becomes one and a

20      half percent, in which case they get a general --

21      the salaries go up by one and a half percent and

22      the RIPs go up by one and half percent --

23                (Discussion off the record.)

24                (Question read.)

25           A.    So if there was a one-year contract

27

1                        S. Banks

2      with a 2 percent general wage increase, and we did

3      nothing else, the recurring increment payments,

4      the schedule would go up by 2 percent.

5                Alternatively, we might agree with the

6      union bilaterally that perhaps there would be a

7      one and a half percent general wage increase, and

8      the recurring increment payments would go up

9      additionally.  For example, a thousand dollars on

10     the ten-year RIP and everything thereafter.

11         Q.    But in either case, what you're trying

12     to get at, if the pattern bargaining is for a 2

13     percent increase over this one-year period to

14     reach an agreement with the total economic value

15     of the salaries plus these types of adjustments,

16     roughly equalling 2 percent; is that correct?

17         A.    I don't think it's quite correct, just

18     because what we're doing is the economic value is

19     the same over the term of the contract, not each

20     year, so if it's a three-year contract that has 2

21     percent raises every year, the overall value is

22     going to be 6 percent compounded to two and two

23     and two.  It's not -- each year has to be

24     equivalent.

25         Q.    With that qualification, is what I

28

1                        S. Banks

2    said correct?

3         A.    Yes, I think so.

4         Q.    Now, we've been talking in terms of

5    civilians.  I think you used that term a couple of

6    times.

7              There are also various unions that are

8    uniformed; is that correct?

9         A.    Correct.

10        Q.    And for purposes of collective

11   bargaining, the fire protection inspectors have

12   been treated as non-uniformed?

13        A.    Correct.

14        Q.    What are examples of uniformed

15   employees?

16        A.    Police officers, correction officers,

17   firefighters and sanitation workers and their

18   supervisors, all of their supervisors.

19        Q.    The pattern bargaining increases for

20   uniformed employees may be different than for the

21   civilians; is that right?

22        A.    Correct.

23              The process is the same, but in most

24   rounds of bargaining the actual value has been

25   different.

29

1                        S. Banks

2          Q.    And the uniforms have been higher?

3          A.    When they're different, the uniform

4     pattern is higher.

5          Q.    Are you aware that earlier the City

6     Council passed a law recognizing the fire

7     protection inspectors as uniformed for collective

8     bargaining purposes?

9          A.    I am.

10         Q.    Why is it that they are not treated as

11    unformed in the collective bargaining agreements

12    then?

13         A.    I wouldn't say that that's accurate.

14    The effect of City Council law that you referenced

15    means that what I described earlier, where all

16    economic and noneconomic items, and, you know, the

17    entire contract is bargained together, that occurs

18    and has occurred for the EMTs and the fire

19    protection inspectors, et cetera, so we do treat

20    them as uniformed employees.

21              In terms of the value of whatever

22    settlements the city proposes, the City Council

23    did not purport to, nor do they have authority to

24    establish what we should or could offer different

25    groupings of employees, so in terms of the

30

1                         S. Banks

2      economic value that we negotiate, you know, even

3      pattern bargaining itself is not proscribed under

4      the law.

5           Q.    Let's turn for a moment to the

6      Department of Buildings.  The Department of

7      Buildings has several different titles of

8      inspectors; is that correct?

9           A.    Yes.

10          Q.    I'm going to refer to them in general

11     as building inspectors, even though I realize that

12     they might have titles like inspector

13     (construction) or inspector (plumbing.)

14          A.    Understood.

15          Q.    Is it correct that most building

16     inspectors in the Department of Buildings are

17     members of Local 211?

18          A.    Yes.

19          Q.    And Local 211 is affiliated with the

20     International Union of Operating Engineers, which

21     is part of the AFL-CIO?

22          A.    I'm not sure about that.  I thought

23     that the umbrella organization was ABI, the Allied

24     Building Inspectors, and 211 is a local of that

25     organization.

34

1                          S. Banks

2      document, you'll see it says, "2007 To 2009

3      Building and Construction Inspectors Agreement."

4                 I realize you came on to OLR in 2009.

5      Have you ever seen this particular document?

6           A.    Yes.

7           Q.    Obviously you haven't scrolled through

8      the whole thing, but are you aware that there was

9      a collective bargaining agreement that was entered

10     into in January 2009 between the City of New York

11     and Local 211?

12          A.    Yes.

13                This appears to be a collective

14     bargaining agreement covering the period of

15     December 2007 to December 2009 covering the

16     building inspector union.

17          Q.    One of the questions that will come up

18     several different times is you'll see that this

19     agreement was executed partway through the period

20     that it purports to cover, about half the way

21     through it.

22                When an agreement is purporting to

23     offer a period prior to the date that it's

24     executed and covering things, among other things,

25     salary, how is that done retroactively?

35

1                        S. Banks

2        A.    We would pay the difference

3    retroactively, and I would say it's overwhelmingly

4    common that an agreement that we reach for a given

5    round of bargaining includes some retroactive

6    period, so in general our office on behalf of the

7    mayor will reach the agreement with the union on

8    all the terms and conditions, including the

9    economic ones, and then we will have it

10   implemented, and if there's retro pay, we would

11   pay that to any affected employees, including --

12   there may be employees who left since, but they

13   would still be entitled to pay under that

14   agreement, and usually that payment is made around

15   60 days after an agreement is reached.

16       Q.    Is it made as a lump-sum payment?

17       A.    Usually yes, a single amount that

18   would cover all the retroactive pay from the

19   beginning of the contract.

20       Q.    Do you know whether in the city's

21   payroll records the amounts are in effect changed

22   so that an employee who was entitled, let's say,

23   to $41,000 in 2008, but was only paid 40,000,

24   because the agreement wasn't entered till 2009, in

25   that type of scenario, are the payroll records

60

1                          S. Banks

2      that you just scrolled through are consistent with

3      a, you know, significantly reduced in terms of

4      monetary spending and impact proposal.

5            Q.    And on the second page of this exhibit

6      that is entitled, "Proposed Phases Per Conference

7      Call, 2/11/2016," you'll see that there is a

8      subheading called, "Phase 1 Inspector Titles."

9                 Do you see that?

10           A.    I do.

11           Q.    And the first point is, "Change the

12     DOB hiring rate to the incumbent rate," and then

13     there is in the right column an overview of steps,

14     "DOB to present budget impact, the OMB

15     consideration and budget funding."

16                Did the DOB present a budget impact

17     from changing the DOB hiring rate to the incumbent

18     rate?

19           A.    I don't specifically recall, because

20     as this implies, which I would agree with, that's

21     really OMB, the Office of Management and Budget's

22     role.

23           Q.    Would the OLR have any role in

24     considering the budgetary impact of these proposed

25     changes?

61

S. Banks

1

2      A.     So I mean certainly we work alongside

3    our colleagues at OMB, and our focus is on the

4    labor impact more so than the budgetary impact, so

5    our expertise is what will the union say, what

6    will other unions say, what -- how does this

7    affect the gentle fabric of the 150 collective

8    bargaining units that I mentioned earlier, so we

9    certainly are part of those conversations, but I

10   would say that OMB's job is to manage the budget,

11   and OLR's job is to manage labor relations.

12      Q.     Do you know whether as a result of the

13   DOB's proposal their DOB hiring rate was changed

14   to the incumbent rate?

15      A.     I believe so.

16      Q.     And do you know whether that was done

17   in 2016 at the -- approximately the -- or the year

18   that we're now looking at, or did it happen

19   sometime later?

20      A.     Yeah, my recollection is that it

21   occurred that year, but it may have been a few

22   months after those initial discussions.

23      Q.     Then under 1 (a) it says, "To adjust

24   the DOB active salaries to offset the new

25   incumbent rate."

84

```
 1                        S. Banks
 2    scrolling through it so you can see all of it.
 3              I know I scrolled through relatively
 4    quickly, but have you ever seen the memo that's
 5    been marked as Exhibit 11 before?  I shouldn't say
 6    memo.  The email.
 7         A.    Yes, so I'm very familiar with the
 8    memo that's referenced in here, the -- you know,
 9    the document that is referred to in the email.
10              I've never seen this email before, but
11    I've definitely seen, and I'm very familiar with,
12    the memo that it's -- that the email is
13    describing.
14         Q.    This is the -- or are you referring to
15    the memo from first deputy budget director Kenneth
16    Godiner or the FDM Fuliehan's city personnel
17    policies and procedures memo?
18         A.    The latter.
19         Q.    Are you familiar at all with the
20    October 31, 2019, compliance memo from first
21    deputy budget director Kenneth Godiner?
22         A.    Not particularly.  I think at the time
23    I was aware that OMB was going to communicate with
24    the agencies, but I don't think I ever reviewed
25    that document.
```

85

1                          S. Banks

2          Q.    And do you know, did this email or a

3     version of this email with different addressees,

4     go out to each agency, or was this specifically

5     directed to Department of Buildings?

6          A.    No, my understanding is it went to

7     every single agency.

8          Q.    And there are two bullet points in the

9     second paragraph of this email that, "Employees in

10    the first two years of city service should be paid

11    the applicable new hire salary, and employees with

12    more than two years the city service should be

13    paid the applicable incumbent minimum salary."

14              Is that consistent with what you were

15    just testifying before we called up this

16    particular document?

17         A.    Yes, that in each instance it's the

18    general rule that in the first two years you

19    should get the new hire rate, and after two years

20    the general rule is that the employee should be at

21    the incumbent minimum rate.

22         Q.    And what is the purpose of the maximum

23    rate if an employee should be at the minimum rate?

24         A.    Well, I mean, this memo contemplates

25    exceptions, right, so general rule is that

86

1                         S. Banks

2    employees should be at the incumbent minimum, but

3    if management has flexibility to pay within a

4    salary range, which as I said is consistent with

5    the collective bargaining agreement, then the

6    range would delineate all the acceptable salaries

7    that we could pay without violating the contract.

8         Q.    And may agencies seek exceptions not

9    just on an individual by individual basis, but on

10   the basis of a group of employees?

11        A.    Yes.

12        Q.    Are there also exceptions made for

13   hard to recruit positions?

14        A.    So hard to recruit is a term of art,

15   right?  And if a title is on the hard to recruit

16   list, that means that the first bullet that you

17   referenced about the new hire salary wouldn't

18   apply, right?  Hard to recruit titles, the minimum

19   is the incumbent.

20             In terms of exceptions to the second

21   bullet, it's not a matter of being on the hard to

22   recruit list as a term of art, but ability to

23   recruit is one of the factors that could lead to

24   an exception making sense.

25        Q.    And when agencies wish to have

87

```
 1                      S. Banks

 2     exceptions made, they need to go to OLR and OMB?

 3          A.    That's right.

 4          Q.    And is this policy still in effect?

 5          A.    Yes.

 6          Q.    This email is dated November of 2019.

 7     Was this the policy before November of 2019?

 8          A.    I think the policy was the policy

 9     beginning in March of 2019.

10          Q.    That's when the city personnel

11     policies and procedure memo is dated March 25 --

12     that's what you're referring to?

13          A.    It is.

14          Q.    Prior to March 25, 2019, was this the

15     policy?

16          A.    I would say that this review process

17     that included OLR and OMB was not the policy.

18                I believe that the city's policy

19     should have been consistent with this, but really

20     there was a new level of oversight and enforcement

21     to make sure that was the case.

22          Q.    So before March of 2019, there wasn't

23     any oversight of this, or was there oversight, but

24     not OLR and OMB?

25          A.    I believe that there are policies that
```

88

1                           S. Banks

2      go back probably to like the late 1980s or early

3      1990s that talk about the incumbent minimum being

4      used as the default, but prior to March of 2019,

5      OLR and OMB did not have to specifically review

6      each exception, so the effect of that was that

7      before this was implemented agencies had more

8      latitude to determine their own exceptions.

9           Q.    And I didn't ask the question very

10     well.  Was there someone, some other entity, that

11     was exercising oversight before March of 2019,

12     such as DCAS or some other agency?

13          A.    So I would say that prior to this memo

14     that OMB was exercising oversight, but not in this

15     way.  In other words, their analysis was based on

16     can the agency budget afford to pay the person

17     this salary.

18               What this memo contemplates and what's

19     still in place is an analysis of whether, even of

20     you can afford to pay a certain salary based on

21     your budget, is it appropriate, and is it

22     consistent with what we should be doing as a city,

23     so OMB exercises some oversight, but it was really

24     a different type of analysis, and no other agency

25     that I'm aware of would have been providing

89

1                        S. Banks

2      oversight.

3           Q.    And let's say in a particular agency

4      either some individuals were being paid within the

5      range, but more than the minimum, as of March of

6      2019.

7                 Did the agency have to go to OLR and

8      OMB and ask for an exception for that employee or

9      were existing employees grandfathered in?

10          A.    It was the latter.  We never had any

11     intention of reducing any existing employees'

12     salaries, but the idea would be to right the ship

13     through attrition.  If the rule remains in place

14     for a long time, it will be universal.

15          Q.    You'll see in the next to last

16     paragraph of this email, the first paragraph on

17     the top of the second page it says, "Lastly, as

18     explained in First Deputy Director Ken Godiner's

19     memo, there will be periodic audits to ensure that

20     agencies are complying with the respective

21     collective bargaining agreements and city hiring

22     rate policies."  Do you see that?

23          A.    I do.

24          Q.    Do you know, are those periodic audits

25     going on?

91

1                          S. Banks

2      they were preparing to make such a request, but I

3      think it's likely that they did.  I don't have a

4      specific independent recollection of that.

5                   What I do remember is that, you know,

6      in those initial few months in late 2019 and early

7      2020, we got a lot of these, you know, because it

8      was the first time this was really being enforced.

9                   We got a lot of these exception

10     requests that we kind of had to wade through.

11          Q.    And near the top of the second page

12     you'll see in an email that right -- who is the

13     writer?  This Graham Rabinowitsch says, "We do not

14     have dates.  We started using the salaries

15     sometime in 2016 for most inspectors."

16                  Does that accord with your memory that

17     the salary changes that had been requested by

18     Department of Buildings were made in 2016?

19          A.    It does.  It's consistent with what we

20     looked at earlier where they talked about hiring

21     within the range.

22          Q.    We are going to switch now to the Fire

23     Department and the fire protection inspectors.

24                  When we were having the deposition

25     before lunch, at one point you said that there

92

1                          S. Banks

2      was -- you did remember a request being made by

3      the Fire Department or a particular agency of the

4      Fire Department for some increases in salary for

5      fire protection inspectors.

6                   What do you remember about that

7      particular request?

8            A.    What I recall is that I think it

9      originated from Chief Spadafora, who at the time

10     was the chief overseeing fire prevention, and he

11     obviously had an interest in the compensation

12     levels and morale within his bureau, and there was

13     a specific proposal that the Fire Department

14     shared with me on behalf of Chief Spadafora, and I

15     never understood that to be the Fire Department,

16     you know, the fire commissioner and the Fire

17     Department's position, but that was something that

18     we discussed internally around the time that we

19     commenced bargaining for the EMS unit, which

20     includes the fire protection inspectors.

21           Q.    And when you say it was discussed

22     internally, who was involved in the discussions?

23           A.    OLR and OMB and the Fire Department.

24           Q.    And who from the Fire Department?

25           A.    My recollection, I mentioned Chief

93

1                          S. Banks

2     Spadafora; David Zweifler -- that's

3     Z-W-E-I-F-L-E-R -- is their director of labor

4     relations; Steve Rush, who was their assistant

5     commissioner at the time.

6              I don't recall anyone else being part

7     of those conversations.

8         Q.    And were the conversations in a single

9     meeting or a series of meetings and phone calls?

10    What was the circumstance?

11        A.    I recall one meeting specifically on

12    that topic, but then as I mentioned we were

13    beginning bargaining with the EMS unit at that

14    time, so we also had management caucuses as part

15    of the bargaining sessions, as well, that touched

16    on a whole host of issues related to EMTs,

17    paramedics, fire protection inspectors.

18        Q.    When you say you didn't understand it

19    was the position of the Fire Department, what was

20    your understanding of the Fire Department's

21    position?

22        A.    I mean, I think in a broad way, the

23    Fire Department and the folks who I was dealing

24    with understand pattern bargaining, and understand

25    that these few hundred employees are within a unit

94

<pre>
 1                        S. Banks

 2      of 4,000, and that any changes to compensation

 3      would have to be negotiated with the union, so,

 4      you know, I don't think they expressed a strong

 5      position one way or the other about how fire

 6      protection inspector compensation might be

 7      adjusted as part of an overall EMS agreement.

 8              I think they deferred to us.

 9          Q.   Let me actually with that background

10      call up a few of the documents, and we will

11      probably get back to the deferred to you, and by

12      us, I assume you mean city OLR?

13          A.   And I would add the OMB labor unit to

14      that, too.  They're a close part of our, you know,

15      negotiation team.

16              MR. LIEDER:  Maureen, could you call

17          up Exhibit 13, please.

18          Q.   Mr. Banks, this is an email from a

19      Fred Novello to Steve Ertrachter, copy to Joseph

20      Zavaglia and forwarded to Robert Rampino.

21              It's a one page set of emails, and

22      given that it was just within FDNY, you probably

23      haven't seen this email before, but you'll see in

24      the middle paragraph of the email that David,

25      presumably referring to David Zweifler, can raise
</pre>

95

1                          S. Banks

2       the starting salary issue with OLR, since the

3       inspectors have not yet reached a labor agreement.

4                    Did Mr. Zweifler prior to the

5       negotiation of the labor agreement with 2507 talk

6       with you about starting salaries for fire

7       protection inspectors?

8            A.    Yes.  I mean, I think that starting

9       salaries is one aspect of the salary schedule and,

10      you know, consistent with my prior answers, right,

11      through Chief Spadafora, the Fire Department, and

12      David brought that issue to OLR, I think it was

13      like in the spring of 2015, and I also mentioned

14      that in the first paragraph here I'm not the Steve

15      that's being referred to, so that wasn't something

16      that was brought up to OLR back at that time.

17           Q.    No, I understand.  I think that's

18      probably a reference to Steve Rush, but I'm not

19      allowed to testify.

20                   Incidentally, do you know Mr. Novello?

21           A.    Yeah, I knew him a little bit.  He

22      worked for Steve Rush in the -- in the Fire

23      Department's budget office.

24           Q.    Did the department ever inform you

25      that it was having difficulty recruiting fire

96

                              S. Banks

1

2     protection inspectors?

3          A.    I don't recall that being emphasized

4     or brought as part of the discussion.

5          Q.    Did it inform you that it was having

6     trouble retaining fire protection inspectors?

7          A.    Same answer.  I do not recall that

8     being -- you know, I don't recall that being

9     emphasized or brought by the Fire Department as

10    part of those discussions.

11              MR. LIEDER:  Maureen, could we put

12         away Exhibit 13 and call up Exhibit 14,

13         please.

14         Q.    Mr. Banks, you'll see that this is an

15    email from Chief Spadafora to Mr. Zweifler, dated

16    April 2015, and let me just scroll through it.  I

17    don't expect to you read every word, but so you

18    have an idea of what's in this memo.

19              Mr. Banks, have you ever seen the

20    memorandum that's been marked as Exhibit 14?

21         A.    So I don't specifically recall reading

22    the memorandum.  I may have, but the contents

23    therein are generally consistent with what I

24    described about those conversations in the spring

25    of 2015, and I see this is dated in April of 2015.

97

1                    S. Banks

2        Q.    And you'll see that the proposal

3    includes what was called a step pay plan for

4    individuals at the fire protection inspector level

5    or fire protection inspector title, and each level

6    of associate fire protection inspector.

7                Was it your understanding that at this

8    time a step pay plan did not exist for the fire

9    protection inspectors?

10       A.    Correct.  In general, a title either

11   has a salary range like we've been discussing

12   throughout the day or a step pay plan, which

13   provides automatic increases to base salary.

14   Usually every year.  Usually they're not

15   necessarily every year.

16       Q.    What's the difference between a step

17   pay plan and a recurring increment recurring --

18   RIP plan?

19       A.    The step pay plan refers specifically

20   to the base salary.  Again, earlier I was

21   distinguishing between the salary and the

22   additional items.

23                A step pay plan is where the actual

24   base salary changes based on years of service, and

25   so separate and apart from the general wage

98

1                          S. Banks

2      increases that I discussed earlier, people

3      progress up an -- progress up each year, I would

4      say.

5              Q.    And do some job titles have step pay

6      plans like this?

7              A.    Yes.

8              Q.    Can you give me examples of titles

9      that do have step pay plans?

10             A.    Teachers, police officers, traffic

11     enforcement agents.  There are a variety, a number

12     of titles that have a step pay plan where

13     basically everybody in the first year has to earn

14     the same salary, everybody in the second year,

15     right?

16                  There is no -- we talked about

17     different things like merit pay, right?  There is

18     no merit pay in a step pay plan.  There is a

19     specific salary based on years of service.

20             Q.    And when you met with Mr. Zweifler and

21     Spadafora and Rush, did you discuss a proposed

22     step pay plan?

23             A.    I think they did.  Chief Spadafora

24     did.

25             Q.    And what was Mr. Zweifler and Mr.

99

1                          S. Banks

2    Rush's attitudes for it?

3         A.    I guess I thought that they -- that

4    they better understood how the collective

5    bargaining process worked and were relatively

6    neutral, I would say.

7         Q.    Did you or people under you reach out

8    to anyone else within the Fire Department, such as

9    the commissioner or HR, to see what their

10   attitudes were to a proposed step pay plan?

11        A.    I didn't.  I didn't, nor am I aware of

12   any of our staff specifically reaching out to the

13   Fire Department.  Just going back to a few answers

14   ago, we definitely talked about all sorts of

15   compensation issues in caucuses at bargaining

16   sessions for EMS that started in May of 2015, and

17   Steve Rush was there, David Zweifler, probably HR

18   representatives and EMS staff, and so issues like

19   this may have been discussed in that forum, but we

20   didn't call the commissioner about this.

21        Q.    You had said that the representatives

22   of the Fire Department were willing to defer to

23   you, to OLR, on what to propose if anything along

24   these lines.

25             In the negotiations, did OLR and the

1                    S. Banks

2     city propose a step pay plan to the union?

3            A.    I think the union proposed a step pay

4     plan for us, and we discussed how to respond and

5     react to that.

6            MR. LIEDER:  I'm going to take things

7            out of order.  Could we call up 16, please.

8            MS. CROUSHORE:  Before you move on to

9            this document, I'm not sure if you said this

10           already.  I just want to say it for the

11           record.

12                 This is also an internal FDNY document

13           that has no OLR, you know, notice or

14           anything on it.

15           MR. LIEDER:  Right.  I agree.

16           Q.    Mr. Banks, I marked as Exhibit 16 an

17    email chain, which also is completely within the

18    Fire Department, but because you have mentioned

19    that the union brought up a step pay plan, I

20    wanted to see if this is what you were referring

21    to.

22                 You'll see that Mr. Zweifler wrote an

23    email to Mr. -- to Chief Spadafora on November 27,

24    2015, which is the first email in the chain, and

25    why don't you read through it and I will then want

1                        S. Banks

2      to see if this accurately reflects your memory of

3      what was proposed.

4           A.    Okay, I've reviewed it, and it does

5      accurately comport with my memory from the

6      bargaining.

7           Q.    And what position did the city take in

8      response to this proposal from the union?

9           A.    We indicated that any increases for a

10     given title, in this case the FPI and AFPIs, would

11     have to be funded within a pattern contract, so we

12     would cost it out, and it would be included in the

13     package, in the economic package.

14          Q.    And what was the union's response to

15     that?

16          A.    Ultimately -- and I think this was a

17     little bit later -- like probably in the spring of

18     2016, they dropped it.

19          Q.    Did they at all push to try to argue

20     that the fire protection inspector should receive

21     something more than the pattern bargaining?

22          A.    So there were a couple of other items

23     that I would consider falling within that

24     category.  I think that ultimately we agreed to

25     equalize some benefits, like an annuity payments

102

1                           S. Banks

2      and uniform allowance payments, for the FPIs with

3      what the EMTs and paramedics got, and we also

4      changed the length of the workweek for the FPIs as

5      part of the overall agreement, so they insisted on

6      some items, but they didn't really insist on their

7      salary schedule proposal that it come out in the

8      fall of 2015.

9          Q.    Is one of the considerations that the

10     OLR has in negotiating a comparison of the pay of

11     individuals in particular titles with the pay of

12     employees in other titles that have similar job

13     responsibilities?

14         A.    I would say that we would take into

15     account the salary levels if the job duties and

16     qualifications are the same or very similar.

17         Q.    At any point during the negotiations,

18     did the union argue that there were individuals

19     who had similar job duties, but were being paid

20     more than the fire protection inspectors?

21         A.    The only context that I recall that

22     coming up in was, as I mentioned, the union

23     demanded, and we ended up agreeing to a change in

24     the length of the workweek, and I do recall the

25     union bringing up that what they viewed as other