# EXHIBIT 49

```
                                                              Page 1
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------------------------------------X
     DARRYL CHALMERS, et al.,
 3
                                    PLAINTIFF,
 4
 5        -against-            Case No.:
                               1:20-cv-03389-AT
 6
 7   CITY OF NEW YORK,
 8                                  DEFENDANT.
     ------------------------------------------------------------X
 9
10                    DATE:  July 15, 2021
11                    TIME:  10:31 A.M.
12
13          DEPOSITION of an Expert Witness, CHARLES
14   SCHERBAUM, taken by the Defendant, pursuant to a Notice and
15   to the Federal Rules of Civil Procedure, taken Via
16   Videoconference, before Jennifer Schwartz and Helen
17   DeLucci, Notaries Public of the State of New York.
18
19
20
21
22
23
24
25
```

1  from a police and sheriff's patrol officer, right?
2       A.    They could be in terms of some of the content of
3  the tasks that they perform but they are cross listed
4  because of the knowledge, skills and abilities required to
5  do those tasks.
6       Q.    I'm just trying to get at how valuable this
7  related occupations portion of O*NET is if they are
8  grouping together just disparate occupations?
9       A.    I would suggest that if it is based on an
10 analysis of the tasks and the KSAOs and the Department of
11 Labor has come to the conclusion that the jobs are fairly
12 similar and the human capabilities required to perform this
13 work, that would seem pretty relevant when we're comparing
14 two jobs to determine if they are similar or not.
15      Q.    Okay.  There's an equation on page 23 of your
16 report.  I was wondering if you could explain that in plain
17 English for me.
18      A.    Sure.  I will do my best at that.
19      Q.    Okay.
20      A.    The similarity index is really a way of
21 quantifying the overlap between two jobs, and what it is
22 looking at is the number of lists -- and we are going to
23 focus just on tasks for the moment.  The number of tasks
24 that the two jobs have in common, the total number of tasks
25 in each job separately.

Page 100

1  and I think that data set goes from the '80s all the way to
2  present.  So, if I was looking at testing an individual --
3  an individual tested in, say, 1992 and later tested and
4  failed but passes at some later point say in 2000, it's
5  not -- these aren't necessarily apples to apples
6  comparisons.
7           We need to look at the same point in time of the
8  applications and the pass rates on these tests.
9      Q.   Finally, after lunch, you were asked about
10 longevity bonuses or bumps in pay.
11          Do you remember the question about that?
12     A.   I do.
13     Q.   And I believe the question asked were you aware
14 that FPIs qualified for longevity increases.
15          Do you know, did building inspectors,
16 construction inspectors also qualify for longevity
17 increases?
18     A.   I can't say.  I believe that they do.  I
19 haven't -- I do have the CBAs.  It's been a long time since
20 I've looked at them, but I think that they also received
21 them.
22     Q.   You also testified, I believe, that, for FPIs,
23 longevity increases are a small percentage of pay.
24          Do you remember that?
25     A.   I do.

1      Q.      Did you attempt to quantify how small it was,
2   and, if so, how small is it?
3      A.      I did look at the payroll data that was provided
4   by the City and, again, this is a very rough way of looking
5   at it, so I'll preface it with that, and I looked across
6   all jobs that were in that data set.  So this is both DOB
7   and FDNY jobs, and I want to say my recollection is
8   correct.  It was something around like 22 -- 21 to $25 a
9   paycheck.
10          Now it appeared that the DOB and FDNY used
11  different payroll codes to capture service differentials.
12  They're not labeled the same way, but it looked like it was
13  in that range of $20 a paycheck, 20 -- say 20 to 25.
14     Q.      And what was roughly an average paycheck?
15     A.      It was more like $1,400.
16     Q.      So, 20 --
17     A.      Excuse me.  I'm sorry.  The line that says
18  regular gross pay was $1,400.  The paycheck of course is a
19  combination of things.
20     Q.      Thank you.  My question wasn't very good there.
21          So, if one were to look at the percentage of
22  compensation that was represented by these longevity
23  bonuses compared to regular gross pay, about what
24  percentage is that?
25     A.      I've been a professor long enough to know that I

| | |
|---|---|
| 1 | don't do math on the fly, but a very small percent. |
| 2 | Q.   Under two percent? |
| 3 | A.   I'm going to say very, very small. |
| 4 | Q.   Okay. |
| 5 | A.   I've made -- everybody has made mistakes on the |
| 6 | board now and then, so you realize -- |
| 7 | Q.   Do you an opinion whether factoring in the |
| 8 | longevity increases, given their size, would have had an |
| 9 | impact on your conclusion that that FPIs were paid less |
| 10 | than building inspectors? |
| 11 | A.   It would not impact my conclusion about the |
| 12 | hourly rates.  I think if we look at the guidelines on |
| 13 | conducting compensation disparity analyses, it is much like |
| 14 | selection procedure analysis, that you can look at the |
| 15 | overall as well as the components. |
| 16 | At least on this component, which is the majority |
| 17 | of the pay, there were disparities.  So, even if I were to |
| 18 | examine that small component, even if there weren't |
| 19 | disparities on that, it wouldn't erase the fact that there |
| 20 | are disparities on the hourly wages. |
| 21 | MR. LIEDER:  I have no further questions. |
| 22 | MS. CROUSHORE:  I don't either.  I think |
| 23 | we're done. |
| 24 | MR. LIEDER:  Thank you. |
| 25 | MS. CROUSHORE:  Thank you so much for taking |