```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```
DARRYL CHALMERS, DARREN CONNORS, GLENN MENDEZ, JAMES NOVA, and FATIMA Q. ROSEMOND,

On behalf of themselves and all others similarly situated, and

ASFCME DISTRICT COUNCIL 37 LOCAL 2507, on behalf of its members,

                            Plaintiffs,

v.

CITY OF NEW YORK,

                            Defendant.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9/16/2021_
```

20 Civ. 3389

**ORDER**

ANALISA TORRES, District Judge:

      Plaintiffs, "minority" and white fire protection inspectors and associate fire protection inspectors (collectively, "FPIs") employed by the Fire Department of the City of New York (the "FDNY") and their representative union, bring this putative class action against Defendant, City of New York (the "City") alleging employment discrimination on the basis of race, in violation of 42 U.S.C. §§ 1981 and 1983, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 et seq. ("Title VII"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. (the "NYCHRL"). Compl., ECF No. 6. The City moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the motion is GRANTED as to the white individual Plaintiff, Darren Connors, and putative class members' (the "white FPIs") claims under Title VII and the NYCHRL, and DENIED in all other respects.

## BACKGROUND[1]

FPIs are employed by the FDNY to conduct inspections of buildings, facilities, vehicles, and public activities in New York City to ensure compliance with safety codes and regulations. Compl. ¶ 1. Before the 1990s, the majority of FPIs were white, but in the last three decades, the proportion of minority FPIs has increased significantly. *Id.* ¶ 2. Presently, only thirty percent of FPIs identify as white. *Id.* ¶¶ 2, 31. Since at least fiscal year ("FY") 2008, the City has paid FPIs salaries that are substantially lower than salaries paid to the City's building inspectors ("BIs") employed by the Department of Buildings, where white employees comprise fifty percent of the workforce. *Id.* ¶¶ 6, 14, 31–32.

FPI positions require an associate's degree, or 60 college credits; BI positions require 60 college credits towards a degree in their field of work. *Id.* ¶¶ 36–37. FPIs and BIs take qualifying exams of similar duration, administered by the same entity, and covering similar subject matters. *Id.* ¶ 39. They both undergo City-administered training, covering a "virtually identical" range of subjects. *Id.* ¶¶ 40–41.

FPIs and BIs share the same principal duty of conducting field inspections to ensure conformance with the City's codes and standards. *Id.* ¶ 42. BIs and FPIs are both tasked with enforcing the City's building codes, though FPIs additionally enforce the City's fire codes. *Id.* ¶ 44. In the course of field inspections, FPIs and BIs must review the same plans and specifications stored on a shared intranet. *Id.* ¶ 43. FPIs inspect almost all the same building types as BIs, though FPIs only inspect one- and two-family housing as part of joint task forces. *Id.* ¶ 45. Like BIs, FPIs conduct inspections while buildings are under construction or repair,

---

[1] The facts in this section are taken from the complaint and "are presumed to be true for purposes of considering a motion to dismiss for failure to state a claim." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 398 (2d Cir. 2015).

or in response to reported violations—though FPIs also conduct annual inspections. *Id.* ¶ 46. At the close of inspection, FPIs and BIs are both empowered to issue certificates that, although differently-titled, share the same function of allowing occupancy or use of the inspected premises. *Id.* ¶¶ 49–51. Finally, FPIs and BIs work on an "equal and collaborative footing" as part of joint task forces. *Id.* ¶¶ 54–56. Plaintiffs do note the positions are not "identical." For instance, FPIs, unlike the majority of BIs, are peace officers, permitting FPIs to issue criminal summonses and court appearance tickets. *Id.* ¶ 53. The two positions have different requirements with respect to working hours, and separate unions. *Id.* ¶¶ 119, 165. And FPIs experience more physical risks in their work, such as being required to enter buildings where fires were recently extinguished. *Id.* ¶¶ 57–59. Plaintiffs contend that such distinctions should militate in favor of FPIs receiving salaries equivalent to, or higher than BIs. *Id.* ¶ 12.

FPI and BI job titles are arranged hierarchically, with four tiers of FPI designations, and three tiers for BIs. *Id.* ¶ 60. Based on publicly available salary data for City employees from FYs 2008–2019, Plaintiffs allege that even adjusted for hours, the City pays FPIs lower salaries than BIs at comparable levels. *Id.* ¶¶ 62–98. For example, in FY 2019, entry-level FPI salary ranges were $46,607 to $66,005, with a median of $46,607, while entry-level BIs received salaries from $61,800 to $80,555, with a median of $65,087. *Id.* ¶ 96. Similarly, associate FPIs earned salaries ranging from $59,872 to $81,624, with a median of $67,073, whereas associate BIs received salaries of $70,161 to $98,347, with a median of $80,152. *Id.* ¶ 96. Plaintiffs also allege that the gap between median FPI and BI salaries has grown steadily over the last 12 fiscal years, from a gap of approximately $2,500 in FY 2008, to a gap of $9,000 in FY 2019. *Id.* ¶¶ 64, 97, 99. Each of the individual Plaintiffs, including one white FPI, received a salary that was lower than the corresponding average BI salary. *Id.* ¶¶ 24, 101.

Plaintiffs allege that FPIs' lower base salaries in turn result in lower overtime pay and pension benefits, because these figures are tied to their base salary. *Id.* ¶¶ 102, 116–19. Plaintiffs contend these disparities amount to disparate treatment of FPIs as a predominantly-minority workforce, compared to similarly situated BIs. *Id.* ¶¶ 193–212.

Plaintiffs also allege that the City has maintained a policy of paying FPIs at, or slightly above, the minimum salary level established in their union's collective bargaining agreement ("CBA"), while paying BIs well above the minimum salary prescribed by their union's CBA—including, in some cases, exceeding the prescribed maximum. *Id.* ¶ 165. For instance, in FY 2018, the FPIs' CBA set minimum salaries for the lowest-grade FPIs at $46,607 for new hires, and $53,598 for incumbents. *Id.* ¶ 166. Plaintiffs submit data indicating that eighty-eight percent of FPIs at that grade were paid at the minimum salary rate, and ninety-nine percent were paid within $400 of the CBA minimum. *Id.* ¶ 167. By contrast, the BIs' CBA established minimum salaries for inspectors at $49,862 for new hires and $57,341 for incumbents. *Id.* ¶ 166. It further set minimum salaries for senior inspectors at $51,328 for new hires and $59,027 for incumbents. *Id.* The salary data for inspectors and senior inspectors indicates that 365 of the 420 BIs at these levels were paid $61,800, or nearly $12,000 above the inspector new hire minimum salary; and the remainder were paid at higher levels. *Id.* ¶ 168. Plaintiffs allege that because of the differences in the racial composition of FPIs and BIs, this practice has resulted in a disparate impact in base compensation—and correspondingly, overtime pay, pensions, and other benefits—which unfairly disadvantages the minority FPIs. *Id.* ¶¶ 173, 177.

Finally, Plaintiffs allege that these compensation disparities are part of a broader pattern of racial discrimination perpetuated by the FDNY, wherein predominantly-minority

FPIs are treated less favorably than firefighters, who are over eighty percent white, and emergency medical service ("EMS") employees, who are about fifty percent white. *Id.* ¶ 142. For instance, Plaintiffs allege that firefighters receive significantly higher base salary ranges, and more generous pension, medical, dental, and educational benefits than FPIs. *Id*. ¶¶ 143–46.  Plaintiffs also contend that FPIs are provided with less safety and protective equipment than firefighters and EMS employees, are not honored or recognized at FDNY awards ceremonies, and are required to wear uniforms that differ from other FDNY employees. *Id.* ¶¶ 147–49.

## DISCUSSION

I. <u>Rule 12(b)(6) Standard</u>

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions." *Twombly*, 550 U.S. at 555.  The court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  On a Rule 12(b)(6) motion, the court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, or documents that the plaintiff knew about and relied upon. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

II. Use of Building Inspectors as Comparators

The City first argues that Plaintiffs have failed to plausibly allege an inference of discrimination that supports their disparate treatment and disparate impact claims, because their chosen comparators—BIs—are not sufficiently similar to Plaintiffs.  Def. Mem. at 6–11, ECF No. 26.  The Court disagrees.

  A. Title VII, § 1981, and NYCHRL Disparate Treatment Claims

Claims of disparate treatment under Title VII and § 1981 are analyzed under the same substantive standards of the *McDonnell Douglas* burden-shifting framework.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Vivienzo v. City of Syracuse*, 611 F.3d 98, 106 (2d. Cir. 2010).  To establish a prima facie case of discrimination under *McDonnell Douglas*, Plaintiffs must demonstrate that they (1) are members of a protected class; (2) are qualified for their positions; (3) suffered an adverse employment action; which (4) took place under circumstances giving rise to the inference of discrimination.  *Ruiz v. County of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010).

To survive a motion to dismiss, the complaint "must be facially plausible and allege sufficient facts to give the defendant fair notice of the basis for the claim; it need not, however, make out a prima face case," *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 228 n.10 (2d Cir. 2014), though the elements of a prima facie case "provide an outline of what is necessary" to render such claims plausible.  *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 461 (S.D.N.Y. 2013) (citation omitted).  At this stage, "a plaintiff has a *minimal* burden of alleging facts suggesting an inference of discriminatory motivation." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (emphasis in original) (quotation marks and citation omitted).

Plaintiffs can raise an inference of discriminatory intent by showing "more favorable treatment of employees not in the protected group." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009) (citation omitted), *superseded by statute on other grounds*. In such cases, they must "show that [they] shared sufficient employment characteristics with the comparator so that they could be considered similarly situated in all material respects." *McDowell v. N. Shore-Long Island Jewish Health Sys., Inc.*, 839 F. Supp. 2d 562, 568 (E.D.N.Y. 2012). This does not require "a showing that both cases are identical." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000). Rather, Plaintiffs need only allege facts demonstrating the two groups are "sufficiently similar 'to support at least a minimal inference that the difference of treatment may be attributable to discrimination.'" *McDowell*, 839 F. Supp. 2d at 569 (quoting *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d. Cir. 2001)).

Plaintiffs raise an "atypical discrimination claim," in that they "do[] not rely on a comparator group of [non-minority] 'co-employees.'" *Hill v. City of New York*, 136 F. Supp. 3d 304, 335 (E.D.N.Y. 2015). Rather, Plaintiffs allege that the City's discriminatory intent can be inferred from the fact that the predominantly-minority FPIs are paid significantly lower salaries than BIs of comparable titles, with comparable job functions—who are also likelier to be white. Compl. ¶¶ 31–102. But the City contends that Plaintiffs' claims fail, because BIs are not "similarly situated" to FPIs in all material respects, citing several factual distinctions between the groups. Def. Mem. at 6–11.

At this early stage of litigation, the Court cannot agree. It is well-established that "'[w]hether . . . employees are similarly situated . . . presents a question of fact,' rather than a legal question to be resolved on a motion to dismiss." *Brown*, 756 F.3d at 230 (citing *Graham*, 230 F.3d at 39); *see also Woods v. Newburgh Enlarged City Sch. Dist.*, 288 Fed.

7

App'x 757, 760 (2d Cir. 2008) (noting it is "a rare case" where the similarity of comparators' situations "can be resolved as a matter of law").  In this Circuit, the question of whether comparators are sufficiently similar is typically resolved at the earliest at the summary judgment stage, following discovery.  *E.g., Ulrich v. Moody's Corp.*, No. 13 Civ. 8, 2017 WL 1232709, at *11–12 (S.D.N.Y. Mar. 13, 2017) (ruling on similarity of comparators on motion for summary judgment), *aff'd* 721 Fed. App'x 17 (2d. Cir. 2018); *Villar v. City of New York*, 135 F. Supp. 3d 105, 121–22 (S.D.N.Y. 2015) (same); *Canales-Jacobs v. N.Y. State Office of Court Admin.*, 640 F. Supp. 2d 482, 504–05 (S.D.N.Y. 2009) (same).  To survive a motion to dismiss, Plaintiffs need only allege facts that give "plausible support to a minimal inference of discriminatory motivation."  *Vega*, 801 F.3d at 84.  The Court finds that Plaintiffs have met that low bar.  Plaintiffs allege that FPI and BI positions have "similar" educational requirements, including the same number of required college credits towards a degree, Compl. ¶¶ 35–37, that FPIs and BIs must sit for exams of a similar duration that cover similar subject matters, *id.* ¶ 39, and that FPIs and BIs undergo City-administered training in a "virtually identical" range of subjects, *id.* ¶¶ 40–41.  They further allege "substantial[] overlap" in the field inspections conducted by BIs and FPIs, including examinations of the same kinds of buildings under the same circumstances, and requiring review of the same plans and specifications stored on a shared database.  *Id.* ¶¶ 42–43, 45–46.  FPIs and BIs may both issue certificates allowing occupancy or use of the premises at the close of the inspection.  *Id.* ¶¶ 49, 51.  And BIs and FPIs work "on an equal and collaborative footing" on various joint task forces.  *Id.* ¶¶ 54–55.

It may well be that the numerous distinctions Defendants point out will ultimately doom Plaintiffs' case at a later stage of litigation.  But given the nuances and complexities

inherent in a putative class-wide employment discrimination suit, for the Court to accept the City's arguments at this early juncture would amount to "improper fact-finding at the pleading stage."[2] *Minto v. Molloy Coll.*, No. 16 Civ. 276, 2021 WL 1394329, at *11 (E.D.N.Y. Jan. 21, 2021). Drawing all reasonable inferences in Plaintiffs' favor, the Court finds Plaintiffs have plausibly alleged that FPIs and BIs "work together and in tandem to perform the same function," and thus have plausibly alleged these groups are similarly situated. *Hill*, 136 F. Supp. 3d at 335–36.

        B.      <u>Title VII and NYCHRL Disparate Impact Claims</u>

Plaintiffs also allege that the City's facially neutral practice of paying FPIs the minimum allowed under their CBA, while paying BIs "much more than the minimum" range prescribed by their CBA, has resulted in a disparate impact actionable under Title VII and the NYCHRL because the predominantly-minority FPIs receive lower compensation than predominantly-white BIs. Compl. ¶ 165.

Under Title VII, to make a prima facie showing of disparate impact, a plaintiff must "(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012) (quotation marks and citations omitted). Unlike a disparate treatment claim, a disparate impact claim "does not require the plaintiff to show that the defendant *intended* to discriminate against a particular group." *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 207 (2d Cir. 2020) (emphasis in original). To survive a motion to dismiss,

---

[2] The Court declines to take judicial notice of the notices of examination (the "Notices") for the FPI and BI positions proffered by the City. *See* ECF Nos. 27-2, 27-3. The Court cannot take judicial notice of documents for the "truth of the matters asserted." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d. Cir 1991). Here, the City asks the Court to do precisely that—that is, to assume that the Notices actually describe in full the relevant requirements and descriptions of the FPI and BI positions, such that the Court could conclude that the BI position is too dissimilar to serve as an adequate comparator to the FPI job. Def. Mem. at 9–10. The Court, therefore, will not consider the Notices at this stage.

Plaintiffs must merely allege sufficient facts to support a plausible claim that an employer's facially neutral practice or policy disproportionately and adversely affects a particular protected group. *Malone v. N.Y. Pressman's Union No. 2*, No. 7 Civ. 9583, 2011 WL 2150551, at *7 (S.D.N.Y. May 31, 2011).

Plaintiffs often rely on statistical evidence to "show a disparity in outcome between groups" and thus "nudge [such a] claim across the line from conceivable to plausible[.]" *Mandala*, 975 F.3d at 209. At the motion to dismiss stage, Plaintiffs are not required "to prove in detail the methodological soundness of [their] statistical assessment" or to "supplement [the complaint's] statistical analysis with corroborating evidence," but "the statistics must plausibly suggest that the challenged practice *actually* has a disparate impact." *Id*. at 209–10 (emphasis in original). The statistical analysis must therefore, at minimum, "focus on the disparity between appropriate comparator groups" or "reveal disparities between populations that are relevant to the claim . . . plaintiff[s] seek[] to prove." *Id*. at 210.

As discussed, at this early stage of the litigation, Plaintiffs have plausibly alleged that BIs are an appropriate comparator group for FPIs. *See supra* § IIA. Moreover, Plaintiffs' statistical analysis, based on publicly available data, demonstrates that, between FYs 2008 and 2019, on average FPIs were paid lower salaries than BIs at comparable job grades. Compl. ¶¶ 61–98. It further indicates the gap between median FPI and BI pay has "grown steadily" over the last twelve years. *Id.* ¶ 99. Plaintiffs attribute this to the City's practice of "pay[ing] the great majority of FPIs the minimum allowed under Local 2507's CBA" while "pay[ing] virtually every BI far more than the allowed minimum[.]" *Id.* ¶ 172. Among other examples, Plaintiffs allege that ninety-nine percent of FPI fire protection inspectors in FY 2018 were paid "at or within $400 of the minimum [for new hire and incumbent salaries] prescribed in

the CBA." *Id.* ¶ 167.  In the same year, eighty-seven percent of BI inspectors and senior inspectors (the equivalent BI job titles)[3] received salaries that started at almost $12,000 higher than the minimum new hire salary set forth in the BIs' CBA.  *Id.* ¶¶ 168–69.  Thus, the Court finds that Plaintiffs have plausibly alleged that the City's practice of paying predominantly-minority FPIs the minimum salary prescribed by their CBA, while paying predominantly-white BIs significantly more than the minimum salary established in their CBA, has "disproportionately and adversely" affected minority FPIs in terms of their compensation.  At this stage, no further showing is needed.[4]

  III.  <u>White FPIs' Claims Under Title VII and NYCHRL</u>

The City next contends that the white FPIs cannot state a claim for disparate treatment under Title VII and the NYCHRL because they cannot allege they were discriminated against on the basis of their race.  Def. Mem. at 4–5.  The City also argues that white FPIs cannot claim associational discrimination under Title VII and the NYCHRL because they do not sufficiently allege the kind of interpersonal relationships with the minority FPIs this Circuit's precedents have recognized as a basis for associational discrimination claims.  *Id.* at 5–6.  The Court agrees.

  A.  <u>Title VII Claims</u>

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual . . . *because of such individual's race*[.]"  42 U.S.C.

---

[3] Plaintiffs indicate that the BI "senior inspector" title is used only for current incumbents and will be eliminated when persons with that title stop working, and that it is the same grade as "inspector."  Compl. ¶ 60.

[4] As the Court has determined Plaintiffs' federal disparate treatment and disparate impact claims are sufficient to withstand the motion to dismiss, it concludes Plaintiffs' NYCHRL claims similarly survive, because "federal . . . civil rights laws [are] a floor below which the City's Human Rights law cannot fall."  The Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85 § 1 (Oct. 3, 2005); *see, e.g., Clarke v. InterContinental Hotels Grp., PLC*, No. 12 Civ. 2671, 2013 WL 2358596, at *11 n.13 (S.D.N.Y. May 30, 2013) (denying motion to dismiss NYCHRL retaliation claim, "without further analysis," because the court had denied defendant's motion to dismiss plaintiff's Title VII claims).

§ 2000e-2(a)(1) (emphasis added).  Plaintiffs argue that it is "inherent" in their discrimination claim that because the City "discriminates against the white FPIs for being in the minority[,] they . . . are discriminated against because of their race."  Pl. Opp'n at 20–21, ECF No. 34.  They contend the present matter is analogous to situations where "plaintiffs claim they had been injured by discrimination directed against them because of their association with members of a protected class."  *Id.* at 21.

But this Circuit's precedents, including those cited by the Plaintiffs, make clear that a white employee suffers discrimination because of the employee's own race where "an employer disapproves of interracial association," and therefore subjects the white employee to adverse action on that basis.  *Holcolmb v. Iona Coll.*, 521 F.3d 130, 138–139 (2d Cir. 2008); *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 112–113 (2d Cir. 2018) (concluding "from the perspective of associational discrimination, sexual orientation discrimination—which is motivated by an employer's opposition to romantic association between particular sexes—is discrimination based on the employee's own sex").

Although the Court declines to read these precedents so narrowly as to require a "romantic interpersonal relationship" for a claim of associational discrimination, it agrees with the City that at this stage, to state a claim under Title VII, Plaintiffs must plausibly allege facts that indicate the white FPIs faced adverse action, and that their race was a "motivating factor" in such action.  *Vega*, 801 F.3d at 86.  Doing so requires pleading facts supporting that a relationship or association between white FPIs and their minority counterparts existed, the City disapproved of this interracial association, and such disapproval was, at least in part, a basis for the discrimination the white FPIs experienced.  *E.g., Holcomb*, 521 F.3d at 138 (upholding associational discrimination claim based on defendants' racially insensitive

12

comments about the white plaintiff's marriage to a Black woman); *Kauffman v. Maxim Healthcare Servs., Inc.*, No. 4 Civ. 2869, 2006 WL 1983196 (E.D.N.Y Jul. 13, 2006) (recognizing associational discrimination claim where white plaintiff alleged retaliation "on account of his claimed opposition" to defendants' racially-discriminatory hiring policies); *Whitney v. Greater N.Y. Corp. of Seventh-Day Adventists*, 401 F. Supp. 1363, 1366 (S.D.N.Y. 1975) (finding plaintiff's complaint sufficiently stated associational discrimination claim where "as alleged, the defendant disapproved of a social relationship between a white woman and a [B]lack man").

Plaintiffs have failed to make the required allegations. Beyond the inference that white FPIs and minority FPIs hold the same job title, that one individual white plaintiff was "paid less than the average salary" for a comparable BI, Compl. ¶ 24, and the conclusory assertion that "the disparate treatment [in compensation] equally affects the white FPIs who are Plaintiffs and [c]lass members," *id.* ¶ 203, Plaintiffs plead no allegations that specifically relate to white FPIs. They do not indicate that white FPIs and their minority counterparts have a "relationship"—personal, social, professional, or otherwise—that goes beyond the tenuous bounds of merely working within the same 400-person department. They do not allege facts indicating that the City disapproved of the interracial relationship between white and minority FPIs, and they do not allege that there is a causal link between the compensation disparities white FPIs face compared to similarly situated BIs and the City's disapproval of interracial relationships or associations. And, although they generally describe FPIs' advocacy for improved working conditions and benefits, they do not allege that white FPIs have experienced consequences with respect to, or that white FPIs advocated for, their minority coworkers. Plaintiffs, therefore, have failed to plead sufficient facts—even under the *de*

*minimis* standard required at this stage—that give rise to an inference of discrimination against the white FPIs on the basis of their own race, as Title VII requires. Therefore, Defendant's motion to dismiss the white FPIs' claims under Title VII is GRANTED.[5]

      B.      NYCHRL Claims

The Court analyzes Plaintiff's NYCHRL claims "separately and independently" from any federal law claims, "construing the NYCHRL's provisions broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible[.]" *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (quotation marks and citation omitted). Importantly, unlike Title VII, where associational discrimination claims have been imputed under specific circumstances from the statute, the NYCHRL specifically prohibits employment discrimination against individuals because of "the actual or perceived race . . . of a person with whom such person has a *known relationship or association.*" N.Y.C. Admin. Code § 8-107(20) (emphasis added); *see, e.g., Lapko v. Grand Mkt. Int'l Corp.*, No. 514403-2019, 2020 WL 4818702, at *4 (N.Y. Sup. Ct. Aug. 12, 2020) (finding plaintiff's complaint sufficiently stated claim for associational discrimination under the broader protections of the NYCHRL, but not under Title VII). Unlike the Title VII context, where a white plaintiff must allege discrimination on the basis of their *own* race, NYCHRL "allow[s] claims by persons who were not themselves members of the protected class, but who were personally affected, albeit indirectly, by virtue of the alleged discrimination." *Axelrod v. 400 Owners Corp.*, 733 N.Y.S.2d 587, 590–91 (N.Y. Sup. Ct.

---

[5] The City initially sought dismissal of Plaintiffs' Title VII claims on the ground that Plaintiffs had failed to administratively exhaust these claims because they had not yet received a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC") despite filing a charge. Def. Mem. at 3. Plaintiffs informed the Court on November 6, 2020, that they had undertaken diligent efforts to obtain their right-to-sue letters and finally received copies via e-mail, rather than mail, on November 5, 2020. ECF No. 37. Because the parties agree that this development rendered the City's administrative exhaustion argument moot, the Court does not address it here. *Id.*

2001); *see also Morton v. 303 W. 122nd St. H.D.F.C.*, No. 100677-09, 2011 WL 2790597, at *1 (N.Y. Sup. Ct. Jul. 7, 2011) (collecting cases).  To maintain a claim under the NYCHRL, therefore, Plaintiffs "must simply allege that [the white FPIs] suffered an independent injury because of its relationship with [the predominantly minority FPIs], who allege[] unlawful discriminatory practices related to [their] terms, conditions, or privileges of employment." *Zhang v. Jenzabar, Inc.*, No. 12 Civ. 2988, 2015 WL 1475793, at *12 (E.D.N.Y. Mar. 30, 2015).

      Affording Plaintiffs' claims the broadest possible construction and drawing all reasonable inferences in their favor, the Court nevertheless finds that, even under this more flexible standard, Plaintiffs' factual allegations as to the white FPIs are too scant to establish a cause of action.  Plaintiffs do not plead facts that go to the "independent injuries" white FPIs have suffered, or the relationship between them and their minority counterparts.  Even cases under the NYCHRL require this bare showing.  *E.g., Lapko*, 2020 WL 4818702, at *1–2, 4 (upholding national origin associational discrimination claim under the NYCHRL where plaintiff alleged defendants asked about his ties to a pro-Russia town and subjected him to adverse employment action thereafter).

Accordingly, Defendant's motion to dismiss the white FPIs' claims under NYCHRL is GRANTED.

## CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is GRANTED as to the claims of the white FPIs under Title VII and the NYCHRL, and DENIED in all other respects. The Clerk of Court is directed to terminate the motion at ECF No. 25.

SO ORDERED.

Dated: September 16, 2021
New York, New York

_____
ANALISA TORRES
United States District Judge