UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DARRYL CHALMERS, DARREN CONNORS, GLENN
MENDEZ, JAMES NOVA, FATIMA Q. ROSEMOND,
and AFSCME DISTRICT COUNCIL 37 LOCAL 2507,

Plaintiffs,

-against-

CITY OF NEW YORK,

Defendant.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___9/19/2022_

20 Civ. 3389 (AT)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiffs Darryl Chalmers, Darren Connors, Glenn Mendez, James Nova, and Fatima Q.

Rosemond, fire protection inspectors and associate fire protection inspectors (collectively,

"FPIs") employed by the Fire Department of the City of New York (the "FDNY"), and their

representative union, AFSCME District Council 37 Local 2507 (the "FPI Union"), bring this

putative class action against Defendant, the City of New York (the "City"), alleging employment

discrimination on the basis of race in violation of 42 U.S.C. §§ 1981 and 1983, Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 *et seq.* ("Title VII"), and the New York City

Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* (the "NYCHRL").  Amend. Compl. ¶¶

20, 22, 27–31, ECF No. 69.

Before the Court are the parties' motions to exclude expert testimony, ECF Nos. 61, 80,

and Plaintiffs' motion for certification of a class and subclass and appointment of class counsel,

ECF No. 61.  For the reasons stated below, Plaintiffs' motion to exclude expert testimony is

GRANTED in part and DENIED in part; the City's motion to exclude expert testimony is

DENIED; Plaintiffs' motion to certify a class is GRANTED; Plaintiffs' motion to certify a

subclass is GRANTED; and Plaintiffs' motion to appoint class counsel is GRANTED.

## BACKGROUND[1]

I.    <u>Plaintiffs' Allegations of Pay Discrimination</u>

FPIs are employed by the FDNY to conduct inspections of buildings, facilities, vehicles, and public activities in New York City to ensure compliance with safety codes, rules, and regulations.  Amend. Compl. ¶ 1.  Prior to 1990, the majority of FPIs were white, but in the last three decades, the proportion of racial minority FPIs has increased significantly.  *Id.* ¶ 2.  Currently, 30% of FPIs identify as white.  *Id.*  Since at least fiscal year ("FY") 2008, the City has paid FPIs salaries substantially lower than those paid to the City's building inspectors ("BIs") employed by the Department of Buildings ("DOB").  *Id.* ¶ 6.  Approximately 50% of BIs are white.[2]  *Id.* ¶¶ 9, 36.

To qualify for an FPI position, applicants must satisfy at least one of the following requirements: (1) possess an associate's degree, which is roughly equivalent to sixty college credits; (2) have a high school diploma and complete twenty college credits, at least nine of which are in subjects related to FPI work; (3) complete a specific type of plumbing program; or (4) obtain three years of full-time experience in fields related to fire protection or inspection for compliance with fire and building codes.  *Id.* ¶ 40.  To qualify for a BI position, applicants must satisfy at least one of the following requirements: (1) complete sixty college credits towards a degree in a field related to BI work; (2) obtain two years of full-time experience in construction; or (3) obtain a license in engineering, architecture, or site safety management.  *Id.* ¶ 41.  The qualifying exams administered by the City's Department of Citywide Administrative Services

---

[1] The facts in this section are taken from the amended complaint and are accepted as true for the purpose of considering a motion to certify a class.  *See Shabazz v. Morgan Funding Corp.*, 269 F.R.D. 245, 249 (S.D.N.Y. 2010) (citation omitted).

[2] Plaintiffs allege that the BI workforce is "predominately white" because the percentage of racial minority BIs during the period at issue, from 2005 to 2020 inclusive, was under forty in ten of those years, between forty and fifty in three of those years, and above fifty in three of those years.  Pl. Mem. at 35, ECF No. 62.

("DCAS") for both FPIs and BIs are similar in subject matter and duration. *Id.* ¶ 43. Both FPIs and BIs undergo City-administered training covering "virtually identical" subject matter, although the training for FPIs is longer in duration. *Id.* ¶¶ 45–46.

FPIs and BIs share the same principal duty of conducting field inspections to ensure conformance with City codes. *Id.* ¶ 48. FPIs and BIs both enforce the City's building codes. *Id.* ¶ 50. FPIs also enforce the City's fire codes. *Id.* In the course of conducting field inspections, both FPIs and BIs review the same building plans and specifications using a shared intranet. *Id.* ¶ 49. FPIs inspect the same types of buildings as BIs, though FPIs inspect one- and two-family homes only as part of joint task forces. *Id.* ¶ 51. FPIs also inspect fire suppression fixtures and equipment; evacuation plans and points of ingress and egress; gas tanks, oil and gas pipelines, and terminals; and hazardous activities such as the storage of flammable materials. *Id.* FPIs and BIs both inspect buildings during construction, repair, alteration, and demolition and in response to reported violations. *Id.* ¶ 52. FPIs also conduct annual or periodic inspections. *Id.* Both FPIs and BIs certify properties or activities for use or habitability. *Id.* ¶¶ 54, 61, 63. FPIs and BIs often work on "an equal and collaborative footing" on joint task forces. *Id.* ¶¶ 66–68.

The FPI and BI positions are not identical. For instance, FPIs, unlike BIs, are peace officers and have the power to issue criminal summonses and court appearance tickets. *Id.* ¶ 65. The two positions have different required work hours and are represented by different unions. *Id.* ¶¶ 135, 182. FPIs face greater physical risks in the course of their work, such as being required to inspect hazardous or combustible materials or enter collapsed buildings, buildings where fires are still smoldering or have recently been extinguished, or buildings in which poisonous fumes or toxic materials are still present. *Id.* ¶¶ 69–71.

FPI and BI job titles are arranged hierarchically, with four tiers of FPI designations and three tiers of BI designations. *Id.* ¶ 72. Based on publicly available data for City employees from FY 2008–2019, the City pays FPIs lower salaries than BIs at comparable levels, even adjusting for regular hours worked per week. *Id.* ¶¶ 73–110. For example, in FY 2019, the entry-level FPI salary range was $46,607 to $66,005, with a median actual salary of $46,607, and the entry-level BI salary range was $61,800 to $80,555, with a median actual salary of $65,087. *Id.* ¶ 108. In that same year, the associate FPI salary range was $59,872 to $81,624, with a median actual salary of $67,073, and the associate BI salary range was $70,161 to $98,347, with a median actual salary of $80,152. *Id.* The gap between median FPI and BI salaries has grown steadily over the past twelve years, from a gap of approximately $2,500 in FY 2008 to a gap of approximately $9,000 in FY 2019. *Id.* ¶¶ 76, 109, 111. FPIs' lower salaries result in lower overtime pay and reduced pension benefits, as these figures are tied to their hourly and annual salary, respectively. *Id.* ¶¶ 8, 114, 132–55. Each individual Plaintiff, including one white FPI, received a salary that was lower than the corresponding average BI salary. *Id.* ¶¶ 28, 113.

The City has engaged in three policies or practices that Plaintiffs allege have caused and perpetuated the pay gap between FPIs and BIs. *Id.* ¶¶ 182–200. First, the City has maintained a policy of paying FPIs the minimum salary established by the FPI Union's collective bargaining agreement ("CBA"), but paying BIs well above the minimum salary prescribed by their union's CBA, and in some cases even exceeding the prescribed maximum. *Id.* ¶ 182. For instance, in FY 2018, the FPIs' CBA set minimum salaries for entry-level FPIs at $46,607 for new hires and $53,598 for incumbents. *Id.* ¶ 183. Eighty-eight percent of entry-level FPIs were paid the CBA minimum, and 99% were paid within $400 of the CBA minimum. *Id.* ¶ 184. By contrast, the BIs' CBA established minimum salaries for entry-level BIs at $49,862 for new hires and $57,341

for incumbents, and for senior BIs at $51,328 for new hires and $59,027 for incumbents.  *Id.* ¶ 183.  In FY 2018, all BIs at these levels were paid at least $61,800—more than the incumbent senior BI minimum salary.  *Id.* ¶ 185.

Second, the City has confined the FPI Union to civilian pattern percentage compensation increases in collective bargaining cycles, even though the New York City Administrative Code (the "Administrative Code") deems FPIs to be uniformed employees for the purpose of collective bargaining.  *Id.* ¶¶ 191–95.  Uniformed pattern percentage compensation increases have either matched or exceeded civilian pattern increases in all relevant years.  *Id.* ¶ 192.  As a result, the FPI Union has been unable to close the pay gap between FPIs and BIs through collective bargaining.  *Id.* ¶ 195.  Third, the City failed to monitor instances of occupational segregation resulting in pay discrimination against racial minority employees across agencies with employees who perform similar work.  *Id.* ¶¶ 196–200.

Finally, Plaintiffs allege that the compensation disparity between FPIs and BIs is part of a history of racial discrimination perpetuated by the FDNY, wherein predominantly racial minority FPIs have been and continue to be treated less favorably than firefighters, who are over 80% white, and emergency medical services ("EMS") employees, who are about 50% white.  *Id.* ¶¶ 156–67.  For instance, firefighters receive significantly higher salaries and more generous overtime, pension, disability, medical, dental, and educational benefits than FPIs.  *Id.* ¶¶ 159–62.  And, FPIs are provided with less safety equipment than firefighters and EMS employees, excluded from FDNY awards ceremonies, and required to wear uniforms that differ from other FDNY employees.  *Id.* ¶¶ 164–67.

II.  <u>Procedural History</u>

On May 1, 2020, Plaintiffs filed a putative class action alleging disparate impact and disparate treatment based on racial discrimination in violation of Title VII and the NYCHRL. Compl. ¶ 16, ECF No. 1.  On September 21, 2020, the City filed a motion to dismiss the complaint.  ECF No. 25.  The City argued that FPIs and BIs are not similarly situated in all material respects such that BIs are not an appropriate comparator group on the basis of which Plaintiffs can support an inference that the difference in pay between the two groups is attributable to discrimination.  Order I at 7, ECF No. 63.  The City also argued that Plaintiffs did not sufficiently allege interpersonal relationships with racial minority FPIs to state a claim for associational discrimination against white FPIs.  *Id.* at 11.  On September 16, 2021, the Court granted the City's motion as to the white FPIs' associational discrimination claims and denied the City's motion in all other respects.  *Id.* at 11, 13–14, 16.  The Court held that whether employees are similarly situated presents a question of fact, and that Plaintiffs plausibly alleged sufficient facts to support an inference of discrimination.  *Id.* at 7–8.  The Court further held that Plaintiffs did not allege sufficient facts to support the associational discrimination claims of white FPIs.  *Id.* at 13–14, 16.

On October 12, 2021, Plaintiffs filed an amended complaint.  ECF No. 69.  Plaintiffs renewed the white FPIs' associational discrimination claims.  *See* Order II at 1, ECF No. 93.  On November 9, 2021, the City moved to dismiss those claims.  *See* ECF No. 73; Order II at 5.  On June 9, 2022, the Court denied the City's motion, finding that Plaintiffs adequately alleged independent injuries to white FPIs based on their association or relationship with racial minority FPIs.  Order II at 11.

On August 30, 2021, Plaintiffs filed a motion to certify a class and subclass, appoint class counsel, and exclude the testimony of the City's expert.  ECF No. 61.  On November 22, 2021, the City filed a motion to exclude the testimony of Plaintiffs' experts.  ECF No. 80.  The Court first addresses the parties' motions to exclude expert testimony, then considers Plaintiffs' motion for certification of a class and subclass and appointment of class counsel.

## DISCUSSION

I.    Expert Testimony[3]

A.  Legal Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which states that an expert qualified "by knowledge, skill, experience, training, or education may testify" if: (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) the expert's testimony "is based on sufficient facts or data;" (3) the expert's testimony is "the product of reliable principles and methods;" and (4) the expert "has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  An expert's testimony must also be "relevant to the task at hand."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied."  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

---

[3] The U.S. Supreme Court has not definitively ruled on the extent to which a district court must conduct a *Daubert* analysis at the class certification stage, but it has suggested in dicta that a *Daubert* analysis may be required. *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 269 (S.D.N.Y. 2018) (citing *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013)).  Courts in this district have routinely assumed without deciding that *Daubert* applies at the class certification stage.  *See id.*; *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 393 (S.D.N.Y. 2018).  The parties to this action also assume that *Daubert* applies.  Therefore, the Court shall apply *Daubert*.

When assessing a motion to exclude expert testimony, a court must first address "the threshold question of whether a witness is 'qualified as an expert . . . to render his or her opinions.'" *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005) (quoting Fed. R. Evid. 702). Next, the court must determine whether the proffered expert testimony is reliable, considering "the theory's testability, the extent to which it 'has been subjected to peer review and publication,' the extent to which a technique is subject to 'standards controlling the technique's operation,' the 'known or potential rate of error,' and the 'degree of acceptance' within the 'relevant scientific community.'" *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015) (quoting *Daubert*, 509 U.S. at 593–94). A court should only exclude expert testimony if flaws in the expert's reasoning or methodology are "large enough that the expert lacks good grounds for his or her conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (quotation marks and citation omitted). Finally, the court must determine whether the expert's testimony will assist the trier of fact. *Nimely*, 414 F.3d at 397 (citations omitted). The testimony must be relevant and not "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help." *Arista Records LLC v. Lime Grp. LLC*, No. 06 Civ. 5936, 2011 WL 1674796, at *4 (S.D.N.Y. May 2, 2011) (quoting *United States v. Mulder*, 273 F.3d 91, 104 (2d Cir. 2001)).

B.  Plaintiffs' Experts

The City moves to exclude the testimony of Plaintiffs' experts. Def. Mem. at 35–40, ECF No. 81. Plaintiffs offer the testimony of Harold W. Goldstein, PhD, and Charles A. Scherbaum, PhD (collectively, "G&S"), industrial and organizational ("I/O") psychology professors, on the similarity of the FPI and BI jobs, the racial composition of the FPI and BI workforces, the difference in pay between FPIs and BIs, and whether a job-relevant rationale for

a difference in pay exists.  G&S Report at 9, ECF No. 62-10.  G&S's report concludes that: (1) the FPI and BI jobs are similar; (2) the racial composition of the FPI and BI workforces are statistically significantly different; (3) BIs are paid statistically significantly more than FPIs; and (4) G&S could not identify any job-relevant reasons supporting a difference in pay.  *Id.* at 57.

The City does not contest G&S's qualifications.  *See* Def. Mem. at 35–40.  Rather, the City argues that G&S's opinion regarding the similarity of the FPI and BI jobs is methodologically flawed.  *Id.* at 36–40; Def. Reply at 3–4, 6–7, ECF No. 87.  The City contends that G&S's remaining opinions regarding racial composition, pay differences, and the existence of job-relevant explanations for pay differences "merely summarize data available publicly," and that if G&S's opinion on job similarity is excluded, their remaining opinions would no longer be "necessary or appropriate."  Def. Reply at 1–2.

1.   Job Similarity

The City contends that G&S's analysis is methodologically flawed for two reasons: (1) G&S rely primarily on a public U.S. Department of Labor ("DOL") website which does not contain data sufficient to support their opinion, and (2) G&S do not adequately explain their conclusion that certain critical tasks performed by FPIs and BIs are similar.  Def. Mem. at 37–39. The Court finds the City's arguments unpersuasive.

The City contends that O*NET, the DOL website on which G&S rely, contains categories relating to work activities, knowledge, skills, job zones, and related occupations that are so exceedingly broad that they are essentially useless in comparing the BI and FPI jobs.  *Id.* at 37.  And, it insists that G&S should assess whether other job titles on O*NET also overlap with the FPI or BI job titles in order to determine whether the O*NET categories are too broad to provide useful points of comparison.  *Id.*  The City points out, for example, that FPIs and BIs are

in the same "job zone" as flight attendants.  *Id.*  It concludes that, because G&S do not assess the potential overbreadth of the O*NET categories, G&S "fail[] to test their own theory of the case" and their opinion is therefore unreliable.  *Id.*

The City is incorrect.  First, O*NET is a reputable source regularly relied upon by experts in G&S's field of I/O psychology to assess job similarity.  G&S Report at 21 (collecting academic publications); *see also* F.P. Morgeson & E.C. Dierdorff, *Work Analysis: From Technique to Theory*, *in* 2 APA HANDBOOK OF INDUSTRIAL & ORGANIZATIONAL PSYCHOLOGY 3–41 (S. Zedeck ed., 2011); F.P MORGESON, M.T. BRANNICK, & E.L. LEVINE, JOB AND WORK ANALYSIS: METHODS, RESEARCH, AND APPLICATIONS FOR HUMAN RESOURCE MANAGEMENT (2019).  Second, G&S apply a methodology common to experts in the field of I/O psychology.  They define job similarity as an overlap of 75% or greater in work activities, tasks, knowledge, skills, or abilities, and use a well-recognized formula for calculating similarity.  G&S Report at 23; *see also* Leaetta M. Hough & Teresa L. Russell, *Metrics for Assessing Similarity of Jobs*, 15 INDUS. & ORGANIZATIONAL PSYCH. 55–60 (2022) (discussing methods used in the field of I/O psychology to determine job similarity, including the Gibson-Caplinger similarity index).  G&S assess thirty-four work activities rated as "important" on O*NET and determine that there is approximately 89% overlap between the FPI and BI jobs; thirteen knowledge areas rated as "important" and determine that there is approximately 77% overlap; twenty skills rated as "important" and determine that there is approximately 78% overlap; and twenty-one abilities rated as "important" and determine that there is approximately 93% overlap.  G&S Report at 23–24, 27, 29, 31.

Although the City argues that the O*NET categories are so broad that obviously unrelated jobs would also be deemed similar to the FPI and BI jobs using G&S's methodology,

this is a red herring.  It may very well be that a particular task or skill that G&S include in their analysis is classified as "important" on O*NET for various jobs ranging from nuclear technicians to photographers.  *See* Def. Reply at 3–4.  But, G&S do not conclude that the FPI and BI jobs are similar based on one task or skill that may be applicable to many jobs.  G&S use eighty-eight distinct points of comparison.  G&S Report at 23–24, 27, 29, 31.  G&S also validate the results of their O*NET comparison by conducting a second similarity analysis using the BI job analysis, FPI Notice of Examination ("NOE"), and FPI training materials and performance appraisal documents provided by the City.  G&S Report at 35–40; Pl. Reply at 17–18, ECF No. 86.

With respect to G&S's second similarity analysis using City documents, the City argues that G&S do not adequately explain their reasoning that certain critical tasks are similar.  Def. Mem. at 38–39.  For instance, G&S conclude without explanation that the FPI task of conducting inspections for violations of laws, rules, and regulations related to fire hazards is similar to the BI tasks of inspecting structures under construction, alteration, or repair for conformance with applicable laws and rules; assessing site conditions for conformance to laws and rules; and performing sweeps of work sites and structures for conformance with laws and rules.  *Id.*; G&S Report at 36.  The City also claims that some critical tasks G&S compare are overbroad and would be similar across a wide variety of jobs.  Def. Mem. at 38–39.  It contends that G&S's opinion is conclusory and based on "nothing more than their own *ipse dixit*."  *Id.*

The Court finds that G&S sufficiently explain their conclusions regarding comparisons of specific critical tasks.  G&S clearly state that the ancillary documents describing the FPI job, such as the FPI NOE, training materials, and performance appraisal documents, are less detailed and less specific than the BI job analysis provided by the City.  G&S Report at 35, 39.  The City argues that G&S should conduct their own job analysis for the FPI position, Def. Reply at 2–3,

11

but the lack of a comparable FPI job analysis is due to the City's failure to locate those documents, Lieder Decl. ¶ 13, ECF No. 62-13.  G&S rely on the next best available information. G&S Report at 35.  The City does not contend that the ancillary documents are inaccurate or unreliable.  Further, understanding the limitations of the ancillary documents, G&S include in their analysis only critical tasks for which there is sufficient information to make a valid comparison to the BI job analysis.  *Id.* at 35, 39.  G&S apply the same similarity index methodology to their assessment of critical tasks based on the ancillary documents as they do for their O*NET analysis, using thirty-two points of comparison.  G&S Report at 35.

The Court finds that the information in the ancillary documents provides "sufficient facts or data" on the basis of which G&S could reasonably conduct a job similarity analysis, *Amorgianos*, 303 F.3d at 265, that G&S apply a reliable methodology, as discussed above, and that there is not "too great an analytical gap between the data and the opinion proffered" such that exclusion of G&S's opinion is warranted, *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 426 (E.D.N.Y. 2011) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  To the extent the City complains of a lack of detail or specificity in the ancillary documents, that critique goes to the weight of G&S's opinion, not its admissibility.  *See id.* ("Where an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may go to the weight, not the admissibility of the expert's testimony.") (quoting *Amorgianos*, 303 F.3d at 267 (quotation marks and alteration omitted)).

The City also contends that G&S ignore evidence of differences between the FPI and BI jobs, noting specifically Plaintiffs' deposition testimony regarding the cachet associated with working for the FDNY, Def. Reply at 7, and G&S's failure to rebut the analysis of the City's expert, Christopher Erath, PhD, regarding job mobility between the FPI and BI positions, Def.

Mem. at 39.  The cachet of working for the FDNY has no bearing on the similarity of the tasks, skills, knowledge, and abilities associated with either the FPI or BI jobs and is therefore irrelevant to G&S's expert opinion.  And, G&S do respond to Erath's critique based on lack of job mobility.  G&S Rebuttal at 5, ECF No. 62-12.  G&S state that, in their expert opinion, Erath's assumption—if two jobs are similar apart from salary, mobility between the two jobs will occur—is flawed.  *Id.*  Therefore, G&S do not ignore relevant factors that would render their analysis unreliable.

Finally, the City argues that G&S do not address the relevant question in this case, which is not whether the jobs are similar, but whether they are similar "in all material respects."  Def. Mem. at 40 (emphasis omitted).  However, whether two employees are similarly situated in all material respects is generally a question of fact for the jury.  *Graham v. L.I.R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citing *Taylor v. Brentwood Union Free Sch. Dist.*, 143 F.3d 679, 684 (2d Cir.1998), *cert. denied*, 525 U.S. 1139 (1999), and *Hargett v. Nat'l Westminster Bank*, *USA*, 78 F.3d 836, 839–40 (2d Cir.1996)).  What constitutes "all material respects" varies with the context of each particular case, but G&S's job similarity analysis provides an "objectively identifiable basis for comparability," *id.* at 40 (citation omitted), which can allow a jury to determine whether the jobs are sufficiently similar for Plaintiffs to prevail on the merits.  Therefore, the Court finds that G&S's opinion regarding job similarity is admissible, and the City's motion to exclude G&S's testimony on this point is DENIED.

2.   Racial Composition, Compensation, and Job-Relevant Reasons for Differences in Pay

The City next argues that G&S's remaining opinions should be excluded because they are not helpful to the factfinder.  Def. Reply at 1–2.  The Court disagrees.  First, in concluding that the racial compositions of the BI and FPI workforces are statistically significantly different, G&S

use data from the New York City Workforce Profile Report between 2005 and 2020 and conduct two separate statistical analyses to determine that the difference in racial composition is significant at the 5% level.  *See Smith v. Xerox Corp.*, 196 F.3d 358, 366 (2d Cir. 1999) (noting that, in employment discrimination cases, statistical significance at the 5% level is sufficient), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134 (2d Cir. 2006).  Assessing whether the racial composition of two different workforces is statistically significantly different goes beyond "lay matters" which can be understood without an expert's help, *Mulder*, 273 F.3d at 104, and provides the factfinder with a tool to better understand the evidence so that it may make its ultimate determination, *see Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, No. 12 Civ. 7372, 2020 WL 4251229, at *4 (S.D.N.Y. Feb. 19, 2020) (citation omitted).

Next, in concluding that the compensation of FPIs and BIs is statistically significantly different, G&S use data provided by the DCAS from 2005 to 2020 and conduct various statistical analyses controlling for variables like tenure and regular hours worked per week.  G&S Report at 41–56.  These statistical analyses also go beyond "lay matters" and provide the factfinder with information that assists in interpretation of the evidence.  *Mulder*, 273 F.3d at 104; *see also Fin. Guar. Ins. Co.*, 2020 WL 4251229, at *4.  Finally, G&S conclude based on their analysis of job similarity that there are no job-relevant factors related to the work performed in either job that would justify a statistically significant pay gap.  G&S Report at 5–6, 57.  Again, this opinion is based on reliable data and methodologically sound statistical analyses, goes beyond "lay matters," and offers information that may help the factfinder interpret the evidence.  *Mulder*, 273 F.3d at 104; *see also Fin. Guar. Ins. Co.*, 2020 WL 4251229, at *4.  Accordingly, the City's

motion to exclude G&S's testimony regarding racial composition, compensation, and job-relevant reasons for differences in compensation is DENIED.

## C.   Defendant's Expert

Plaintiffs move to exclude the testimony of the City's expert.  Pl. Mem. at 20–21, ECF No. 62.  The City offers the testimony of Christopher Erath, PhD, an economist and director at BLDS, LLC, on "G&S's failure to consider labor market evidence relevant to" "whether the nature of work performed by [FPIs] is similar to work performed by [BIs]," as well as an assessment of G&S's opinions on "whether there are disparities in racial composition between [FPIs] and [BIs]" and whether "there are differences in compensation between [FPIs and BIs]." Erath Report at 1, ECF No. 62-24.  Erath concludes that: (1) G&S's opinion that FPIs and BIs perform similar tasks "is inconsistent with the lack of movement from FPI to BI" positions; (2) G&S's opinion that the FPI and BI jobs "have similar knowledge, skill, and ability requirements" is "at odds with the requirements for each job"; (3) G&S's data on the racial composition of the FPI and BI workforces is flawed and, even assuming that the data is accurate, it "show[s that] [BIs] were less than 50 percent white in several years"; (4) G&S's opinion that BIs are paid significantly more than FPIs is flawed because it "is based only on base salary and no other element of compensation"; and (5) G&S's opinion that there is no job-related reason for the salary difference between FPIs and BIs "disregard[s] the lack of movement from FPI to [BI positions] and the differences in qualifications sought."  *Id.* at 10.  Plaintiffs do not contest Erath's qualifications; rather, they seek to exclude his testimony on the grounds that it is speculative, methodologically flawed, outside his area of expertise, and opines on matters a factfinder is capable of understanding without expert help.  Pl. Mem. at 21–24, 30–31, 34–35.

1.    Job Mobility

Erath opines that, "[i]f, as [P]laintiffs allege, the FPI and [BI] jobs are similar and [BIs] are paid more, we should observe [FPIs] attempting to switch jobs and become [BIs]."  Erath Report at 2.  He analyzes data on civil service exam applications by 669 people "who held an FPI position during the 2005–2020 period"[4] and finds that twelve applied for a BI exam.  *Id.* Those same 669 people submitted applications for exams for approximately 250 other jobs during the same time period.  *Id.*  Erath concludes that this data is "inconsistent with the notion that the FPI and [BI] jobs are comparable except for compensation."  *Id.* at 3.

Plaintiffs contend that Erath's opinion on job mobility is not helpful to the jury because it is not based on scientific knowledge and addresses only lay matters that a factfinder can understand without an expert's help.  Pl. Mem. at 21–22.  Plaintiffs also argue that Erath does not use a reliable methodology because, among other things, he does not identify a threshold for the extent of job mobility one would expect to see between two similar jobs with differing compensation.  Pl. Reply at 4.  Finally, Plaintiffs claim that the data Erath uses is unreliable because it includes extraneous and irrelevant data, Pl. Mem. at 28–29, and because Erath cannot identify from which database the data was extracted, by whom, or by what method, *id.* at 24; Erath Tr. at 10:9–23, 112:9–114:16, ECF No. 62-25; Erath Report at 2–3.

The Court agrees.  Proposed expert testimony should be excluded if it will not assist the factfinder because it is based on "common sense, the antithesis of expert knowledge."  *Betances v. Fischer*, No. 11 Civ. 3200, 2021 WL 1534159, at *3 (S.D.N.Y. Feb. 23, 2021) (quotation marks and citation omitted); *see also United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008). Erath's opinion that, all else being equal, an employee would prefer the higher paying of two

---

[4] FPI and BI positions are both civil service jobs that require satisfactory completion of a written exam.  *See* Erath Report at 2.

similar jobs, is a matter of common sense, and Erath concedes as much.  During his deposition,

he stated that he had never advanced this theory in any previous case in which he has testified as

an expert because "[i]t's such a basic concept . . . you wouldn't even advance it.  You would just

assume it."  Erath Tr. at 117:20–118:5.  Erath therefore understands this proposition to be

common sense, so much so that he has never before felt compelled to specifically state it.

 The City claims that Erath's opinion is based on the labor economics theory of

compensating wage differentials and not merely common sense.  Def. Mem. at 43–44; Erath

Report at 5.  But, that theory states that "higher wages (than can seemingly be explained by

reference to skill level or human capital) . . . are paid to workers who perform jobs that have

particular hazards or other unpleasant features associated with them."  OVERVIEW

COMPENSATING DIFFERENTIALS, OXFORD REFERENCE, https://www.oxfordreference.com/view/

10.1093/oi/authority.20110803095628783; *see also* Robert S. Smith, *Compensating Wage*

*Differentials and Public Policy: A Review*, 32 INDUS. & LAB. RELS. REV. 339, 339 (1979).  It

does not deal with employee preference for higher pay, all else being equal; rather, it deals with

compensation for *differences* between jobs which make one job less desirable.  Further, Erath

relies on the theory of compensating wage differentials in forming his opinion on compensation,

not job mobility.  Erath Report at 5.

 Because the proposition on which Erath relies is common sense, Erath's expert testimony

would be appropriate only to the extent he explains how job mobility, or lack thereof, is related

to job similarity.  *See Medidata Sols., Inc. et al. v. Veeva Sys., Inc.*, No. 17 Civ. 589, 2021 WL

3773464, at *2 (S.D.N.Y. Aug. 25, 2021) (noting that where an expert's analysis is based on a

commonsense proposition, "expert testimony . . . is warranted only to the extent that it explains

*how*" specific observations bear on an issue in dispute (emphasis in original)).  However, Erath

fails to articulate a cognizable methodology for his analysis.  He "articulates no method by which to quantify" job mobility, or the relationship between mobility and job similarity.  *Id.* at *3.  He merely states that "very few" FPIs took the BI exam without identifying a threshold for how many exam applications would evince job similarity.[5]  Therefore, Erath does not articulate a testable methodology, let alone one with a knowable rate of error or standards governing its application.  *See Daubert*, 509 U.S. at 593–94 (listing considerations in assessing methodological reliability).

Moreover, the data on which Erath relies is suspect.  Although Erath claims to have analyzed the number and percentage of FPIs who "attempted to obtain [BI] positions" during the relevant period, his analysis includes extraneous and irrelevant data.  *See* Erath Report at 2–3.  For instance, Erath identifies one person who "served [as a BI], resigned, and then became an FPI."  *Id.*  Evidently, the data includes people who applied for civil service exams *before* they became FPIs.  In his deposition, Erath confirmed that the data on which he relied includes applications submitted by people who were not yet FPIs at the time of the application.  *See* Erath Tr. 136:5–19; 141:15–142:17.  Plaintiffs' expert, Charles Scherbaum, PhD, analyzes the same data and finds that, out of 4,761 datapoints, 1,872 represented applications for civil service exams by people who were not yet FPIs at the time of the application.  Scherbaum Decl. ¶¶ 8–9, ECF No. 62-36.  Therefore, Erath's analysis does not accurately measure whether FPIs attempted to obtain BI positions, or any other civil service positions, because nearly 40% of the data represents people who were not FPIs at the time of their civil service exam application.[6]  For this

---

[5] Erath also seems to treat job similarity as a binary variable, i.e., the FPI and BI jobs either are or are not similar. *See* Erath Report at 3–5.  This is inconsistent with defense counsel's own theory of the case, which treats job similarity as a matter of degree.  *See* Def. Mem. at 4, 29, 41 (arguing that FPIs and BIs are not "sufficiently similar").

[6] Scherbaum also finds that 1,709 datapoints represent applications prior to FY 2005, which is outside the period in dispute, and 706 data points represent applications by entry-level FPIs for promotion to an associate FPI position. *Id.* at ¶ 9.  FPIs applying for promotion within the FPI hierarchy are not attempting to obtain another civil service

reason, his analysis is unreliable. *See Cayuga Indian Nation of New York v. Pataki*, 83 F. Supp. 2d 318, 323 (N.D.N.Y. 2000) (excluding an expert opinion where the data on which the expert relied could not "properly form a basis" for his analysis); *see also Forte v. Liquidnet Holdings, Inc.*, No. 14 Civ. 2185, 2015 WL 5820976, at *8 (S.D.N.Y. Sept. 30, 2015) (excluding Erath's opinion partly because it relied on irrelevant data and, therefore, his analysis lacked probative value), *aff'd*, 675 F. App'x 21, 24 (2d Cir. 2017).

Erath also admits that he cannot attest to the validity of the data. An expert opinion should be excluded where an expert utterly lacks any information regarding the validity or reliability of the data on which they rely. *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 339 (N.D.N.Y. 2021) ("[An expert's] ignorance as to the most basic facts underlying the data he relies on . . . precludes any assessment of the validity of [his opinion], and thus warrants exclusion." (quotation marks, citation, and alterations omitted)). Erath does not know who prepared the spreadsheet on which he relies, from what records the data was obtained, whether the dataset is complete or accurate, *see* Erath Tr. 112:9–114:16, or even the time period covered by the dataset, *compare* Erath Report at 2 ("I obtained data showing exams applied for . . . during the 2005–2020 period.") *with* Erath Tr. 132:16–133:7 (Erath "do[es]n't recall" whether he included in his analysis applications made prior to 2005). For the foregoing reasons, Plaintiffs' motion to exclude Erath's opinion on job mobility is GRANTED.

### 2. Job Similarity

Erath opines that one potential reason for the lack of mobility between the FPI and BI jobs is that FPIs do not qualify for BI jobs. Erath Report at 3. As explained above, Erath's opinion regarding job mobility is excluded. But, because Erath lists his opinion on job mobility

---

job, and therefore should not be included in Erath's analysis of mobility. Defendants do not dispute Scherbaum's calculations, which show that approximately 90% of the data on which Erath relies is irrelevant.

separately from his opinion that "the requirements of each job" are "at odds" with G&S's conclusion that "the jobs have similar knowledge, skill, and ability requirements," *id.* at 10, the Court will consider his job similarity opinion independently.

Erath obtained the Notices of Examination ("NOEs") for FPIs from 2009 to 2015, *id.*, and for BIs from 2010, 2014, and 2019. *Id.* at 4. His report excerpts the educational and experience requirements from the respective NOEs and quotes from a BI NOE, although it is unclear which year's NOE is quoted. *Id.* at 4–5. Erath then concludes that "knowledge, experience and education requirements clearly differ" between the FPI and BI jobs, and therefore the two jobs are dissimilar. *Id.* at 5. Plaintiffs argue that Erath is not qualified to opine on job similarity, as it is outside his area of expertise, and that his opinion is conclusory and amounts to nothing more than his own *ipse dixit*. Pl. Mem. at 23–24. The Court agrees.

First, Erath states in his report that he "[is] not a job content expert and take[s] no position on the 'nature of the work' portion of the G&S report beyond the labor market evidence described [in his report]." Erath Report at 2 n.1; *see also* Erath Tr. 31:23–33:13. Yet, he purports to compare the skills and abilities required to perform the FPI and BI jobs, *id.* at 3–5, which is squarely within the "nature of the work" portion of G&S's report, *see* G&S Report at 20–40. Erath provides no labor economics theory or labor market evidence supporting his conclusion regarding job similarity; he relies solely on his comparison of the NOEs, without explaining his methodology. *See* Erath Report at 3–5. Thus, by his own admission, Erath is not qualified to proffer an opinion about job similarity based on a comparison of job requirements. *See Nimely*, 414 F.3d at 396 n.11 (An expert must be "qualified . . . by knowledge, skill, experience, training, or education to render his [ ] opinions." (quoting Fed. R. Evid. 702) (quotation marks omitted)).

Second, even if Erath were qualified to render an opinion on job similarity, his report merely quotes from the NOEs and explicitly identifies only one difference between the FPI and BI exams.  *See* Erath Report at 3–5.  Erath does not explain how he compares the duties and requirements of each job.  Because Erath does not provide any methodological explanation connecting his conclusion to the data, there is "too great an analytical gap between the data and the opinion proffered."  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Chen-Oster v. Goldman, Sachs & Co.*, No. 10 Civ. 6950, 2022 WL 814074, at \*18 (S.D.N.Y. Mar. 17, 2022) (excluding an expert's conclusory opinion); *In re Rezulin Prod. Liab. Litig.*, 369 F. Supp. 2d 398, 426 (S.D.N.Y. 2005) (excluding an expert opinion where the expert failed to offer an explanation of her methodology).  Thus, Plaintiffs' motion to exclude Erath's opinion on job similarity is GRANTED.

### 3.   Racial Composition

Erath opines that: (1) G&S's comparison of the racial composition of the FPI and BI workforces is methodologically flawed because G&S double-count employees that changed jobs within a fiscal year, Erath Report at 8; (2) G&S should have filled in missing race information for employees who had a reported race in one year but not another, *id.*; (3) G&S do not account for the possibility that the applicant pools for the FPI and BI positions differ by race, even though their opinion is premised on the assumption that the racial composition of the FPI and BI workforces should be identical, *id.*; and (4) G&S's conclusion that BIs are predominantly white and FPIs are predominantly racial minorities is contradicted by their own data showing the percentage of racial minority BIs has increased over time and that the BI workforce has been less than 50% white since 2018, *id.* at 9.  Plaintiffs contend that Erath's opinion is not helpful to the factfinder because it is speculative and irrelevant.  Pl. Mem. at 34–35.  The Court agrees with

Plaintiffs as to Erath's opinions about G&S's double-counting of employees, G&S's assumption that the FPI and BI workforces should have identical racial compositions, and G&S's conclusion that BIs are predominantly white. But, Erath's opinion regarding G&S's failure to account for employee race which was reported in some years and not others is admissible.

First, Erath's opinion regarding G&S's double-counting of employees is irrelevant because G&S provide corrected analyses and updated tables. G&S Rebuttal at 12–13, 19–21. G&S's analyses are essentially unchanged, and their results remain statistically significant. *Id.* Erath's opinion is therefore not helpful to the factfinder, as his critique is no longer applicable. *See Chen-Oster*, 2022 WL 814074, at *4 ("Expert evidence is not immune from the relevance requirement of Federal Rule of Evidence 401.") (citing *United States v. Khan*, 787 F.2d 28, 34 (2d Cir. 1986)).

Next, Erath's opinion that G&S's calculations are based on the unreasonable assumption that the "qualified applicant pools" for FPI and BI jobs should have identical racial compositions, Erath Report at 8, is irrelevant because racial disparities in hiring are not at issue. Plaintiffs allege that FPIs are treated differently based on the racial composition of the FPI workforce relative to that of the BI workforce. Pl. Mem. at 34–35. Accordingly, G&S assess whether there is indeed a difference in the racial composition of the two workforces. G&S Report at 12–19. Why such a difference exists, or whether it should exist, is irrelevant. Therefore, Erath's opinion on this point must be excluded. *See Chen-Oster*, 2022 WL 814074, at *4 (citing *Khan*, 787 F.2d at 34); *E.E.O.C. v. Bloomberg*, No. 07 Civ. 8383, 2010 WL 3466370, at *6 (S.D.N.Y. Aug. 31, 2010) (Expert evidence must be "sufficiently tied to the facts of the case that it will aid" the factfinder. (quoting *Daubert*, 509 U.S. at 591)).

Further, Erath's opinion that G&S's data is at odds with their conclusion that BIs are predominantly white, Erath Report at 9, is not helpful to the factfinder because it does not present any analysis.  It is solely based on his recitation of data already laid out in tables in G&S's report.  *Id.*  Thus, it does not go beyond "lay matters" which a factfinder can understand without an expert's help.  *Mulder*, 273 F.3d at 104; *see also Fin. Guar. Ins. Co.*, 2020 WL 4251229, at *4.

However, Erath's opinion regarding G&S's failure to substitute missing race information for employees which had a reported race in one year but not another, Erath Report at 8, is admissible.  "[E]xpert opinions which assess or critique another expert's substantive testimony are relevant[.]"  *Deutsch*, 768 F. Supp. 2d at 481 (quotation marks and citation omitted); *see also In re Scotts EZ Seed Litig.*, No. 12 Civ. 4727, 2017 WL 3396433, at *14 (S.D.N.Y. Aug. 8, 2017).  Plaintiffs' attacks on Erath's suggested methodology go to the weight of Erath's opinion, not its admissibility.  *See In re Scotts EZ Seed Litig.*, 2017 WL 3396433, at *14.  For these reasons, Plaintiffs' motion to exclude Erath's testimony as to the racial composition of the FPI and BI workforces is GRANTED in part, and DENIED in part.

### 4.    Compensation

Erath opines that G&S do not adequately determine disparities in compensation between FPIs and BIs because "they simply analyze base salary even though 'compensation' has other aspects," such as differentials to recognize length of service and other lesser payments included in a regular paycheck.  Erath Report at 5.  He insists that G&S should assign value to "non-salary" differences between the FPI and BI jobs, *id.* at 5–7, control for tenure, time in current job, education, and performance, *id.* at 9, and account for the difference in time it takes candidates to meet the hiring requirements of each job and the "highly statistically significant"

difference in likelihood of promotion between the two jobs, *id.* at 6.  Plaintiffs argue that Erath's opinion will not help the factfinder because it is speculative and because Erath does not reliably apply a methodology to his analysis.  Pl. Mem. at 30, 32–34.

The Court finds that Erath's critique of G&S's methodology is admissible to the extent that he states that G&S do not account for differentials to recognize length of service, lesser payments included in a regular paycheck, tenure, time in current job, education, and performance.  Erath Report at 5, 9.  As stated above, "expert opinions which assess or critique another expert's substantive testimony are relevant[.]"  *Deutsch*, 768 F. Supp. 2d at 481 (quotation marks and citation omitted).  Plaintiffs' attacks on Erath's suggested methodology go to the weight of Erath's opinion, not its admissibility.  *See In re Scotts EZ Seed Litig.*, 2017 WL 3396433, at *14.

However, the rest of Erath's opinion regarding compensation must be excluded.  First, Erath opines that G&S should assign value to nonpecuniary aspects of the FPI and BI jobs but does not state whether experts in the field of labor economics typically take such factors into account, or how such nonpecuniary aspects should be valued.  In fact, the same textbook that Erath cites in his report when discussing compensation, *see* Erath Report at 5, describes "nonwage compensation" as "employer-provided medical and life insurance, retirement plans, vacation days, [and] Social Security payments," RONALD G. EHRENBERG & ROBERT S. SMITH, MODERN LABOR ECONOMICS: THEORY & PUBLIC POLICY (11th ed. 2014).  In other words, the only academic text to which Erath refers suggests that compensation may include quantifiable nonwage factors such as health benefits, but does not support Erath's assertion that intangible factors like employer reputation can or should be valued in assessing compensation.  Therefore, there is no methodological support for Erath's opinion, and any attempt to value such intangible

24

aspects would be purely speculative.  *See Electra v. 59 Murray Enters.*, 987 F.3d 233, 254 (2d

Cir. 2021) ("[E]xpert testimony should be excluded if it is speculative or conjectural[.]").

Second, Erath does not identify the methodology he employs in his analysis of the

difference in time until first promotion or the likelihood of promotion between BIs and FPIs.

Erath Report at 6.  Without identifying the source of this information, Erath states that there is a

difference in years of experience required to qualify for each job, and that this directly impacts

time until first promotion.  *Id.*  But, he does not actually analyze time until first promotion.  *Id.*

Erath also ignores the fact that there are multiple ways to meet the educational or experience

requirements of each job.  *See* Amend. Compl. ¶¶ 40–41.  He further states that the difference in

likelihood of promotion between the two jobs is "highly statistically significant," but does not

specify which statistical test he conducted nor whether the difference is significant at the 5%

level.  Erath Report at 6.  Thus, the Court cannot conclude that his analysis is reliable.  *See In re*

*Rezulin Prod. Liab. Litig.*, 369 F. Supp. 2d at 426 (excluding an expert opinion where the expert

failed to offer an explanation of her methodology).  For these reasons, Plaintiffs' motion to

exclude Erath's opinion on compensation is GRANTED in part, and DENIED in part.

II.     Class Certification

Plaintiffs seek to certify a class of persons who were employed as FPIs at any time

between three years prior to the filing of the complaint and the date of class certification, on

behalf of whom the named Plaintiffs bring their disparate treatment claims under the NYCHRL.

Amend. Compl. ¶ 204.  Plaintiffs also seek to certify a subclass of persons who were employed

as FPIs at any time between three years prior to the filing of the complaint and the date of class

certification and who do not self-identify as white, on behalf of whom the named Plaintiffs, with

the exception of plaintiff Connors, bring their disparate treatment and disparate impact claims under Title VII and the NYCHRL.  *Id.*

A.  Legal Standard

To certify a class under Rule 23(b)(3), a court must determine that the proposed class meets the numerosity, commonality, typicality, and adequacy requirements of Federal Rule of Civil Procedure 23(a), as well as the predominance and superiority requirements of Federal Rule of Civil Procedure 23(b)(3).  Plaintiffs must meet each of the Rule 23(a) and 23(b)(3) requirements by a preponderance of the evidence.  *Clark v. City of New York*, No. 18 Civ. 2334, 2021 WL 603046, at *2 (S.D.N.Y. Feb. 16, 2021) (citing *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008)).  The members of the proposed class must also be ascertainable "by reference to objective criteria."  *Katz v. Prof'l Billing Collections, LLC*, No. 20 Civ. 3043, 2021 WL 2418387, at *2 (S.D.N.Y. June 14, 2021) (quoting *Stinson v. City of N.Y.*, 282 F.R.D. 360, 367 (S.D.N.Y. 2012)).

B.  Numerosity

A proposed class is sufficiently numerous if "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).  It is not necessary that Plaintiffs demonstrate evidence of the exact size of the proposed class, nor the identity of all class members; rather, the Court must make a factual finding as to the approximate size of the class and determine whether it meets the legal standard governing numerosity.  *Robinson v. N.Y. City Transit Auth.*, 19 Civ. 1404, 2020 WL 5814189, at *4 (S.D.N.Y. Sept. 30, 2020).  A proposed class with more than forty members presumably satisfies the numerosity requirement.  *Id.* (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)).

G&S calculate that the proposed class has 507 members.  G&S Report at 11.  Erath agrees that the proposed class has approximately 507 members.  Erath Tr. 34:13–35:3.  Because the percentage of racial minority FPIs has ranged from 69.5% to 74.2% in the three years prior to the filing of the complaint, the number of subclass members is approximately 365.  G&S Report at 13.  The Court finds that the proposed class and subclass satisfy the numerosity requirement of Rule 23(a).

### C.  Commonality

The commonality requirement is satisfied where a class-wide proceeding is capable of "generat[ing] common answers apt to drive the resolution of the litigation."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citation and emphasis omitted).

In support of their disparate impact claims on behalf of the subclass, Plaintiffs must show that there is a "general policy of discrimination" even though City employees use discretion in making compensation decisions.  *See Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 72 (S.D.N.Y. 2018) (citation omitted).  Plaintiffs may do so by showing that there is a "common mode of exercising discretion that pervades the entire company."  *Dukes*, 564 U.S. at 356.  Plaintiffs must identify the specific employment practice being challenged, *id.* at 357 (citing *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988)), and provide "significant proof" of disparate impact, *Chen-Oster*, 325 F.R.D. at 73.  A common mode of exercising discretion "need not strip managers of all flexibility in compensation . . . decisions."  *Id.*

Plaintiffs need not identify a common mode of exercising discretion in support of their disparate treatment claims on behalf of the class and subclass.  *Id.* (citing *Davis v. District of Columbia*, 246 F. Supp. 3d 367, 393 (D.D.C. 2017), *aff'd in part, rev'd in part and remanded*, 925 F.3d 1240 (D.C. Cir. 2019)).  If Plaintiffs can prove at the merits stage that the City had the

27

intention to discriminate, it is irrelevant whether the City carried out that intention through a "common mode." *Id.* (citing *Hill v. City of N.Y.*, 136 F. Supp. 3d 304, 354 (E.D.N.Y. 2015)). "[E]vidence of intent can be circumstantial, including evidence that is entirely statistical in nature." *Davis*, 246 F. Supp. 3d at 393 (quotation marks omitted). At the class certification stage, Plaintiffs may provide "significant proof" supporting their disparate treatment claims via statistical and anecdotal evidence. *Chen-Oster*, 325 F.R.D. at 76.

          1.    Disparate Impact

Plaintiffs identify three policies that allegedly disparately impact the proposed subclass: (1) the FDNY's policy of paying FPIs only the CBA minimum, together with the DOB's practice of paying BIs significantly more than the CBA minimum; (2) the City's refusal to treat FPIs as uniformed employees for the purpose of collective bargaining; and (3) the City's failure to monitor the pay of similar employees in different agencies to ensure occupational segregation does not adversely impact members of a protected group. Pl. Mem. at 39. Each of these policies applies equally to all subclass members. *See Robinson*, 2020 WL 5814189, at *5. Further, each of these policies is centralized within the City. *Id.*; *see also Clark*, 2021 WL 603046, at *4 ("The commonality requirement may be satisfied where plaintiffs' various alleged injuries 'derive from a unitary course of conduct by a single system.'") (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997)).

First, the City's explicit policy is to pay all employees the CBA minimum. *See* Def. Mem. at 23. The City insists that, because the DOB and the FDNY act independently in choosing to comply with or diverge from the City's policy, there is no "policy or practice" affecting the subclass. *Id.* at 23–24. However, the discretion afforded to the FDNY and DOB in making decisions regarding pay does not destroy Plaintiffs' claims, as the FDNY and DOB are

not exercising broad discretion on an individualized basis.  *See Chen-Oster*, 325 F.R.D. at 74–75.
Rather, the FDNY and DOB merely decide whether or not to adhere to the City's policy, and the
decision of each department impacts all FPIs and all BIs, respectively.  This is not a situation in
which "[n]umerous different supervisors and decision-makers from different departments were
involved in the [pay] decisions."  Def. Mem. at 24 (quoting *Alleyne v. Four Seasons Hotel—N.Y.*,
No. 99 Civ. 3432, 2001 WL 135770, at *8 (S.D.N.Y. Feb. 15, 2001)).  The City has a policy of
paying employees the CBA minimum, to which the FDNY adhered, *see* Def. Mem. at 23, and
whether that policy discriminated against the subclass "raises yes-or-no questions that can be
answered in 'one stroke,'" *Chen-Oster*, 325 F.R.D. at 75 (quoting *Dukes*, 564 U.S. at 350).

Second, all subclass members are treated as civilian employees for the purpose of
collective bargaining, *see* Banks Tr. 28:10–13, ECF No. 62-28, and all subclass members are
FPIs within the ambit of the Administrative Code, which states that FPIs are uniformed
employees for the purpose of collective bargaining, N.Y.C. Admin. Code 12-307a(4)(i).  The
City states that BIs are also treated as civilian employees in collective bargaining, so the City's
policy of treating FPIs as civilian employees cannot be evidence of discrimination.  Def. Mem. at
24–25.  The City misses the point.  Plaintiffs do not allege that the City treats FPIs and BIs
differently in this regard, but rather that the City's policy disparately *impacts* the subclass by
suppressing the wages of racial minority FPIs and preventing FPIs from closing the wage gap.[7]
Amend. Compl. ¶ 195.

Third, the City's decision not to monitor differences in the pay of similar employees in
different agencies applies to all City employees, including all subclass members, equally.  The

---

[7] The City's argument that it treats BIs and FPIs equally in applying civilian pattern increases to both groups during
collective bargaining is also suspect.  BIs are not identified as uniformed employees by the Administrative Code, but
FPIs are so identified.  N.Y.C. Admin. Code 12-307a(4)(i).  The City therefore diverges from the Administrative
Code in treating FPIs as civilians for the purpose of collective bargaining but does not do so for BIs.

City argues that occupational segregation is irrelevant because Plaintiffs do not argue that the City steers racial minority employees toward FPI jobs or away from BI jobs, or that there is any discrimination in hiring or testing for these positions.  Def. Mem. at 27.  But, occupational segregation can and does exist, whether or not an employer intentionally steers racial minority applicants toward or away from certain positions.  *See, e.g.*, NEW YORK CITY COUNCIL DATA OPERATIONS UNIT, PAY EQUITY IN NYC 14–15 (2021), ECF No. 62-2.  Indeed, this case does not concern discriminatory hiring, but rather the discriminatory impact of the City's policies on the pay gap between a predominantly racial minority position and a comparable group of similar, predominantly white employees.  Whether the difference in racial composition between the FPI and BI workforces is due to chance, intentional steering, or some other reason, is of no import. Therefore, none of the identified policies applies to subclass members in individualized ways.

Plaintiffs also provide "significant proof" that the identified policies disparately impact the subclass, including expert analysis showing that FPIs and BIs perform similar jobs, that the FPI workforce consists of significantly more racial minority employees than the BI workforce, that FPIs are paid significantly less than BIs, and that there are no differences in the content of the jobs that would explain the difference in compensation.  *See generally* G&S Report.  Even considering Erath's expert opinion critiquing certain of G&S's calculations discussed above, the Court is not convinced that any of G&S's conclusions would be altered by applying Erath's proposed methodology.  *See generally* Scherbaum Decl.  And, Plaintiffs' anecdotal evidence shows that decisions regarding FPI pay may have been racially motivated.  *See* Chalmers Tr. 37:22–42:21, 68:7–69:21, 81:14–83:25, ECF No. 62-7.  Thus, the Court finds that Plaintiffs have established commonality for the purpose of their disparate impact claims.

2.     Disparate Treatment

Plaintiffs may establish commonality with respect to their disparate treatment claims by showing that the proposed class and subclass members were subject to the same policies that disadvantaged them relative to a comparator group of employees that performed similar duties. *See Hill*, 136 F. Supp. 3d at 323–28.  Plaintiffs must establish that the City's discriminatory intent can be inferred from "statistical evidence, anecdotal evidence, or evidence that a similarly-situated group was not subjected to the same policies," *id.* at 354, and provide significant proof supporting their disparate treatment claims, *see Chen-Oster*, 325 F.R.D. at 76.

The Court finds that FPIs and BIs are plausibly similarly situated.  FPIs and BIs perform similar tasks and the jobs require similar knowledge, skills, and abilities, *see* G&S Report at 20–39, and FPIs and BIs often "work together and in tandem to perform the same function of [inspecting buildings for violations of the City code], sometimes conducting these [inspections] jointly" on joint task forces.  *Hill*, 136 F. Supp. 3d at 335–36; *see also* Rosemond Tr. 78:10–79:2, ECF No. 62-6; Chalmers Tr. 69:22–71:18; Connors Tr. 84:17–86:9, ECF No. 62-8; Mendez Tr. 91:19–93:19, 95:22–97:6, ECF No. 62-9.  On at least two occasions, City officials have considered consolidating the FPI and BI jobs.  *See* ECF Nos. 62-19, 62-20, 62-21.

The City argues that FPIs and BIs are not similarly situated because they work for different agencies under different leadership, perform different kinds of inspections, and belong to different unions.  Def. Mem. at 28.  The Court is not convinced that the differences the City points out dictate that BIs cannot reasonably be used as a comparator group for FPIs.  *See, e.g.*, *Parra v. Bashas', Inc.*, 536 F.3d 975, 979 (9th Cir. 2008) (certifying a class where the class and comparator group worked in different stores under different supervisors).  Ultimately, whether the two jobs are similar enough for Plaintiffs to prevail on their disparate treatment claims is a

31

question of fact for the jury. *Graham*, 230 F.3d at 39 (citing *Taylor*, 143 F.3d at 684, and *Hargett*, 78 F.3d at 839–40). Therefore, the Court finds that Plaintiffs have identified a comparator group in relation to which they can show that the class and subclass were disadvantaged. *See Hill*, 136 F. Supp. 3d at 323–28. The Court also finds that Plaintiffs have established the existence of common issues, as their disparate treatment claims are based on the same City policies identified above, which the Court has determined raise common questions.

The Court rejects the City's argument that the inclusion of white FPIs in the class destroys commonality. *See* Def. Mem. at 32. To state a disparate treatment claim under the NYCHRL, a plaintiff must show that he or she is a member of a protected class or has been discriminated against on the basis of "a known relationship or association" with someone else who is in a protected class. N.Y.C. Admin. Code 8-107(1)(a)(3), 8-107(20). Plaintiffs allege that white FPIs have suffered from discrimination due to their association with racial minority FPIs. Amend. Compl. ¶ 15. The City asserts that Plaintiffs have not sufficiently pleaded a "relationship" or "association" between white and racial minority FPIs. Def. Mem. at 32. However, the Court has already held that Plaintiffs sufficiently pleaded an association. *See* Order II. Further, the alleged discrimination "applies to—and therefore aggrieves—all, rather than just [racial minority FPIs], creating common questions sufficient to satisfy commonality." *Abbananto v. County of Nassau*, No. 19 Civ. 01102, 2022 WL 326982, at *6 (E.D.N.Y. Feb. 3, 2022) (emphasis omitted).

Finally, Plaintiffs adduce significant proof supporting their disparate treatment claims using evidence common to all class and subclass members. As stated above, Plaintiffs provide expert analysis comparing the job requirements, pay, and racial composition of BIs and FPIs. *See generally* G&S Report; *see also Chen-Oster*, 325 F.R.D. at 76 (finding that evidence of

statistically significant pay disparities supported plaintiffs' disparate treatment claim).  Plaintiffs

also show that BIs are not subject to the practice of confining pay to CBA minimums, as are

FPIs, Amend. Compl. ¶ 184; that the City does not treat FPIs as uniformed employees for the

purpose of collective bargaining despite the Administrative Code requirement that directs FPIs

be treated as such, *see* N.Y.C. Admin. Code 12-307a(4)(i); Rush Tr. 50:17–51:7; Banks Tr.

27:11–28:3, 101:7–102:8; that decisions about FPI pay may be racially motivated, *see* Chalmers

Tr. 37:22–42:21, 68:7–69:21, 81:14–83:25 (discussing the late Chief Ronald Spadafora of the

FDNY exclaiming that the FDNY was racist and would not support the pay increase plan for

FPIs); and that the City is aware of the FDNY's long history of racial discrimination, Amend.

Compl. ¶¶ 168–181; NEW YORK CITY COUNCIL DATA OPERATIONS UNIT, PAY EQUITY IN NYC

15 (2021).  Thus, the Court finds that Plaintiffs have demonstrated commonality as to the class

and subclass on their disparate treatment claims.

     D.  Typicality

     Typicality "is satisfied when the lead plaintiffs' claims arise from the same series of

events and find support in the same legal theories as the claims of all of the remaining class

members."  *Houser v. Pritzker*, 28 F. Supp. 3d 222, 245 (S.D.N.Y. 2014); *see also* Fed. R. Civ.

P. 23(a)(3) (requiring that "the claims or defenses of the representative parties are typical of the

claims or defenses of the class").  The lead plaintiffs' claims need not be "identical" to the class

members' claims, but the lead plaintiffs must "have the 'incentive to prove all the elements of

the cause of action which would be presented by the individual members of the class were they

initiating individualized actions.'"  *Houser*, 28 F. Supp. 3d at 245 (quoting *In re NASDAQ

Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 510 (S.D.N.Y. 1996)); *see also Caridad v.

Metro–N. Commuter R.R.*, 191 F.3d 283, 293 (2d Cir. 1999), *called into question on other*

*grounds by In re IPO*, 471 F.3d 24 (2d Cir. 2006) ("[Typicality] requires that the disputed issue of law or fact occupy essentially the same degree of centrality to the named plaintiff[s'] claim as to that of other members of the proposed class." (quotation marks and citation omitted)).

The City does not dispute typicality.  *See* Def. Mem.  Because Plaintiffs are all FPIs subject to the identified City policies that are paid less than their BI comparators, *see* Amend. Compl. ¶¶ 183–189, and no named plaintiff advances any unique claims, the Court finds that Plaintiffs' claims are typical of the class, and each named plaintiff other than Connors has claims typical of the subclass.

### E.  Adequacy

Adequacy requires courts to inquire whether (1) "plaintiff[s'] interests are antagonistic to the interest of other members of the class," and (2) "plaintiff[s'] attorneys are qualified, experienced and able to conduct the litigation."  *Floyd v. City of N.Y.*, 283 F.R.D. 153, 161 (S.D.N.Y. 2012) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000)).  Defendants do not contest the latter point.  *See* Def. Mem.  Regarding the former issue, "[i]n order to defeat a motion for certification, any conflicts between the class representative and members of the putative class must be 'fundamental.'"  *Ligon v. City of N.Y.*, 288 F.R.D. 72, 80 (S.D.N.Y. 2013) (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)).

The Court finds that Plaintiffs' interests do not conflict with those of the class or subclass.  As discussed above, Plaintiffs' claims are representative of those of the class and subclass.  Further, Plaintiffs understand their duties as class representatives.  *See* Chalmers Tr. 35:22–38:11; Connors Tr. 42:12–43:13; Mendez Tr. 54:21–55:13; Nova Tr. 26:2–27:5; Rosemond Tr. 75:24–77:8.  Plaintiffs have shown their commitment to the case by answering

interrogatories, responding to requests for production, and sitting for depositions.  Lieder Decl.

¶ 14.  Plaintiffs have retained counsel experienced in employment discrimination class action

cases.  *Id.* ¶¶ 15–22; Valli Decl. ¶¶ 6–9, ECF No. 62-51.  The Court finds that Plaintiffs have

demonstrated adequacy.

> F.  Predominance

Rule 23(b)(3) requires that "questions of law or fact common to class members

predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).

The predominance requirement "ensures that the class will be certified only when it would

'achieve economies of time, effort, and expense, and promote uniformity of decision as to

persons similarly situated, without sacrificing procedural fairness or bringing about other

undesirable results.'"  *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91,

104 (2d Cir. 2007) (alterations omitted) (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591,

615 (1997)).  Plaintiffs meet this requirement "if resolution of some of the legal or factual

questions that qualify each class member's case as a genuine controversy can be achieved

through generalized proof, and if these particular issues are more substantial than the issues

subject only to individualized proof."  *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir.

2002).  "The predominance requirement calls only for predominance, not exclusivity, of

common questions."  *In re LIBOR–Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430,

No. 11 Civ. 5450, 2018 WL 1229761, at *5 (S.D.N.Y. Feb. 28, 2018) (quoting *In re Visa

Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001)).  But, the predominance

standard is "more demanding" than the commonality requirement under Rule 23(a).  *Id.* (quoting

*Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 138 (2d Cir. 2015)).

Courts "must assess (1) the elements of the claims and defenses to be litigated; and (2) whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief." *Nextel*, 780 F.3d at 138 (quotation marks and citation omitted).  This assessment is "more qualitative than quantitative, and must account for the nature and significance of the material common and individual issues in the case." *In re LIBOR*, 2018 WL 1229761, at *5 (quotation marks and alterations omitted).  "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages[.]" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quotation marks and citation omitted).

Here, "the elements of the claims and defenses to be litigated," *In re LIBOR*, 2018 WL 1229761, at *5 (quotation marks and citation omitted), are governed by the three-step *McDonnell Douglas* burden-shifting framework for Title VII disparate impact and disparate treatment claims.  *See United States v. City of N.Y.*, 731 F. Supp. 2d 291, 299 (E.D.N.Y. 2010) (disparate impact); *United States v. City of N.Y.*, 717 F.3d 72, 83 (2d Cir. 2013) (disparate treatment); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *holding modified by Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993).  The first step requires Plaintiffs to make a prima facie showing of discrimination.  *City of N.Y.*, 717 F.3d at 84.  If Plaintiffs meet their initial burden, the second step requires the employer "to rebut the presumption of discrimination." *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  The third step shifts the burden back to Plaintiffs.  Each of these steps requires a somewhat different showing depending

on whether Plaintiffs are bringing a disparate impact or disparate treatment pattern-or-practice claim.  *Id.*; *see also City of N.Y.*, 731 F. Supp. 2d at 299.

               1.     Disparate Impact

For a disparate impact claim, Plaintiffs make out a prima facie claim if they "(1) identify a specific employment practice or policy; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012) (quotation marks and citations omitted).  "Statistics alone can make out a prima facie case," *City of N.Y.*, 731 F. Supp. 2d at 300, but "'[t]he statistics must reveal that the disparity is substantial or significant,' and 'must be of a kind and degree sufficient to reveal a causal relationship between the challenged practice and the disparity,'" *Chin*, 685 F.3d at 151 (quoting *Robinson*, 267 F.3d at 160).

The Court finds that Plaintiffs have proven predominance.  Plaintiffs provide evidence that the difference in compensation between FPIs and BIs is statistically significant at two standard deviations or more.  *See* G&S Report at 41–55; *see also City of N.Y.*, 731 F. Supp. 2d at 301 ("The Second Circuit has repeatedly recognized that standard deviations of more than 2 or 3 units can give rise to a prima facie case of disparate impact because of the low likelihood that such disparities have resulted from chance.") (quoting *United States v. City of N.Y.*, 637 F. Supp. 2d 77, 93 (E.D.N.Y. 2009) (alteration omitted)).  Plaintiffs also provide evidence that the difference in racial composition between the FPI and BI workforces is statistically significant at two standard deviations or more, *see* G&S Report at 12–19, as well as anecdotal evidence of racial bias in decisions regarding FPI pay, *see* Chalmers Tr. 37:22–42:21, 68:7–69:21, 81:14–83:25.  Whether Plaintiffs' evidence actually makes out a prima facie case is a question left for trial, but Plaintiffs have provided generalized proof sufficient for the predominance inquiry.

The second step of *McDonnell Douglas* shifts the burden to the City "to demonstrate that the challenged practice or policy is 'job related for the position in question and consistent with business necessity.'" *City of N.Y.*, 731 F. Supp. 2d at 299 (quoting 42 U.S.C. § 2000e–2(k)(1)(A)(i)). At this step, the City "would retain the right to demonstrate that there were other, legitimate explanations" for the disparate impact. *Chen-Oster*, 325 F.R.D. at 81 (citation omitted). Whether the challenged processes are job related or consistent with business necessity is a question of generalized proof. The City applies the policies of paying employees the CBA minimum, treating FPIs as civilian employees for the purpose of collective bargaining, and failing to monitor pay differences among similar employees in different agencies to each member of the class and subclass. The City's rebuttal of Plaintiffs' proof would require the City to explain the business necessity of each of the challenged policies, and, therefore, require proof on a general level rather than on an individualized basis. *See Chen-Oster*, 325 F.R.D. at 82 ("Defendants are tasked not with rebutting the causal link between the challenged policies and every single class member's claim, but rather, establishing that the challenged policies were a business necessity.").

The third step of *McDonnell Douglas* shifts the burden back to Plaintiffs "to establish the availability of an alternative policy or practice that would also satisfy the asserted business necessity, but would do so without producing the disparate effect." *City of N.Y.*, 731 F. Supp. 2d at 299. The Court sees no reason, and the City has presented none, why this step, should it become necessary, would not also require generalized proof. *See Chen-Oster*, 325 F.R.D. at 82. Thus, Plaintiffs have established predominance for their disparate impact claims.

2.    Disparate Treatment

For the purposes of a disparate treatment pattern-or-practice claim, Plaintiffs make out a prima facie claim at the first step of *McDonnell Douglas* if they can show that (1) "discrimination was the company's standard operating procedure[,] the regular rather than the unusual practice," and (2) "the discrimination was directed at a class of victims." *City of N.Y.*, 717 F.3d at 83 (quotation marks omitted). "[A] statistical showing of disparate impact might suffice." *Id.* at 84.

Plaintiffs' statistical evidence makes out a prima facie showing of disparate treatment because, as the Court already concluded, Plaintiffs' statistical evidence of pay disparities and difference in racial composition is the type of generalized proof that satisfies the predominance requirement. *See City of N.Y.*, 717 F.3d at 88 ("The statistical disparities supporting the unchallenged finding . . . [of] disparate impact also served to establish a prima facie case on the . . . claim of a pervasive pattern of discriminatory treatment.").

Next, the burden "shifts to the employer 'to rebut the presumption of discrimination.'" *City of N.Y.*, 717 F.3d at 84 (quoting *Burdine*, 450 U.S. at 254). "The employer need only 'articulate some legitimate, nondiscriminatory reason for'" its presumptively discriminatory actions. *Id.* (quoting *Burdine*, 450 U.S. at 253) (emphasis omitted). The City may rebut the presumption by attacking the accuracy or adequacy of Plaintiffs' statistics, or "by accepting [Plaintiffs'] statistics and producing non-statistical evidence to show that it lacked such an intent." *Id.* at 85. Here, as with Plaintiffs' disparate impact claims, the City's rebuttal evidence with respect to Plaintiffs' statistics, or with respect to a non-discriminatory reason for the enactment and maintenance of the challenged policies, would be subject to generalized proof. Finally, if the City rebuts the presumption of discriminatory intent, the case proceeds to trial on

the issue of liability.  *Id.*  "The Court sees no reason why trial . . . would alter the balance of the evidence any further."  *Chen-Oster*, 325 F.R.D. at 83.

The City asserts that individualized inquiry would be needed to show whether each individual class member held the minimum qualifications for becoming a BI and is therefore entitled to the higher pay afforded to BIs, pointing to caselaw stating that difference in qualifications is a nondiscriminatory reason for difference in pay or promotion.  Def. Mem. at 34–35.  The City is incorrect.  First, the City cannot be heard to argue that the nondiscriminatory reason for their policies, which apply to *all* FPIs, is based on differences in qualifications *among* FPIs, such that some FPIs would be entitled to higher pay based on their qualifications and others would not.  To the extent that the City will argue the difference in pay between FPIs and BIs is due to the difference in qualifications for the two jobs, that rationale will apply to all FPIs, and is therefore subject to generalized proof.  Second, Plaintiffs allege, and the jury will decide, whether the FPI and BI jobs are "sufficiently similar that the City should have paid FPIs at least as much as BIs."  *See* Amend. Compl. ¶ 213.  If the jury decides FPIs should be paid as much as BIs because the jobs are sufficiently comparable, then FPIs are entitled to higher pay because the job for which they are currently qualified is underpaid.  Class members would be entitled to relief by virtue of being FPIs, regardless of whether they meet a separate set of qualifications.  Therefore, the Court finds that Plaintiffs have established predominance on their disparate treatment claims.

### G.  Superiority

Rule 23(b)(3) requires that "a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy."  Courts analyze: (1) the interest of the class members in maintaining separate actions; (2) "the extent and nature of any litigation concerning

the controversy already commenced by or against members of the class"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the difficulties likely to be encountered in the management of a class action." *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 230 (2d Cir. 2006) (quoting Fed. R. Civ. P. 23(b)(3)).

First, disaggregating the claims into hundreds of individual proceedings would only waste "time, effort, and expense" and increase the likelihood of conflicting outcomes for Plaintiffs. *Amchem*, 521 U.S. at 634 (citation omitted). "[B]ecause substantive Title VII law suggests that aggregate assessment and pro rata distribution is a fairer method of affording individual relief . . ., it is clearly desirable to concentrate the litigation of the claims in this forum." *Easterling v. Conn. Dep't of Corr.*, 278 F.R.D. 41, 50 (D. Conn. 2011) (quotation marks omitted). Additionally, each class member has a relatively small claim such that class members would struggle to find representation and pursue their claims on an individual basis. Pl. Mem. at 48. The alternative to class certification is that the FPI Union would encourage individual FPIs to file claims and seek to intervene in the present case. *Id.* A class action is clearly superior to a proceeding with potentially hundreds of individual plaintiffs.

Second, Plaintiffs seek injunctive relief requiring the City to increase FPIs' pay. *Id.* at 49. All class members' interests are implicated by the present case, and it is more expedient to concentrate in one forum the litigation of all class members' claims based on differences in pay due to racial discrimination. Third, a class action would be manageable under these circumstances. As discussed above, the class size is approximately 500 and the subclass size is approximately 365, and fundamental questions in this case apply to all class members such that material issues could be litigated efficiently in a class action.

The City argues that the fairer and more efficient way for class members to remedy unequal pay is through collective bargaining.  Def. Mem. at 25, 32–33.  The City ignores the crux of the issue:  Plaintiffs allege that FPIs are unable to negotiate substantial pay increases due to the City's discriminatory treatment of FPIs during collective bargaining, such as by refusing to apply uniformed pattern increases to FPIs, *see* Amend. Compl. ¶ 17, and that the FDNY, with its history of racial discrimination, *see id.* ¶¶ 168–181, refuses to advocate for higher pay for FPIs during negotiations, *see* Chalmers Tr. 82:9–83:2.  The City argues that this is not a situation in which the FPI Union pursued a pay increase and was stymied.  Def. Mem. at 33.[8]  But, that is precisely what Plaintiffs allege, and Plaintiffs have submitted evidence to support their claim. *See, e.g.*, Chalmers Tr. 82:9–83:2.  Under these circumstances, continuing to pursue wage increases through collective bargaining would not be a superior method of adjudication because it would not provide greater "fair[ness] and efficien[cy]."  Fed. R. Civ. P. 23(b)(3).

Further, the individual class members cannot pursue such negotiations; they are dependent on the FPI Union to represent their interests.  The alternative that the City suggests, then, is not available to the class members themselves.  And, Plaintiffs allege racial discrimination; the FPI Union cannot address such discrimination during collective bargaining. Accordingly, the Court finds that Plaintiffs have proved superiority.

---

[8] The City claims that the FPI Union dropped its wage increase proposal during the most recent CBA negotiation in favor of pursuing other benefits such as increased work hours per week, indicating that the FPI Union did not deem the wage increase proposal to be a priority.  Def. Mem. at 26.  The City's citations to the deposition testimony of former FDNY Commissioner of Budget and Finance, Steve Rush, and First Deputy Commissioner and General Counsel of the City's Office of Labor Relations, Steven Banks, do not support its argument.  Both Rush and Banks testified that the FPI Union would not be able to negotiate a pay increase without accepting decreases in other forms of compensation such that the economic value of total compensation would not exceed the civilian pattern increase. *See* Rush Tr. 50:17–51:7, ECF No. 82-15 (stating that, because the City negotiates under pattern bargaining, in order to negotiate higher wages, the FPI Union would also have to "negotiate givebacks"); Banks Tr. 101:7–102:8, ECF No. 82-13 (stating that the FPI Union dropped its wage increase proposal because increases would "have to be funded within a pattern contract"); *id.* at 27:11–28:3 (explaining that the total economic value of compensation, wage and otherwise, cannot exceed the pattern increase).

H.  Ascertainability

The City's records allow the ascertainment of all members of the proposed class and subclass, as they are all FPIs employed by the City during the period at issue, except for a small number of FPIs whose records do not contain a racial self-identification.  *See* Pl. Mem. 36.  FPIs with an unidentified race may be asked to provide an affidavit stating their racial identification in order to become a subclass member.  *See Goldemberg v. Johnson & Johnson Consumer Cos.*, 317 F.R.D. 374, 399 (S.D.N.Y. 2016) ("[A]scertainability requirement of Rule 23 can, at minimum, be met on the basis of sworn statements indicating" subclass eligibility.).  Here, the use of affidavits is administratively feasible and affects only a small number of subclass members.  Therefore, the members of the proposed class and subclass are readily ascertainable.

For these reasons, Plaintiffs' motion for certification of a class and subclass is GRANTED.

III.    Appointment of Class Counsel

Rule 23(c)(1)(B) requires a court certifying a class to appoint class counsel under Rule 23(g).  Rule 23(g)(1)(A) requires a court to consider: (1) "the work counsel has done in identifying or investigating potential claims in the action;" (2) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;" (3) "counsel's knowledge of the applicable law;" and (4) "the resources that counsel will commit to representing the class."  Plaintiffs' counsel satisfy this criteria.  Plaintiffs' counsel identified and investigated the claims in this case.  Lieder Decl. ¶¶ 4–12.  They are experienced in handling employment discrimination class action litigation and have litigated cases involving claims under Title VII and the NYCHRL.  *Id.* ¶¶ 18–23; Valli Decl. ¶¶ 6–23.  Plaintiffs' counsel's engagement of expert witnesses, management of discovery, and preparation of various filings including the

class certification motion before the Court show that they have committed sufficient resources to the litigation. Lieder Decl. ¶¶ 23–25. They are able to fairly and adequately represent the interests of the proposed class and subclass. *Id.* ¶¶ 26–27. Accordingly, Plaintiffs' motion for appointment of class counsel is GRANTED.

## CONCLUSION

For the reasons stated above:

- The City's motion to preclude G&S's testimony is DENIED.

- Plaintiffs' motion to preclude Dr. Erath's testimony is GRANTED in part and DENIED in part.

- Plaintiffs' motion for certification of a class is GRANTED.

- Plaintiffs' motion for certification of a subclass is GRANTED.

- Plaintiffs' motion to appoint class counsel is GRANTED.

The Clerk of Court is directed to terminate the motions at ECF Nos. 61 and 80.

SO ORDERED.

Dated: September 19, 2022
New York, New York

_____
ANALISA TORRES
United States District Judge