IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DARRYL CHALMERS, DARREN CONNORS, GLENN MENDEZ, JAMES NOVA, FATIMA Q. ROSEMOND, and AFSCME DISTRICT COUNCIL 37 LOCAL 2507,<br><br>Plaintiffs,<br><br>v.<br><br>THE CITY OF NEW YORK,<br><br>Defendant. | Case No. 20 Civ. 3389 (AT) |

**DECLARATION OF MICHAEL D. LIEDER IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**

I, Michael D. Lieder, declare upon personal knowledge and under penalty of perjury that the following is true and correct:

1. I am an attorney at law, admitted to the bar of the District of Columbia and admitted before the United States District Court for the Southern District of New York *pro hac vice* to represent Plaintiffs and the class in this case.

2. I am a partner at my firm, Mehri & Skalet PLLC ("M&S"), and along with several other members of my firm, am co-counsel for the Plaintiffs in this action.

3. I am familiar with the facts and circumstances set forth herein, and I make this Declaration in support of Plaintiffs' Motion for Preliminary Approval of Settlement.

4. Darryl Chalmers, an associate fire protection inspector with the Fire Department of the City of New York ("FDNY") who became the lead plaintiff in the case, contacted me in October 2019 about representing fire protection inspectors in a racial discrimination case against

1

the City of New York ("City"). After several conversations with him, I decided to focus on a possible racial discrimination claim based on the differences in pay between fire protection inspectors and associate fire protection inspectors (together "FPIs"), who were primarily people of color, and building inspectors and associate building inspectors (together "BIs"), who were primarily white.

5. During the investigation, Mr. Chalmers put Aisha Rich, an associate at M&S, and me in touch with numerous other FPIs. In these meetings, we discussed FPI duties and requirements and whatever they knew about BI duties and requirements. In several of these meetings and communications, Mr. Chalmers was accompanied by Michael Reardon, another FPI.

6. As part of the pre-filing investigation, we also reviewed numerous documents, some provided by FPIs with whom we talked, and others available on the Internet, including the Collective Bargaining Agreements ("CBAs") applicable to FPIs and BIs and annual reports issued by the City's Department of Citywide Administrative Services ("DCAS") that contained, among other information, racial demographic information for FPIs and BIs.

7. In addition, we were able to obtain information about the number of FPIs and BIs each year back to FY 2008 and the salaries of each FPI and BI each year from the website www.seethroughny.net. We used that data to present the statistical analyses in paragraphs 60 to 102 of the complaint filed May 1, 2020.

8. Next, as part of our investigation, we contacted two prominent industrial psychologists, Drs. Harold Goldstein and Charles Scherbaum. They interviewed an FPI who, earlier in his career, had been a trainer of BIs, to attempt to determine the similarity of the job duties performed by FPIs and BIs.

2

9. In addition to performing these factual investigations, Ms. Rich and I performed legal research to try to assess the viability under federal law and the New York City Human Rights Law of atypical discrimination claims where the comparators were not other individuals with the same job title but persons with a different job title employed at a different agency of the same employer.

10. I drafted the complaint based on all the factual and legal information that we had gathered and frequently reached out to Mr. Chalmers when I found I needed additional information for the complaint.

11. After M&S decided to represent the FPIs in litigation, Mr. Chalmers identified several other potential plaintiffs who worked in different functional areas of the Bureau of Fire Prevention with different FPI titles. I talked with each of the potential plaintiffs and Darren Connors, Glenn Mendez, James Nova, and Fatima Rosemond all agreed to serve as plaintiffs. In taking a leadership role in the litigation, these Plaintiffs also incurred risk of retaliation.

12. Mr. Reardon was also willing to be a plaintiff. Despite his willingness, I decided for strategic reasons not to include Mr. Reardon as a plaintiff, but he remained very involved in the case, as discussed below.

13. In addition, in February of 2020, Cyrus Mehri and I reached out to Sara Wyn Kane, Robert J. Valli, Jr and Matthew Berman of Valli Kane & Vagnini LLP ("VKV"), a New York firm with whom we had worked before, to serve as co-counsel in the lawsuit. They agreed and have worked closely with us throughout the litigation.

14. In response to the complaint, which was filed May 1, 2020, the City filed a motion to dismiss that Plaintiffs opposed. While briefing on that motion was still ongoing, the parties negotiated a case management plan that covered the period through the class certification phase of

the case. The Court approved the plan and the parties commenced with discovery, which lasted for about nine months. The City produced about 58,691 pages of documents in response to our document production requests, and Plaintiffs produced about 13,529 pages of documents to the City, making a total of 72,220 pages to be reviewed. Lawyers and paralegals from M&S and VKV reviewed each of these documents. Each Plaintiff answered the City's interrogatories, and the City answered Plaintiffs' interrogatories. The City deposed each of the five Plaintiffs, and M&S and VKV lawyers deposed seven non-expert defense witnesses.

15. We also retained Drs. Goldstein and Scherbaum as Plaintiffs' experts. The experts reviewed documents that we provided to them from the universe of documents produced in the case. Equally important, they analyzed the voluminous human resources and payroll data that the City produced in response to our document production requests to determine the differences in pay and racial composition between FPIs and BIs. I worked closely with Drs. Goldstein and Scherbaum throughout the process to help them understand the issues that were relevant to this atypical case and to identify and provide the information that they needed to address those issues. Eventually, they prepared an expert report that was critical to Plaintiffs' class certification motion.

16. Throughout the discovery and litigation process, we kept the five individual Plaintiffs, Mr. Reardon, and Oren Barzilay, the president of Local 2507, informed of developments through emails and Microsoft Teams conference calls. They all participated in the calls and provided input when requested.

17. The City deposed Dr. Scherbaum, and I deposed the City's expert, Dr. Christopher Erath. Those depositions were cited heavily in Plaintiffs' motion for class certification and the parties' cross-motions to exclude the other party's expert testimony. The Court largely granted Plaintiffs' motion to exclude the testimony of Dr. Erath, denied the City's motion to exclude the

4

testimony of Plaintiffs' experts, appointed M&S and VKV as Class Counsel, and granted Plaintiffs' motion for class certification. ECF No. 98.

18. About a week after the Court's ruling on these motions, in late September 2022, the parties agreed to enter into settlement negotiations. Early on, the parties agreed to appoint Robin Gise of JAMS ADR Services as the mediator, partly because she had successfully served as a mediator previously in cases litigated by VKV and by the lead lawyer for the City, Kami Barker.

19. The settlement negotiations consumed over nine months. Initially, we provided Ms. Barker and Ms. Gise a lengthy written settlement demand that included a large spreadsheet analyzing the Class's damages prepared by Dr. Scherbaum. It took the City several months to review the demand and obtain settlement authority, and the mediation sessions began in January 2023.

20. Under the direction of Ms. Gise, Class and City Counsel had numerous negotiating sessions during 2023: in person for six full-day mediation sessions, by video conference calls on more than ten occasions, through numerous subsequent telephone and conference calls, and scores (maybe hundreds) of email exchanges dedicated to meaningful discussion and resolution of the parties' claims and defenses in this action.

21. Three of the Plaintiffs – Mr. Chalmers, Mr. Connors, and Ms. Rosemond – along with Mr. Reardon – participated in all or all but one of the in-person mediation sessions. We kept all the Plaintiffs and Messrs. Reardon and Barzilay informed of developments and sought their input throughout the process.

22. During the mediation, the City produced additional human resources and payroll data for FY 2022 and most of FY 2023, and both parties' experts performed supplemental statistical analyses primarily for purposes of the pay adjustment calculations.

23. In addition, during the mediation, we researched and prepared several analyses of key legal issues that we provided to the City on topics such as the applicability of the continuing violation doctrine, prejudgment interest, and service awards.

24. During the mediation sessions, the parties vigorously debated the size and scope of the claims, the likelihood of the claims' success on the merits, the continuing violation theory, whether certain of the payments would be factored into the calculation of Plaintiffs' employee pension benefits, whether the City as a municipality was likely to be required to pay prejudgment interest and, if so, the appropriate rate of interest, the manner in which potential damages associated with plaintiffs' claims could be calculated and collected, and equitable relief intended to foster an environment of inclusion and mutual respect. During the negotiations, the parties agreed on an administrator of the settlement and an expert to perform damages calculations, and the parties engaged in discussions with them to ensure that all the provisions could be feasibly performed.

25. Starting in about June 2023, the parties graduated from drafting a memorandum of understanding to exchanging drafts of the settlement documents. On or about July 21, 2023, the parties tentatively agreed on the amount of the proposed settlement consideration. On or about August 9, 2023, these negotiations culminated in an agreement among the lawyers to settle the Plaintiffs' claims on the terms set forth in the Stipulation. It was fully signed on August __, 2023.

26. The negotiations, while always cordial and professional, were conducted at arm's length.

27. According to Dr. Scherbaum, the Damages Class had under 550 members as of March 25, 2023, the last date for which the City produced data. The eventual number of Pay Adjustment Class members cannot be known until the end of the Pay Adjustment Period (August

31, 2024), but as of March 25, 2023, there were approximately 365 FPIs, all of whom will be members of the Pay Adjustment Class if they are still employed as of September 1, 2023, and all of whom are members of the Damages Class as well. The City has informed us that it intends to hire at least 50 more FPIs before August 31, 2024, so the number of Pay Adjustment Class members probably will be above 400.

28.     We currently estimate the amount to be distributed to Damages Class members to be at least $18.4 million. From the $29.2 million, we estimate that about $1.7 million will be distributed to Pay Adjustment Class members, about $8.9 million will be paid in attorneys' fees and expenses if we seek and the Court awards 30% of $29.2 million as fees, $90,000 will be paid in service awards if the Court awards the full amount to be requested, and no more than $80,000 will be paid to the Administrator and Expert. The Administrator, Settlement Services Inc. ("SSI"), a wholly owned subsidiary of Epiq, has submitted a non-binding estimate of fees in the total amount of $43,500.

29.     The provisions in the Stipulation concerning relief for the Pay Adjustment Class are intended to achieve the goal of the injunctive relief requested in the Amended Complaint in a different manner. To achieve this goal, the parties negotiated salary increases for the one-year Pay Adjustment Period that, based primarily on 2023 data, would roughly equalize average FPI and BI salaries for employees at similar levels of the organizational hierarchies. We expect that, in the ongoing CBA negotiations, the City and Local 2507 will arrive at salaries for FPIs that will implement increases for the period beyond the end of the Pay Adjustment Period that are at least equal to the negotiated increases for FPIs during the Pay Adjustment Period. Based on these negotiations, we believe that the City shares the expectation of negotiating an increase of FPIs' salaries in the next CBA. Although the Stipulation does not bind either party during the CBA

negotiations, both parties have strong incentives to agree on wages that align FPI and BI pay.

30. Part of the awards to Damages Class members, and all of the awards to Pay Adjustment Class members, will be treated as wages. The City has agreed to pay the employer share of employment taxes, which increases the value of the settlement in this case over the apparent value of settlements in which the settlement fund must pay the employer's share of employment taxes. In addition, the wage portions of the awards will count toward Settlement Class members' pension benefits and the City has agreed to pay the employer contributions toward the pension plan attributable to those awards.

31. M&S has worked on this case for almost four years, and VKV has worked on this case for about 3 ½ years, without any reimbursement or compensation. By the time Class Counsel's duties under the settlement are concluded, each of our two firms will have devoted over five years to the litigation.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

| August 25, 2023 | /s/ Michael D. Lieder |
|---|---|
| Date | Michael D. Lieder |