

July 3, 2025

**VIA ECF**
Honorable Analisa Torres
United States District Judge
United States District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007

   Re: *Chalmers v. City of New York*, No. 20 Civ. 3389 (AT)

Dear Judge Torres:

Court-appointed class counsel, Mehri & Skalet, PLLC ("M&S"), who represents the Damages Plaintiffs, respectfully submits this pre-motion letter setting forth the bases of its anticipated Motion to Enforce the Court's Order Approving Class Action Settlement (ECF No. 211) (the "Settlement Order").

The Administrator of the Qualified Settlement Fund ("QSF"), Settlement Services, Inc., a wholly owned subsidiary of Epiq Systems Inc. (together, "Epiq"), violated its obligations under the Settlement Order.  Epiq wired the entirety of M&S's court-awarded attorneys' fees and expenses, totaling $6,822,603.38, from the QSF to an unknown fraudster, ignoring repeated instructions from M&S's managing partner to wire funds to M&S's account.  Of that amount, $4,555,954.48 has been recovered on behalf of the QSF, resulting in a remaining shortfall of $2,266,648.90 plus unrecovered interest, which Epiq has so far refused to return to the QSF.

M&S quickly undertook to confirm and has confirmed that the QSF has not otherwise been affected; no money for class member payments is missing.

**Background**

**A.** **Settlement Approval and Appointment of Epiq as QSF Administrator.**

M&S is one of the nation's leading civil rights firms, frequently representing employees in class action lawsuits on a contingent basis.  This often requires (as in this case) an investment of millions of dollars of the firm's time and advancement of out-of-pocket costs, frequently by drawing down a line of credit, which must be repaid.

After vigorously litigating this case for over five years, M&S and co-counsel successfully negotiated a settlement that resolved the case for nearly $30 million on behalf of New York City Fire Protection Inspectors.  The Court approved the settlement on March 18, 2025 (ECF No. 211), noting that "this was a complex case that entailed significant risk and required substantial time and labor from class counsel, who performed at a high level . . . , fronting significant out-of-pocket costs and foregoing other streams of revenue with no guarantee of payment."  (Mar. 17, 2025 Tr. 18:8-13.)

The QSF was established to distribute the settlement funds as directed by the Court.  (ECF No. 168-1 ¶ I.2.)  Epiq was appointed as the Administrator of the QSF.  (*Id.*)  Epiq has annual

Hon. Analisa Torres  
July 3, 2025                                                                                                                Mehri & Skalet, PLLC

revenue of over a billion dollars, operates in 18 countries, and has over 6,000 employees. Pursuant to the Settlement Order, Epiq was to pay Court-awarded "attorneys' fees and expenses to M&S by no later than 30 days after the Effective Date," i.e., by May 16, 2025. (*Id.* ¶ V.5.)

**B.     If Epiq Had Not Disregarded M&S's Repeated Instructions, Epiq Would Never Have Wired QSF Funds to the Fraudster.**

On May 2, 2025, Ellen Eardley, M&S's managing partner, emailed Robert Hyte, M&S's contact at Epiq, asking Epiq to split the upcoming payment to M&S into two installments. Reinforcing that instruction, on May 8, 2025, she emailed instructions to Mr. Hyte and his colleagues to wire $5,322,603.38 to M&S's account at EagleBank, the same bank that holds the QSF account established by Epiq, and to retain the remaining $1,500,000 for later payment to M&S.

Epiq disregarded Ms. Eardley's instructions. M&S has learned that on May 9, just a day after Ms. Eardley's second email, a fraudster purporting to be Mike Lieder, the lead M&S lawyer on the *Chalmers* representation, apparently sent contradictory wire instructions to Mr. Hyte using Mr. Lieder's email account.[1] The fraudster's email—which M&S does not have and has not seen—evidently instructed Epiq to wire the full $6,822,603.38 to an account at U.S. Bank. The fraudster's wire instructions conflicted both in terms of which bank and which account the funds would be wired to and Ms. Eardley's earlier repeated instructions to make the payment in two installments. Ms. Eardley emailed Mr. Hyte a *third* time on May 14, 2025, after Mr. Hyte received the fraudster's email, once again with the correct instructions.

Notwithstanding conflicting wire instructions from Ms. Eardley and the fraudster, Epiq never contacted Ms. Eardley to confirm M&S's instructions. Neither did Epic contact Mr. Lieder to confirm the instructions. Rather, we understand from Epiq, on May 15 or 16, 2025, Mr. Hyte called an unverified phone number, provided to him *by the fraudster* via email—in direct violation of commonly known industry standards—and confirmed the fraudulent wire instructions *with the fraudster*. Then, on May 16, 2025, having fallen for the fraud, and having failed to exercise adequate protocols to protect against it, Epiq wired $6,8322,603.38 to the fraudster's account at U.S. Bank instead of M&S's EagleBank account. Epiq did not implement even the most basic security protocols. Authenticating a payee's identity requires verification from two or more independent categories of credentials, which could only be known to the payee; a phone call to someone claiming to be the payee does not suffice—for the reasons this case demonstrates. Epiq has admitted its failures: Mr. Hyte stated to me and Ms. Eardley on a call on May 20, 2025 that he did not perform "sufficient clearance" or follow proper procedures.

Soon after receiving the funds, on May 20, 2025, U.S. Bank alerted EagleBank of suspicious wire transfers out of the fraudster's account. We understand that U.S. Bank then froze the account, which still held approximately $2.8 million. Another approximately $1.75 million of the stolen funds has since been recovered by U.S. Bank, for a total of $4,555,954.48 (of the $6,8322,603.38) recovered to date.[2] We were informed that on June 27, 2025, U.S. Bank returned that $4,555,954.48 to EagleBank, which in turn returned that amount to the QSF on July 1, 2025. Epiq then remitted those funds to M&S today (using proper authentication procedures this time), resulting in a remaining shortfall of $2,266,648.90 plus unrecovered interest.

---

[1] M&S was not aware that Mr. Lieder's email had been compromised, and it is no longer compromised.  
[2] We have been informed that U.S. Bank does not expect to recover additional funds.

Hon. Analisa Torres  
July 3, 2025                                                                                                          Mehri & Skalet, PLLC

---

### Argument

**A.       This Motion Is Properly Made to This Court.**

This Court "retain[ed] jurisdiction . . . to implement or enforce the relief and rights provided in th[e] Revised Stipulation of Settlement, until all obligations under the Revised Stipulation have been satisfied." (ECF No. 168-1 ¶ IX.4.)[3] Fund administrators like Epiq operate as a "functional fiduciary" and have fiduciary duties to "detect and prevent fraud and theft." *Disberry v. Emp. Rels. Comm. of Colgate-Palmolive Co.*, 646 F. Supp. 3d 531, 541-42 (S.D.N.Y. 2022); *see also Leventhal v. MandMarblestone Grp. LLC*, 2019 WL 1953247, at *6 (E.D. Pa. May 2, 2019).

**B.       The Law Is Clear that Epiq Must Make the QSF Whole Now, Not Later.**

Epiq has so far refused to refund the remaining $2,266,648.90 it wired to the fraudster, plus unrecovered interest that would have accrued, instead insisting that all ongoing investigations must conclude before determining which party must make payment. Epiq's proposed approach violates both the Settlement Order and the clear law governing Epiq's obligations. And it significantly prejudices M&S, a small firm with limited operating funds, working on a contingency basis and having significant current financial obligations. On the undisputed facts, Epiq is liable for the loss and must refund the QSF. The QSF's beneficiaries' (including M&S's) rights against Epiq are not affected by the possibility that Epiq might have rights or remedies against others. Nor can Epiq avoid payment now by trying to shift blame to others.

Cases like this one—considering who must bear the loss where funds wired from banks are redirected to a fraudster—are increasingly common, and to resolve them courts routinely apply the so-called "imposter rule" derived from Section 404 of Article 3 of the Uniform Commercial Code ("UCC"). *See, e.g., Beau Townsend Ford Lincoln, Inc. v. Don Hinds Ford, Inc.*, 759 F. App'x 348, 356-57 & n.5 (6th Cir. 2018). Under the rule, the party responsible for the loss is the party in the best position to have prevented it by exercising reasonable care. Imposter rule cases often arise in the context of diverted settlement payments and follow the same pattern as here: an unknown fraudster intervenes in the parties' email communications to send superseding, fraudulent wire instructions to the payor, who, relying on those instructions *without sufficiently verifying and confirming them*, acts upon them, and as a result, misdirects the payor's bank to wire funds to the fraudster rather than to the intended payee. *See Parmer v. United Bank, Inc.*, 2020 WL 7232025, at *6 (W. Va. Dec. 7, 2020).

Courts overwhelmingly hold that the payor (here, Epiq) must bear the loss because if it had exercised the necessary care and properly verified the wire instructions received (for instance, by using a multifactor authentication process), the loss could have been avoided. *See id.* at *6. When a payor does not take these steps, as Epiq did not, courts conclude that the payor is required to remit the funds to the payee despite having already wired funds to the fraudster. *See, e.g., Ostrich Int'l Co., Ltd v. Michael A. Edwards Grp. Int'l Inc.*, 2023 WL 4025870, at *5-6 (C.D. Cal. May 18, 2023) (although plaintiff's counsel's email was compromised, the firm "could not have discovered the fraud because all the incoming and outgoing emails were diverted

---

[3] Such "ancillary jurisdiction confers the authority to force compliance with the terms agreed upon by the parties, whether that entails decreeing specific performance, entering a monetary judgment, or fashioning other appropriate relief." *Dannhauser v. TSG Reporting, Inc.*, 2019 WL 2950142 (S.D.N.Y. June 21, 2019), *report and recommendation adopted* (S.D.N.Y. Jul. 9, 2019).

Hon. Analisa Torres  
July 3, 2025                                                                                                           Mehri & Skalet, PLLC

---

and deleted" and defendants were in the best position to prevent the harm by calling the firm to confirm instructions), *aff'd*, 2024 WL 2237734 (9th Cir. May 17, 2024); *Erie Ins. Co. v. WAWGD, Inc.*, 2024 WL 1856155, at *5 (D. Md. Apr. 29, 2024) (rejecting argument that the risk should fall on plaintiff whose email system was compromised because that "completely glosses over the many communications and actions that led to remittance of the settlement funds to the imposter. Based on those intervening acts, it is evident that not only was [the payor] in the best position to prevent the fraud, but that it also failed to exercise reasonable care"); *see also Arrow Truck Sales, Inc. v. Top Quality Truck & Equip., Inc.*, 2015 WL 4936272, at *6 (M.D. Fla. Aug. 18, 2015) (concluding that payor, not payee, is liable because the wire instructions plaintiff provided were legitimate, "but the wires were still sent based on the prior fraudulent wire instructions"); *Jetcrete N. Am. LP v. Austin Truck & Equip., Ltd.*, 484 F. Supp. 3d 915, 920 (D. Nev. 2020) (payor "was in the best position to prevent the loss" by taking steps to properly verify the wiring instructions).

Epiq ignored well-established and accepted practice under which payment requires independent confirmation of instructions from an authorized individual, not the wrongdoer, using previously agreed authentication credentials. Instead of properly verifying the wire instructions, Epiq improperly relied on information from the imposter's email, a practice that is routinely rejected. *See Thomas v. Corbyn Rest. Dev. Corp*, 332 Cal.Rptr.3d 839, 852 (Cal. Ct. App. May 27, 2025) ("rather than determine the correct phone number via a source extrinsic to the spoofed email thread . . . Defendants' counsel relied on further information provided by the imposter"); *Parmer*, 2020 WL 7232025, at *6 ("[H]ad [the payor] exercised reasonable care and verified the wire transfer instructions her counsel received, the loss could have been averted."); *Ostrich Int'l*, 2023 WL 4025870, at *4 ("A party who receives conflicting wiring instructions may reasonably avoid losses due to fraud by calling the other party to confirm the correct instructions."); *see also Mile High, LLC v. Flying M Aviation, Inc.*, 407 So.3d 1133, 1138 (Ala. Civ. App. Jan. 5, 2024) ("Even conceding that a reasonable person would not have detected the signs that the email and wiring instructions were fraudulent, it remains that [the payor] was wiring a large sum of money as settlement proceeds. . . . Because [the payor] did not contact [the payee] to verify the [contradictory] wire-transfer instructions, [the payee] was completely unaware of the fraudulent wiring instructions before the wire transfer was executed; therefore, [the payee] could not have prevented it from occurring.").

Epiq admitted that after receiving conflicting wire instructions from M&S and the fraudster it failed to take necessary steps to verify the correct instructions—even after Ms. Eardley's repeated correct instructions on May 2, 8, and 14. Epiq's undisputed failures were reckless and are dispositive as a matter of law. *See Arrow Truck*, 2015 WL 4936272, at *6 ("The [impostor's] instructions involved completely different information from all of the [other] instructions.").

## Conclusion

For these reasons, M&S respectfully requests that the Court set an expedited briefing schedule for M&S's anticipated motion, by which M&S will move the Court for an order requiring that Epiq make the QSF whole by depositing the sum of $2,266,648.90 plus unrecovered interest that would have accrued to the QSF and requiring Epiq to fulfill its obligations under the Settlement Order by paying M&S the amounts due to it. M&S proposes one week for its motion, one week for Epiq's response, and one week for M&S's reply.

Hon. Analisa Torres  
July 3, 2025

Mehri & Skalet, PLLC

Respectfully submitted,

MEHRI & SKALET, PLLC

_____
Cyrus Mehri

cc: All counsel of record (via ECF)  
Matthew Cates (mcates@epiqglobal.com)  
Sarah Turner (sarah.n.turner@us.dlapiper.com)  
Matt Hiller (matt.hiller@us.dlapiper.com)